Peter M. Rehon (SBN 100123)
Mark V. Isola (SBN 154614)
REHON & ROBERTS
A Professional Corporation
Ten Almaden Blvd., Suite 550
San Jose, CA  95113-2238
Telephone: (408) 494-0900
Facsimile: (408) 494-0909

Raymond P. Niro, Esq.
Paul K. Vickrey, Esq.
David J. Sheikh, Esq.
Richard B. Megley, Jr., Esq.
Karen L. Blouin, Esq.
NIRO, SCAVONE, HALLER & NIRO
181 W. Madison St., Suite 4600
Chicago, IL 60602
Telephone: (312) 236-0733
Attorneys for Plaintiff/Counterclaim Defendant Illinois Computer Research,
LLC and Third-Party Defendant/Counterclaimant Scott C. Harris

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (San Jose Division)

| | |
|---|---|
| ILLINOIS COMPUTER RESEARCH, LLC, | Case No.  CV 08-80075 Misc. JF/HRL |
|     Plaintiff and Counterclaim Defendant, | [Action pending in the United States District Court for the Northern District of Illinois as Case No. 07 C 5081] |
|     v. | |
| FISH & RICHARDSON P.C., | **DECLARATION OF KAREN L. BLOUIN** |
|     Defendant, Counterclaimant and Third-Party Plaintiff, | |
|     v. | Date:   May 13, 2008 |
| SCOTT C. HARRIS, | Time:   10:00 a.m. |
|     Third-Party Defendant and Counterclaimant, | Courtroom 2 |
|     v. | Hon. Magistrate Judge Howard Lloyd |
| FISH & RICHARDSON P.C., | |
|     Defendant, Counterclaimant, Third-Party Plaintiff and Counterclaim Defendant. | |

**\*\* CONFIDENTIAL – FILED UNDER SEAL\*\***

1

Decl_Blouin.doc

1  **DECLARATION OF KAREN L. BLOUIN**

2  I, Karen L. Blouin declare and state as follows:

3  1.  I am an associate with the law firm of Niro, Scavone, Haller & Niro , which is

4  counsel for Plaintiff/Counterclaim Defendant Illinois Computer Research, LLC and Third-Party

5  Defendant/Counterclaimant Scott C. Harris.  I have personal knowledge of the matters contained

6  herein and if called as a witness could testify competently thereto.

7  2.  Attached as Exhibit A is a true and correct copy of the Complaint for Patent

8  Infringement filed on September 10, 2007 in the Northern District of Illinois, Case No. 07 5081,

9  Docket No. 1.

10  3.  Attached as Exhibit B is a true and correct copy of the Order entered November 6,

11  2007, Case No. 07 5081, Docket No. 38.

12  4.  On April 14, 2008, the deposition of Katherine Lutton was taken pursuant to a

13  Notice of Deposition.  Attached as Exhibit C is a true and correct copy of the Deposition

14  Transcript of Katherine Lutton.

15  5.  On April 15, 2008, the deposition of Peter Devlin was taken pursuant to a Notice

16  of Deposition.  Attached as Exhibit D is a true and correct copy of the Deposition Transcript of

17  Peter Devlin

18  6.  On August 29, 2007, Ray Niro, of the law firm Niro, Scavone, Haller & Niro sent

19  an initial notice letter to Google, Inc.  Attached as Exhibit E is a true and correct copy of a letter

20  to Michelle Lee of Google, Inc. from Ray Niro, dated August 29, 2007.

21  7.  On  December 11, 2007, Ray Niro, of the law firm Niro, Scavone, Haller & Niro

22  was copied on a letter sent to Scott Harris, a Niro firm client.  Attached as Exhibit F is a true and

23  correct copy of a letter from Fish & Richardson P.C. to Scott Harris regarding Mr. Harris=capital

24  contribution.

25  8.  Attached as Exhibit G is a true and correct copy of the Advanced Patent Law

26  Institute faculty. This document can be found at

27  http://www.hewm.com/docs/en/8AnnualAPLawInstitute.pdf..

28  9.  Attached as Exhibit H is a true and correct copy of the Docket Report for Case No.

2

Decl_Blouin.doc

1   1:07 cv 00671.  The Docket Report shows the entered Pro Hac Vice application of Katherine
2   Lutton.

3       10.     Attached as Exhibit I is a true and correct copy of a relevant excerpt from the
4   Patent Troll Tracker blog dated January 19, 2008.  This excerpt was obtained from a library of
5   Patent Troll Tracker blogs downloaded, saved and stored by the Niro firm, as the Patent Troll
6   Tracker is no longer available to the general public

7       11.     Attached as Exhibit J is a true and correct copy of a relevant excerpt from the State
8   Bar of California.  The member search portion of the website is available at
9   http://members.calbar.ca.gov/search/member.aspx.

10      12.     Attached as Exhibit K is a true and correct copy of the Ainvitation only@ home page
11  of the Patent Troll Tracker blog found at http://trolltracker.blogspot.com.

12      13.     Attached as Exhibit L is a true and correct copy of a relevant excerpt from the
13  Patent Troll Tracker blog dated February 23, 2008.  This excerpt was obtained from a library of
14  Patent Troll Tracker blogs downloaded, saved and stored by the Niro firm, as the Patent Troll
15  Tracker is no longer available to the general public.

16      14.     Attached as Exhibit M is a true and correct copy of the Complaint for Case No. 08-
17  4022 filed in the Western District of Arkansas, Docket No. 1.

18      15.     Attached as Exhibit N is a true and correct copy of a relevant excerpt from the
19  Patent Troll Tracker blog dated December 6, 2007.   This excerpt was obtained from a library of
20  Patent Troll Tracker blogs downloaded, saved and stored by the Niro firm, as the Patent Troll
21  Tracker is no longer available to the general public.

22      16.     Attached as Exhibit O is a true and correct copy of a relevant excerpt from the
23  Patent Troll Tracker blog dated December 19, 2007.  This excerpt was obtained from a library of
24  Patent Troll Tracker blogs downloaded, saved and stored by the Niro firm, as the Patent Troll
25  Tracker is no longer available to the general public.

26      17.     Attached as Exhibit P is a true and correct copy of a relevant excerpt from the
27  Patent Troll Tracker blog dated September 6, 2007.   This excerpt was obtained from a library of
28  Patent Troll Tracker blogs downloaded, saved and stored by the Niro firm, as the Patent Troll

Decl_Blouin.doc

**DECLARATION OF KAREN L. B LOUIN**

1    Tracker is no longer available to the general public.

2        18.    Attached as Exhibit Q is a true and correct copy of the Society of Professional

3    Journalists Code of Ethics found at www.spj.org/ethicscode.asp.

4        19.    Attached as Exhibit R is a true and correct copy of the article from the University

5    of Southern California, "What are the Ethics of Online Journalism?" found at

6    http://www.ojr.org/ojr/wiki/ethics.

7        20.    Attached as Exhibit S is a true and correct copy of the Official Cisco blog, dated

8    March 24, 2008.  The Official Cisco blog can be found at http://blogs.cisco.com/home.

9        21.    Attached as Exhibit T is a Description of Frenkel's Unattributed Quotation of the

10    Fainaru-Wada Decision.  This Exhibit was prepared by comparing the Fainaru-Wada decision

11    with the unattributed quotation found in Frenkel's brief, p. 10.

12        22.    Attached as Exhibit U is a true and correct copy of Scott Harris= Counterclaim

13    Against Fish & Richardson P.C. filed on October 31, 2007 in the Northern District of Illinois,

14    Case No. 07 5081, Docket No. 27.

15        23.    Attached as Exhibit V is a true and correct copy of the Order entered March 4,

16    2008, Case No. 07 5081, Docket No. 114.

17        I declare under penalty of perjury under the laws of the State of Illinois that the foregoing

18    is true and correct. Executed on April 22, 2008.

19

20                                            Karen L. Blouin  /s/
                                             Karen L. Blouin

21

22

23

24

25

26

27

28

4

Decl_Blouin.doc

**DECLARATION OF KAREN L. BLOUIN**

# Exhibit A

**FILED**

NR

SEP 1 0 2007
9-10-07
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS COMPUTER RESEARCH, LLC., )
                                    )
                    Plaintiff,      )    Case No.
                                    )
        v.                          )    **JURY TRIAL DEMANDED**
                                    )
GOOGLE INC.,                             **07CV 5081**
                                         **JUDGE PALLMEYER**
                    Defendant.           **MAGISTRATE JUDGE VALDEZ**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Illinois Computer Research, LLC ("ICR") complains of defendant, Google Inc. ("Google") as follows:

1.    This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has exclusive jurisdiction over the subject matter of this case under 28 U.S.C. § 1338(a).

2.    Illinois Computer Research, LLC ("ICR") is an Illinois limited company that has a principal place of business at 125 South Wacker Drive, Suite 300, Chicago, Illinois 60606. ICR owns United States Patent No. 7,111,252 ("the '252 Patent"), entitled "Enhancing Touch And Feel On The Internet," which issued on September 19, 2006 (Exhibit A), and has the exclusive right to license and enforce the '252 Patent and to collect all damages for infringement. ICR has standing to sue for infringement of the '252 Patent.

3.    Google Inc. ("Google") is a Delaware corporation having engineering, technical and business offices in this judicial district at 20 West Kinzie Street, Chicago,

Illinois 60610. Google is registered to do business in the State of Illinois as Google Inc.-IL.

4.    Google transacts substantial business in this judicial district and has committed acts of infringement in this judicial district, at least by soliciting advertising from Illinois companies and by operating websites and conducting business over those websites that are accessible to residents of Illinois, including the book search feature which infringes the '252 Patent.

5.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

6.    Google has infringed, and is now directly infringing, at least claim 1 of the '252 Patent and indirectly infringing at least claims 7, 8, 11 and 13 of the '252 Patent through, among other activities, the manufacture, use, sale and/or offer for sale of Google's Book Search product or service which allows or facilitates online viewing of a limited number of pages from a book. Google has also infringed the '252 Patent by knowingly and actively inducing others to infringe, and by contributing to the infringement of others by the manufacture, use, sale and/or offer for sale of Google's Book Search product or service, and by intentionally aiding, assisting and encouraging the infringement of others through the manufacture, use, sale and/or offer for sale of the Google Book Search product or service.

7.    Google's infringement, contributory infringement and inducement to infringe has injured plaintiff ICR and ICR is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

8.    Google received actual notice of the '252 Patent by at least by August 30, 2007.

2

WHEREFORE, plaintiff ICR respectfully requests this Court enter judgment against defendant Google Inc., and against its subsidiaries, successors, parents, affiliates, officers, directors, agents, servants, employees, and all persons in active concert or participation with them, granting the following relief:

A.    The entry of judgment in favor of ICR, and against the defendant;

B.    An award of damages adequate to compensate ICR for the infringement that has occurred, together with prejudgment interest from the date the infringement began, but in no event less than a reasonable royalty as permitted by 35 U.S.C. § 284;

C.    Increased damages as permitted under 35 U.S.C. § 284;

D.    A finding that this case is exceptional and an award to ICR of its attorneys' fees and costs as provided by 35 U.S.C. § 285;

E.    A permanent injunction prohibiting further infringement, inducement and/or contributory infringement of the '252 Patent; and,

F.    Such other relief that ICR is entitled to under law and any other and further relief that this Court or a jury may deem just and proper.

### Jury Demand

Plaintiff demands a trial by jury on all issues presented in this Complaint.

Raymond P. Niro
Richard B. Megley, Jr.
Karen L. Blouin
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0733
Fax: (312) 236-3137

Attorneys for Illinois Computer Research, LLC

3

# Exhibit B

Order Form (01/2005)    Case 1:07-cv-05081    Document 38    Filed 11/06/2007    Page 1 of 1

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 5081 | **DATE** | 11/6/2007 |
| **CASE TITLE** | Illinois Computer Research, LLC vs. Google Inc., et al | | |

**DOCKET ENTRY TEXT**

Plaintiff, Illinois Computer Research, LLC, hereby voluntarily dismisses, with prejudice, only those claims made by ICR against Defendant, Google, Inc. Case remains pending as to all remaining claims and counterclaims.

Docketing to mail notices.

| | Courtroom Deputy Initials: | ETV |
|---|---|---|

# Exhibit C
# Filed Under Seal

# Exhibit D
# Filed Under Seal

# Exhibit E
# Filed Under Seal

# Exhibit F
# Filed Under Seal

# Exhibit G





THE STANFORD PROGRAM IN LAW, SCIENCE & TECHNOLOGY
BERKELEY CENTER FOR LAW & TECHNOLOGY AT BOALT HALL
THE UNIVERSITY OF TEXAS SCHOOL OF LAW

8TH ANNUAL

# ADVANCED PATENT LAW INSTITUTE

Earn up to 15.75 Hours of Credit Including 3.00 Hours of Ethics Credit



November 28*, 29-30, 2007

The Fairmont San Jose

San Jose, California

\* Evening Sessions on Fees and Licensing—Included in Registration

MAJOR SPONSORSHIP PROVIDED BY



8TH ANNUAL

# ADVANCED PATENT LAW INSTITUTE

November 28*, 29-30, 2007 • The Fairmont San Jose • San Jose, CA

\* Evening Sessions on Fees and Licensing—Included in Registration

Earn up to 15.75 Hours of Credit Including 3.00 Hours of Ethics Credit

## WEDNESDAY EVENING – NOV. 28, 2007

**5:30 p.m.          Registration Opens**

Light buffet provided.

**6:00 p.m.                    1.00 hr**

**Controlling Fees: Creative Billing Structures, ADR, and the Management of IP Legal Fees**

A panel of outside counsel discusses approaches to managing legal expenses, including using in-house counsel for work historically done by outside counsel, using mediation throughout a dispute, non-billable-hour-based fee structures in major litigations, and controlling costs in portfolio management by increasing communication and accountability. The panel will address the nuts-and-bolts of their approaches, where they've worked, and where they haven't.

Moderator: Karen Boyd, Patent Mediation and Consulting, Palo Alto, CA

Barbara A. Caulfield, Affymetrix, Inc., Santa Clara, CA

Rick Frenkel, Cisco Systems, Inc., San Jose, CA

Meg Snowden, Impax Laboratories, Inc., Hayward, CA

Wayne P. Sobon, Accenture, San Jose, CA

**7:00 p.m.          Break**

**7:15 p.m.                    1.00 hr**

**Licensing, Portfolio Monetization and the Future of Contingency Fee Patent Litigation**

A discussion of the business of acquiring, valuing, licensing, and asserting patents, covering current trends impacting the business, from the point of view of those who view their patent portfolio as a necessary defensive evil, those who see it as a valuable profit center, and those for whom asserting patents is a business model unto itself.

Moderator: Matthew F. Weil, McDermott, Will & Emery, Irvine, CA

Ron Epstein, iPotential, LLC, San Mateo, CA

Vincent Pluvinage, Intellectual Ventures, Bellevue, WA

Ronald J. Schutz, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN

**8:15 p.m.          Adjourn**

## THURSDAY MORNING – NOV. 29, 2007

**Presiding Officer:**
**Robert Barr, Berkeley Center for Law and Technology, Berkeley, CA**

**8:00 a.m.          Registration Opens**

Includes continental breakfast.

**8:50 a.m.          Welcoming Remarks**

**9:00 a.m.                    .50 hr**

**Indirect and Divided Infringement**

This session will address indirect infringement in a Post-DSU World as well as the emerging questions concerning divided infringement.

Mark A. Lemley, Stanford Law School, Of Counsel, Keker & Van Nest, LLP, Stanford, CA

**9:30 a.m.                    1.00 hr**

**Strategic Patent Prosecution**

2007 has seen the most significant changes to patent law since 1952. The panel will discuss how prosecution strategy must change in the new environment. Highlighted topics will include the new continuation rules, claim limits, examination support documents and divisionals, obviousness after *KSR*, the scope of enablement requirements and prosecution disclaimer.

Jean Burke Fordis, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Palo Alto, CA

Alan H. MacPherson, MacPherson Kwok Chen & Heid LLP, San Jose, CA

Lee Van Pelt, Van Pelt, Yi and James, Cupertino, CA

**10:30 a.m.          Break**

**10:45 a.m.                    .75 hr**

**USPTO Rule Changes and Initiatives**

Continuation rule changes and their strategic implications will be discussed. PTO initiatives, including accelerated examination, pre-appeal briefs, peer to patent pilot program, and the highway pilot program with the JPO will also be addressed.

William S. Galliani, Cooley Godward LLP, Palo Alto, CA

**11:30 a.m.                    .75 hr**

**Reexaminations After *KSR***

*KSR International v. Teleflex, Inc.* has been called "the most important patent case of the last 20 years." It is widely thought that *KSR* made it much easier to invalidate patents for obviousness and, in particular, increased the attractiveness of reexamination proceedings to patent defendants. This session will discuss potential reexamination strategies and recent empirical data from the perspective of the PTO, patent owners, and litigants.

Marc David Peters, Morrison & Foerster LLP, Palo Alto, CA

USPTO Representative - TBA

### LUNCHEON PRESENTATION

**12:15 p.m.          Pick Up Box Lunch**

Included in conference registration fee.

**12:30 p.m.                    .75 hr**

**Forum Selection**

Venue is a crucial consideration for patent litigators and their clients. The benches, jury pools, local rules, and outcomes differ greatly among the jurisdictions handling a significant number of patent cases. This panel discussion will provide data and anecdotes to help evaluate and compare these jurisdictions.

Moderator: Charles S. Crompton, Latham & Watkins LLP, San Francisco, CA

Ruffin B. Cordell, Fish & Richardson P.C., Washington, DC

David H. Weinberg, JuryScope, Inc., Greenbrae, CA

### THURSDAY AFTERNOON

**Presiding Officer:**
**Alan H. MacPherson, MacPherson Kwok Chen & Heid LLP, San Jose, CA**

**1:30 p.m.                    .75 hr**

**Developments in Claims Construction**

Overshadowed by the U.S. Supreme Court/ Federal Circuit colloquy, this core issue has percolated along quietly. This year's pitfalls and construction trends of the moment will be explored, with an eye toward a more tactical approach to *Markman* mechanisms responsive to those trends. The Federal Circuit still controls the keys to the kingdom, but are the locks secure?

Kenneth R. Adamo, Jones Day, Dallas, TX

**2:15 p.m.**                                           **1.00 hr ethics**

### Privilege Waiver, Work Product Immunity, and the Trial Counsel Exemption: The New Rules for Everyone

The Federal Circuit's decision in *In re Seagate* re-wrote the rules on willful infringement and the advice-of-counsel defense. The changes will impact everyone—in-house and outside counsel, trial and opinion counsel. Panel members will summarize the critical changes from *In re Seagate* and other recent cases, then consider their impact on each stage of a typical patent litigation matter. The discussion will include the new "objective recklessness" standard for willfulness, the new scope of privilege waivers, and the new questions left unanswered by the Federal Circuit.

> Moderator: Mallun Yen, Cisco Systems, Inc., San Jose, CA
>
> Robert D. Fram, Heller Ehrman LLP, San Francisco, CA
>
> David L. McCombs, Haynes and Boone, LLP, Dallas, TX
>
> Erik R. Puknys, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Palo Alto, CA

**3:15 p.m.**        **Break**

**3:30 p.m.**                                           **.50 hr ethics**

### Inequitable Conduct

A review of current issues relating to the inequitable conduct defense, including the most recent Federal Circuit case law on materiality, intent and the balancing test to assess enforceability of a patent in suit.

> Robert J. Goldman, Ropes & Gray, LLP, Palo Alto, CA

**4:00 p.m.**                                           **.50 hr**

### Extraterritoriality of U.S. Patent Law after *Microsoft v. AT&T*

The Supreme Court's decision in *Microsoft v. AT&T* certainly narrowed the applicability of U.S. Patent Law to foreign activities. This discussion will focus on whether arguments still remain for liability under U.S. Patent Law for non-U.S. activities and how the courts likely are to respond to those arguments.

> Christopher W. Kennerly, Baker Botts L.L.P., Dallas, TX

**4:30 p.m.**                  **1.00 hr including .25 hr ethics**

### Judicial Panel

In a time of evolving patent landscape and increased activity in the Supreme Court, legislature and Patent and Trademark Office, a panel of distinguished District Court Judges discuss their experiences with and, thoughts on, managing, hearing and trying patent cases.

> Moderator: Katherine Kelly Lutton, Fish & Richardson P.C., Redwood City, CA
>
> Hon. David J. Folsom, United States District Court, Eastern District of Texas, Texarkana, TX
>
> Hon. Ronald M. Whyte, United States District Court, Northern District of California, San Jose, CA
>
> Hon. Lee Yeakel, United States District Court, Western District of Texas, Austin, TX

**5:30 p.m.**        **Adjourn**

FRIDAY MORNING – NOV. 30, 2007

**Presiding Officer:**
**Robert Barr, Berkeley Center for Law and Technology, Berkeley, CA**

**7:30 a.m.**                  **Conference Room Opens**
Includes continental breakfast.

**8:00 a.m.**                                           **.75 hr ethics**

### E-Discovery Update: Rules, Case Law and Obligations

The new e-discovery rules were implemented a year ago and this session will provide practitioners with valuable insight on their impact to patent litigation. Our panel of outside and in-house counsel will share their unique perspectives on the pitfalls and opportunities presented by electronic discovery, and they will identify real world best practices for dealing with complex technological and strategic challenges. The panel will also discuss emerging trends and key learnings from the case law so that you will be prepared to provide expert guidance to your clients regarding e-discovery.

> Allon Stabinsky, Intel Corporation, Santa Clara, CA
>
> Glenn E. Westreich, Nixon Peabody LLP, San Francisco, CA

**8:45 a.m.**                                           **.50 hr ethics**

### Subject Matter Conflicts

A discussion of ethics and risk management issues arising in intellectual property practice, including technical subject matter conflicts, client identity issues, and recent developments.

> John Steele, Fish & Richardson, P.C., Redwood City, CA

**9:15 a.m.**                                           **1.00 hr**

### *MedImmune* and Licensing

This session explores the state of Article III jurisdictional requirements for patent validity challenges by patent licensees after the Supreme Court's rejection of the "reasonable apprehension of suit" test in *MedImmune v. Genentech*. It also examines the viability of a merits-based defense to such a challenge based on licensee estoppel. Finally, the panel will present and discuss the potential enforceability of various licensing provisions, such as "no challenge" clauses and "termination for challenge" clauses, intended to restore some balance to patent licensing relationships in the wake of the *MedImmune* decision.

> Tim Crean, SAP AG, Palo Alto, CA
>
> Alfred C. Server, M.D., Ph.D., Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA
>
> Hannah Shen-Mei Williams, Genentech, Inc., San Francisco, CA

**10:15 a.m.**        **Break**

**10:30 a.m.**                                          **.50 hr**

### Saying Too Much or Not Enough: The Uncompromised Tension of Claim Breadth, Enablement, and Written Description

This presentation will center on the recent developments in the case law related to enablement and written description, including pitfalls of claim drafting and litigation strategies for validity challenges.

> I. Neel Chatterjee, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA

**11:00 a.m.**                                          **.50 hr**

### Obviousness after *KSR*

In *KSR*, the Supreme Court changed the standard for obviousness. We now know what the correct test is not, but the Supreme Court did not clearly articulate what it is. This session will discuss obviousness cases post-*KSR*, the current relevance of secondary indicia of non-obviousness, and the likely impact of *KSR* going forward.

> Daralyn J. Durie, Keker & Van Nest, San Francisco, CA

**11:30 a.m.**                                          **.50 hr**

### The Merged Implied License and Exhaustion Doctrines—Is there a Divorce in the Future?

Federal Circuit authority renders the implied license doctrine and the exhaustion doctrine nearly indistinguishable. Yet, the underpinnings of each are entirely different, the former in contract law and the latter in constitutional law. Recognizing that difference, should the exhaustion doctrine be given an identity of its own with clearly unique attributes and characteristics?

> William L. Anthony, Jr., Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA

**12:00 p.m.**        **Lunch on Your Own**

FRIDAY AFTERNOON

**Presiding Officer:**
**Christopher J. Byrne, National Semiconductor, Santa Clara, CA**

**1:15 p.m.**                                           **.50 hr**

### Patent Prosecution Study

A major new study of patent prosecution reveals the hidden truth about the PTO's actual grant rates, the use of continuations, and the shocking facts about which industries face the toughest prosecutions.

> Mark A. Lemley, Stanford Law School, Of Counsel, Keker & Van Nest, LLP, Stanford, CA

## CONFERENCE FACULTY AND PLANNING COMMITTEE

**1:45 p.m.**     .50 hr

**The Dark Forest of § 101 Subject Matter: Software, Business Methods & Tax Schemes, Oh My!**

As technology and human knowledge advance, attempts to patent those advances can challenge prevailing law, policy and wisdom. This session will examine current "taxing" subject matter areas, including business methods, tax schemes, check processing, and other areas of innovation under attack for patentability. We will briefly overview both U.S. and other responses to these challenges, and note the state of any legislative or judicial actions.

Wayne P. Sobon, Accenture, San Jose, CA

---

**2:15 p.m.**     .75 hr

**Remedies: Damages, Injunctions, and the Pendulum Swing**

In the last year there has been a movement in both the courts and Congress to rein in what many claim is a legal framework too favorable to patent owners. Are damages and injunction doctrines broken and in need of fixing? What should a reasonable royalty be when a patent covers only a small improvement to a complex product or system? When should non-competitors such as individual inventors and research institutions be entitled to injunctions? With the pendulum swinging, what is the reasonable balance that should be struck, and will we go too far in restricting patent remedies? This session will cover key recent developments and their implications for the future of patent remedies.

Gary H. Ritchey, Ph.D., Townsend and Townsend and Crew LLP, Palo Alto, CA

Julie S. Turner, The Turner Law Firm, Palo Alto, CA

---

**3:00 p.m.**     .75 hr

**Antitrust and SSO Developments**

Litigation at the intersection of standards development, antitrust, and patent law has been increasing. This session will cover the assertion of antitrust, unfair competition, and related defenses to the assertion of patents that are alleged to be essential to implement standards. It will also address responses by the standards development community and government antitrust enforcers to the increased prominence of patent-related issues in standards development.

John (Jay) A. Jurata, Heller Ehrman LLP, Washington, DC

Gil Ohana, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, CA

**3:45 p.m.**     **Adjourn**

---

**3:45 p.m.**

**Possible Patent Reform "Add-On" Session**
*See www.utcle.org for program updates.*

**Patent Reform**     .75 hr

This session will take place *IF* patent reform legislation is passed by both the House and the Senate, and will address key provisions and implications. If legislation is not passed by both houses, this session will not be offered.

Speakers TBA

**4:30 p.m.**     **Adjourn**

---

KENNETH R. ADAMO
Jones Day
Dallas, TX

WILLIAM L. ANTHONY, JR.
Orrick, Herrington & Sutcliffe LLP
Menlo Park, CA

ROBERT BARR*—CO-CHAIR
Berkeley Center for Law and Technology
Berkeley, CA

KAREN BOYD*
Patent Mediation and Consulting
Palo Alto, CA

BARBARA A. CAULFIELD
Affymetrix, Inc.
Santa Clara, CA

I. NEEL CHATTERJEE*
Orrick, Herrington & Sutcliffe LLP
Menlo Park, CA

RUFFIN B. CORDELL
Fish & Richardson P.C.
Washington, DC

TIM CREAN
SAP AG
Palo Alto, CA

CHARLES S. CROMPTON*
Latham & Watkins LLP
San Francisco, CA

DARALYN J. DURIE
Keker & Van Nest, LLP
San Francisco, CA

RON EPSTEIN
IPotential, LLC
San Mateo, CA

MICHAEL J. ESPOSITO*
University of Texas School of Law
Continuing Legal Education Department
Austin, TX

HON. DAVID J. FOLSOM
United States District Court
Eastern District of Texas
Texarkana, TX

JEAN BURKE FORDIS
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
Palo Alto, CA

ROBERT D. FRAM*
Heller Ehrman LLP
San Francisco, CA

RICK FRENKEL
Cisco Systems, Inc.
San Jose, CA

WILLIAM S. GALLIANI*
Cooley Godward LLP
Palo Alto, CA

ROBERT J. GOLDMAN*
Ropes & Gray, LLP
Palo Alto, CA

THEODORE A. "TED" HERHOLD*
Townsend and Townsend and Crew LLP
Palo Alto, CA

JULIE M. HOLLOWAY*
Wilson Sonsini Goodrich & Rosati
Palo Alto, CA

JOHN (JAY) A. JURATA
Heller Ehrman LLP
Washington, DC

CHRISTOPHER W. KENNERLY
Baker Botts L.L.P.
Dallas, TX

DALE S. LAZAR*
DLA Piper
Reston, VA

MICHELLE LEE*
Google Inc.
Mountain View, CA

MARK A. LEMLEY*—CO-CHAIR
Stanford Law School
Of Counsel, Keker & Van Nest, LLP
Stanford, CA

KATHERINE KELLY LUTTON*
Fish & Richardson P.C.
Redwood City, CA

ALAN H. MACPHERSON*
MacPherson Kwok Chen & Heid LLP
San Jose, CA

DAVID L. MCCOMBS*
Haynes and Boone, LLP
Dallas, TX

GIL OHANA
Wilmer Cutler Pickering Hale and Dorr LLP
Palo Alto, CA

JAMES PAMPINELLA*
Navigant Consulting, Inc.
San Francisco, CA

MARC DAVID PETERS
Morrison & Foerster LLP
Palo Alto, CA

VINCENT PLUVINAGE
Intellectual Ventures
Bellevue, WA

JAMES POOLEY*
Morrison & Foerster LLP
Palo Alto, CA

ERIK R. PUKNYS*
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
Palo Alto, CA

GARY H. RITCHEY, PH.D.
Townsend and Townsend and Crew LLP
Palo Alto, CA

RONALD J. SCHUTZ
Robins, Kaplan, Miller & Ciresi L.L.P.
Minneapolis, MN

ALFRED C. SERVER, M.D., PH.D.*
Wilmer Cutler Pickering Hale and Dorr LLP
Boston, MA

BARTON "BART" E. SHOWALTER
Baker Botts L.L.P.
Dallas, TX

MEG SNOWDEN
Impax Laboratories, Inc.
Hayward, CA

WAYNE P. SOBON
Accenture
San Jose, CA

ALLON STABINSKY
Intel Corporation
Santa Clara, CA

JOHN STEELE
Fish & Richardson P.C.
Redwood City, CA

JULIE S. TURNER
The Turner Law Firm
Palo Alto, CA

LEE VAN PELT*
Van Pelt, Yi and James
Cupertino, CA

BRYAN VAN UDEN*
CRA International, Inc.
Houston, TX

MATTHEW F. WEIL*
McDermott, Will & Emery
Irvine, CA

DAVID H. WEINBERG
JuryScope, Inc.
Greenbrae, CA

GLENN E. WESTREICH*
Nixon Peabody LLP
San Francisco, CA

HON. RONALD M. WHYTE
United States District Court
Northern District of California
San Jose, CA

HANNAH SHEN-MEI WILLIAMS
Genentech, Inc.
San Francisco, CA

VERNON M. WINTERS*
Weil, Gotshal & Manges LLP
Redwood Shores, CA

Hon. Lee Yeakel
United States District Court, Western
District of Texas
Austin, TX

MALLUN YEN*
Cisco Systems, Inc.
San Jose, CA

*planning committee members

# UTCLE eLibrary

## Essential Practice Resources for Patent Lawyers

Visit **www.utcle.org** for access to thousands of up-to-date papers, PowerPoint presentations, and Audio-to-Go files from leading practitioners and academics. Materials are available for over 40 different practice areas.

### Easy Search of the Best Articles and Resources

Superb resources at your fingertips, with lightning-fast searches by keyword, author, or conference name. Filter your search by a date range or practice area, and get relevant results within seconds.

### Audio-to-Go Files 

Listen on your iPod: The eLibrary includes related audio files for most papers that are easily saved to your computer, your iPod, or MP3 player. Read the article and listen to the presentation at your computer, or on the go!

### Special Subscription Rate of $195 Save $200

eLibrary materials are available as single (á la carte) purchases or through an eLibrary subscription. Limited time special offer: Join the eLibrary in 2007 and get a one-year membership subscription for only $195—save $200 off the regular subscription price of $395. Your membership provides access to all the materials in the eLibrary—download them whenever, wherever, and as often as you want!

UTCLE eLibrary—leading professional resources at your fingertips!

## www.utcle.org



### ABOUT THE COVER

*"Stamp," paint and ash on artboard, 30" x 24", framed is by Jennifer Chenoweth, Todd Campbell, and Travers Swan. For more information, visit www.fisterrastudio.com*

---

**R E G I S T R A T I O N   F O R   P J 0 7**

*Mail this registration form to:*
The University of Texas School of Law, Attn: PJ07
P.O. Box 7759, Austin, TX 78713-7759 *or fax a copy to: (512) 475-6876*

PLEASE PRINT CLEARLY

Bar Card# _____ ☐ TX  ☐ Other State: _____ ☐ N/A

Name [ Mr. / Ms. ] _____

Firm _____

Address _____

City _____ State _____ Zip _____

Telephone _____ Fax _____

Registrant's Email **(required)** _____

Assistant's Email **(optional)** _____

Invoices, confirmations and receipts are emailed to these addresses.

**REGISTRATION:**
*Includes Course Binder, Wednesday Evening Sessions, and Thursday Box Lunch Presentation*

☐ Early Registration Fee due by Wednesday, Nov. 21, 2007 ............ $775.00

☐ Registration Fee after Wednesday, Nov. 21, 2007 ............ $825.00

**CONFERENCE PUBLICATIONS AND MEDIA**
*Allow 2–4 weeks from the conference date for delivery.*

☐ Course Binder *Without* Conference Registration ............ $200.00
   *Note: Conference registration includes Course Binder.*

☐ Audio CD Set ............ $175.00

☐ eBinder on CD (PDF format) ............ $200.00/$50.00
   *($200 purchased alone, $50 with registration or purchase of Course Binder or Audio CD Set)*

**IN-HOUSE CLE:** Bring the conference in-house and learn at your convenience.
*Allow 2–4 weeks from the conference date for delivery.*

☐ In-House CLE for 2—*Includes Audio CD Set and  Course Binder* ............ $750.00

_____ Add participants (includes Course Binder) for $200 each ............ $ _____

**TOTAL ENCLOSED** ............ $ _____

METHOD OF PAYMENT

☐ Check (make checks payable to: **The University of Texas at Austin**)

☐ VISA   or   ☐ Mastercard   (sorry, no AMEX or Discover)

Card # ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐ - ☐☐☐☐

X _____   ☐☐/☐☐
Authorized Signature                           Exp. Date (mm/yy)

## SAN JOSE

*November 28\*, 29-30, 2007*

**CONFERENCE LOCATION**



**The Fairmont San Jose**
170 South Market Street
San Jose, CA 95113
866-540-4494
408-998-1900

**SPECIAL ROOM RATE $169**
good through October 29, 2007
(subject to availability)

**Parking:** Valet Only: $26;
self parking lots nearby
(subject to change)

**● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ● ●**

### KEY DATES

Registration & Cancellation

November 21, 2007—5 p.m.
*last day for early registration*
add $50 for registrations
received after this time

November 23, 2007—5 p.m.
*last day for full refund*

November 26, 2007—5 p.m.
*last day for partial refunds*
$50 processing fee applied

November 28, 2007—6 p.m.
*Wednesday evening session begins*

November 29, 2007—9 a.m.
*institute begins*

## Advanced Patent Law Institutes
*Each program uniquely tailored to its locale*



### PATENT LAW IN AUSTIN, TX

**Oct. 24, 25-26, 2007 • Four Seasons Hotel**

Join leading practitioners, academics and in-house counsel from the Southwest and Silicon Valley in Austin, Texas for two days of presentations on a rich array of prosecution and litigation topics. Cool weather, great city, music and food—at the Four Seasons Austin.



### PATENT LAW IN SAN JOSE, CA

**Nov. 28, Nov. 29-Dec.1, 2007**
**The Fairmont San Jose**

Come to the heart of Silicon Valley, and join leading judges, practitioners and in-house counsel from Google, eBay, Cisco Systems and Genentech at the Fairmont San Jose. This conference is jointly sponsored by the Berkeley Center for Law and Technology at Boalt Hall School of Law and Stanford Law School.



### PATENT LAW IN ALEXANDRIA, VA

**Jan. 10-11, 2008 • USPTO–Main Auditorium**

This conference provides the insider's perspective on USPTO initiatives, practice rules, developments, and much more. Join USPTO senior staff, leading practitioners, academics and members of the federal judiciary from a variety of courts and forums in the Washington DC area, for two days at the USPTO. The conference is jointly sponsored with the George Mason University School of Law.

---

## UTCLE

THE UNIVERSITY OF TEXAS AT AUSTIN
THE UNIVERSITY OF TEXAS SCHOOL OF LAW
P.O. Box 7759 • Austin, TX 78713-7759

*This program is not printed or mailed at state expense.*

**MCLE**
This course has been approved for Minimum Continuing Legal Education credit by the State Bar of Texas Committee on MCLE in the amount of 15.75 hours, of which 3.00 credit hour will apply to legal ethics/ professional responsibility credit. The University of Texas School of Law is a State Bar of California approved MCLE provider (#1944).

8ᵀᴴ ANNUAL
### ADVANCED PATENT LAW INSTITUTE
*November 28\*, 29-30, 2007 • The Fairmont San Jose • San Jose, CA*

**NON-PROFIT-ORG**
U.S. Postage Paid
The University of
Texas
School of Law

E-mail us at
utcle@law.utexas.edu
or call us at
512-475-6700
for more information

# Exhibit H

PATENT

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:07-cv-00671-SLR

Cisco Systems Inc. et al v. GPNE Corp.

Assigned to: Judge Sue L. Robinson

Cause: 28:2201 Declaratory Judgment

Date Filed: 10/24/2007

Jury Demand: Both

Nature of Suit: 830 Patent

Jurisdiction: Federal Question

**Plaintiff**

**Cisco Systems Inc.**                    represented by    **Daniel V. Folt**
Duane Morris LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801
(302) 657-4900
Email: dvfolt@duanemorris.com
*TERMINATED: 11/14/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Jacobs Louden**
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302)658-9200
Email: kjlefiling@mnat.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Marsden, Jr.**
Fish & Richardson, P.C.
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE 19899-1114
(302) 652-5070
Fax: (302) 652-0607
Email: marsden@fr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scientific-Atlanta Inc.**          represented by    **Daniel V. Folt**
(See above for address)
*TERMINATED: 11/14/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Jacobs Louden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Marsden, Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Arris Group, Inc.**          represented by    **Karen Jacobs Louden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Marsden, Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Thomson Inc.**          represented by    **Karen Jacobs Louden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Marsden, Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**GPNE Corp.**          represented by    **Richard K. Herrmann**
*a Delaware company*                    Morris James LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306

(302) 888-6800
Email: rherrmann@morrisjames.com
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Cisco Systems Inc.**

**Counter Defendant**

**Scientific-Atlanta Inc.**

**Counter Defendant**

**Arris Group Inc.**

**Counter Defendant**

**Thomson Inc.**

**Counter Claimant**

**GPNE Corp.**          represented by   **Richard K. Herrmann**
*a Delaware company*                 (See above for address)
                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/24/2007 | 1 | COMPLAINT filed with Jury Demand against GPNE Corp. - Magistrate Consent Notice to Pltf. ( Filing fee $ 350, receipt number 149349.) - filed by Cisco Systems Inc., Scientific-Atlanta Inc.. (Attachments: # 1 Exhibits A-C# 2 Civil Cover Sheet # 3 Acknowledgement of Consent Form)(ead) (Entered: 10/25/2007) |
| 10/24/2007 | | Summons Issued as to GPNE Corp. on 10/24/2007. (ead) (Entered: 10/25/2007) |
| 10/24/2007 | 2 | Notice of Availability of a U.S. Magistrate Judge to Exercise Jurisdiction (ead) (Entered: 10/25/2007) |
| 10/25/2007 | 3 | Report to the Commissioner of Patents and Trademarks for Patent/Trademark Number(s) 6,282,406; 7,200,406; 7,209,748; (ead) (Entered: 10/25/2007) |
| 10/31/2007 | | Case assigned to Judge Sue L. Robinson. Please include the initials of the Judge (SLR) after the case number on all documents filed. (rjb) (Entered: 10/31/2007) |
| 11/14/2007 | 4 | NOTICE OF SUBSTITUTION OF COUNSEL re Cisco Systems Inc., Scientific-Atlanta Inc.: Entry of appearance of attorney Karen Jacobs Louden and William J. Marsden, Jr.. Attorney Daniel V. Folt terminated. (Louden, Karen) Modified on 11/15/2007 (fmt, ). (Entered: 11/14/2007) |
| 11/14/2007 | 5 | Disclosure Statement pursuant to Rule 7.1 filed by Cisco Systems Inc., Scientific-Atlanta Inc. identifying None as Corporate Parent. (Louden, Karen) (Entered: 11/14/2007) |
| 11/29/2007 | | Summons Reissued as to GPNE Corp.. (els) (Entered: 11/29/2007) |

| 11/29/2007 | 6 | Return of Service Executed by Cisco Systems Inc., Scientific-Atlanta Inc.. GPNE Corp. served on 11/29/2007, answer due 12/19/2007. (Louden, Karen) (Entered: 11/29/2007) |
| --- | --- | --- |
| 12/04/2007 | 7 | AMENDED COMPLAINT *Amended Complaint For Declaratory Judgment* against GPNE Corp.- filed by Cisco Systems Inc., Scientific-Atlanta Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Louden, Karen) (Entered: 12/04/2007) |
| 12/04/2007 | 8 | Disclosure Statement pursuant to Rule 7.1 filed by Cisco Systems Inc., Scientific-Atlanta Inc. identifying none as Corporate Parent. (Louden, Karen) (Entered: 12/04/2007) |
| 12/04/2007 | 9 | Disclosure Statement pursuant to Rule 7.1 filed by Cisco Systems Inc., Scientific-Atlanta Inc. identifying Thomson SA as Corporate Parent. (Louden, Karen) (Entered: 12/04/2007) |
| 12/18/2007 | 10 | STIPULATION TO EXTEND TIME to answer, move or otherwise respond to complaint to January 18, 2008 - filed by Cisco Systems Inc., Arris Group, Inc., Thomson Inc., Scientific-Atlanta Inc., GPNE Corp.. (Herrmann, Richard) (Entered: 12/18/2007) |
| 12/20/2007 | | SO ORDERED - re 10 STIPULATION TO EXTEND TIME to answer, move or otherwise respond to complaint to January 18, 2008 - Set/Reset Answer Deadlines: GPNE Corp. answer due 1/18/2008. Signed by Judge Sue L. Robinson on 12/20/07. (rwc) (Entered: 12/20/2007) |
| 12/26/2007 | 11 | MOTION for Pro Hac Vice Appearance of Attorney Katherine Kelly Lutton, Ruffin B. Cordell and Christopher O. Green - filed by Cisco Systems Inc., Arris Group, Inc., Thomson Inc., Scientific-Atlanta Inc.. (Marsden, William) (Entered: 12/26/2007) |
| 01/08/2008 | | SO ORDERED, re 11 MOTION for Pro Hac Vice Appearance of Attorney Katherine Kelly Lutton, Ruffin B. Cordell and Christopher O. Green filed by Arris Group, Inc., Thomson Inc., Scientific-Atlanta Inc., Cisco Systems Inc. Signed by Judge Sue L. Robinson on 1/8/08. (dab) (Entered: 01/08/2008) |
| 01/18/2008 | 12 | ANSWER to Amended Complaint with Jury Demand, COUNTERCLAIM against all plaintiffs by GPNE Corp..(Herrmann, Richard) Modified on 1/25/2008 (nfn, ). (Entered: 01/18/2008) |
| 01/18/2008 | 13 | MOTION to Transfer Case to Eastern District of Texas, Marshall Division - filed by GPNE Corp.. (Herrmann, Richard) (Entered: 01/18/2008) |
| 01/18/2008 | 14 | SEALED OPENING BRIEF in Support re 13 MOTION to Transfer Case to Eastern District of Texas, Marshall Division filed by GPNE Corp..Answering Brief/Response due date per Local Rules is 2/7/2008. (Herrmann, Richard) (Entered: 01/18/2008) |
| 01/24/2008 | 15 | REDACTED VERSION of 14 Opening Brief in Support *of Motion to Transfer* by GPNE Corp.. (Herrmann, Richard) (Entered: 01/24/2008) |

| 01/25/2008 | | CORRECTING ENTRY: D.I. 12 was modified to reflect that counterclaims were filed against plaintiffs not defendants as previously indicated. The face of the docket has been corrected to reflect the correct party roles. (nfn) (Entered: 01/25/2008) |
|---|---|---|
| 02/07/2008 | 16 | SEALED ANSWERING BRIEF in Opposition re 13 MOTION to Transfer Case to Eastern District of Texas, Marshall Division filed by Cisco Systems Inc., Arris Group, Inc., Thomson Inc., Scientific-Atlanta Inc..Reply Brief due date per Local Rules is 2/19/2008. (Louden, Karen) (Entered: 02/07/2008) |
| 02/07/2008 | 17 | SEALED DECLARATION re 16 Answering Brief in Opposition, *to Defendant's Motion to Transfer of William J. Marsden, Jr.* by Cisco Systems Inc., Thomson Inc., Scientific-Atlanta Inc., Arris Group Inc.. (Attachments: # 1 Exhibit A-P (SEALED))(Louden, Karen) (Entered: 02/07/2008) |
| 02/11/2008 | 18 | ANSWER to Counterclaim *Arris Group, Inc.'s Reply to Defendant GPNE Corp.'s Answer and Counterclaims* by Arris Group, Inc..(Louden, Karen) (Entered: 02/11/2008) |
| 02/11/2008 | 19 | ANSWER to Counterclaim *Thomson, Inc.'s Reply to Defendant GPNE Corp.'s Answer and Counterclaims* by Thomson Inc..(Louden, Karen) (Entered: 02/11/2008) |
| 02/11/2008 | 20 | ANSWER to Counterclaim *Cisco Systems, Inc. and Scientific-Atlanta, Inc.'s Reply to Defendant GPNE Corp.'s Answer and Counterclaims* by Cisco Systems Inc., Scientific-Atlanta Inc..(Louden, Karen) (Entered: 02/11/2008) |
| 02/13/2008 | 21 | REPLY BRIEF re 13 MOTION to Transfer Case to Eastern District of Texas, Marshall Division filed by GPNE Corp.. (Herrmann, Richard) (Entered: 02/13/2008) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/22/2008 14:22:41 | | |
| **PACER Login:** | ns0012 | **Client Code:** | NSHN-PTT |
| **Description:** | Docket Report | **Search Criteria:** | 1:07-cv-00671-SLR Start date: 1/1/1970 End date: 2/22/2008 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# Exhibit I

| SEARCH BLOG | | FLAG BLOG | Next Blog»                    Create Blog | Sign In

# Patent Troll Tracker

**MONDAY, JANUARY 21, 2008**

## Paul Ware and Acacia

OK, people. I'm not dead yet. To the small inventor commentor on the last post, did you even *read* what I wrote?

Since I have gotten so many emails and comments regarding how great the "small inventor" is and how these inventors are unfairly maligned, I thought I'd put the spotlight on a couple of prolific inventors. Well, prolific in the sense of number of defendants sued, anyway.

I'll start off today looking at Paul Ware.

Paul N. Ware (not to be confused with Goodwin Proctor lawyer Paul F. Ware) is a former airline pilot who owns a patent reported to be on "a system that eliminates the need to have a cardholder's name and account number printed on a receipt by numbering the credit card sales," a method that "is used by nearly every retailer in the country."

Ware's patent is U.S. Patent 4,707,592, titled "Personal Universal Identity Card System for Failsafe Interactive Financial Transactions." It was filed in October 1985 and issued in November 1987. In 2003, he granted an exclusive license to TechSearch, LLC -- the company that is now Global Patent Holdings. Later, Acacia acquired that license from TechSearch.

Ware has been featured in several news articles as the "face of the small inventor." See this Financial Post story from January 2006, reporting that how he knew the industry was practicing his invention back in the late 80s, but waited until Acacia called him in 2004 before actively monitizing his invention. See similar insight from Mr. Ware here.

In May 2005 and September 2005, two ex-parte reexaminations on the '592 patent were filed. After interviews conducted by lawyers from the litigation firm Friedman, Suder & Cooke, and a response emphasizing the uniqueness of the transaction number, which was alleged to be new in 1985, the PTO issued a reexamination certificate last summer confirming all of the claims of the '592 patent.

**Email TrollTracker**

trolltracker@gmail.com

**About Me**

Troll Tracker
Just a lawyer, interested in patent cases, but not interested in publicity

View my complete profile

**Troll of the Month for December**



**EFF is helping bloggers protect their Constitutional right to anonymous speech**



Ware and Financial Systems Innovation, LLC (a subsidiary of Acacia, formerly a subsidiary of TechSearch, the company now known as Global Patent Holdings) have filed 10 patent litigations in the last four years, against 144 defendants. Friedman, Suder & Cooke is representing Ware and Acacia in all of the litigation, most of which are pending either in the Northern District of Georgia or Northern District of Texas. The big filing was one last June against 106 defendants, which I reported on here. While 3 of Ware's cases were settled, the rest were stayed pending the first reexamination. There are motions in each of those cases to lift the stay. Some are being granted, but in other cases, more trouble brews.

The reason is that in April and May of 2007, following the Supreme Court's decision in *KSR*, two other third party requesters submitted ex parte reexamination requests based on other prior art. The PTO granted the reexam requests in each case, and each case is now awaiting a first office action.

In fact, in the massive Ware/FSI/106-defendant case in Rome, Georgia, Judge Beverly Martin ordered the one case to be split into four parts and stayed pending this second reexamination. She really seemed to criticize Acacia's strategy of suing everyone in one case, and perhaps her ruling was a bit of a backlash. She wrote (on December 27, 2007):

> As the court advised plaintiffs' counsel at a hearing on December 17, 2007, the court finds itself utterly unable to manage this case as a single lawsuit. . . . Because of the enormity of the number of defendants accused of infringement in this action, and because each of those defendants will be entitled to be heard from in the claim construction process, this case is particularly appropriate for a stay pending the USPTO's determination as to whether any claims will be cancelled. Cancellation of even one claim could eliminate hundreds of pages of briefing on the subject by the numerous defendants sued in this action. . . . Mr. Ware has made the tactical choice to sue over 100 defendants in this action, and did not file this action until roughly six months ago. As a result of Mr. Ware's decision in this regard, the court must necessarily look for ways to manage this litigation, and waiting for the USPTO's reevaluation of his patent seems an obvious solution.

So that's where Mr. Ware is today. Having allegedly discovered a great way to combat credit card fraud in 1985, he waited 22 years to sue the industry, and now is having his cases stayed pending

## Blogs TrollTracker Reads

Dennis Crouch's Patently-O Blog

Peter Zura's 271 Patent Blog

Patent Prospector

Michael Smith's EDTX Blog

Phillip Brooks' Patent Infringement Updates

Techdirt

Above The Law

WSJ Law Blog

Overlawyered

Patent Baristas

Just a Patent Examiner

Hal Wegner's Blog

IP Geek

Delaware IP Law Blog

Chicago IP Litigation Blog

Washington State Patent Law Blog

Anticipate This!

Benefit of Hindsight

Patent Demand

Ideation Lab

SCOTUSBlog

How Appealing

The Volokh Conspiracy

Patently Absurd Inventions Archive

Patently Silly

## EMail Newsletter

Enter your email address below to receive the Patent Troll Tracker blog posts in a daily newsletter. The newsletter, containing the previous day's posts, will be emailed late in the morning, Eastern US Time.

patent should not have been issued at the time, and are thus refusing to pay him. Others have settled. I don't know how much money he has made over this idea, but I'm quite sure that without TechSearch and Acacia, he would have made nothing. It's a win-win situation for Ware and Acacia. He helps Acacia make money and thus satisfy its shareholders; Acacia helps him get money from a patent he had left for dead. It will be interesting to see what happens now.

Tomorrow, I'll look at an inventor with even more patents and more lawsuits: J. Carl Cooper.

Posted by Troll Tracker at 12:01 AM     0 comments

Labels: Acacia, Financial Systems Innovation, Friedman Suder, Paul Ware, TechSearch

SATURDAY, JANUARY 19, 2008

## The Writing Process

When I started this blog, I just wanted to focus on the great many patent cases being brought by companies that make no products, and exist solely to license patents and monetize them. There was a convenient term already out there -- I'm not Peter Detkin, so I didn't coin it. So I used it: patent troll. I guess I didn't expect all the kerfuffle that would cause among those who make a living monetizing intellectual property. Even Ray Niro used the term in his chapter in the book *Making Innovation Pay* - albeit while arguing that these so-called patent trolls were beneficial to society. Right next to the picture of him with his Ferrari near his Aspen home.

Anyway, over the last few months I have begun to transition out the term. It doesn't add anything to the dialogue; in fact, it distracts from the message I'm trying to get across. That message being that patents are not being asserted like they were 20 years ago, that today's American small and large businesses have to navigate a minefield like never before. Whether the plaintiffs are well-deserving individual inventors, their shell corporations, or large licensing entities solely seeking to monetize patents, it adds up for the mom-and-pop businesses and the big corporations alike. All I want to do is highlight who is behind these cases, who is backing them financially, and where these cases are being litigated. And if we can have some fun along the way, and not take ourselves so seriously, all the better, right?

This whole "reward" business has obviously created a roadblock in my quest. Mr. Niro claims to be close - he may even know who I am already. So be it. This blog, or others like it, will continue whether I'm unmasked or not. In fact, I won't be surprised if others plan similar types of information-gathering services. For profit, of course. (I knew



Subscribe

Delivered by FeedBurner

Subscribe Now: Feed Icon



Subscribe in a reader

Google



Blog Archive

▼ 2008 (17)

  ▼ January (17)

    Paul Ware and Acacia

    The Writing Process

    Survey Results

    A Note About Civility

    Oral Argument in Quanta v. LG

    Patent Exhaustion Takes
        Center Stage at SCOTUS

    Is the United States Navy the
        Latest Patent Troll?...

    New York Times Article Sets
        the Stage for Upcoming...

    Troll Call and Other Statistics
        for December 2007

    Global Patent Holdings Sues
        Boca Raton Resort & Cl...

    Wednesday Miscellany, 1/9/08

    Number of Utility Patent
        Claims Issued By USPTO
        Pe...

    Rembrandt's Interesting
        Injunction Strategy (Possi...

    4 Interesting New Cases From
        Last 2 Weeks of Decem...

    Acacia December 2007 Update

    Global Patent Holdings Update

    Happy New Year

► 2007 (136)

I should have patented this business method).

So I'll continue on for a while, see how it goes. But despite the fact that the vast majority of my readers when surveyed said they aren't offended by the term patent troll, I'm going to cut back on my use, if not stop using it altogether. You can make your own conclusions.

Many of you wrote in comments in the survey that you don't see how I get the time to write as much as I do. This post took 20 minutes, including writing and editing. There was no research involved. Most of my posts, including research, writing, and editing, take 30-45 minutes, and I do about 4 a week. I tend to think of my ideas for a post while exercising - and usually desperately scribbling notes when I'm done so I don't forget. Some posts (Fortune 100) take longer than others.

My estimate is that over the course of a year, I probably will have sacrificed 200 billable hours to this blog. Lucky for me, I'm a workaholic, so due to the massive hours I have put up in the past, nobody is going to miss those billable hours. I do much of my writing on the weekend.

For example, due to the fact I'm definitely crammed with work this week, I already wrote this week's posts. Unless something earth-shattering happens, this week I'm featuring a look back at entities I have featured in the past. On Monday, I have a dream that I'll feature Acacia, and their efforts to make all inventors equal. Well, I'll focus only on Paul Ware and J. Carl Cooper on Monday, but these are impressive inventors, and their litigation is no less impressive.

If any new cases are filed this week -- well, they'll have to wait until I extricate myself from this pile of paper.

Posted by Troll Tracker at 11:46 AM    11 comments
Labels: blogging

FRIDAY, JANUARY 18, 2008

## Survey Results

View my survey results here. For those of you who just want the summary, read on and don't click through. Note that I couldn't enable the results with the "other" entries revealed, because a few of you provided personal information, such as phone numbers. It would have been a violation of those people's privacy to enable everyone to see, and there was no way for me to delete any entries. So, instead, below are some typical responses for each of the questions which allowed an "other" answer.

### Labels

104 E. Houston St. (3)

1st Media (1)

1st Technology (3)

Acacia (42)

Accolade Systems (1)

ADISCOV (2)

Adv Tech Incubator (1)

Alexsam (4)

Aloft Media (1)

Altitude Capital Partners (9)

anagrams (3)

anonymity (11)

Antor Media (5)

AOL (1)

Apple (7)

Aris Mardirossian (1)

Artesyn (1)

AT_T (6)

attorney-trolls (7)

Austin (1)

Automated Facilities (2)

Autotext (3)

Barry Thomas (1)

BarTex (3)

Beneficial Innovations (1)

Bill Gates (1)

bio-pharma (4)

blogging (15)

Bodog (2)

Boston (1)

bounty (2)

Brian Marcus (1)

British Technology Group (1)

Bruce Renouard (1)

Burst.com (1)

Cablevision (1)

The results will remain available for the next week or so, after which the link will be inactive.

1. Are you offended, in general, by the term "patent troll?"
12% of you are offended.
88% are not.

2. To which of the following categories should the term patent troll apply?
88% of you said it should apply to "Corporations whose sole purpose is to obtain and assert patents, with little or no connection to the inventors."
73% of you said it should apply to "Venture capital or other financial firms who are acquiring IP as an investment to be capitalized through enforcement (e.g., Altitude Capital Partners)"
64% of you said it should apply to "Contingency fee lawyers who go around putting bounties on bloggers' heads"
58% of you said it should apply to "Shell corporations set up by the patent inventor, who have filed numerous lawsuits against dozens of companies"
51% of you said it should apply to "Corporations that make products, but are acquiring and asserting patents with no relationship to their products, as a revenue-generating business model"
The other choices got less than majority support.
41 of you indicated "other." Here are some of the more interesting ones:

--> anyone (including, if the shoe fits, individual inventors and/or university entities) engaged primarily in naked patent licensing without any attendant technology transfer; anyone whose business is inventing patents rather than patenting inventions (though perhaps the latter should be labeled troll facilitators)

-->One key feature of a patent troll is the inability of the defendant to assert any patents against patent counterclaims. Corporations that make products take a risk by suing, regardless of the relationship between the asserted patents and their products. Trolls take no risk, and that's what dictates their style of litigating akin to class action securities lawyers.

-->Patent attorneys who write up paper patents with themselves listed as the inventor or co-inventor.

-->Local and state government hiding behind 14th amendment

-->There is no such thing

Calvin Ayre (3)
Card Activation Techs (1)
champerty (1)
Charles Hill (1)
Choongsoo Park (1)
Ciba (1)
Cingular (1)
Cisco (4)
Citrix (1)
Clay Dark (1)
Comcast (1)
Commil USA (2)
Computer Acceleration (3)
Constellation IP (1)
contingency fee (4)
Cooley (2)
Coronary Stent Visualization Corp. (1)
corporate shell games (2)
Creative Internet (1)
Credit Card Fraud Control Corp. (1)
Cross Atlantic (1)
CSIRO (3)
Cybergym (3)
Dallas (4)
Dan Henderson (1)
dance contest (1)
Data Encryption (1)
Data Match (2)
David Pridham (7)
Dechert (2)
defendants_sued (8)
Dell (2)
Dennis Crouch (8)
Diagnostic Systems (1)
Digital Choice (2)
Digital Reg (2)

3. If I decide to stop using the term "patent troll," which of the following choices is the best substitute?
66% of you implore me to keep using the term.
17% of you like "non-practicing entity"
Only 6% of you liked "patent speculator"
21 of you indicated "other." Here are some of the more interesting ones:

-->Patent Shark (I got a lot of these)

-->"PLEC" - Patent Licensing / Enforcement Company

-->patent enforcer

-->Patent [insert derogatory term here]

-->dirty rotten patent sharks (with hat tip to Monty Python episode on names for Belgians)

4. How do you feel about the mix of serious content and humorous content on the blog?
88% of you said "just right."
10% of you said "too serious."
2% of you are no fun whatsoever.

5. If you have any suggestions on how to improve/enhance the blog, please let me know here.
I got 48 comments, with a wide range. Here are some of the more interesting ones:

-->I got quite a few "don't change a thing" - thanks...

-->1. Hold a limerick or "actual rhyme" poetry contest--that would be more fun than haiku. 2. Report more on the patent attorneys with the white hats who fight the big, bad trolls. 3. Solicit other attorneys over the Web to anonymously help out in various projects (e.g., compiling particular kinds of lawsuit statistics; researching and shedding light on the background of certain trolls) to save yourself time and increase effectiveness. 4. Provide an overview of the typical strategies of patent trolls both pre-lawsuit and after a lawsuit is filed. 5. Provide an overview of the typical order of events in a litigation in the various rocket docket jurisdictions (and explain how this differs from non-rocket dockets). [May be a good project to ask other litigators to contribute to, anonymously, one from each of the relevant jurisdictions.]

-->If you are getting too busy, consider accepting posts by guest commentators, sort of like this blog does: http://www.volokh.com/

Digital Technology Licensing (1)
Disc Link (1)
DJ (2)
DocuMed (1)
Document Generation Corp. (1)
eBay (1)
ECF (1)
Electrolux (1)
epicRealm (2)
Eric Albritton (3)
Erich Spangenberg (13)
ESN (3)
Eurotroll (1)
Evil Pete (1)
examiner overload (1)
F_G Research (1)
Facebook (2)
Federal Circuit (4)
Fenner Investment (1)
Financial Systems Innovation (2)
Fish_Richardson (15)
Fluid Dynamics (1)
Ford (1)
Forgent (1)
Fortune 100 (4)
FotoMedia (1)
FRCP 1 (1)
Freedom Wireless (1)
Friedman Suder (4)
Function Media (2)
GE Healthcare (1)
Gellman (2)
Gemini IP (1)
General Patent Corp (2)
Global Commns (1)
Global Patent Holdings (10)
GM (1)

(note - I'm considering it)

-->More JPEGs

-->add a forum for people to discuss the cases (note - anyone want to send me the "Dummies Guide" to adding a forum to your blog?)

-->I really enjoy reading your blog. I think you do a great job at uncovering a lot of shady lawsuits. However, sometimes I feel like you view anyone other than a large corporation as a patent troll. I know that you came up with metrics to classify level of troll (or non-troll) but the vibe is still there and I am glad that you have created this survey to (hopefully) remedy this problem. Individual inventors and bankrupt companies should be able to exercise their patent rights. They took a chance, disclosed their technology, and for one reason or another could not make it commercially successful. Those who are able to make the invention commercially successful should respect patent rights of others, as others should respect their patent rights.

-->Include nude pictures of the patent attornies involved. Seriously though - Check out Roughly Drafted. The writer uses some really nice graphics to make his points. (comment - no!!!)

-->Be more explicit in expressing the bases for your conclusions. You often assert premises to arguments that are assumed; if you are asserting a particular practice or tactic to be bad or unfair, explain why you think so, rather than simply saying that it is. For example, explain why it's such bad thing to sue multiple defendants if the claims asserted have merit.

-->I am offended by the constant mischaracterization of Acacia as a Patent Troll. Acacia has done an outstanding job of enforcing our patents as an exclusive licensee. We are a small company that could not afford to enforce the patents directly. As is the case of many of the patents that Acacia acts as exclusive licensee, ours is encompassed in our technology and actively marketed by our company. This hardly makes Acacia or our company a patent troll. Boo hoo for the big companies that would otherwise infringe our patents and would rather us be roadkill on their way to huge profits and market domination. I think you should get your facts staright before you start your mischaracterization campaign against Acacia or its clients. I find your vetting of the facts to be fairly accurate, however, this is poisoned by your bias. I do not accept that you would like to see inventors or small companies abridged from enforcing their patents to the benefit of large entities. Your blog is intelligent but this bias toward large entities is illogical.

6. Choose the answer below that best describes you:

Google (11)

GPNE (1)

Guardian Media (1)

haiku (3)

Hal Wegner (3)

Harthcock (2)

Hennigan Bennett (3)

Hospital Systems (1)

HP (2)

Hugh Hefner (1)

Hybrid (2)

Hypercom (1)

IBM (2)

Illinois Computer Research (5)

injunctions (1)

Innovative Patented Technology (2)

Inpro (2)

Intellectual Ventures (7)

International Intellectual Mgmt (1)

International Printer (1)

IP business models (1)

IP Innovation (3)

iPhone (1)

J. Carl Cooper (1)

James Parker (9)

James Sokolove (1)

Jarg (1)

Jenner Block (2)

Johnny Ward (3)

Johnson_Johnson (1)

joint infringement (1)

Joseph Zito (2)

Judge Clark (5)

Judge Davis (3)

Judge Everingham (1)

Judge Folsom (3)

16% of you chose "associate at law firm"
14% of you chose "in-house counsel"
14% of you chose "partner at law firm"
10% of you chose "small business owner"
8% of you chose "inventor"
About 5% of you are at a law school (clearly, Dennis Crouch isn't referring enough people to me)
About 3% of you are at the PTO/US Courts/other government

That's the people who answered. I got 25% "others," with some of the interesting answers as follows:

-->I totally forgot about "consultants" - there were a few of you.

-->Journalists

-->Retired

-->Computer Scientist

-->Quite a few people identified themselves as "open source advocates" and the like

7. Choose the answer below that you think best describes me:
29% of you think I'm an associate at a law firm.
21% of you think I'm a partner at a law firm.
13% of you think I'm an in-house counsel.
8% of you think I'm at a law school.
Only 1 of you thinks I'm an inventor.
37 of you chose "other," with some of the interesting answers as follows:

-->You are a patent attorney that specializes in defending large corporations that willfully infringe on the patents of small inventors. You started troll tracker as a vehicle to pollute the jury poll against your rivals and potential rivals :)

-->someone with courage and insight

-->I haven't a clue and I don't care. You perform a public service. Keep it up.

-->Bored

-->I like this question. It gives a good picture of your motivation. Ego!

8. Where do you live?
23% of you live on the East Coast of the U.S.

Judge Moore (1)

Judge Ward (2)

jury verdict (6)

Katten Muchin (1)

Katz (4)

Kevin Zilka (1)

Keystone Autonics (1)

Klausner (1)

KSR (3)

Larry Flynt (1)

Larry Germer (1)

law firms (1)

LG (3)

LHConcepts (1)

Lin Packaging (1)

Linex (1)

linux (1)

Lonestar Inventions (2)

Lowe's (1)

LPL Licensing (1)

magically changing docket dates (1)

malpractice (1)

Marshall Credit (2)

Marshall Electronics (3)

Marshall Packaging (2)

Matt Powers (1)

McKesson (1)

McKool Smith (8)

MDL (2)

Media Technologies Licensing (1)

media troll-coverage (8)

Memory Control (1)

MercExchange (1)

Mershon (1)

MHL TEK (2)

Michael Smith (7)

21% of you live on the West Coast of the U.S.
14% of you live in the Midwest
10% of you live in Texas
10% of you live in Europe
5% of you live in Asia

9. Where do you think I live?
26% of you think I live on the East Coast of the U.S.
23% of you think I live in Texas
18% of you think I work at the Niro Scavone law firm or live on Planet Niro
16% of you think I live on the West Coast of the U.S.
1 of you thinks I live in India!

10. What is your opinion on Global Patent Holdings' assertion of claim 17 of the reexamined '341 patent against anyone with a website with a JPEG image on it?
46% of you haven't reviewed the claim.
27% of you chose "the claim is invalid" (whether you reviewed the claim before choosing that, I have no idea)
12% don't care, because it's my problem, not yours. Hey, thanks.

Here's a bonus: the top 10 search terms used to reach my blog in the last week (not including troll tracker or something similar):
1. Wiav Solutions
2. Erich Spangenberg
3. Acacia
4. Mondis
5. Altitude Capital
6. Scott Harris
7. silly patents
8. contingency fee lawyers
9. Jerry Harthcock
10. Global Patent Holdings
53. "I need a good patent attorney for my ofdm wireless idea"
58. "Is there a law to stop patent infringement?"
87. "How to troll for fish"
98. "Reverse commode"
101. "When did Barack Obama work for White & Case?" (it was Sidley, wasn't it?)
130. "Your ip address be gone, troll."

Thanks for all the feedback, everybody! I do appreciate it. I may be "unmasked" soon, and I'm not sure if I'll keep the blog going after that, or I might transform it into more of a community/collaboration. But until then, other than some dark periods coming up where work will make blogging just completely prohibitive, I'll be back with more interesting news on patent litigation in general, and patent trolls,

Microsoft (9)
Minerva (5)
MIT (1)
Mobile Micromedia (2)
Mondis (2)
Monts_Ware (6)
motions_compel (1)
Motorola (2)
NDGA (1)
netPL (1)
Network Signatures (1)
New York Times (1)
NextCard (3)
Nintendo (1)
Niro Scavone (23)
Nokia (2)
non-EDTX rocket dockets (1)
Northeastern U (1)
Ocean Tomo (1)
Online Res. (1)
open source (1)
OPTi (3)
Orbitz (1)
Orion IP (12)
Otis Carroll (1)
PA Advisors (1)
Paice (1)
Paid Search Engine (1)
Palm (1)
Parallel Networks (1)
Parallel Processing (1)
patent exhaustion (4)
Patent Hawk (4)
patent reform (33)
Patriot Scientific (1)
Paul Hickman (4)
Paul Ware (1)

shell corporations, individual inventors, greedy corporations, "serial infringers" (as Patent Hawk and others call them), and everyone else.

Posted by Troll Tracker at 9:03 AM    6 comments
Labels: blogging

THURSDAY, JANUARY 17, 2008

## A Note About Civility

It is absolutely unacceptable for people to post threats in the comments. They will be deleted as soon as I see them. I was just made aware of one such threat posted over a month ago, and was appalled. I don't care if the threats are meant to be sympathetic towards me, it will be deleted.

Also, please be aware that unless you are using a proxy server, I can obtain the IP address of anyone who leaves a comment on this blog.

Posted by Troll Tracker at 7:06 PM    1 comments

WEDNESDAY, JANUARY 16, 2008

## Oral Argument in Quanta v. LG

The Supreme Court had oral argument this morning in Quanta v. LG, the patent exhaustion case. Maureen Mahoney of Latham & Watkins argued for Quanta. Thomas G. Hungar, Deputy Solicitor General, gave the United States' views on behalf of Quanta. Carter G. Phillips of Sidley & Austin argued for LG.

It's very hard to read Supreme Court tea leaves. In this case, though, I think that Justices Roberts, Stevens, and especially Breyer honed in on exactly the problem with the Federal Circuit's opinion in LG. Justices Alito and Thomas were completely quiet. Justices Scalia, Kennedy, Ginsburg and Souter asked questions, but without really revealing which way they were leaning, although Justice Scalia did seem to discount that LG/Intel's notice meant anything, and Justice Ginsburg picked up on the fact that LG could have expressly conditioned its license requiring Intel to sell products only to licensed companies. So, on balance, I'd say the Court appears to be *leaning* towards overturning the Federal Circuit, but perhaps only slightly, and I certainly won't be surprised if it's a 5-4 or 6-3 decision the other way. And who knows what the scope of the opinion will be? Should be interesting.

That's just my opinion. You can form your own opinions by reading the oral argument transcripts, located here. Scroll to the end of this post if you want to see the links to news stories on the case. Meanwhile,

Performance Pricing (1)
Peter Courture (1)
Peter Zura (2)
Philips (1)
Phoenix IP (3)
PhoneTel (1)
Plutus IP (11)
Polaris IP (2)
Polymer Solvents (2)
Positive Techs (1)
Power Integrations (1)
Power-One (1)
Premier Intl (1)
privilege (2)
PSN Illinois (1)
QPSX (1)
Quantum World (1)
RealNetworks (1)
Red Hat (1)
Reese (1)
Refined Recommendation (2)
Reid (1)
Rembrandt (7)
RIM (1)
Ron Laurie (1)
Rule 11 (2)
Rusty Rose (3)
Rutan Tucker (2)
Sam Baxter (2)
Samsung (2)
Saxon Innovations (3)
Scott Harris (15)
Scott Lewis (3)
Screentone (2)
Seagate (4)
Silicon Valley (2)
silly patents (1)

these are a couple of highlights:

This is what Deputy SG Hungar was able to rattle off before he was interrupted by Justice Ginsburg:

> For 150 years this Court has held that an authorized sale removes the particular item sold from the protection of the patent laws. The [Federal Circuit] erroneously transformed that patent-exhaustion doctrine from a definitional principle that delimits the scope of the patent grant into an optional default assumption that can be discarded at the whim of the patentee. If the rationale of the court of appeals were correct, this Court's decisions in cases like Univis, Motion Picture Patents, Straus, Bauer and Boston Store would have to have gone the other way, because in each of those cases this Court held that the exhaustion principle overrode express restrictions that the patentee had attempted to impose on after-sale use or resale by an authorized purchaser.
>
> This Court should follow its precedents and reaffirm the principle that the patent-exhaustion docrine precludes a patentee from employing the patent law to enforce post-sale restrictions on use or resale by authorized purchasers . . .

I also thought this exchange between Justice Breyer and Carter Phillips was the heart of why Justice Breyer will either write the majority opinion or a strongly worded dissent!

> JUSTICE BREYER: So what I do I go to the shop and I buy this, this mechanism with the pedals on it, and then I insert it in my bicycle. Now, actually I need help in doing that, but I do it. Okay. Now I start pedaling off, and now what is it for all these things here that would stop that original inventor from catching me and hauling me into court, and say, what you've done, Breyer, is you've put my -- my mechanism here in this bicycle and I happen to have a patent on the system. And now you start talking to me about, well, the patent was exhausted on the bicycle -
> MR. PHILLIPS: Pedal.
> JUSTICE BREYER: -- pedals, but not on the system.
> MR. PHILLIPS: Right.
> JUSTICE BREYER: And you agree that shouldn't happen.
> MR. PHILLIPS: Right.
> JUSTICE BREYER: But if I follow you and I write an opinion just for you, what stops it from happening?
> MR. PHILLIPS: Well, in that -- in that particular context, in the absence of relatively clear notice, I think it would be quite

Simon Passanante (1)

Sky Technologies (2)

Slashdot (1)

small inventors (2)

Software Rights Archive (1)

Sony (1)

SP Technologies (2)

Sprint (1)

ST Sales Tech (3)

standing (1)

statistics (31)

Steve Jobs (1)

StorMedia (2)

stupid patent tricks (8)

Supreme Court (3)

Susman Godfrey (3)

Sutton (1)

T-List (1)

Taeus (1)

Target (2)

TechSearch (1)

Tessera (1)

Texas MP3 Technologies (1)

TGIP (5)

Thomas Harvey (1)

threatening emails (3)

Tillotsin (2)

Time Warner (1)

Tinkers_Chance (1)

Traffic Information (2)

Trent West (1)

Triton IP (2)

troll assessment (3)

Trontech (1)

Typhoon Touch (1)

UFOs (1)

US Navy (1)

reasonable to potentially find that there was an implied license to use it under those circumstances.

JUSTICE BREYER: Then why isn't it in your case?

JUSTICE BREYER: Why doesn't it mean that? Why isn't it in your case equally?

MR. PHILLIPS: Because the courts below specifically analyzed whether there was -- JUSTICE BREYER: You mean that they just got it all wrong? You mean it should be that they got it wrong?

MR. PHILLIPS: No, no. They got it right because there was very specific and explicit notice provided to the purchaser at the time of the purchase that, while this clearly gives you the right to use this particular product, what it doesn't give you the right

JUSTICE BREYER: Oh, so if I go in the bicycle shop, I go in the bicycle shop and I buy the pedals and then they give me, you know, one of these pieces of paper that has all of the 42,000 words on it and there in these 42,000 words it says, and now you are put on notice that once you put it in your bicycle and you pedal away, they're going to get you and you're going to be hauled into Patent Court, then -- then that's okay?

MR. PHILLIPS: Well, Justice Breyer, we can quarrel about sort of the nature of the notice and what notice is adequate to do that, but the basic point here, which I think is indisputable, is that, one, the notice here is quite clear. It's one page. It's very specific. These are very sophisticated parties and they understood that they were not obtaining an implied license by purchasing the chips rather than going out and purchasing the systems.

JUSTICE SOUTER: Okay. But assuming a simple notice, the answer to his bicycle hypo is yes, they can chase me down the road.

MR. PHILLIPS: Oh, to be sure.

I just cannot imagine this court -- the court that issued *KSR* -- accepting a situation where bicycle manufacturers can chase bicycle users down the road. Again, maybe I'm wrong. Maybe they'll just count on the courts to invalidate "system" patents strongly based on "component" patents.

Later, Justice Breyer was back on his bicycle kick...

JUSTICE BREYER: Then explain -- now this you might know because it's just following up on what Justice Souter said better than I did. I think from these briefs I've gotten the impression that at least some people think that where you invent a component, say, like the bicycle pedals, and it really has only one use, which is to go into a bicycle, it's the easiest thing in the world to get a patent not just on that component but to also get

Vdata (2)

venue (30)

Verizon (2)

Verve (1)

Viacom (1)

Visto (1)

VTran (1)

Wal-Mart (1)

Ward_Olivo (4)

Warren Heit (1)

Wavport (1)

Web Telephony (1)

Weil Gotshal (3)

White_Case (1)

Wi-LAN (3)

WIAV (1)

willfulness (3)

Williams Kherkher (1)

Yahoo (2)

Zappos (1)

a patent on the system, which is called handlebars, body, and
pedals.

And since that's just a drafting question, all that we would do by
finding in your favor is to destroy the exhaustion doctrine,
because all that would happen, if it hasn't happened already, is
these brilliant patent lawyers, and they don't even -- they can be
great patent lawyers, not just fine lawyers, and just draft it the
way I said and that's the end of the exhaustion doctrine. And
that's why it is preferable to say it is exhausted. What is
exhausted? One, the patent on this component and, two, the
patent on any system involving this component where that
system is the only reasonable use of the component, rather
than using the terminology "implied license."

Now, I think that's an argument that's being made in some of
these briefs, and if so I'd like to you reply.

MR. PHILLIPS: Well, I think that clearly understates the role of
the PTO in granting a separate patent. I mean, this is not --
these are not things you pick up at the corner drugstore. You
have to justify them. And if you look at Section 282, "a patent
shall be presumed valid," each claim shall be presumed valid
independently of the validity of other claims. And there's an
independence that's embedded in this entire scheme. If it's true
that the PTO has in fact granted patent rights on something
that's fundamentally not different from the other -- from some
other patent, the solution to that is a validity challenge. And
candidly, I think that's exactly what all of those arguments are

CHIEF JUSTICE ROBERTS: Well, then -

MR. PHILLIPS: -- is patent validity challenges.

CHIEF JUSTICE ROBERTS: That argument didn't prevail last year
in the KSR case, right? I mean, we're -- we've had experience
with the Patent Office where it tends to grant patents a lot more
liberally than we would enforce under the patent law.

MR. PHILLIPS: Right, but all -- I'm not --I'm not particularly
criticizing the PTO. What I'm saying is that the statutory scheme
presumes that there is a separateness when a patent is issued
and, therefore -- and which is why -- again, the first -- there's no
reason to go to an expansion of the first-sale doctrine in order to
deal with the kinds of problems you have here because in
general -- in general you can deal with it as a matter of implied
license, but that issue has been resolved adverse to the other
side in this case, and there's no reason to sort of fill in that void.

Finally, Chief Justice Roberts identified what is troubling him. I
thought Carter Phillips' reply was pretty good:

CHIEF JUSTICE ROBERTS: And the way you achieve that result is

to condition the sale. What you're trying to do is expand what you get under a condition to what you get under a notice. And the reason that troubles me is because if you had imposed a condition on the sale, Intel wouldn't have paid you as much for it. But you say, all right, we'll take the money because -- additional money because there's no condition, but we want to achieve the same result because of the notice.

MR. PHILLIPS: I mean there can't -- there's no serious basis for doubting what Intel knew precisely what it was getting in this. It was getting peace on both sides of the aisle in terms of litigation, and it knew that there were separate patents here and that when it sold the chips it would certainly be entitled to assume that there would be exhaustion. That's the provision you read. But when it sells the chips, it didn't know and it specifically gave notice that it recognized that that doesn't remotely say what the right answer is with respect to the systems and with respect to the methods. And that to me, Mr. Chief Justice, is the fundamental distinction.

Here are some links to news stories about the oral argument in *Quanta v. LG*. I'll update these with additional links as they come in.

Justices Skeptical of Patent-Holders' Claim (law.com, subscription required?)
U.S. Patent Case Likely to Redefine Royalties (International Herald Tribune, quoting Bob Krupka of Kirkland & Ellis)
U.S. High Court Uncomfortable with LG Position in Patent Case (CNNMoney)
Court May Limit Patent Owners' Rights (AP)
Quanta v. LG: Will the Supreme Court Clarify the Exhaustion Doctrine? (Patently-O, guest post by Charley Macedo)

Note that all of the above links tend to predict that the Supreme Court will overturn the Federal Circuit. Now, for a contrary view, we have:

Patent Exhaustion: Supreme Court Fatigue? (e-Commerce News -- the author concludes that the entire patent bar "hopes that the Supreme Court does not overrule the reasonable approach taken by the Federal Circuit." You mean, other than all those members of the patent bar who submitted amicus briefs for Quanta? I guess if Hal Wegner says it, it must be true for the entire patent bar if you're a DC patent lawyer...).
Exhaustion Exasperated (Patent Hawk). Of course there's Patent Hawk on the other side, describing Quanta's attorney as a "spitter" and the deputy SG as a "lapdog." Ever the painter of words, is Patent Hawk. I may not agree with his point of view, but it's refreshing to see the irreverence.

Posted by Troll Tracker at 5:37 PM      0 comments
Labels: patent exhaustion, Supreme Court

## Patent Exhaustion Takes Center Stage at SCOTUS

I'm pushing the survey results back until Friday because (1) I'm out of the office this week, (2) I haven't figured out how to share my results yet, and (3) I had forgotten that today is the Supreme Court oral argument in Quanta v. LG. I previously posted about the case here and here, but for the really best summary, I have two words for you: SCOTUS Wiki!!! Seriously, today is the first I have ever checked out this really cool website.

See also this article from today's Financial Times, which calls LG's position "absurd," and adds

> chips are only useful if combined with other components to make a computer. But in the true spirit of global profit- maximisation, LG wants the people that make computers – and not just people that make chips – to pay for its technology. The Supreme Court must decide whether LG's patent rights are "exhausted" when it licenses the technology to Intel, or whether it can continue to extract patent royalties all the way up the manufacturing chain.

Hat tips to Howard Bashman for pointing out the FT article and to SCOTUSBlog for directing me to the wiki. For more information, see this guest post on Philip Brooks' Patent Infringement Updates blog, by a couple of attorneys from Amster Rothstein.

While I won't be able to follow the Supreme Court argument in real time, I'll post some observations on it tonight, time permitting.

Posted by Troll Tracker at 5:14 AM      0 comments
Labels: patent exhaustion, Supreme Court

TUESDAY, JANUARY 15, 2008

## Is the United States Navy the Latest Patent Troll?

Network Signatures, LLC of Rancho Santa Margarita, California, is the exclusive licensee of U.S. Patent 5,511,122, a patent which is owned by the U.S. Navy. This patent relates to secure communication and authentication methods involving the use of public and private keys. Thanks to the plaintiff filing their agreement with the Navy publicly, we learn that the Navy gets 30% of any litigation proceeds.

Well, Network Signatures has now sued Bank of America, Wachovia,

Wells Fargo, and Washington Mutual, all in the Central District of
California (Orange County), hoping to start monetizing the Navy's
patent. The U.S. Navy is not practicing this invention, but their
exclusive licensee told the Navy that it was. Is that so? Check out
their website and decide for yourself. One could argue it is practicing
something - using a cell phone to authenticate so you don't have to
carry around a VPN password-generating device. But that's not what
Network Signatures is suing over, if you read the complaint carefully.

While I am not making this conclusion, there is certainly room to
argue that in this case, the United States Navy is authorizing the filing
of some very patent troll-like lawsuits. At the very least, the Navy has
authorized patent infringement lawsuits against the financial services
industry, and stands to make money off of those suits. Unbelievable.

Posted by Troll Tracker at 9:15 AM    1 comments
Labels: Network Signatures, US Navy

MONDAY, JANUARY 14, 2008

## New York Times Article Sets the Stage for Upcoming Patent Reform Debate Renewal

The New York Times had an interesting feature on the soon-to-be-
renewed fight in Washington over patent reform. The reporter, John
Markoff, highlighted that the big corporations were for patent reform,
and that certain individual inventors are against it, and summarized
some of the reasons given for the positions of both sides (e.g., huge
NTP-RIM damages award out of proportion to the inventiveness and
validity of the NTP patents in one corner, the chance that patent
reform will change the incentive for inventors in the other).
Unfortunately, the article seemed to miss the third wheel here: the
biotech industry's opposition.

The individual inventors featured in the article were Dean Kamen and
Steve Perlman. There is no doubt that Kamen and Perlman are
not "patent trolls," despite that the article seems to improperly lump
them with the trolls. There are extensive quotes from Perlman. I have
a few problems with Perlman's conclusions about how the proposed
patent reform will impact inventors like him.

First, Perlman claims that patent reform is unnecessary in light of two
recent Supreme Court cases: *eBay v. MercExchange* and *KSR v.
Teleflex*. This makes little sense. Sure, the threat of injunction has
been greatly reduced for trolls. But that won't stop the Acacias and
Global Patent Holdings of the world from suing massive amounts of
defendants. Further, many patent trolls are simply
conducting "research" to take advantage of the "CSIRO loophole" to

eBay. In addition, *KSR* is of little help in jurisdictions that rarely if ever grant summary judgments. Patent holders will still be able to sue on clearly invalid patents, get no stay pending reexamination, and put tremendous pressure on defendants to settle or face massive verdicts.

The proposed patent reform addresses these problems. In the words of Mark Lemley, quoted in the article, "I have to say I'm frankly astonished that apportionment has been this controversial. I can't think of a straight-faced argument that you as a patent owner are entitled to more than your invention has contributed to a product."

Perlman also is concerned because in the computer industry, innovation reduces cost. According to Perlman, under patent reform, if you reduce the cost of your device, then your apportionment becomes less and less. Huh? I sure hope he was misquoted there (the problems with newspaper interviews - I'm sure there's a 1,000-word explanation that makes his point better). But if you invent a tremendous improvement in computers, that drives the market, the current patent reform bill will allow you to get the entire market value. And if you just invent a tweak that's very useful, you can still use experts to prove how much your improvement is worth as a percent of the overall invention. What's controversial about that?

Finally, Perlman opines that under patent reform, "Microsoft will clone a crummy version of one of [his] inventions, and [he]'ll be bowled over." Yes, and if they do that, then under patent reform, you still will be able to get an injunction and enhanced damages for Microsoft's willful infringement.

To be sure, there's more to the current patent reform bill than damages apportionment and venue reform. Some of it I support, some of it, well, I could live without it (first-to-file!). And I'm sure there will be many changes ahead. But I sure hope that the individual inventor community does better than "damages apportionment will lead to the end of innovation as we know it" and "let the Supreme Court fix it, and don't touch the laws, Congress."

Update: The following blogs are also covering the NYT story:
Immodest Proposals has a blog titled "This Congress Might Get Something Right?!?"
Leveraging Ideas has a story titled "Patent Reform: Boring But Important"
ZDNet has a Government Blog titled "Patent Reform: Stopping the Insanity or Inventor Ripoff?"
TechCrunch has a blog titled "Patent Reform Act Focuses on the Wrong Problem" (the real problem is poor patent quality, says the blog.

Posted by Troll Tracker at 12:01 AM     9 comments

Labels: New York Times, patent reform

FRIDAY, JANUARY 11, 2008

## Troll Call and Other Statistics for December 2007

We reached the end of 2007. All the other blogs are reporting an overall decrease in IP litigation, a cutback from 2006, or are reporting the slightest of increases in patent filings from 2006 to 2007. That's simply not true. By the real count -- the number of defendants sued for patent infringement -- 2007 was a record year. In fact, here's my headline: "2007 shows a 30% increase in patent litigation over 2006, fueled by a 40% increase in the Eastern District of Texas." And certainly from the number of patent cases brought by non-practicing entities and so-called patent trolls, it was a year that saw a tremendous increase in both the quantity and diversity of these entities.

Before we go on, let's explore statistics for a minute. Say in 2006 there are 25 lawsuits, each against 1 defendant. Then in 2007, there are 20 lawsuits, each against 5 defendants. 25 defendants sued 1 year, 100 the next. The patentees could have filed 100 lawsuits, and in effect, did so. Why isn't that a 4-fold increase? Yet people look just at the number of cases filed, which gets them to declare a 20% decrease.

This month, I'd like to start with the 2007 year-end statistics. Here's what I have compiled:

As a disclaimer, these numbers are taken raw from PACER/ECF without my usual investigation to make sure they aren't a transfer/duplicate/etc. But since I'm comparing several years, there needs to be an apples-to-apples comparison, and I'm not about to go look at every case in 2006!One other disclaimer: I didn't actually count every defendant in every case. I took the top jurisdictions, counted them, and extrapolated. The ones I counted constituted over two-thirds of the patent cases, so if my number of defendants is off, it's not off by much. Plus, the same extrapolation method was used for all three years I compare below.

With those disclaimers out of the way, this is what the data shows when looking at the national patent infringement statistics:

- In 1990, there were 921 patent cases nationwide (1 in EDTX), and 1,596 defendants sued (1 in EDTX).
- In 2006, there were 2,822 patent cases nationwide (264 in

EDTX), and 6,118 defendants sued (996 in EDTX).

- In 2007, there were 2,953 patent cases nationwide (364 in EDTX), and 8,045 defendants sued (1,402 in EDTX).
- Comparing 2007 to 2006, nationwide there was a 4.6% increase in patent cases (I have read 6% elsewhere), but there was a 31.5% increase in the number of defendants sued for patent infringement.
- Comparing 2007 to 2006 just for the Eastern District of Texas, there was a 37.9% increase in the number of patent cases, and there was a 40.8% increase in the number of defendants sued for patent infringement.
- Comparing 2007 to 1990, nationwide there has been over a tripling in the number of patent cases (+221%), and a quintupling in the number of defendants sued for patent infringement (+404%).
- In 1990, the Eastern District of Texas accounted for roughly 1/100 of all national patent cases, and less than 1/100 of all defendants sued.
- By 2007, those EDTX numbers had grown to being roughly 1/8 of all national patent cases and 1/5 of all defendants sued.

I say pshaw to the notion that patent infringement increased only 4-6% in 2007. Look at the defendants sued: there was over a 30% increase this past year. That's the number that matters. Now where will 2008 fall?

Let's next turn to the numbers from December for the 7 districts I have been highlighting this year.

December statistics

ED Texas: 21 patent cases, 82 defendants sued (11 troll cases)
CD California: 21 patent cases, 82 defendants sued (6 troll cases)
D New Jersey: 11 patent cases, 20 defendants sued (0 troll cases)
D Delaware: 19 patent cases, 40 defendants sued (2 troll cases)
ND Illinois: 12 patent cases, 30 defendants sued (3 troll cases)
ND California: 4 patent cases, 9 defendants sued (0 troll cases)
SD New York: 7 patent cases, 11 defendants sued (1 troll cases)

December was the first month this year that another district rivaled the Eastern District of Texas in both cases filed and defendants sued.

Non-EDTX Troll/NPE Cases

There were some interesting non-practicing entity /troll cases filed outside of the Eastern District of Texas in December. Some were very interesting. For the first month since I started the blog, I have more "NPE" cases outside of EDTX than I do inside. A preview of life

after venue reform, perhaps? Here are the highlights:

1) Document Generation Corp. v. AllMeds, and 18 other defendants (SDIL, December 4). I featured this case here.

2) Action Technologies, LLC v. Avid Technology, Inc. (SDNY, December 4). Action is sub of General Patent Corp., according to the statement it filed with the court in New York. I profiled GPC here.

3) Global Patent Holdings, LLC v. ADT, and 6 other defendants (SDFL, December 5). I featured this case here.

4) Innovative Patented Technologies, LLC v. Nokia & Samsung (SDFL, December 5). Scott Harris, J-Beau, and Niro. Blogged it here.

5-8) Network Signatures, Inc. v. Bank of America Corp. (CDCA, December 10).
Network Signatures, Inc. v. Wachovia Corp. (CDCA, December 10).
Network Signatures, Inc. v. Wells Fargo & Co. (CDCA, December 10).
Network Signatures, Inc. v. Washington Mutual Bank (CDCA, December 10). You might think by looking at Network Signatures' website that I have incorrectly included these four cases as "non-practicing entity" cases. But there's more here than meets the eye. I'll elaborate more in a special spotlight on these cases next Tuesday. I'll add a forward link here once I create that post.

9) Guardian Media Technologies, Ltd. v. Daewoo Electronics Corp. (CDCA, December 18). Guardian Media is a Texas limited partnership that bought two patents in 2003, and has sued a bunch of companies. It is in patent litigation all over, and the patent-in-suit is in ex parte reexamination. This lawsuit was filed two months after the PTO issued an 81-page office action rejecting the claims of the patent-in-suit as invalid.

10) PSN Illinois, LLC v. Abcam, Inc., Abgent, Inc., Affinity Bioreagents, Inc., Discoverx Corp., Exalpha Biologicals, Inc., Genetex, Inc., LifeSpan Biosciences, Inc., Multispan, Inc., and Novus Biologicals, Inc. (NDIL, December 21). An old troll friend returns! PSN Illinois is a shell. I'm not sure who owns it, but Chicago-area attorney Michael Mazza represented it in 3 prior patent litigations. 2 of the 3 prior PSN Illinois litigations were over pet litter patents, and the other one over porcelain veneer restoration materials. This new case asserts two patents titled "Molecular Cloning and Expression of G-Protein Coupled Receptors." It's safe to say that if you have a single entity asserting pet litter, porcelain veneer, and molecular cloning patent, it's a troll. And in this case, a BIOTROLL. The inventor of the two patents-in-suit is now a University of Cincinnati professor. He evidently sold his patents back in September 2007.

11) Fifth Market Inc. v. CME Group Inc. (Del, December 21). 5th
Market is a failed startup. I found this article from 1999 interviewing
some of the inventors of the now-asserted patent. The inventors
generally list 5th Market in their LinkedIn profiles as being a past job.
But the first-named inventor, Scott Nieboer, still seems to run this
website from his office in Nashville, where he also runs a few other
businesses - investment businesses. Here is the cached "management"
page from the old Fifth Market website. My conclusion? A once-
company, now a shell being monetized.

12) Wall Corporation v. BondDesk Group LLC (Del., December 26). I'm
really not sure about this one. The first-named inventor, Webster
Hughes of Charlotte, NC, was in upper management at X-Bond, the
company that first owned the patent-in-suit. Then in September 2004
the patent was assigned to Wall Corp of Greenwich, CT, a company I
can find nothing about. Now Wall Corp lists its address as the same as
the law firm that filed the suit - Shore Chan Bragalone, of Dallas.
Shore Chan is a firm I have featured as representing Acacia. This one
has a general smell of a troll case about it, but I can't say for sure.
Since there's nothing about Wall anywhere I can find, I'm putting it at
least in the NPE camp for now.

13) Zappos.com v. Global Patent Holdings (DNV, December 26) (DJ).
See here.

14) Meirav Kesher Hadadi, Ltd. v. Zipcar Inc., Mobility Inc. d/b/a
Flexcar, and I-Go (NDIL, December 28). The plaintiff is an Israeli shell
corporation set up by the Israeli inventor of the car rental patent.
One of the defendants, I-Go, is Chicago's only non-profit car sharing
service. It actually seems like a pretty cool idea -- the defendants'
idea, that is, not the plaintiff's patent, the claims of which seem
stretched to be able to capture the accused "product."

15) Innovative Patented Technology, LLC v. Motorola (NDIL, December
31). I profiled this case here.

16) Harvard Label v. Advanced Card Technologies LLC (CDCA,
December 31) (DJ). According to ACT's website, it is a subsidiary of
General Patent Corp.

Cumulative Statistics for 2007

Here are the cumulative statistics for all of 2007, comparing the
various "big 7" districts.

ED Texas: 364 patent cases, 1,402 defendants sued (151 troll cases)
CD California: 272 patent cases, 729 defendants sued (23 troll cases)

D New Jersey: 187 patent cases, 349 defendants sued (13 troll cases)
D Delaware: 147 patent cases, 350 defendants sued (18 troll cases)
ND Illinois: 137 patent cases, 261 defendants sued (26 troll cases)
ND California: 131 patent cases, 249 defendants sued (19 troll cases)
SD New York: 102 patent cases, 255 defendants sued (14 troll cases)

That's one patent case filed a day in the Eastern District of Texas. 28
defendants sued a week! Twice as many as any other district. Over
150 troll cases (41%).

Here is my last "troll call" for 2007 - the December cases. I'm planning
a little bit of a change for 2008, by the way. While EDTX still drives
the troll cases, I no longer plan to track EDTX and non-EDTX troll
cases separately. Starting with January's troll call, everything will be
merged. Hopefully that will make this sort of post more readable.

Troll Call for December 2007 in EDTX

141) Klausner Technologies v. Apple, AT&T, AT&T Mobility, CSC
Holdings, Comcast, eBay, GotVoice, Simulscribe (Marshall, December
3). Dovel & Luner filed this lawsuit, which I blogged about here.

142) epicRealm Licensing, LLC v. The Macerich Co. (Texarkana,
December 3). epicRealm made my original blog post, at #6, from way
back in January. This case is one that Judge Folsom ordered to be
bifurcated from the original one.

143) Typhoon Touch Technologies, Inc. v. Motion Computing, Inc.,
Dell, Inc., Nova Mobility Systems (Tyler, December 5). This looks like
a once-company that has gone over to the dark side.

144) Tessera, Inc. v. A-DATA Technology Co., A-DATA Technology USA,
Acer, Inc., Acer America, Centon Electronics, Elipida Memory, Elipida
Memory USA, International Products Sourcing Group, Kingston
Technology Co., Nanya Technology Corp., Nanya Technology USA,
Peripheral Devices & Products Systems, Powerchip Semiconductor
Corp., ProMOS Technologies, Inc., Ramaxel Technology Ltd., SMART
Modular Technologies, Inc., TwinMOS Technologies Inc., TwinMOS
Technologies USA (Marshall, December 7). Some people consider
Tessera to be a research institution. Some people consider it to be a
patent troll. It's hard to decide, but if you sue 18 companies in one
lawsuit in Marshall, Texas, you inch towards that troll line.

145) Coronary Stent Visualization Corp. v. Philips Electronics North
America Corp. (Marshall, December 17). Acacia, as I described here.

146) Trover Group, Inc. v. Regions Bank (Marshall, December 18).
According to this article, Trover Group was previously known as Dozier

Financial Corp. Indeed, Trover is run by Charles Dozier, one of the inventors of the patents-in-suit. This appears to be an inventor's shell.

147) Beneficial Innovations v. AOL, Google, IGN Entertainment, Morris Communications Co., Dallas Morning News, Tribune Interactive, Yahoo! and YouTube (Marshall, December 20). I discussed Beneficial Innovations and inventor Sheldon F. Goldberg last week.

148) Parallel Networks, LLC v. Netflix, ATA Airlines, E*Trade, John Wiley & Sons, SkyMall, and The Finish Line (Marshall, December 28). The funny thing about this case, is that it asserts U.S. Patents 5,894,554 and 6,415,335 -- the same two patents asserted by epicRealm in its prior litigations. Same attorneys, same principals seem to be involved. Perhaps Parallel Networks is just a new name for epicRealm.

149) Media Technologies Licensing, LLC v. Tristar Productions, Ace Authentic, Bench Warmer Int'l, Press Pass, Razor Entertainment Group, Razor Entertainment LLC, SA-GE Collectibles, and Stellar Collectibles (Marshall, December 28). Media Technologies Licensing is a California LLC (in Beverly Hills) formed by the inventor of the patents-in-suit, Adrian Gluck. Those patents are 5,803,501 and 6,142,532. The patents are titled "Memorabilia Card" and had been previously asserted against The Upper Deck Co. in the Central District of California. In fact, Media Technologies Licensing filed another case just last week in CDCA. So it's strange seeing them in Texas, but there they are.

150) American Microsystems Ltd. v. WIAV Solutions, LLC (DJ) (Sherman, December 28). For more on this new case involving new troll WIAV, see here.

151) Mondis Technology Ltd. v. LG Electronics, LG Electronics USA, Hon Hai Precision, and Innolux (Marshall, December 31). And you can go to that same post for information on Mondis, too.

TT

Posted by Troll Tracker at 12:08 AM    3 comments

Labels: epicRealm, General Patent Corp., Guardian Media, Media Technologies Licensing, Parallel Networks, patent reform, PSN Illinois, statistics, Tessera, Typhoon Touch, venue

THURSDAY, JANUARY 10, 2008

## Global Patent Holdings Sues Boca Raton Resort & Club

Check out all of those JPGs on the website at the Boca Raton Resort & Club. I guess somebody had a bad stay there or couldn't get a good tee time, for on Tuesday 1/8, Global Patent Holdings asserted its JPEG-on-a-website patent in SDFL against the Club. If you don't know what I'm talking about, click on the Global Patent Holdings label below. Niro Scavone, of course.

Posted by Troll Tracker at 11:17 AM    0 comments
Labels: Global Patent Holdings, Niro Scavone

WEDNESDAY, JANUARY 9, 2008

## Wednesday Miscellany, 1/9/08

A bunch of tidbits today, mainly thanks to reader tips. Before I get to them, if you haven't done so already, you have two days to take my Patent Troll Tracker Blog Survey before it closes. I'll provide the results next week.

1) My post last Friday on Mondis prompted Inpro to take Dechert off of its "extended team" on its website. But thanks to a reader tip, you can still see Dechert featured as part of the Inpro team in this Inpro document.

2) A reader (who I am keeping anonymous for now) compiled for me a list of recent patent litigations where the inventor(s) of the patent(s)-in-suit were patent attorneys. I know there are more than are on the list, but these are mainly the cases I have featured on this blog. If anyone knows of any other patent-attorney-as-inventor cases, let me know. Meanwhile, see the current list by clicking on this link. Note this list doesn't include the case brought yesterday in Texas (see #8 below). Update, 1/10/08: now it does, plus it includes another case sent my way.

3) Not many interesting cases from last Wednesday-Friday, but one did catch my eye. After Burst.com got a reported $50M settlement from Microsoft, and a reported $10M from Apple, RealNetworks decided to file its own declaratory judgment case against Burst, in the Northern District of California. An eager Burst.com investor has evidently been posting evidence of several companies' infringement on YouTube (see here), including RealNetworks. Unfortunately, the complaint is not available online yet.

4) I don't usually post about Federal Circuit decisions, but I have to take issue with the CAFC's 2-1 opinion in *SRI Int'l, Inc. v. Internet Security Sys., Inc.* (January 8, 2008). The majority (Rader, Mayer) acknowledged that the prior art Live Traffic paper invalidated the four patents-in-suit, if publicly available, but reversed a summary

judgment of invalidity because it was doubtful that putting a paper on an Internet FTP Server constituted public availability. They likened it to the thesis, sitting in the library, without an index so people could find it. Anyone who has ever used an FTP server knows that this conclusion is just not true. And Judge Moore, in dissent, picked up on the exact issue in footnote 1 and surrounding text:

> The majority concludes without any evidence or support in the record that the FTP server "did not contain an index or catalog or other tools for customary and meaningful research." The majority bases this conclusion on a number of "facts" not supported by the record or even argued by the parties. First, the majority implies that a sophisticated computer security researcher would need a "README" file to find a file in an FTP server. There is no support in the record for this suggestion and the parties never argued it. The majority also states, without record support, that "it is doubtful that anyone outside the review committee looking for papers submitted to the Internet Society's Symposium would search a subfolder of an SRI server" and "it is also doubtful that anyone outside the review committee would have been aware of the paper or looked for it at all in early August 1997." Neither of these "doubts" are supported by any record evidence. Moreover, the relevant inquiry for public accessibility is not whether a reference is available to people looking specifically for that reference, but rather whether the reference is publicly available to someone looking for information relevant to the subject matter. Given that the EMERALD subdirectory was publicized to the cyber security community as a source of information related to projects on intrusion detection, this paper, like everything else in the EMERALD subdirectory, was publicly accessible to anyone interested in material on intrusion detection.

Right on, Judge Moore! This is actually an important issue: there haven't been many published cases if any at all that attempt to meaningfully extrapolate the CAFC's library indexing law to specific areas of the Internet. This is important enough that I hope the whole court considers the issue *en banc*. But somehow I doubt it.

5) Acacia has struck again. Its subsidiary, Credit Card Fraud Control Corporation, sued six companies (Full Spectrum Telecommunications, National A-1 Advertising, Network Telephone Services, SPG Solutions, Utel Networks, and Teligence), on U.S. Patent No. 6,282,276 ("Method of Billing a Value-Added Call"). Acacia alleges it is the exclusive licensee of the '276 patent. The patent itself seems to be owned by Fraud Control Systems.com, a Boca Raton, Florida company owned by the inventor, David Felger. The fascinating thing about this is that if you go to Fraud Control Systems' website (and you should do it before

they change it, which they always do to TrollTracker), it says for more
information about the "patented fraud-control solutions," contact Rick
S. Nathan of Pricewaterhouse Coopers. Is PWC somehow involved in
this Acacia litigation? Somehow, I doubt it.

6) Speaking of Acacia, I profiled here a 23-defendant case Acacia
subsidiary Autotext filed in Cleveland. I thought the case was frivolous
and should be dismissed immediately. I guess Acacia listened, for
yesterday it did dismiss the entire litigation. No reasons given, of
course.

7) Further speaking of Acacia, it has moved to transfer its own case!
Really. Acacia subsidiary Refined Recommendation Corporation sued
Netflix in New Jersey. Netflix moved to transfer the case to the
Northern District of California, where it is headquartered, and where
significant prior art is located (not to mention it's close to the
Portland, Oregan patent attorney inventor, Gary Odom a/k/a Patent
Hawk - see here for my prior post explaining that one). Take that,
said Acacia. Not only will we oppose your motion, but we'll cross-
move to transfer the case - to the Central District of California. The
reasons? There's infringement there. But there was alleged
infringement in New Jersey, right? What makes CDCA *more* convenient
than NDCA? According to Acacia, it gets cases done faster -- 7.2
months to 7.4 months. Not kidding. Acacia wants the court to transfer
the case to CDCA to save 6 days. Their cross-motion seems like a bit
of a waste of the court's time. If you're going to send the case 3,000
miles across the country, why not send it to where the defendant and
all the documents are located?

8) And speaking of meaningless shells, venue ridiculousness, and
patent-attorney-trolls, we turn to Traffic Information LLC, a company
formed by yet other Portland, Oregon patent attorneys Bruce DeKock
and Kevin Russell to assert U.S. Patent No. 6,785,606. "Traffic" made
my September Troll Call at #103 when it/they sued Honda. Yesterday
they/it struck again, suing Alpine Electronics (CDCA), Magellan
Navigation (NDCA), and Sanyo North America (SDCA) in Marshall,
Texas. Parker Bunt & Ainsworth leads the 3-Texas-firm contingent
representing Traffic Information/DeKock/Russell. 42% of ALL
complaints filed in Marshall so far in 2008 have been patent
infringement complaints (3 out of 7), and 100% of the EDTX patent
cases this year have been filed in Marshall. The statistic is
meaningless now due to the early date, but I'll be checking back with
it periodically throughout the year.

Back on Friday with December's Troll Call.

Posted by Troll Tracker at 9:17 AM     0 comments
Labels: Acacia, attorney-trolls, Autotext, Burst.com, Credit Card

Fraud Control Corp., Dechert, Federal Circuit, Inpro, Judge Moore, Mondis, RealNetworks, Refined Recommendation, Traffic Information, venue

TUESDAY, JANUARY 8, 2008

## Number of Utility Patent Claims Issued By USPTO Per Year Has Quintupled in 30 Years

Dennis Crouch had an interesting post from December 23 on rising claim counts. Dennis provides a graph showing that the number of average total claims in a U.S. Patent rose from about 10 in 1976, to 15 in 1995, to nearly 20 in 2004.

Looking at 1976 through 2006, we can go here to find the number of utility patents issued per year, and multiply it by Dennis's number, to get roughly the following graph, of the number of patent claims issued per year, over a 30-year period (imagine that there are actually *readable* numbers along the x-axis representing years from 1976 to 2006 - it's amazing I was even able to figure out how to do this graph - can't figure out how to get the years on it so anyone can read them, but you get the picture).



### Number of Utility Patent Claims Issued by USPTO per Year, 1976-2006

| Year | Patents Issued | Claims/Patent | Claims Issued |
|------|----------------|---------------|---------------|
| 1976 | 70,226 | 10.1 | 709,282 |

| 1977 | 65,269 | 10.2 | 665,744 |
| 1978 | 66,102 | 10.7 | 707,291 |
| 1979 | 48,854 | 11.7 | 571,572 |
| 1980 | 61,819 | 11.3 | 698,555 |
| 1981 | 65,771 | 12.4 | 815,560 |
| 1982 | 57,888 | 11.6 | 671,501 |
| 1983 | 56,860 | 11.7 | 665,262 |
| 1984 | 67,200 | 11.4 | 766,080 |
| 1985 | 71,661 | 11.0 | 788,271 |
| 1986 | 70,860 | 11.8 | 836,148 |
| 1987 | 82,952 | 11.9 | 987,129 |
| 1988 | 77,924 | 12.6 | 981,842 |
| 1989 | 95,537 | 13.2 | 1,261,088 |
| 1990 | 90,365 | 12.9 | 1,165,709 |
| 1991 | 96,511 | 12.5 | 1,206,388 |
| 1992 | 97,444 | 13.0 | 1,266,772 |
| 1993 | 98,342 | 14.8 | 1,455,462 |
| 1994 | 101,676 | 14.6 | 1,484,470 |
| 1995 | 101,419 | 16.1 | 1,632,846 |
| 1996 | 109,645 | 17.2 | 1,885,894 |
| 1997 | 111,984 | 17.1 | 1,914,926 |
| 1998 | 147,518 | 16.7 | 2,463,551 |
| 1999 | 153,485 | 17.9 | 2,747,381 |
| 2000 | 157,494 | 18.4 | 2,897,890 |
| 2001 | 166,036 | 18.9 | 3,138,080 |
| 2002 | 167,331 | 19.2 | 3,212,755 |
| 2003 | 169,023 | 19.6 | 3,312,851 |
| 2004 | 164,291 | 20.2 | 3,318,678 |
| 2005 | 143,806 | 19.5 | 2,804,217 |
| 2006 | 173,771 | 19.5 | 3,388,535 |

Note that the number of claims issued per year has almost quintupled in those 30 years, from under 700,000 claims per year to over 3 million for the last several years. That's amazing. And people wonder why the PTO is passing rules attempting to limit continuations and the number of claims per application.

Posted by Troll Tracker at 12:02 AM     0 comments

Labels: examiner overload, patent reform, statistics

M O N D A Y ,   J A N U A R Y   7 ,   2 0 0 8

## Rembrandt's Interesting Injunction Strategy (Possibly)

There is one patent troll case (that I know of) going to trial this month in the Eastern District of Texas: Rembrandt v. Ciba Vision. Rembrandt may be up to something interesting.

Besides Rembrandt's foray into high tech patents, Rembrandt also bought contact lens patents, and put them in a shell named Rembrandt Vision Technologies, L.P. Rembrandt sued Bausch & Lomb and Ciba Vision in Marshall, Texas back in October 2005. Eventually, Bausch & Lomb settled, and Ciba decided to take it to trial. The parties agreed to have Magistrate Everingham preside over the case (or, as several friends in Texas call him, "Magistrate Chad"). Jury selection was supposed to have been January 3, with trial beginning January 15 (update: I am informed jury selection is January 30, with opening statements to begin immediately thereafter).

In the pretrial order, Ciba asserted that Rembrandt settled with Bausch & Lomb, whereby in exchange for money, not only did Rembrandt dismiss B&L (and maybe give it a license), it also gave its injunction rights to B&L. According to Ciba, Rembrandt did this in an attempt to skirt *eBay*:

> CIBA wishes to bring to the Court's attention the serious issues that arise from the Master Agreement (the "Settlement Agreement") settling the dispute between defendant Bausch & Lomb Inc. ("B&L") and Rembrandt Vision. In addition to dismissing all pending claims between B&L and Rembrandt Vision, the Settlement Agreement will effectively cause B&L to switch sides in this litigation – from being CIBA's co-defendant (and sharing privileged defense strategies with CIBA under a common interest agreement) to pursuing an injunction against CIBA under the Chang patent. While the Settlement Agreement is lengthy and complex, in effect it purports to split the beneficial ownership of the patent such that Rembrandt Vision's parent companies keep rights to virtually all monies flowing from this action, but B&L obtains the right to seek an injunction against CIBA under the patent in the event that Rembrandt Vision prevails against CIBA at trial. This assignment of the right to seek an injunction is a transparent attempt to circumvent the guidance of the Supreme Court's eBay decision, in which a plurality of justices counseled against granting injunctions to non-practicing plaintiffs. *See eBay, Inc. v. MercExchange, LLC,*

> 126 S. Ct. 1837, 1842 (2006). Neither Rembrandt Vision nor its
> parent companies practice the invention of the Chang patent. By
> purporting to transfer the right to seek an injunction to B&L,
> Rembrandt Vision hopes to improve its chances of obtaining an
> injunction. CIBA believes there are serious problems with this
> arrangement in addition to those concerning injunctive relief
> that could affect the trial of this case and intends to raise these
> issues at the appropriate time, including, but not limited to, an
> opposition to any post-verdict motion by Rembrandt Vision for an
> injunction. CIBA expects that discovery on the circumstances
> underlying the Settlement Agreement and the timing of B&L's
> decision to switch sides in this litigation will be necessary. CIBA
> also anticipates that B&L's new alignment with Rembrandt
> Vision, given the confidential, strategic information governed by
> the Common Interest Agreement between CIBA and B&L, may
> give rise to separate issues regarding the conduct of counsel for
> Rembrandt Vision and B&L. CIBA may also take separate action
> against B&L and Rembrandt Vision for breaching the terms of the
> Common Interest Agreement between B&L and CIBA.

Of course, Rembrandt disagreed, stating that Ciba mischaracterized
the Rembrandt-B&L agreement and that Rembrandt would be happy
to explain at the court's convenience, but it did not flat-out deny it
wouldn't use the agreement to aid in its seeking an injunction. If true,
and that's what Rembrandt is really trying to do, then it's a very
interesting strategy. Side with one of the co-defendants and induce
them to switch sides to improve their chance of an injunction. Fish &
Richardson represents Rembrandt, along with a host of local counsel,
including Parker Bunt & Ainsworth, Ireland Carroll & Kelley, Brown
McCarroll, and Jones & Jones. Banner Witcoff appears to represent
Ciba, along with Sidley Austin and Potter Minton, and perhaps others.
Note's Ciba's veiled threat to go after Fish & Richardson. Just what
Fish needs!

The other case that was going to go to trial in January was Mobile
Micromedia Solutions LLC v. Nissan. Just last week, however, Judge
Folsom granted a motion continuing the trial until May 2008, due to
the "numerous pending motions for summary judgment, Daubert
motions, voluminous motions *in limine*, and a plethora of exhibit
issues and deposition designations," along with the unavailability of a
key plaintiff's witness. Judge Clark's cases slated for January 2008
trial appear to have settled. I don't know of any Ward or Davis cases
going to trial, so Rembrandt may have center stage this month in
EDTX.

Posted by Troll Tracker at 12:06 AM    1 comments
Labels: Ciba, injunctions, Judge Everingham, Rembrandt

FRIDAY, JANUARY 4, 2008

## 4 Interesting New Cases From Last 2 Weeks of December

Well, what do we have for you today? How about the Rothschild family investing in a Eurotroll, and suing in Marshall, Texas? How about an ex-Fish & Richardson *associate* buying patents for millions of dollars (while an associate) and being D/J'd in Sherman, Texas after trying to shake down an EDTX company? How about a couple of lawsuits by a guy who, with related patents, has made the Electronic Frontier Foundations' 10 Most Wanted Invalid Patents? How about yet another Scott Harris/J-Beau/Ray Niro lawsuit? Yeah, you could read those other ABA-nominated patent blawgs, but I've got your *juicy* patent news right here!

WIAV Solutions: Choongsoo Park

Let's start off with the D/J case of American Microsystems Ltd. v. WIAV Solutions, filed in the Eastern District of Texas on December 28. Now why would anyone file a D/J case in the Eastern District? Well, in this case, perhaps it makes sense. The accused infringer is a company located smack dab in the middle of EDTX. It received letters from WIAV Solutions, a company of unknown origin (so unknown that AML had to plead WIAV was not from Texas on "information and belief"). Actually, the letters came from Sidley Austin-San Francisco.
Since AML couldn't figure out who is behind WIAV Solutions, I decided to dig around to see if I could figure it out. It wasn't too hard. WIAV asserted U.S. Patents 5,400,338 and 6,480,497 in its correspondence with AML. These patents, prosecuted by Townsend and Townsend and Crew in San Francisco, were originally assigned to Metricom of Los Gatos, CA. From there, they went to Ricochet Networks, which became part of Terabeam, of San Jose, CA. They show no further assignment.

But Google and the USPTO Assignment database shed more information. The USPTO Assignment database shows WIAV Solutions buying a boatload of patents from Skyworks Solutions. In the transaction, executed in September 2007, WIAV listed an address in Reston, Virginia (which appears to be a home address). If you search for "5400338 6480497 Terabeam," you get one result: a Terabeam SEC filing showing the sale of these patents. A couple more clicks, and you get this SEC filing -- the actual assignment agreement transferring patents from Terabeam to SPH America, a Virginia limited liability company, located at the same address as WIAV. All in all, SPH America bought 4 patents from Terabeam for $5M, including the two now-in-suit.

But who is behind Virginia LLCs SPH America and WIAV Solutions? According to Virginia corporate filings and Terabeam/Proxim SEC documents, it was Choongsoo Park, who, at the time of the purchases, was a lowly associate in the D.C. offices of Fish & Richardson. TrollTracker does not understand how an associate can afford to spend $5M on patents (more, actually, if you include the 88 patents bought from Skyworks). But apparently Park knew what he was doing - he has an advanced degree in Electrical Engineering.

Park is no longer on the F&R website (as of sometime between Halloween and now), so apparently he no longer works for F&R. Question is whether he's happy or not litigating his patents in Sherman, Texas against a company that actually employs people in the District. More on the case here. More on the technology behind the original Metricom/Ricochet system here. Metricom, the original technology developer, was a victim of the tech bubble bursting. The Ricochet technology is a good example of what others described to be exciting technology that generated a lot of buzz, but never got off the ground due to a bad business model.

It would be nice to hear that Park has left F&R to form his own company to commercialize the Ricochet technology, rather than, as American Metrosystems alleged, making money only "by suing alleged infringers of [the] patents and negotiating license fees from its victims." Time will tell. You have to admit: it's a bit strange, a law firm associate spending multi-millions on patents that are then asserted in an attempt to gain licensing revenue. It's one thing to be Scott Harris, and invent your own patents. It's quite another to be, well, Acacia, or Erich Spangenberg. You have to wonder whether Park is fronting for someone else.

Mondis Technology Ltd.: Inpro Licensing SarL

IPEG had an interesting post about how Europe has generally escaped the patent troll problem. But Europeans have been rumored to be gobbling up US patents to sue in American courts. This case is a perfect example. On New Years' Eve, Mondis Technology Ltd. of London sued Korean manufacturer LG, and Taiwanese manufacturers Hon Hai and Innolux (both related to Foxconn), in Marshall, Texas (on 5 patents). Dechert-Philadelphia filed the complaint, with help from Otis Carroll.

Who is Mondis Technology? According to UK corporate documents, it is Inpro Limited. Inpro is a EuroTroll, apparently. Mondis was originally formed at 160 Queen Victoria St. in London -- home of Dechert's offices there. Then it was moved to 19 Perrin Lane in Hampstead, London. That is the same address as a company known as Inpro IP Services. Inpro IP Services and Inpro Limited appear to me to be

related to Inpro Licensing, a Luxembourg company that bought the IP portfolio of once-company Elonex, of London. And Inpro's mission? To make money off of intellectual property. Other ties between Inpro-Luxembourg and Mondis? Inpro considers Dechert to be part of its extended team. The same Dechert lawyers who represented Inpro in patent litigation against RIM appear to be representing Mondis in this case. My conclusion: Mondis is an Inpro company.

Oh, and then there's this: click on "DDC Patents" on Inpro's "Current Projects" web page, and you get 3 out of the 5 patents in suit. So I guess that's more circumstantial evidence.

Another fascinating tidbit: RIT Capital Partners, a publicly traded company on the London Stock Exchange that is about 25% owned by the Rothschild family, owns more than 10% of Mondis. You know, related to the winemaking Rothschilds? Other directors of Mondis include David John Morrison, who owns Prospect Investment Management, a London private equity firm. This is a well-funded EuroTroll. What's it doing slumming in Texas?

I may have the answer: It looks like "Mondis"/Inpro bought the five patents in suit from Hitachi on October 30, 2007. I'm sure LG and Foxconn will send a big thank-you to Hitachi for that. Of course, LG and Hitachi already have 4 patent litigations pending between them in the Eastern District. So could it be that Hitachi is hitting back at LG not just with a suit brought by itself, but with a troll lawsuit? I have no idea, but if true, it would be interesting....

Beneficial Innovations: Sheldon Goldberg

Beneficial Innovations is a Nevada company owned by patent inventor Sheldon F. Goldberg. He is suing companies on U.S. Patents 6,712,702 (Method and System for Playing Games on a [Computer] Network) and 6,183,366 (Network Gaming System). He was noted four years ago on Slashdot for threatening a bunch of companies that he owned the rights to games played on a computer network. Jason Schultz, a/k/a LawGeek, called the '366 patent his Silly Internet Patent #4 a ways back. Sheldon Goldberg made the EFF's "Most Wanted" poster for "Crimes Against the Public Domain, Willful Ignorance of Prior Art, and Egregious Displays of Obviousness." (oh, hello, Acacia!). According to Ted Frank's post on the wonderful blog, Overlawyered, Goldberg's other patents claimed computer solitaire, on-line game rankings, and pop-up advertising. Goldberg first sued a bunch of defendants in June 2007, and it hardly rated a mention here. But given this second suit and my additional research, this certainly falls under the patent troll category, in my opinion.

16 defendants have now been sued in Marshall: Blockdot,

CareerBuilder, Cnet Networks, Digg, Ebaum's World, Jabez Networks,
The New York Times, The Washington Post, The Weather Channel, and
The Washington Post.Newsweek Interactive Company were sued in
June on the same two patents. The latest suit named AOL, The Dallas
Morning News, Google, IGN Entertainment, Morris Communications,
Tribune Interactive, Yahoo!, and YouTube. Dovel & Luner, a firm that
is challenging Niro Scavone for the most contingent-fee multi-
defendant cases, represents Beneficial Innovations.

Innovative Patented Technologies: James B. "J-Beau" Parker/Scott
Harris

Speaking of Niro, he filed his own New Years Eve case, in Chicago, on
behalf of Innovative Patented Technologies. The first IPT case filed
was in South Florida, in early December, as I reported here. James "J-
Beau" Beauregard Parker owns Innovative Patented Technologies, a
company that does nothing other than hold patents invented by Scott
Harris, a former Fish & Richardson principal who is in a dispute with
his former firm (and litigation in Chicago). IPT does nothing other
than assert patents and try to collect licensing fees. The latest
company to be sued was Motorola, on the same 4 patents as the South
Florida litigation. Since Motorola has a big facility in South Florida,
why not sue them there and/or add them to the other case? Anyway,
Motorola's popular RAZR phone and its Q smartphone were listed as
accused products.

To recap, at least the following 5 lawsuits against 10 defendants are
now pending involving the Scott Harris patents now owned by James
Parker -- all brought by the Niro firm:

Memory Control Enterprise, LLC v. Honda, LG Electronics, Motorola,
Oakley, and US Cellular (NDIL, August 2007)
BarTex Research, LLC v. FedEx (EDTX, August 2007)
Illinois Computer Research v. Google (NDIL, September 2007)
Innovative Patented Technology v. Nokia and Samsung (SDFL,
December 2007)
Innovative Patented Technology v. Motorola (NDIL, December 2007)

There were other troll cases filed in the second half of December in
EDTX and elsewhere, but that's enough for today! The rest can wait
for the December Troll Call, coming sometime next week.

Survey reminder

Don't forget to take my Patent Troll Tracker Blog Survey if you haven't
already.

(Update: hey - welcome to all the visitors from The New York Times -

my first link from "traditional" media. Wonder if it's because I mentioned they are a defendant in the Goldberg lawsuit. This is a disappearing link, though - after Saturday, January 5, it will likely be gone).

Posted by Troll Tracker at 12:07 AM     0 comments
Labels: Beneficial Innovations, Choongsoo Park, Dechert, Eurotroll, Fish_Richardson, Innovative Patented Technology, Inpro, James Parker, Mondis, Niro Scavone, Scott Harris, WIAV

THURSDAY, JANUARY 3, 2008

## Acacia December 2007 Update

Turning to our busiest patent troll in 2007, Acacia, it kept up momentum in December with new lawsuits.

Acacia's new subsidiary Coronary Stent Visualization Corp., established in Delaware on 11/19/07 with a principal place of business of 500 Newport Center Drive, 7th Floor, Newport Beach, CA, filed a lawsuit less than a month after formation. Acacia sued Philips Electronic North America Corp. on 3 patents owned by Cedars-Sinai Medical Center (Los Angeles) and allegedly exclusively licensed to Acacia. The exclusive license likely happened at some point just prior to February 2007, when Cedars-Sinai (represented by Jones Day-LA) told the PTO it had lost its small entity status. The 3 patents are 5,054,045; 5,457,728; and 5,822,391. The lawsuit, involving a Los Angeles patentee, Los Angeles inventors, a Los Angeles exclusive licensee/plaintiff, a Los Angeles prosecuting attorney/law firm (well, now-defunct Lyon & Lyon, anyway), and a New York defendant, was filed in Marshall, Texas on 12/17/07 by DiNovo Price Ellwanger of Austin.

Acacia also filed a big case on December 4, in the Southern District of Illinois (East St. Louis) - the second case they have filed there. This time the sub was Document Generation Corp., and Acacia used Simon Passanante of St. Louis. Patent asserted was 5,148,366. Again, Acacia said it is only the exclusive licensee. 19 defendants were sued, all in the medical software field. GE Healthcare and McKesson are the big ones, but 17 small-to-medium business were sued, too:

1. AllMeds, Inc. (Tennessee-based corporation)
2. Allscripts, LLC (Chicago, Illinois)
3. Cerner Corp. (Missouri)
4. Healthport, Inc. (South Carolina)
5. eClinicalWorks, LLC (Massachusetts)
6. Sage Software Healthcare, Inc. (Florida)
7. AMT Solutions, Inc. (Texas)

8. iMedica Corp. (California - Northern)
9. McKesson Corp. (California - Northern)
10. MediNotes Corp. (Iowa)
11. Misys Healthcare Systems, LLC (North Carolina)
12. NextGen Healthcare Information Systems, Inc. (Pennsylvania)
13. Noteworthy Medical Systems, Inc. (Ohio - Northern)
14. Infor-Med Medical Information Systems, inc. (California - Central)
15. Pulse Systems, Inc. (Kansas)
16. SSIMED, LLC (Connecticut)
17. Physician Micro Systems, Inc. (Washington)
18. A4 Health Systems, Inc. (Chicago, Illinois)
19. GE Healthcare (New Jersey)

So, let's get this straight. Acacia, a California company located in CDCA, is an exclusive licensee who has sued 19 defendants, who are located in 17 different judicial districts (including CDCA). The original assignee and inventors were all from Minnesota, then the patent was transferred via merger and relocation to a company in the Southern District of Ohio, and finally has ended up with I-Think, LLC, an Ann Arbor Michigan corporation which appears to be a subsidiary of the original Minnesota assignee, now called DocuMed. That's about 20 different judicial districts that make sense in terms of venue, yet Acacia chose the Southern District of Illinois. Why, exactly? What's in East St. Louis that appeals to Acacia?

According to this website, DocuMed itself has only 2 employees, one of which is presumably the VP, Secretary and Treasurer of I-Think, Douglas Kassab. This looks like a once-company, looking for a cashout before one of its remaining assets, a patent that expires in 22 months, is no longer useful.

Back tomorrow with some highlights of the last couple of weeks in the Eastern District of Texas.

Posted by Troll Tracker at 12:07 AM     0 comments
Labels: Acacia, Coronary Stent Visualization Corp., DocuMed, Document Generation Corp., GE Healthcare, McKesson, Philips, venue

W E D N E S D A Y ,  J A N U A R Y  2 ,  2 0 0 8

## Global Patent Holdings Update

Let's start the new year off with an update on our #1 patent troll from 2007, Global Patent Holdings.

To recap, it filed another patent infringement case on the JPEG-on-a-website patent (5,253,341) on December 5 in Florida. Then while I was on hiatus, Nevada company Zappos.com filed a declaratory

judgment complaint in Las Vegas on December 26, seeking a declaratory judgment of invalidity, noninfringement and intervening rights on the GPH '341 patent. Parsons Behle & Latimer of Salt Lake City filed the DJ complaint on Zappos.com's behalf.

The DJ complaint, available here, has some nice insights into the Niro firm's method of trying to collect on behalf of GPH. Evidently, on August 14, Mr. Niro sent a claim chart to Zappos, explaining how the Zappos website infringes the reexamined claim 17 of the patent. I'm a bit miffed by that, because Mr. Niro refused to send me a claim chart as to my website. Zappos did not attach the claim chart to its complaint. Nor did it attach the "royalty schedule," which Niro also sent to Zappos. The Niro firm wrote to Zappos again on September 27, notifying it of the Green Bay Packers lawsuit, and then on December 12, notifying it of the Florida lawsuit.

With four litigations now pending in three districts against 17 companies, MDL seems like an increasingly likely option.

Back tomorrow with an update on Acacia.

Posted by Troll Tracker at 9:30 AM     5 comments
Labels: Global Patent Holdings, MDL, Niro Scavone, Zappos

T U E S D A Y ,   J A N U A R Y   1 ,   2 0 0 8

## Happy New Year

I thought the last half of December would be quiet in terms of patent troll activity. Well, not really. Happy New Year to everyone, and look for the following stories this week and next:

- Global Patent Holdings and Acacia updates
- News about a bunch of patent troll cases in the Eastern District of Texas, including one involving yet another Fish & Richardson attorney?
- Is one of the newest patent trolls . . . the US Navy?
- Wrap-up on 2007 statistics, including December's list.

Meanwhile, nothing starts the new year like some humor. Thanks to a reader, we have these two comic strips by James Turner, about patent trolls (click here and here).

Posted by Troll Tracker at 1:11 PM     1 comments

Newer Posts                    Home                    Older Posts

Subscribe to: Posts (Atom)

# Exhibit J

# THE STATE BAR OF CALIFORNIA

Monday, April 21, 2008                                                                                          State Bar Home

Home > Attorney Search > Attorney Profile

## ATTORNEY SEARCH

## Richard Gregory Frenkel - #204133

## Current Status: Active

This member is active and may practice law in California.

See below for more details.

## Profile Information

| Bar Number | 204133 | | |
|---|---|---|---|
| Address | Cisco Systems, Inc.<br>M/S Sjc-10/2/1<br>170 W Tasman Dr<br>San Jose, CA, 95134 | **Phone Number** | (408) 525-5673 |
| | | **Fax Number** | (408) 526-5952 |
| | | **e-mail** | rfrenkel@cisco.com |
| **District** | District 3 | **Undergraduate School** | Univ of Michigan; Ann Arbor MI |
| **County** | Santa Clara | **Law School** | Loyola Law School; Los Angeles CA |
| **Sections** | None | | |

## Status History

| Effective Date | Status Change |
|---|---|
| *Present* | Active |
| 12/6/1999 | Admitted to The State Bar of California |

Explanation of member status

## Actions Affecting Eligibility to Practice Law

### Disciplinary and Related Actions
This member has no public record of discipline.

### Administrative Actions
This member has no public record of administrative actions.

Start New Search >

**Contact Us**    **Site Map**    **Privacy Policy**    **Notices**    © 2008 The State Bar of California

# Exhibit K

 **Blogger™**

# This blog is open to invited readers only

http://trolltracker.blogspot.com/

If you are a reader of this blog, tell us who you are! Sign in using your **Google** Account.

| Username (Email) | | |
|---|---|---|
| Password | | Forgot your password? |
| Remember Me? | ☐ | This is not recommended for shared computers! |

SIGN IN

# Exhibit L

| |SEARCH BLOG|  | | FLAG BLOG|Next Blog»    Create Blog | Sign In

# Patent Troll Tracker

A look behind the curtain at the people or organizations behind the many patent lawsuits brought by corporations that make or sell no goods or services.

SATURDAY, FEBRUARY 23, 2008

## Blogger, Revealed

Live by anonymity, die by anonymity.

Yes, I have been unmasked. It happened quite the way this blog happened - I got an anonymous email, from the guy who probably collected the bounty, telling me I better tell everyone who I am (and he clearly knew), or else he would take care of it for me. The clear threat in the email is that he would do it in a way I wouldn't be happy about. I don't know what that means, but as I have been growing weary of anonymity anyway, here I am.

So now that it's happened, let me introduce myself. My name is Rick Frenkel. I started in IP over 10 years ago, as a law clerk at Lyon & Lyon in Los Angeles. After a few years there as a law clerk and attorney, I litigated patent cases for several years at Irell & Manella. Two years ago I moved to the Valley and went in-house at Cisco. In my career, I have represented plaintiffs, defendants, large companies, small companies, individual inventors, universities, and everything in between. I currently work at Cisco.

When I started the blog, I did so mainly out of frustration. I was shocked to learn that a huge portion of the tech industry's patent disputes were with companies that were shells, with little cash and assets other than patents and a desire to litigate, and did not make and had never made any products. Yet when I would search the Internet for information about these putative licensors, I could find nothing. I was frustrated by the lack of information, and also by the vast array of anti-patent-reform bloggers out there, without a voice supporting what I did believe and still believe is meaningful reform.

Why blog anonymously? For one, I really didn't want the publicity. Second, I feared that someone would claim to have the patent on blogging, and I might face a retaliatory lawsuit. I was close, no?

I never expected the blog to get quite the following it did. It has brought new information to me, in the many emails from people alerting me to this, that, and the other. Incredible stories, about

### Email TrollTracker

trolltracker@gmail.com

### About Me

Troll Tracker
Just a lawyer, interested in patent cases, but not interested in publicity

   View my complete profile

EFF is helping bloggers protect their Constitutional right to anonymous speech



### Blogs TrollTracker Reads

   Above The Law (People Magazine, for Lawyers)

   Anticipate This!

   Benefit of Hindsight

   Chicago IP Litigation Blog

   Delaware IP Law Blog

   Dennis Crouch's Patently-O Blog (the Godfather of Patent Blogs)

   How Appealing (Howard Bashman)

   IAM Magazine Blog (Euro-focused)

patents on gift cards and videos-on-a-website, and demand for tens of millions of dollars. I have been exposed to a clearly overworked PTO examining core, who can't help the fact that the number of claims being examined has quintupled in recent years, while the average years of service of the examiner core has been decreasing. Couple that with the "correction" to obviousness laws by the Supreme Court in KSR, and the huge increase in the number of patent cases in the courts, and we are in the middle of the perfect storm of patent news. My blog fulfilled a long-felt need - the need for people to share information about who are the entities out there asserting patents. And for those people who keep claiming that I am biased against the individual inventor, you haven't been reading me close enough. I just don't think that if you sue dozens of companies in one lawsuit, claiming to own the smartphone on a patent issued years after the smartphone market took off, you shouldn't be shocked if you are the subject of scrutiny, whether from me or others.

Although my direct manager at Cisco knew I was writing the blog, the content was entirely my own, and nobody at Cisco ever wrote any content for me or made any attempts to edit me, nor was anyone up the chain above my direct manager aware that I was the author.

Cisco respects intellectual property, and indeed is one of the most innovative companies in the world. Our patent portfolio, consistently ranked as one of the tops in our field, is the result of numerous of hours spent by our hard-working engineers. Our research and development is significant; during the last fiscal year, Cisco spent over $4.5 billion in developing innovative new products and solutions. Cisco also has a culture of openness and transparency. Within Cisco, there are both company blogs, and also blogs by employees on their own time. This blog is in that tradition, and I am proud to be part of a terrific organization.

Thanks to Dennis Crouch for blazing the patent blawg path. I have been reading your blog from day one. In that light, also to Peter Zura, Michael Smith, and even Gary Odom (Patent Prospector), who probably gets the most credit in inspiring me to write something from my own perspective.

Thanks also to all the people who kept my secret for so long. I'm surprised with all the friends and family that knew, it took as long as it did. Someone may have made $15,000 or so from a bounty posted by Ray Niro on this one - not sure I'll ever find out who or how. I don't actually even care.

Finally, thanks to all the readers who have emailed me with support and ideas. Not sure any of you want to be named, but you know who

Ideation Lab

IP Dragon (China)

IP Geek (Euro-focused)

IP Kat (UK)

Just a Patent Examiner

Michael Smith's EDTX Blog

Overlawyered

Patent Baristas

Patent Demand

Patent Prospector

Patently Absurd Inventions Archive

Patently Silly

Peter Zura's 271 Patent Blog

Phillip Brooks' Patent Infringement Updates

SCOTUSBlog

Spicy IP (India)

Techdirt

The Volokh Conspiracy

Washington State Patent Law Blog

WSJ Law Blog

**EMail Newsletter**

Enter your email address below to receive the Patent Troll Tracker blog posts in a daily newsletter. The newsletter, containing the previous day's posts, will be emailed late in the morning, Eastern US Time.

Enter your email address:

[ Subscribe ]

Delivered by FeedBurner

Subscribe Now: Feed Icon

encouraged me to write as a hobby. I'll thank them personally.

Now that I have been unmasked, I'm not sure where the blog is going from here. I'd like to keep it going. For one, I still have quite a few post ideas in me (indeed, I have several already prepared, waiting to go). Further, there aren't many in-house counsel blogging, and I think we deserve a voice. I'm going to take off the next couple of weeks to think it over.

Rick Frenkel
trolltracker@gmail.com

Posted by Troll Tracker at 4:00 PM     50 comments
Labels: blogging

### FRIDAY, FEBRUARY 22, 2008

## Desire2Appeal

A Lufkin, Texas jury found for Blackboard in the Desire2Learn patent trial, finding the claims valid, infringed, and awarding $3.1 million in damages, according to Desire2Learn's blog and other newswires. News reports say that Blackboard sought $17 million. Ex parte and inter partes reexaminations have been ordered by the Patent Office (13 months ago), but there have been no office actions in those reexams, despite the Patent Office's commitment to resolve reexaminations with "special dispatch."

An inequitable conduct trial to Judge Clark is ongoing.

Posted by Troll Tracker at 7:20 PM     0 comments
Labels: Blackboard, Desire2Learn, jury verdict, Lufkin

## Ted Frank on Patent Reform

Ted Frank is a resident fellow at the American Enterprise Institute for Public Policy Research and Director of the AEI Legal Center for the Public Interest, and a blogger-contributor to Overlawyered ("Chronicling the high cost of our legal system"). Frank authored an interesting paper, published yesterday, titled "There Is a Role for Congress in Patent Reform." In it he concludes:

> Barfield and Calfee's Biotechnology and the Patent System is correct about the importance of the patent system to American innovation. But patent litigation is broken, and Congress is every bit as qualified as--and often more qualified than--the courts to fix it. Patent reforms are possible that discourage patent trolls while protecting the rights of both legitimate patent-holders and


Subscribe in a reader

Google



Blog Archive

▼ 2008 (49)

  ▼ February (20)

    Blogger, Revealed

    Desire2Appeal

    Ted Frank on Patent Reform

    Email From Sorensen

    Mike Masnick on Intellectual Property

    Troll Wars

    Saffran Final Judgment Upped to $501 Million Again...

    Business Method Patents To Face Scrutiny By En Ban...

    Friday Miscellany, 2/15/08

    Happy Valentine's Day

    Taurus/Orion/Spangenberg Hold Off Ford in Madison;...

    $432 Million Verdict in Marshall Texas Patent Case...

    Saffran v. Boston Scientific

    Two New Blogs I'm Reading on Global IP

    Acacia Sues Apple over iTunes ... In East St. Loui...

    Patent Litigation Statistics for January 2008

    Global Patent Holdings' Amended Complaint in Flori...

    Victory for Rembrandt

    The Once-Company

    Manic Monday

  ► January (29)

► 2007 (136)

defendants and satisfying the "do no harm"[46] principle of Barfield and Calfee.

To read Frank's entire report, click here. To read the other side of the story, about why patent reform is evil and will bankrupt our economy, click on the "Patent Prospector" link on the right.

Posted by Troll Tracker at 3:30 PM    1 comments
Labels: patent reform

## Email From Sorensen

Dear Anonymous:

It has come to the attention of Sorensen Research and Development Trust that your blog has made reference to SRDT, describing recently filed cases as a "last gasp to get retirement money" and "last gasp for filing infringement suits."

In the interest of fair reporting, you may want to investigate a little further. Attached is a news release for your review. You may find it interesting to know that in the infringement litigation involving Black & Decker, defense counsel for Black & Decker is none other than the law firm of Niro Scavone, et al.


+++++++


Well, I'm always interested in fair reporting. So here is the Sorensen Press Release. Sorensen is seeking $1.44 Billion from Black & Decker, and has filed 23 new patent lawsuits in the last 3 months. Clearly, Sorensen is seeking more than retirement money. I stand corrected.

Posted by Troll Tracker at 3:06 PM    1 comments
Labels: Sorensen

**THURSDAY, FEBRUARY 21, 2008**

## Mike Masnick on Intellectual Property

Mike Masnick of TechDirt has posted the first in what he promises to be a series exploring intellectual property. In the first installment, he explores the dialog between two of our founding fathers, Thomas Jefferson and James Madison, on the nature of intellectual property, and their concerns that too-strong intellectual property laws could lead to abuse. The compromise that they arrived upon was the now-familiar refrain from Article I, Section 8 of our Constitution:

### Labels

104 E. Houston St. (3)

1st Media (1)

1st Technology (3)

Acacia (47)

Accolade Systems (1)

ADISCOV (2)

Adv Tech Incubator (1)

Alexsam (5)

Aloft Media (1)

Altitude Capital Partners (9)

anagrams (3)

anonymity (12)

Anthony O. Brown (1)

Antor Media (5)

AOL (1)

Apple (9)

Aris Mardirossian (1)

Artesyn (1)

AT_T (6)

attorney-trolls (7)

Austin (1)

Automated Facilities (2)

Autotext (3)

Barry Thomas (1)

BarTex (3)

Beneficial Innovations (1)

Bill Gates (1)

bio-pharma (4)

Blackboard (2)

blogging (22)

Boca Resort (3)

Bodog (2)

Boston (1)

Boston Scientific (2)

bounty (2)

Brian Marcus (1)

> The Congress shall have Power ... To promote the Progress of
> Science and useful Arts, by securing for limited Times to Authors
> and Inventors the exclusive Right to their respective Writings and
> Discoveries.

Mike queries whether the patent system we have today is always
generating exclusive rights that "promote the progress of science." It
will be fun to see where Mike goes with this.

Posted by Troll Tracker at 11:41 PM    9 comments
Labels: constitution, TechDirt

TUESDAY, FEBRUARY 19, 2008

## Troll Wars

Some interesting developments in the Global Patent Holdings
litigation going on in Nevada (against Zappos) and Florida (against
Boca Resort). The long sad story is below, but for those with a short
attention span, here is the abbreviated version: Essentially, Global
Patent Holdings, hurting that Boca Resort *called it a patent troll*,
said "oh yeah, GPH is really an 80-year-old and a 70-year-old in a
wheelchair - who you callin' troll, son of Enron?" Meanwhile, at the
same time in Nevada, GPH told the court that it, not the inventors,
owned the rights to the patents. Boca Resort replied by saying, "Hey
Niro, you started it - you were the one who wrote the article saying
you're a patent troll anyway. And by the way, if the inventors have a
stake, then where's the real party in interest? Dismiss this case, your
honor!"

Or something like that. Not sure I would have used the T-word in the
first place in a pleading, but you have to admit - Boca Resort is trying
the "raw and fresh" approach.

So what's so interesting about this, other than the playground insults
being tossed about? Well, if you remember, Global Patent Holdings
filed an amended complaint in Florida to better plead joint
infringement. I reported on it a couple of weeks ago, and also
suggested that Boca Resort file a motion to strike impertinent
material.

What I missed at the time was that GPH also filed an opposition to
Boca's initial motion to dismiss, and in it, suggested that Global
Patent Holdings consisted of the 70 and 80-year-old inventors,
confined to their wheelchairs and destitution. If you don't believe me,
read it for yourself here - see pp 1-2 & 12. GPH also cited the Judge
Folsom decision in EDTX preventing ICON Health & Fitness from calling

British Technology Group (1)

Bruce Renouard (1)

Burst.com (1)

business method patents (1)

Cablevision (1)

Calvin Ayre (3)

Card Activation Techs (1)

champerty (1)

Charles Hill (1)

Choongsoo Park (1)

Ciba (3)

Cingular (1)

Cisco (4)

Citrix (1)

Clay Dark (1)

Comcast (1)

Commil USA (2)

Computer Acceleration (3)

Constellation IP (1)

constitution (1)

contingency fee (4)

Cooley (2)

Coronary Stent Visualization
Corp. (1)

corporate shell games (2)

Creative Internet (1)

Credit Card Fraud Control Corp. (
1)

Cross Atlantic (1)

CSIRO (3)

Cybergym (3)

Dallas (4)

Dan Henderson (1)

dance contest (1)

Data Encryption (1)

Data Match (2)

David Pridham (7)

Dechert (2)

Paul Hickman a patent troll *at trial* over his Cybergym holding company, and a stipulation in a NDCA case where the parties *stipulated* not to call Rambus a patent troll.

But that's interesting, about the inventors being part of GPH, or otherwise having an interest in the case, because in the Zappos case, in its motion to transfer from Nevada to Illinois, GPH submitted a declaration of Anthony O. Brown, stating under oath that GPH owned the patents fully and exclusively. See here, on page 2. So which is it, do the inventors of the GPH patent have an interest in the litigation or not?

Also, in the GPH Zappos Exhibits, notice on page 8 the royalty schedule being offered: from $50,000 for a company of annual revenue of $10M to $50M, up to $15M for a company of $51.2B annual revenue or more. The GPH letter to the Boca Resort demanded $800K for the right for Boca to post JPEG or other compressed images on its website, so GPH must have figured out the Boca Resort's revenue.

Anyway, Boca Resort must have listened to me, because it also filed a motion to strike the GPH Amended Complaint as being impertinent - like I suggested! Boca suggests that Niro injected the "patent troll" term into the debate by authoring a law review article, declaring that he is the original patent troll. The motion to strike is "because the [amended complaint of GPH] (1) invades the privacy of individuals who are in no way involved in the suit and is misued by Plaintiff in an offensive and insensitive manner, or (2) disparages Boca Resort's ultimate owner, also a non-party, on matters that are irrelevant to Boca Resort, its business, or the subject matter of the suit."

Boca Resort also filed a renewed motion to dismiss the new complaint, explained here. Evidently, GPH's infringement contentions sent in its pre-filing letters differ greatly from its amended complaint. It's an interesting theory - not sure it can happen "on the pleadings," or whether the court will allow discovery before treating it as a summary judgment motion.

Fun to watch things heat up. I think GPH is now forced into a corner to either submit declarations of the inventors that they have a financial stake in the litigation, or barring that, it seems to be an admission that their amended complaint was much ado about nothing, and should be stricken. GPH's right next move is to file a second amended complaint, removing the references to the inventors, and avoid having to reveal that information. Whether GPH's amended complaint survives Boca's renewed motion to dismiss the amended complaint: that's another thing. I think the complaint survives.

Venable is representing Boca Resort; Parsons Behle & Latimer (of Salt

defendants_sued (8)

Dell (3)

Dennis Crouch (9)

Desire2Learn (2)

Diagnostic Systems (1)

Digital Choice (2)

Digital Reg (2)

Digital Technology Licensing (1)

Disc Link (1)

DJ (2)

DocuMed (1)

Document Generation Corp. (2)

eBay (1)

ECF (1)

EDTX (1)

Electrolux (1)

en banc (1)

epicRealm (2)

Eric Albritton (4)

Erich Spangenberg (14)

ESN (3)

Eurotroll (2)

Evil Pete (1)

examiner overload (1)

F_G Research (1)

Facebook (2)

Federal Circuit (5)

Fenner Investment (1)

Financial Systems Innovation (2)

Fish_Richardson (16)

Fluid Dynamics (1)

Ford (1)

Forgent (1)

Fortune 100 (4)

FotoMedia (1)

FRCP 1 (1)

Freedom Wireless (1)

Lake City, Utah) is representing Zappos; and Niro Scavone appears for the 70-year-old woman in the wheelchair, the 80-year old destitute inventor, and some company run by Anthony O. Brown that must be proud to be sharing all that licensing revenue with these inventors. They must be getting as much as the Niro firm's contingency, right?

On an unrelated note, LexisNexis now has a Patent Law Center, and they named this blog one of their "Top Blogs," along with 7 others. That Top Blogs list also led me to two great foreign blogs I have now added to my blogroll: IP Dragon out of China, and IP Kat out of the UK. Thanks for the honor, LexisNexis.

TT

(By the way, this entire post was due to a reader tip. My email inbox exploded over the weekend with suggestions for new posts. I appreciate the input. I actually had all my posts prepared for the week, and had to shift things around.)

Posted by Troll Tracker at 12:07 AM    3 comments
Labels: Boca Resort, Global Patent Holdings, Niro Scavone, Parsons Behle, Venable, Zappos

MONDAY, FEBRUARY 18, 2008

## Saffran Final Judgment Upped to $501 Million Against Boston Scientific

Judge Ward awarded $69 Million in pre-judgment interest, and entered final judgment in the amount of $501,261,011. You can download the final judgment here.

Posted by Troll Tracker at 12:13 AM    0 comments
Labels: Boston Scientific, Judge Ward, Saffran

FRIDAY, FEBRUARY 15, 2008

## Business Method Patents To Face Scrutiny By En Banc Federal Circuit

Dennis Crouch has an excellent summary of the Federal Circuit's en banc order today, revisiting whether business method claims are patentable and whether State Street Bank should be overruled. Dennis lists the en banc questions and claim 1 of the Bilski patent here.

In addition to Dennis's excellent summary and questions to ponder, I also invite potential amici to recall the Supreme Court's handling of *Laboratory Corp. of America v. Metabolite Labs* (2006). On that

Friedman Suder (4)

Function Media (2)

GE Healthcare (1)

Gellman (2)

Gemini IP (1)

General Patent Corp (3)

Global Commns (1)

Global Patent Holdings (16)

GM (1)

Google (11)

GPNE (1)

Guardian Media (1)

haiku (3)

Hal Wegner (3)

Harthcock (2)

Hennigan Bennett (3)

Hospital Systems (1)

HP (2)

Hugh Hefner (1)

Hybrid (2)

Hypercom (1)

IBM (2)

Illinois Computer Research (6)

indirect infringement (1)

injunctions (1)

Innovative Patented Technology (4)

Inpro (2)

Intellectual Ventures (7)

International Intellectual Mgmt (1)

International Printer (1)

IP business models (1)

IP Innovation (5)

IPCom (1)

iPhone (1)

J. Carl Cooper (2)

James Parker (10)

appeal from the Federal Circuit, the Supreme Court first granted certiorari, on the following question:

> Is it permissible to patent a correlational relationship in a medical test result, such that a doctor necessarily infringes on the patent simply by thinking about the relationship after looking at the test result?

However, before a decision could be issued, the Court DIG'd the case (dismissed it as improvidently granted). There was surmise, at the time, that the Court felt comfortable raising the 35 USC 101 issue when the Federal Circuit had not even considered the issue in its opinion. It was the wrong vehicle.

Justices Stevens, Breyer and Souter dissented from the decision to DIG the case. In their opinion, written by Justice Breyer, the 3 justices queried whether claim 13 of that patent could really be patentable. Claim 13 was:

> A method for detecting a deficiency of cobalamin or folate in warm-blooded animals comprising the steps of:
> assaying a body fluid for an elevated level of total homocysteine; and
> correlating an elevated level of total homocysteine in said body fluid with a deficiency of cobalamin or folate.

On page 13 of the dissent, the 3 justices pointed out that *State Street Bank* might be inconsistent with prior cases of the Supreme Court, citing the 1854 Supreme Court decision in *O'Reilly v. Morse*. The 3 justices concluded that the correlation of claim 13 was an "unpatentable natural phenomenon."

Now, we really will have the Federal Circuit focusing on business method patents, fair and square. And you can be certain that this patent-happy Supreme Court, fresh off of decisions in *eBay*, *Medimmune* and *KSR*, will itself be taking up 35 USC 101 in the 2008-2009 term.

Party briefs are due March 6. Amicus briefs (for whatever position) are due 30 days later. Oral arguments to take place May 8, 2008 in Washington, D.C. Expect a Federal Circuit en banc opinion sometime in the late Summer or Fall.

Note: any bets on the first blogger to declare that this en banc order is yet another reason for Congress to stop considering patent reform? My money is on Gary Odom.

Posted by Troll Tracker at 4:32 PM    3 comments

James Sokolove (1)

Jarg (1)

Jenner Block (2)

John Desmaris (1)

Johnny Ward (3)

Johnson_Johnson (1)

joint infringement (1)

Joseph Zito (2)

Judge Clark (6)

Judge Davis (3)

Judge Everingham (1)

Judge Folsom (3)

Judge Love (1)

Judge Moore (1)

Judge Ward (3)

jury verdict (10)

Katten Muchin (1)

Katz (5)

Kevin Zilka (1)

Keystone Autonics (1)

Klausner (1)

KSR (3)

Larry Flynt (1)

Larry Germer (1)

law firms (1)

LG (3)

LHConcepts (1)

Lin Packaging (1)

Linex (1)

linux (1)

Lonestar Inventions (2)

Lowe's (1)

LPL Licensing (1)

Lucent (1)

Lufkin (1)

magically changing docket dates (1)

Labels: business method patents, en banc, Federal Circuit, usefulness

## Friday Miscellany, 2/15/08

Here are seven random patent tidbits I have collected recently, thanks in large part to emailed tips.

1) There have already been as many patent lawsuits filed in the Eastern District of Texas in February than in all of January there. A busy month, indeed.

2) When Acacia (a California corporation) sued Apple (a California corporation) for the second time recently in the Southern District of Illinois, I asked out loud in one of my posts, why the SDIL? I think I may know the answer: because it's faster than Texas. *Document Generation v. Allmeds* got an 18-month time-to-trial already - June 2009. In Texas, that case would have been slated for trial probably six months later than that, at least. What remains to be seen is if it's a district that will transfer cases out, like WDWI.

3) I have heard from a couple of commenters on the blog plus a few emails that the Sorensen Research & Development patent expired on February 5, 2008, so this was the last gasp for filing infringement suits. At least two of the defendants have filed for re-exam at the USPTO. Most actions are being stayed pending re-exam.

4) In the Scott Harris/Illinois Computer Research/James Parker/Ray Niro v. Google/Fish & Richardson case in Chicago, things are starting to heat up again. Fish & Richardson has filed a motion for leave to file an amended complaint, adding six new defendants other than Scott Harris. They claim that each of the defendants has an interest in the outcome of the lawsuits involving Illinois Computer Research's patent bought from Scott Harris. Unfortunately, the proposed amended complaint was filed under seal. According to paragraph 6 of the complaint, each of the new entities "appears to be closely connected to and represented by the same law firm representing Mr. Harris and ICR, namely Niro, Scavone, Haller & Niro." Of course, the best things in life are always in the footnotes. And here is footnote 2:

> In moving to amend its Counterclaim and Third-Party Complaint, Fish & Richardson is obligated to advise the Court that this may not be the last proposed amendment to add parties that Fish & Richardson will file. Fish & Richardson currently believes that it has an adequate factual and legal basis to add the Niro firm as a party defendant to this lawsuit, based upon claims of aiding and abetting breaches of fiduciary and contractual duty. Many of the facts upon which those claims may be based are set forth in the

malpractice (1)

Marshall Credit (2)

Marshall Electronics (3)

Marshall Packaging (2)

Matt Powers (1)

McKesson (1)

McKool Smith (9)

MDL (4)

Media Technologies Licensing (1)

media troll-coverage (8)

Memory Control (1)

MercExchange (1)

Mershon (1)

MHL TEK (2)

Michael Smith (7)

Microsoft (9)

Minerva (7)

MIT (1)

Mobile Micromedia (2)

Mondis (2)

Monts_Ware (6)

motions_compel (1)

Motorola (3)

NDGA (1)

netPL (1)

Network Signatures (1)

New York Times (1)

NextCard (4)

Nintendo (1)

Niro Scavone (27)

Nokia (3)

non-EDTX rocket dockets (1)

Northeastern U (1)

Ocean Tomo (1)

once-company (1)

Online Res. (1)

open source (1)

proposed Amended Counterclaim and Third-Party Amended Complaint.

Recognizing the consequences and gravity of naming a professional law firm as a party to a lawsuit, however, particularly in a case in which they are counsel of record, at this time Fish & Richardson has not added the Niro firm as a party in its proposed Amended Counterclaim and Third-Party Complaint. Instead, before Fish & Richardson would ask for leave to do so, it would seek to complete at least the expedited discovery it requested of Mr. Harris in November 2007, and which remains outstanding, and to depose Mr. Harris and conduct a Rule 30(b) (6) deposition on issues relating to the Niro firm's activities. Given the time that will be required to complete that discovery and other outstanding issues, Fish & Richardson may later request the Court to extend the deadline for adding parties from March 31, 2008, to a date that allows the completion of at least the outstanding expedited discovery and the depositions identified above.

Joe Mullin, on his blog, has a L'Affaire Harris Timeline.

5) And now for something completely different: the Top Ten Search Terms of the Week to reach this website:

1. Saffran or Boston Scientific
2. Rembrandt
3. Scott Harris
4. IPcom Nokia
5. Erich Spangenberg
6. Minerva
7. Eric Albritton
8. Antor Media
9. Global Patent Holdings
10t. Wiav/Choongsoo Park
10t. Alexsam
10t. Altitude Capital
10t. Courtney Sherrer (why so many????)
23. When can you see Gemini constellation?
45. Who is Troll Tracker?

6) Traffic Information, LLC pulled an Antor Media (or is it a Fulbright?) last month. First it sued just 3 defendants; then in an amended complaint filed just after the original complaint, it added 9 more defendants, to make 12 total. In my monthly totals, I had only counted the first three defendants. I have now corrected the statistics on the original page, which you can see here. If anyone catches on to any other cases with amended complaints adding other

OPTi (3)
Orbitz (1)
Orion IP (12)
Otis Carroll (1)
PA Advisors (1)
Paice (1)
Paid Search Engine (1)
Palm (1)
Parallel Networks (1)
Parallel Processing (1)
Parsons Behle (1)
patent exhaustion (4)
Patent Hawk (4)
patent reform (36)
Patriot Scientific (1)
Paul Hickman (4)
Paul Ware (1)
Performance Pricing (1)
Peter Courture (1)
Peter Zura (2)
Philips (1)
Phoenix IP (3)
Phoenix Licensing (1)
PhoneTel (1)
Plutus IP (11)
Polaris IP (2)
Polymer Solvents (2)
Positive Techs (1)
Power Integrations (1)
Power Jamb (1)
Power-One (1)
Premier Intl (1)
private equity funded patent litigation (1)
privilege (2)
PSN Illinois (1)
QPSX (1)

defendants, feel free to clue me in.

7) Finally, in the Global Patent Holdings v. ADT case in Florida, there has been a motion to stay pending reexam filed 2/14 by HearUSA. It will be interesting to see how that develops. Do South Florida judges typically grant stays pending reexam?

TT

Posted by Troll Tracker at <u>10:08 AM</u>     <u>0 comments</u>
Labels: <u>Acacia</u>, <u>blogging</u>, <u>Document Generation Corp.</u>, <u>Fish_Richardson</u>, <u>Global Patent Holdings</u>, <u>Illinois Computer Research</u>, <u>Niro Scavone</u>, <u>Reexamination</u>, <u>Scott Harris</u>, <u>Sorensen</u>, <u>Traffic Information</u>, <u>venue</u>

**THURSDAY, FEBRUARY 14, 2008**

## Happy Valentine's Day

This being Valentine's Day, I thought I'd point out Michael Smith's humorous post about why some lawyers in Texas are hanging with Chad, while others <u>choose Love</u>.

This is a good patent to litigate with Judge Love on Valentine's Day:

<u>Quantum World</u> (1)

<u>RealNetworks</u> (1)

<u>Red Hat</u> (1)

<u>Reese</u> (1)

<u>Reexamination</u> (2)

<u>Refined Recommendation</u> (2)

<u>Reid</u> (1)

<u>Rembrandt</u> (10)

<u>Restricted Spending Solutions</u> (1)

<u>RIM</u> (2)

<u>Ron Laurie</u> (1)

<u>Rule 11</u> (2)

<u>Rusty Rose</u> (3)

<u>Rutan Tucker</u> (2)

<u>Saffran</u> (2)

<u>Sam Baxter</u> (2)

<u>Samsung</u> (2)

<u>Saxon Innovations</u> (3)

<u>Scott Harris</u> (16)

<u>Scott Lewis</u> (3)

<u>Screentone</u> (3)

<u>Seagate</u> (4)

<u>Sharp</u> (1)

<u>Silicon Valley</u> (2)

<u>silly patents</u> (2)

<u>Simon Passanante</u> (1)

<u>Sky Technologies</u> (2)

<u>Slashdot</u> (2)

<u>small inventors</u> (2)

<u>SMDK</u> (2)

<u>Software Rights Archive</u> (1)

<u>Sony</u> (1)

<u>Sorensen</u> (3)

<u>Source Inc.</u> (2)

<u>SP Technologies</u> (2)

<u>Sprint</u> (1)

<u>ST Sales Tech</u> (3)



[Candy box construction and method, Steven W. Stanton](#)

Posted by Troll Tracker at 12:01 AM     0 comments
Labels: Judge Love, silly patents

WEDNESDAY, FEBRUARY 13, 2008

## Taurus/Orion/Spangenberg Hold Off Ford in Madison; Blackboard-Desire2Learn Trial Begins in Lufkin

Dennis Crouch has an interesting post about the Erich Spangenberg dispute with car companies in Madison, Wisconsin. See his post here, complete with links to the decision of Judge Crabb, ruling that at this point, the court is not willing to pierce the corporate veil to hold that an agreement between Orion IP (a Spangenberg company) and defendants was binding on Orion IP's sister corporation, Taurus IP (a Spangenberg company). Now you see the marker, now you don't. Quite a shell game.

What also intrigued me about Dennis's post was the link to the 2007 Foley presentation on patent trolls. Thanks for the plug on page 10,

standing (1)
statistics (32)
Steve Jobs (1)
StorMedia (2)
stupid patent tricks (8)
Supreme Court (3)
Susman Godfrey (3)
Sutton (1)
T-List (1)
Taeus (1)
Target (2)
TechDirt (2)
Technology Licensing Corp. (1)
TechSearch (2)
Tessera (1)
Texas MP3 Technologies (1)
TGIP (5)
Thomas Harvey (1)
threatening emails (3)
Tillotsin (2)
Time Warner (1)
Tinkers_Chance (1)
Traffic Information (4)
Trent West (1)
Triton IP (2)
troll assessment (3)
Trontech (1)
Typhoon Touch (1)
UFOs (1)
US Navy (1)
usefulness (1)
Vdata (2)
Venable (1)
venue (35)
Verizon (2)
Verve (1)
Viacom (1)

Foley! What most intrigued me about the Foley presentation was its comment, on page 14, that Sharp is "the most sophisticated patent troll yet"). Wait a minute. This Sharp? This one? Maybe it's Sharp Technology Ventures. Still, a troll? Does anyone know what Foley is talking about?

In other news, Blackboard (a company headquartered in Washington, DC) and Desire2Learn (a Canadian company, from Ontario), are litigating U.S. Patent 6,988,138 ("Internet-Based Education Support System and Methods") in Lufkin, Texas. Jury selection was Monday in Judge Clark's courtroom.

Interestingly, Desire2Learn is blogging about the trial. Desire2Learn has already invalidated 35 out of the 44 claims of the '138 patent. I love how Desire2Learn refers to the inventors in quotes - "inventors." From Desire2Learn's blog, we learn that the Software Freedom Law Center filed an ex parte reexamination request, and Desire2Learn filed an inter partes reexamination request. Both were granted, and are continuing in parallel to the trial. We also learn that Judge Clark did not rule on any pending summary judgment motions, and decided to hold them for trial.

I absolutely love the transparency. I wish more companies - plaintiffs or defendants - would blog about their litigation like this. Other coverage on the trial: The NOSE; Desire2Blog; and The Kitchener, Ontario Record (which begins: "Everything Desire2Learn has built over the last nine years will soon be in the hands of 12 randomly selected people from an area where pro rodeo circuit stops outnumber sizeable software companies two to zero. Unlike barbecues, taco places, and Southern Baptist churches, the high-tech industry doesn't have much of a presence in Lufkin, Texas, where Blackboard Inc. has chosen to sue its Kitchener (Ontario)-based competitor for patent infringement. East Texas is, however, known for juries friendly to patent owners like Blackboard ....").

Barbecues, taco places, and Southern Baptist churches. That ought to get my random referrals from Google churning. Seriously, though - how long has it been since there has been a patent trial in Lufkin, Texas? Should be interesting to follow along the Desire2Learn blog.

Posted by Troll Tracker at 12:01 AM     9 comments
Labels: Blackboard, Dennis Crouch, Desire2Learn, Erich Spangenberg, Judge Clark, Sharp

T U E S D A Y ,   F E B R U A R Y   1 2 ,   2 0 0 8

## $432 Million Verdict in Marshall Texas Patent Case

Visto (1)

VTran (3)

Wal-Mart (1)

Ward_Olivo (5)

Warren Heit (1)

Wavport (1)

Web Telephony (1)

Weil Gotshal (3)

White_Case (1)

Wi-LAN (3)

WIAV (1)

willfulness (3)

Williams Kherkher (1)

Yahoo (2)

Zappos (3)

This one deserves its own post. See the verdict here, awarding nearly $432 Million as a reasonable royalty to a New Jersey doctor against Boston Scientific. My prior post is below.

Anyone know what percentage this is of the Boston Scientific accused product's sales? Email me.

Posted by Troll Tracker at 11:42 AM    7 comments
Labels: Boston Scientific,  jury verdict,  Saffran

## Saffran v. Boston Scientific

Dr. Bruce Saffran sued Boston Scientific Corp. in December 2005 on U.S. Patent 5,653,760 ("Method and Apparatus for Managing Macromolecular Distribution"). Dickstein Shapiro (DC) filed the complaint, along with Eric Albritton. Kenyon & Kenyon appeared for Boston Scientific, along with Melvin Wilcox and Melissa Smith. The plaintiff is a doctor from Princeton, New Jersey. The defendant is a company based in Massachusetts. The trial? Marshall.

Opening arguments and jury selection were last Monday, February 4. Eric Albritton did both for Dr. Saffran. Kenyon chose to use its own attorneys for opening and voir dire. Wonder if they pronounced it the right way - the Texas way (Vwahr Dye-er). Closing arguments were yesterday morning. Michael Smith said he will have the scoop when the jury reaches a verdict - but there is no word yet. When there is, I'll provide a link.

Posted by Troll Tracker at 12:11 AM    0 comments
Labels: EDTX,  Eric Albritton,  jury verdict

## Two New Blogs I'm Reading on Global IP

Well, these blogs aren't new, but they're new to me.

First, I am enjoying Spicy IP, a blog written by 9 contributers (including Duncan Bucknell, the clear non-Indian of the bunch but a well-known IP blogger). Spicy IP's goal is to "increase transparency in Indian intellectual property policy/institutions." The contributors have now posted over 350 posts on Indian IP issues. According to this post, India has had about 80 or so patent cases so far -- in its history. There were that many in the first ten days of 2008 in the US. But it's fair to say that Indian patent litigation is something that might be on our minds less than a decade from now. So no time like the present to start to learn the issues.

Second, Intellectual Asset Management Magazine (IAM) has a blog,

which doesn't appear to have any name - perhaps the IAM Magazine Blog? Joff Wild, the London-based editor, comments mainly on European patent issues like the Nokia-IP-Com case, but on other issues as well. While I'd like to see IAM put up some links on the side of its page to some of the blogs it cites (it is more like a magazine than a blog right now), it's a very interesting and timely read. For example, this recent post surmises that a proposed new pan-European patent court will adopt injunction rules that will be very bad for trolls.

Other interesting blogs are on the right side of my page. I'm sure I'm forgetting some others. Although I don't agree with IP attorney Brett Trout on some issues, he does have a pretty big list of patent blogs on his site. His blogroll seems focused on US patent issues - comprehensively, I might add. Perhaps he'll be interested in a global patent meme as well.

Posted by Troll Tracker at 12:07 AM      0 comments
Labels: blogging

**MONDAY, FEBRUARY 11, 2008**

## Acacia Sues Apple over iTunes ... In East St. Louis, Again

New Acacia subsidiary Restricted Spending Solutions, LLC sued Apple last Wednesday in East St. Louis, Illinois, in the Southern District of Illinois. Acacia sued Apple last November in the Southern District of Illinois over the iChat feature, as I reported here. Then Acacia sued 19 defendants in the medical field in East St. Louis in December. This caused me to puzzle why East St. Louis? So this is the third lawsuit filed by Acacia in the Southern District of Illinois in the last four months.

The latest Apple lawsuit asks the court to order Apple to contact each of its customers of iTunes, and destroy all existing copies of iTunes that uses the "iTunes Allowance component" featured on iTunes. The complaint alleges that:

> The iTunes Allowance feature is a component of iTunes which allows family members and friends to create an account for automatically transferring chosen dollar amounts via a credit card to a recipient's iTunes Store account for use by recipient in the iTunes Store.

In this case, Acacia alleges it owns the patent-in-suit, 7,143,064, titled "Controlled Entertainment Spending Account," as opposed to other cases where it is an exclusive licensee. Here's claim 1 of what I consider to be a business-method patent:

A computer-based method for allocating parental funds in preestablished accounts for use by children, comprising;

providing a bank or credit account containing parental funds for allocation to at least one child;

creating a secondary account file with an internet music file supplier accessible by a child for spending on internet music purchases; and

periodically transferring directly and automatically to said secondary account file from said bank or credit account an allowance payment for use by said child to purchase and transfer music files over the internet using a personal computer;

wherein said steps of creating a secondary account file and periodically transferring funds from said bank or credit account to said secondary account are performed using information supplied by said parent over the internet using a personal computer.

The priority date of the '064 patent is possibly April 16, 1996 (it is a continuation-in-part of a division of a continuation-in-part of an abandoned application). Pretty early if it is entitled to the earliest application, but either way definitely a headache for Apple on one of its top-selling services.

Posted by Troll Tracker at 6:32 AM    3 comments
Labels: Acacia, Apple, Restricted Spending Solutions, venue

FRIDAY, FEBRUARY 8, 2008

## Patent Litigation Statistics for January 2008

At long last, here are my January 2008 patent litigation statistics (updated 2/13/08 to account for 9 defendants added in an amended complaint). In total, PACER/ECF showed 230 patent cases filed in January 2008, compared to 210 in January 2007. This is a 10% year-to-year increase. PACER/ECF has a flaw in that it records what I have heard called "false positives." For example, when TiVo v. EchoStar came back from the Federal Circuit appeal, the Eastern District of Texas counted it as a new case, and it was counted as one of the February 2008 cases. I will not include it on my list. False positives were present in 2007 and they are present in 2008, so I still think there is a 10% year-to-year increase. But, in actuality, out of the 230 cases PACER/ECF counted, I think there were actually 202 new patent litigation cases filed in January 2008.

I have a tradition of tracking the top jurisdictions both by number of cases filed and by number of defendants. Here is my top 10 list for January 2008. Guess who's number 1?

1. Eastern District of Texas: 15 new cases filed, 116 defendants sued. (11 Marshall, 1 Texarkana, 3 Tyler)
2. Northern District of California: 15 cases, 26 defendants.
3. District of New Jersey: 11 cases, 20 defendants.
4. District of Delaware: 10 cases, 32 defendants.
5. Central District of California: 10 cases, 20 defendants.
6. Western District of Washington: 9 cases, 14 defendants.
7. Northern District of Illinois: 9 cases, 12 defendants.
8. Southern District of California: 8 cases, 12 defendants.
9. Southern District of New York: 6 cases, 16 defendants.
10. Southern District of Florida: 6 cases, 7 defendants.

So what's new about this month's top ten? For one, we welcome a few new districts: Western District of Washington, Southern District of California, and Southern District of Florida. What's not new? The fact that 1 out of every 4 defendants sued nationwide was sued in the Eastern District of Texas (116 out of 453).

Other districts with double-digit number of defendants: Eastern District of Michigan (11), Western District of Wisconsin (11), and Eastern District of Virginia (10). All in all, 52 out of the 94 judicial districts in the country had at least one patent case in January.

For the top ten, here's the percentage, in each district, of total civil cases that are patent infringement cases:

1. District of Delaware: 14%
2. Eastern District of Texas: 7%
3. Western District of Washington: 4%
4. Southern District of California: 3.5%
5. Northern District of California: 2%
6. District of New Jersey: 2%
7. Central District of California: 1%
8. Northern District of Illinois: 1%
9. Southern District of New York: 1%
10. Southern District of Florida: 1%

So I think that #3-#10 above are in the "noise" range. But it's pretty amazing about the Eastern District, and especially Delaware.

I also tracked cases by "categorization." My categories were as follows:

Patentee is company that makes products: 149 cases, 257 defendants (1.7 defendants per case)
University/research center: 0 cases
Patentee is individual inventor: 12 cases, 14 defendants (1.2 defendants per case)
Patentee is company that makes no products: 41 cases, 182 defendants (4.4 defendants per case)
That's interesting: "competitor" patent cases comprised 74% of all cases in January, but 57% of all defendants sued. "Non-competitor" patent cases were 26% of cases, and 43% of defendants sued.

I also looked at the breakdown between "competitor/university/research" (CUR) and "individual inventor/shell corporation/troll" (IST) cases for each of the top ten districts.

TXED: 27% CUR, 73% IST
CAND: 47% CUR, 53% IST
NJD: 91% CUR, 9% IST
DED: 90% CUR, 10% IST
CACD: 80% CUR, 20% IST
WAWD: 89% CUR, 11% IST
ILND: 56% CUR, 44% IST
CASD: 13% CUR, 87% IST
NYSD: 67% CUR, 33% IST
FLSD: 50% CUR, 50% IST

Well, this really comes as no surprise. Most of the non-practicing entities are flocking to Texas. A few in Northern California (although that's a little bit due to declaratory judgment cases like RealNetworks v. Burst.com). In case you are surprised about the Southern District of California, see #2 below.

To conclude, here are a dozen of the more interesting non-practicing entity cases from January 2008. My intent is to pick the 12 of each past month I found most interesting. That's completely subjective. Disclaimer: of course, the below list is not comprehensive of all such cases filed in January (I left at least 5 off this list, including cases I previously featured, like Alexsam and others), the below list is not in any particular order, and the fact that these cases are listed below does not mean I am criticizing or condoning any of these cases!

1) Power Jamb, LLC v. City of New York; New York City Fire Department; New York City Fire Academy; and 4 Fire Department leaders (New York, New York, January 17). Power Jamb is a shell for the inventor, Michael Bishop. He has asserted U.S. Patent 5,906,493, "Firefighter Training Door Device." His complaint alleges that he applied for the patnet in 1997, and the fire department

bought training devices from him. His patent issued in 1999, and continued to purchase until 2006, when the NYFD copied his device for its own. So I can understand the suit, if the allegations are true. I'm just trying to picture, suing the NYFD in New York. It doesn't look like Bishop has requested a jury trial. Good move.

2) Sorensen Research & Development Trust v. 13 defendants in 9 cases (7 in San Diego, California, and 2 in San Francisco, California, January 4-23). I have yet to feature SRDT, an entity asserting the patents invented by Jens Ole Sorensen relating to plastic injection molded parts. One of the more notable defendants was Motorola. Not sure why the surge of cases, though - there have already been 3 more in February. Last gasp to get retirement money?

3) Credit Card Fraud Control Corp. v. Full Spectrum Telecommunications; National A-1 Advertising; Network Telephone Services; SPG Solutions; Teligence; UTEL Networks (Marshall, Texas, January 7). This is Acacia, with another multi-defendant lawsuit, this time in Texas. See #5 here.

4) Global Patent Holdings v. Panthers BRHC d/b/a Boca Raton Resort & Club (West Palm Beach, Florida, January 8). I want to know the back story. Ray Niro, according to published interviews with him in legal magazines, has a home in the West Palm Beach area. Was he treated badly here? Why sue the local resort? The latest volley was an amended complaint, blaming the Boca Resort for Enron and the subprime mortgage crisis. Posts on this case: 4A; 4B; 4C.

5) Minerva Industries v. RIM, Apple, Motorola, and 30 other companies (Marshall, Texas, January 22). This one struck me because of the broadness of the issued claim and the breadth of the companies sued. Every smart phone sold in the country could possibly be implicated. And of all my stories in January, this one got the most widely disseminated. Well, all of the ones I started. Read the Minerva saga here: 5A; 5B. Our Patent Office is creating global chuckles. Read about it in Italian, Polish, German, Russian, French, Japanese, Dutch, or in English on any one of a number of websites.

6) Source, Inc. v. 38 defendants (Marshall, Texas, January 23). This one got my Bloated Case Award for the most number of defendants sued in one case during the month of January.

7) Innovative Patented Technology v. ICON Health & Fitness (West Palm Beach, Florida, January 24). I thought this case was interesting because it demonstrated that there's another connection between Niro Scavone and J. Beauregard Parker other than the Scott Harris connection. Parker's company sued on a patent not invented by Harris. My post on it was here.

8) VTran Media Technologies v. 11 defendants in 4 cases (Marshall, Texas; Huntsville, Alabama; Harrisburg, Pennsylvania; and Philadelphia, Pennsylvania, January 25-31). This one got my Most Likely To Be MDL'd Award for January.

9) SMDK Corp. v. Creative Labs, Audiovox, Coby Electronics, Creative Tech, Epson America, Seiko-Epson, Seiko Corp.; Phison Corp., TIC Computer; Thomson; and Vosonic Tech (Marshall, Texas, January 24). This one intrigued me because SmartDisk was an actual company, whose assets were sold to Mitsubishi. Everything but the patents, which remained with the owners, who decided to go into the lawsuit business. The prototypical once-company.

10) IP Innovation, LLC & Technology Licensing Corp. v. Mitsubishi Electric (Chicago, Illinois, January 17). This was J. Carl Cooper's 10th patent litigation (at least) involving the same patent. My feature on Cooper and his companies was here.

11) LivePerson, Inc. v. NextCard, LLC & Marshall Credit Strategies, LLC (Wilmington, Delaware, January 29) (D/J). Next Card and Marshall Credit Strategies are shells controlled by Edward "Rusty" Rose, a friend of President Bush. Evidently, they are running around accusing LivePerson's product of infringement, even though LivePerson isn't part of the suit filed by NextCard and MCS in Texas. This one looks like a likely candidate for transfer. For my earlier posts, see here: 11A; 11B.

12) Traffic Information LLC v. Alpine Electronics of America; Magellan Navigation; and Sanyo North American Corp. (Marshall, Texas, January 8). Another multi-defendant case for the shell of Portland patent attorneys looking to make some money. See #8 here. And what do you, know - they added nine defendants making this a 12-defendant case. A brief update here.

Anyway, that's what I found interesting. Hope you found this month's statistics useful. Let me know what else you might want to see out of this.

TT

Posted by Troll Tracker at 12:19 AM    2 comments
Labels: Acacia, Global Patent Holdings, Innovative Patented Technology, IP Innovation, Minerva, NextCard, Power Jamb, SMDK, Sorensen, Source Inc., statistics, Traffic Information, venue, VTran

THURSDAY, FEBRUARY 7, 2008

## Global Patent Holdings' Amended Complaint in Florida and Motion to Dismiss in Nevada

In the case in Florida against the Boca Resort, GPH amended its complaint to add the following two passages:

> The coinventors of the '341 patent were Anthony Rozmanith and Dr. Neil Berinson. Anthony Rozmanith is 80 years old; Dr. Berinson is now deceased but is survived by his 70-year-old widow; both live on Social Security payments and minimal royalties from their licenses. Mr. Rozmanith suffers from diabetes and had no taxable income at all in 2006. Dr. Berinson's widow, who suffers from neuropathy, colitis and arthritis of the hip and spine (as a result of which she is unable to walk without assistance), had a total of $18,100 in taxable income in 2006.

and

> Defendant Boca Resort is a Delaware corporation with principal offices at 501 East Camino Real, Boca Raton, Florida 33431. Its ultimate owner, The Blackstone Group LP, 345 Park Avenue, New York, N.Y. 10154, manages funds of hedge funds and real estate funds, among other activities. Blackstone owns more than 1,400 hotels having a reported value of $24.7 billion, for which it states that it provides in-house operating expertise in every facet of the business, particularly Internet-related functions. In addition to being a financial advisor to Enron, Blackstone has been the promoter of a number of collateralized debt obligations funds (CDO's) – the type of security which is at the heart of the subprime mortgage crisis. Blackstone Group has been reported by Forbes as having annual revenues of $8.7 billion on which it makes an annual profit of $2.3 billion. Its annual revenue from real estate such as Boca Resort has been reported as $1.22 billion.

What GPH's amended complaint doesn't allege is that the inventor's widow is getting any money at all from the ongoing litigation. Without that, the statements about her health are just irrelevant. Even if she is sharing in the litigation proceeds, her financial state and state of health are hardly complaint material. Further, how is Boca Resort's parents alleged participation in the Enron scandal and the subprime mortgage crisis relevant to a patent case?

If Vegas had a line on possible responses to this complaint, I'd place my money on Federal Rule of Civil Procedure 12(f):

> The court may strike from a pleading an insufficient defense or

any redundant, immaterial, impertinent, or scandalous matter.

A non-scandalous part of the amended complaint, which seems to at least facially address Boca Resort's motion to dismiss, is the description of how Boca Resort is a "joint infringer" because it controls and directs the performance of each of the method steps of claim 17:

> Boca Resort is a "joint infringer" of claim 17 of the '341 patent (a form of direct infringement) because Boca Resort, through its website (http://www.bocaresort.com/) controls and directs the performance of each of the method steps of claim 17 which are not performed by the Boca Resort website itself. Boca Resort's website includes Javascript programs and html directives, which are downloaded to the user's computer and are executed on that computer. Copies of these Javascript programs, html files and other website materials (computer programs) are stored on Boca Resort's servers, for downloading and use on user's computers. In order to control the execution of the programs which are executed on the user's computer, Boca Resort's website stores a set of computer programs which it then sends to the user's computer for execution by that computer. Since the programs which the user's computer eventually executes are all supplied to the user's computer by Boca Resort's own website, operating on Boca Resort's own server, Boca Resort controls and directs the operation of those programs on the user's computer. Nothing happens at the user's computer in connection with the method steps of claim 17 that is not a direct result of the execution of programs and website material supplied by Boca Resort's website.

I haven't considered this substantively, but it was an interesting strategy by Boca Resort to force GPH's hand so early in the litigation, and get the kind of detailed infringement contentions that one usually fights to get a plaintiff to give and usually doesn't get it until well into discovery.

In Nevada, on the other hand, Global Patent Holdings claims the court has no personal jurisdiction over it in the declaratory judgment action brought by Zappos. That's despite the fact it directed threat letters into Nevada at 3 Nevada corporations, and settled with 2 of them. I'm not sure *Red Wing Shoe* saves GPH or not. Part of GPH's theory is that the previous two licenses were issued by TechSearch, not GPH, and they are not the same company. But aren't they both shells of Anthony O. Brown? He claims GPH has no affiliation with TechSearch, so maybe there's more to that story? Zappos will respond later this month, and I'm sure will have an answer.

What about the fact that GPH has sued not only in Chicago, where it

is located, but also in West Palm Beach, Florida? Can a patent licensing entity sit in its offices, firing letters all over the country, suing wherever it feels like it, really not be subject to personal jurisdiction in the judicial districts where it sends its licensing demands? Well, hey, Lauren Gelman over at Stanford blurbed a case where a judge seemed to regrettingly say yes (link). Nice blurb, Lauren.

The key here for Zappos is going to be to establish that TechSearch, the shell company owned by Anthony O. Brown (see here) and GPH, the shell company owned by Anthony O. Brown (per Acacia), are the same for the purposes of examining whether it is "fair play and substantial justice" to make Brown's GPH stand trial in Nevada since the patents it now controls were licensed to Nevada companies, an act that would seem to meet the exception in *Red Wing Shoe*. The judge should look at analogous circumstances, such as the FTC's recent enforcement against Negotiated Data Solution, making it abide by commitments made by its predecessor-in-interest, who pledged $1,000 licenses to a standards body (interesting analysis here). If standards-body commitments run with the patent, then so should personal jurisdiction based on licensing revenue. In this case, it shouldn't matter, because Zappos might be able to pierce the corporate veil and argue that fairness should not allow Mr. Brown to play corporate shell games to avoid facing declaratory judgment lawsuits. But even if GPH was independently owned, I think there's a fairness argument that personal jurisdiction should run with the patent, and where it has previously been licensed and enforcement activity.

Or am I nuts for thinking that? No, wait, don't answer that.

Posted by Troll Tracker at 6:23 AM       7 comments
Labels: Boca Resort, Global Patent Holdings, Zappos

## Victory for Rembrandt

Rembrandt, a licensing entity that acquires patents and sues companies that make products, and that allegedly makes no products of its own, got $41M from a Marshall, Texas jury yesterday, according to Michael Smith's blog. Well, the verdict part was according to his blog, not the commentary on who is Rembrandt. What else does Rembrandt have in its attic? A whole lot more patent litigation, that's what. In Marshall, Texas. Also according to Smith: the jury did not find willfulness, and rejected Ciba's defenses of invalidity.

It will be interesting to see what happens with the motion for a permanent injunction.

Posted by Troll Tracker at 6:10 AM    0 comments
Labels: Ciba, jury verdict, Rembrandt

TUESDAY, FEBRUARY 5, 2008

## The Once-Company

I have used the expression "once-company" in some of my posts. Let me explain. Sometimes a company has a really great idea, builds products, hires people, files patent applications. Due to some factor -- maybe it's just the right product at the wrong time, maybe it's just poor sales and marketing -- the company doesn't make it. It goes out of business, shuts its doors, or sells its assets to the highest bidder.

Some of those times, the company says "ho, what do we have here, some patents?" Then they decide, "well, we couldn't make any money selling products to consumers, so let's make money the old-fashioned way: sue our competitors who are successful selling products to consumers." You know, because even though our business selling products covered by our patents was a complete and total failure, our competitors' success is entirely based on our patented technology.

That was a little tongue-in-cheek, but this accounts for a large chuck of the patent litigation I see. So now when you see the phrase "once-company," you know what I'm talking about. If you need an example, consider the case filed a couple of weeks ago, SMDK Corp. v. Creative Labs, and 10 other defendants. Even though SMDK is from Florida, and all of the defendants are either from California, New York, or overseas, the case was filed in Marshall, Texas, of course. SMDK used to be known as SmartDisk Corporation. SmartDisk actually had a pretty good product - not a complete failure. They sold all of their assets to a subsidiary of Mitsubishi last July. Why? According to the former company's explanation, financial losses and cash shortages made the business untenable. Oh, and their struggle to maintain market share due to "infringement of SmartDisk's intellectual property by unlicensed third parties." So they morphed from SMartDisK into SMDK, for the stated purpose of having the "company's primary business" be "generat[ing] income from its patent portfolio."

SmartDisk's chairman of the board was Addison M. Fischer, who is the head of Fischer International in Naples, Florida. Fisher is well-known in the computer security industry, having been a founder of VeriSign. SmartDisk was a spin-off from Fischer International. It is unknown but I suspect Fischer has some financial stake in SMDK (he had a nearly 40% stake in SmartDisk).

From the Smartdisk disclosure, we also learn that the company had asserted its patents before, against Archos. In that case, filed in the

Eastern District of Texas with Judge Ward (2:05-cv-101), the claims of
the two patents-in-suit (6,658,202 and 6,987,927) were construed on
November 28, 2006. Based on that Markman ruling, Archos moved for
summary judgment of noninfringement on each patent in April 2007.
But the case settled over the summer of 2007, before Judge Ward
ruled on the motions.

And that is the story of the once-company, SmartDisk of Florida, now
a shell whose purpose is to do nothing but sue others and get money.
And they hired good attorneys to do it: Ward & Olivo and McKool
Smith. There are plenty of other companies of similar ilk out there, in
various stages of unwinding. As I try to categorize cases as
either "competitor" or "shell corporation" patent lawsuits, the once-
company is the most difficult to pigeonhole.

Now, I know I'm going to get a bunch of email asking me why I hate
failed or failing companies, and how dare I suggest they don't have a
right to assert patents. To be clear: I have nothing wrong with a
patent-holder from asserting its/his/her patents. I certainly think a
failed or failing company has the right to do so (with qualifications I
need not get into here, such as the founders didn't hoard the IP and
hide it from the creditors to try to cash in on their own, etc.). I'm
only making this post to point out a category of patentee I see a lot,
and how hard it is to define this category of company.

That's it for me when I'm back with the January patent litigation
statistics on Friday. Unless, of course, any cases pop up this week
with scads of defendants or a request billions of dollars.

Posted by Troll Tracker at 12:02 AM    12 comments
Labels: McKool Smith, once-company, SMDK, Ward_Olivo

MONDAY, FEBRUARY 4, 2008

## Manic Monday

It's February now, and I'm working on the January patent litigation
statistics. So I won't have much to post this week. But over the
weekend I came up with a couple of posts, for today and tomorrow.

Before I get into things, I wanted to note that Michael Smith is
reporting that the Rembrandt v. CibaVision trial started in Marshall
last Thursday. Here is my earlier post on that trial.

(Michael Smith is also reporting that Lucent won a defense verdict
over Dell in a long-running patent dispute in Sherman. I hear this one
is noninfringement. If I am counting right, that's two big defense
verdicts for John Desmaris of Kirkland & Ellis in a little over six

months in the Eastern District. I noted the other one here).

This month, I'm working on a little different angle for patent litigation statistics. As I have said, I am no longer focusing primarily on the Eastern District of Texas. Sure, interesting cases are still being filed there, but I have started to notice cases being filed in places where you just don't hear about patent cases. I am still experimenting on different ways of presenting the data, and I'm still waiting on the returns from California and New York.

Meanwhile, here are a couple of my highlights for January:

Most Likely To Be MDL'd: VTran Media Technologies. After filing a lawsuit a few months ago in the Eastern District of Texas against Comcast, Charter, Time Warner and Verizon, VTran has been quiet. As I reported here (#118), VTran is asserting patents first involved in a divorce proceeding, and then sold in an Ocean Tomo auction. But last week, VTran went wild, filing three new lawsuits. The first was also in the Eastern District of Texas, against Cebridge Acquisition Corp. (d/b/a Suddenlink Communications, formerly known as Cox). Fair enough. But then VTran sued Bright House Networks, Knology Inc., and Mediacom Communications Corp. in Huntsville, in the Northern District of Alabama. The next day, VTran sued Atlantic Broadband Finance, Cablevision, and MetroCast Cablevision of New Hampshire in Harrisburg, in the Middle District of Pennsylvania. With four lawsuits in three judicial districts against eleven companies, I'd say it's time to whip out those MDL rules.

2/1 Late Morning Update: Make that five lawsuits in four judicial districts against fifteen companies. I missed one VTran filed in Philadelphia against Armstrong Utilities, Blue Ridge Communications, RCN Corp, and Service Electric Television.

Bloated Case Award: This award goes to Source Inc., who sued 38 defendants in one case in the Eastern District of Texas. You can see the list of the 38 defendants, including JP Morgan and US Bank, on this Affiliate Marketing blog. The patent-in-suit is RE36,116 (see it here, including in red the changes made in the reissue). The inventor listed is Patrick D. McCarthy of Louisville, Kentucky. Source, Inc. has a website touting its "LoyaltyShare" program. It looks like Source has a whole team -- in the Central District of California, mind you; it doesn't appear to be a pure patent troll. McCarthy doesn't appear to be listed among the executives. This blog not only has a link to the complaint, but has some reactions from those sued and asks some good questions.

More tomorrow.

Posted by Troll Tracker at 12:35 AM    0 comments
Labels: Ciba, Dell, John Desmaris, Lucent, MDL, Rembrandt, Source Inc., VTran

---

**T H U R S D A Y ,   J A N U A R Y   3 1 ,   2 0 0 8**

## Nokia Sued for 17.7 Billion USD By IP Licensing Shop

That got your attention, didn't it? Thanks to a reader tip, we get a story from Cellular News that German IP licensing company IPCom GmbH & Co., KG, asserting German patents obtained from Robert Bosch GmbH, sued Nokia for $17.7B USD ($12B Euros) at the end of December in Manheim. IPCom is 50% owned by a private equity fund, Fortress Investment Group of Frankfurt, who is funding the legal action, according to the report. Heise Online reports that IPCom is an "exploiter of patents." For those who were wondering, yes, there are US counterparts. I think they're buying cowboy hats as we speak in Pullach (near Munich).

Saturday update: Interesting post on the IPEG blog about the IP-Com/Nokia lawsuit.

Posted by Troll Tracker at 7:30 PM    4 comments
Labels: Eurotroll, IPCom, Nokia, private equity funded patent litigation

---

## Boca Resort Opens New Front in Assault on Global Patent Holdings' JPEG-on-a-Website Patent

Ray Niro emailed me yesterday, complaining about the personal attacks being made on him in Slashdot. There's a right to free speech, but there's also a line. I don't care if one's address is public information or not: don't publish someone else's personal information in a blog post or in comments. I have had plenty of home addresses available to me on the web - even Niro's - but legal or illegal, I thought it's plain wrong. I hope Slashdot can remove the entries telling people where he and his children live.

He also tells me he now definitely knows who I am. I'm waiting for confirmation, since he didn't tell me my name. Then we'll see. According to him, one of my "friends" turned me in for the cash. Thanks, whoever you are, if true.

Meanwhile, I might as well get rid of a couple of posts I have saved, and was planning to post next week, when I'm not going to be able to post for various reasons. You know, go out with a bang, so to speak!

Global Patent Holdings is facing several new attacks from parties it has sued on its JPEG-on-a-website patent. Boca Resort, the latest to be sued, has filed a motion to dismiss based on the theory that GPH has not and cannot prove direct infringement of its claim by any one entity, and under *BMC v. Paymentech*, the complaint requires dismissal. It's an interesting strategy, and one that nobody else in the GPH lawsuits has tried yet.

In the GPH v. CDW & Motorola case in the Northern District of Illinois, CDW has moved to stay the litigation pending the ex parte reexamination just filed on the '341 patent, which I discussed here. Click on the Global Patent Holdings label/tag below if you don't know what I'm talking about.

Finally, according to GPH's status report in the Green Bay Packers litigation, both Apple and Kraft have settled, choosing to pay far less than the cost of litigation. The rest of the defendants, including the Green Bay Packers, will continue to fight. Global Patent Holdings has asked for a fact discovery period of 3 months, ending May 1, followed by expert reports on May 15 and June 1, and trial in August 2008. They claim that there is no requirement for a Markman hearing, and that "the reexamination has effectively decided the issues of validity and claim construction." Defendants would like more time, of course.

So when's someone going to refer this case to MDL? Or do we really want three judges making Markman rulings at the same time?

Posted by Troll Tracker at 10:05 AM     8 comments
Labels: anonymity, blogging, Boca Resort, Global Patent Holdings, indirect infringement

WEDNESDAY, JANUARY 30, 2008

## Hola

I have been counting visitors now for a little over 6 months. This morning, around 5am Eastern, visitor #100,000 came to the blog, from Mendoza, Argentina, through this link (hey, Digg in Spanish). Muchas gracias!

Posted by Troll Tracker at 10:23 AM     30 comments
Labels: blogging

## Patent Cases and Multi-District Litigation

Today at 9:30 am in Phoenix, Arizona, the Judicial Panel on Multidistrict Litigation will meet to select new cases for MDL treatment. The fact that they are holding the hearing at the site of

the Super Bowl, so close to the big game, has to be coincidental, right? Ever try getting a hotel in a Super Bowl city so close to the game? Not easy.

All patent litigators need to learn the MDL rules and JPML procedure. Why? Because after patent reform, patentees will be litigating their multi-defendant cases in multiple venues. Congress already anticipated how to manage these types of cases. Let's take a look at 28 USC 1407:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: Provided, however, That the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded.

That's just legal-talk for this: if a patent is being litigated in a multiple of districts, it's a candidate for MDL treatment.

Now, why should the contingency bar learn to love the JPML? It's simple: the JPML can transfer patent cases *anywhere*. So, after patent reform, a patentee like Minerva can sue 33 companies in 6 fora (they'll have to sue somewhere that actually makes sense), then ask the JPML to send the case somewhere where there is a judge with good patent experience and plenty of time and willingness to handle complex patent litigation. And where better for that than the Eastern District of Texas?

Yes, patent reform may end the prospect of having *trials* in Marshall when it doesn't make sense to do so, but that won't stop plenty of patent cases being referred there by the JPML for pretrial. Of course, defendants will argue for keeping the case at least in a court that will eventually see the case for trial, so there are more battles ahead. Pracitioners should learn these rules!

There are already a few existing MDL patent cases: the ones involving Katz, Rembrandt, and Acacia's streaming media patent. Currently, the many Katz cases are consolidated in Los Angeles with Judge R. Gary

Klausner, who had heard a Katz case or two in the past. The Rembrandt cases are consolidated with Judge Gregory Sleet in Delaware. Again, he's the trial judge for at least some of the numerous cases. Finally, the Acacia cases are consolidated with Judge James Ware of San Jose, California, who already has construed many (if not all) claim terms.

There are currently two patent cases being considered for MDL treatment. Today, the JPML will discuss MDL No. 1910 -- *In Re Phoenix Licensing, LLC Patent Litigation*. State Farm, USAA, and others filed a declaratory judgment complaint against Phoenix Licensing, LLC and LPL Licensing (represented by Dovel & Luner) in July 2007. In August 2007, Phoenix and LPL sued Chase Manhattan, JP Morgan Chase, etc., etc., etc., in a massive 23-defendant litigation in Marshall, Texas. Discover Products filed a DJ in Chicago in October 2007, and Citicorp Credit Services filed a DJ in Delaware in October 2007.

Who are Phoenix Licensing and LPL Licensing? I posted about them back in September here - see #101. Richard Libman is the manager (and maybe sole member) of Phoenix Licensing, according to Arizona corporate records available here (hopefully). He also is the manager of LPL Licensing (here). The patents involved in the MDL are 5,987,434 ("Apparatus and Method for Transacting Marketing and Sales of Financial Products"), 6,076,072 ("Method and Apparatus for Preparing Client Communications Involving Financial Products and Services"), and 6,999,938 ("Automated Reply Generation Direct Marketing System"). Yes, I'm sure that Chase and JP Morgan didn't do any sales or marketing before Libman showed them how it's done. Then again, Sterne Kessler did have Libman write an article on business method patents in the financial services industry. The article says he "is a recognized leader, innovator and important influence in the area of financial product marketing." So it must be true.

In addition, the defendants sued by Acacia subsidiary Screentone Systems are seeking MDL treatment in MDL No. 1926 - *In Re Halftone Color Separations ('809) Patent Litigation*. I'm not sure this one will succeed. Under current venue rules, Screentone probably had proper venue in the Eastern District of Texas when they sued all the defendants. However, according to the defendants, Acacia/Screentone may not have had proper standing at the time of filing. If that's true, then the first-filed cases would be the 4 declaratory judgment cases filed by defendants in the Western District of Washington, Central District of California, and District of Delaware. I can see MDL treatment being proper under the new venue rules, and can see it when the actual first-to-file cases are in different districts, so maybe this will work. But I also understand the counter-argument: defendants should not be able to split up and file DJs to manufacture MDL jurisdiction. Right now, the JPML meets

every other month, so the Acacia Screentone MDL probably will be considered at their hearing at the end of March.

For those who think that the JPML being overrun with cases is not going to happen, look at all of the products liability cases that are given MDL treatment. It works, and there's no reason to think it won't work in the patent context, too. The real battle will be over where to refer the case. Much more information on the JPML website for those who want to get a head start.

On another note, Michael Martin has a post on the pending patent reform in the Senate. He explains why the proposed reforms could help solve the problem of patent thickets. He even backs off his earlier conclusion that damages apportionment may be disastrous for the emerging market for ideas. It's an intelligent post, and I encourage everyone to read it. If the Patent Prospector blog is posting that the pending reform isn't far from being fair, then perhaps it's going to happen, after all. This is consistent with what I'm reading: that patent reform is in "the final stretch."

Posted by Troll Tracker at 12:09 AM     7 comments

Labels: Acacia, Katz, MDL, patent reform, Phoenix Licensing, Rembrandt, Screentone, venue

---

**TUESDAY, JANUARY 29, 2008**

## I'm Being Hacked

Several email alerts from Blogger this morning, warning me that people are trying to figure out my password and log into my account. Blogger is not the paradigm of security, so who knows how much time I have left. Even though my password was already strong, to be safe, I changed it to something even stronger. There are 62 upper-case-letter, lower-case-letter, and number choices for each slot, so an 8-character password has, I think, 220,000,000,000,000 different combinations. That's 220 trillion. Good luck. And that's if I limited my password to 8 characters or less.

Meanwhile, hacking is a crime. Can anyone tell me whether there are civil or criminal penalties for inducing others to hack?

On a happier note, thanks for all the email. I won't be able to respond to it all, or even look at it closely until the weekend.

Posted by Troll Tracker at 11:22 AM     27 comments

Labels: blogging

---

## Innovative Patented Technology Asserts Patent

## Not Invented By Scott Harris

I reported here that Innovative Patented Technology LLC, a James Beauregard Parker company, existed solely to assert the patents invented by former Fish & Richardson partner Scott Harris. So imagine my surprise when last Thursday, Innovative Patented Technology, represented by Niro Scavone, sued ICON Health & Fitness on a patent invented by Gary J. Colassi, a different Niro Scavone client. Correction: Innovative Patented Technology exists solely to assert patents it didn't invent, just like many others are doing. Hey - it's the American way. (Yeah, let's not "cause harm to the current regime" and "destabilize" this wonderful system of ours).

Colassi, from Norton, Massachusetts, owns the World Gym in Foxborough, home of the New England Patriots. According to the Boston Globe, he sued Cybex International in 2002 on a "Treadmill Belt Support Deck." Three years later, Colassi's lawyers at Niro Scavone won a $2.5 million jury verdict for him ($2.63M including interest). Judge Rya Zobel (D. Mass.) granted a permanent injunction in favor of Colassi. That verdict was affirmed on appeal on February 14, 2007. The Federal Circuit issued its mandate on March 30, 2007.

Curiously, despite this tremendous victory, Colassi wasted no time getting rid of his patent. Before the Federal Circuit even officially affirmed the district court, Colassi assigned the patent (which had been 6,123,646, but reissued in 2006 as RE39,180). Innovative Patented Technology became the owner of the '180 reissue patent as of February 28, 2007. That's now two Niro Scavone clients who "found" James B. Parker to continue to assert their patents.

While the Colassi v. Cybex lawsuit was filed in Boston, and went through an extensive Markman hearing and ruling with Judge Zobel there, along with extensive motion practice, a jury trial, and post trial motions, Innovative Patented Technology sued ICON, a Delaware corporation with Utah headquarters, in West Palm Beach, Florida. That's near where Parker lives, but otherwise has no connection to the case.

Why would Gary Colassi, fresh off a $2.6M verdict and permanent injunction, affirmed on appeal, then sell his patents to another Niro client, James Parker? Could it be that Parker is funding the expenses for the probably contingency-fee lawsuit and Colassi gets a cut? For Colassi's sake, I hope so. But it's an interesting strategy, with these Scott Harris and now Gary Colassi cases coming to Parker and then being filed in South Florida. I don't pretend to understand it yet, but there's something about this strategy that just cries for investigation by a real journalist.

Posted by Troll Tracker at 5:27 AM    3 comments
Labels: Innovative Patented Technology, James Parker, Niro Scavone,
venue

**MONDAY, JANUARY 28, 2008**

## Welcome

Welcome to all the new visitors to my site. Evidently, I was
TechDirt'd, Slashdotted, and featured as the ABA Blawg of the Week
all at the same time. Pretty cool.

Posted by Troll Tracker at 8:52 PM    8 comments
Labels: blogging, Slashdot, TechDirt

## Global Patent Holdings' JPEG Patent: Back to Reexamination

An anonymous third-party requester,* represented by attorney Vernon
Francissen of Chicago (Ray Niro's next-door neighbor!), has filed a
request for ex parte reexamination of the just-reexamined claim 17 of
Global Patent Holdings' U.S. Patent 5,253,341, the JPEG-on-a-website
patent. You can download the request, look at it yourself, copy it as
an exhibit for your answer and/or other pleadings, here (very big file,
please be patient while it loads). The request suggests 19 new
substantial questions of patentability, 3 involving anticipation and 16
involving obviousness.

Of course, the best part of the reexamination request is the citation
of this blog! See Request at 15-16 & nn. 22-24. Now, this isn't the holy
grail of legal journalism, an acknowledgement from Linda Greenhouse
or Nina Totenberg (like that's going to happen), but this may be even
better. I actually haven't reviewed the entire 61-page request that
closely yet, but wanted to get the news before you read a puff piece
about it in the Chicago Tribune or ABA Journal. I can see the Trib's
headline now: "Pesky Serial Infringers Dare to Challenge The Great
and Almighty Niro in What Surely Will Be Futile Act of Desperation."
Or, you can read the real news here (click on this link for all of my
posts tagged "Global Patent Holdings" - especially good for those just
tuning in who have no idea what I'm talking about - it's a patent,
being asserted against the use of compressed data like a JPEG, on a
website).

Now, who IS Global Patent Holdings? Simply put, it's what TechSearch
became after it sold most of its assets to Acacia. TechSearch/GPH is
Anthony O. Brown. And who is Mr. Brown? A lawyer, for one.
According to this DePaul Law School publication (see page 22), Mr.
Brown has a law degree from Case Western Reserve in Cleveland, and

was an attorney-advisor with the SEC in Washington. Then he became a partner at Jenner & Block in Chicago. Brown made a $24 million deal with Acacia in January 2005, obtaining $5 million in cash, $17 million in Acacia stock, and a $2 million guarantee for two years of consulting. Here's a March 2001 Wall Street Journal article about TechSearch, quoting Brown and his attorney, Ray Niro.

More to come, I'm sure.

TT

* It wasn't me, I swear.

Posted by Troll Tracker at 12:08 AM     5 comments
Labels: Anthony O. Brown, Global Patent Holdings, Reexamination

## Alexander Poltorak: Check Your Facts

Alexander Poltorak is CEO of General Patent Corp., an IP licensing shop I featured some time ago, nicknaming them "Acacia of the East" (watch out for falling houses). Poltorak has an editorial in the Christian Science Monitor today where he decries the impending patent reform that the Senate will soon take up. He claims, without citation, that

> just a handful of high-tech giants -- Microsoft, Intel, Cisco, Oracle, and Dell -- support the proposed reforms. Small high-tech companies -- the true innovators of this industry -- overwhelmingly reject them as do innovators from other industries.

Ignoring for now the false and unfounded claim that these companies are not "true innovators," his premise that these five companies are the entire support for the patent reform bill is absolutely not true, and Polotrak should open his eyes and learn the truth. Just last week, over 150 companies and organizations sent a letter in support of patent reform to the Senate leadership, urging passage of S.1145. Those letter-signers included more than just the 5 high-tech "giants" that Polotrak alleges constitute the entire support for patent reform. See for yourself here.

Supporters include members of the financial services industry, like Capital One, Citigroup, and Fidelity Investments, members of the energy industry, like Chevron, venture capital firms like Sternhill Partners, other industries, such as the American Corn Growers Association, plenty of Chambers of Commerce, representing small businesses of America, and even some of the "small" high-tech

companies Polotrak claims to unanimously oppose patent reform
(e.g., Netflix). No, despite what some people claim, the support for
the first meaningful reform to our patent laws in 50 years is far
but "narrow."

I also take issue with Polotrak's unsupported claim that

> the proposed changes in US patent law will make it easier for
> offshore copycats to bring their pirated goods into the US with
> impunity. More jobs will be lost as a result, with devastating
> consequences for American competitiveness in the global
> economy.

Sorry, I just don't buy the argument that damages apportionment and
venue reform will be a devastating blow to American competitiveness
in the global economy. Where's the economic support for that?
Further, damages reform and venue reform do NOT affect the ITC's
jurisdiction and the ability to get exclusion orders there
against "offshore copycats." The real opposition from the General
Patent Corporations of the country is the fear that a patent will no
longer be a lottery ticket, a spin on the wheel of fortune. And I'm sure
we will hear an ever-louder parade of horribles from this crew as the
Senate approaches its vote.

(Note: I realize the biotech industry has a different angle, and their
own reasons for opposition. My comments above were aimed at the
patent licensing industry's organized opposition, not the biotech
opposition. That's for another day).

Posted by Troll Tracker at 12:01 AM     16 comments
Labels: General Patent Corp, patent reform

FRIDAY, JANUARY 25, 2008

## Robert Dorf and Alexsam

Alexsam first came onto my radar in July 2007, when it sued Evolution
Benefits & Humana in Marshall, Texas on an electronic gift card
patent, 6,000,608. Alexsam is represented by McClanahan & Clearman
in that case, which has just had its initial status conference, and
discovery is just beginning. In September, Alexsam filed a second
lawsuit, this time against IDT Corporation. The '608 patent was also
asserted, but so was U.S. Patent 6,189,787. Same lawyers. Pleadings
completed in December; still waiting on a scheduling conference.

Let's see, July, September, ... November! Yep, in November, Alexsam
filed a third lawsuit, against Unitedhealth Group, Exante Bank, and 2

related entities. Again, same lawyers, same 2 patents. This one's also in the pleading stage.

What's two months from November, you ask? Why, it's January. And right on schedule, Alexsam filed a fourth case on January 17 against Shell Oil Co., Pier 1 Imports, and Metromedia Steakhouses Company (Ponderosa and Bonanza), against using the same lawyers to assert the same '608 and '787 patents. All because the defendants sell gift cards that practice the invention of the patents, according to the complaints.

My first post on Alexsam explained that the company was set up in Texas as a shell for the inventor Robert Dorf, and that his wife also appeared to be an officer. An address in Sarasota, Florida was listed. In fact, Robert Dorf also has a non-functioning website, http://www.alexsam.net/.

Alexsam also sued once before: it filed a lawsuit in September 2003 in the Eastern District of Texas against Datastream Card Services, Globetel Communications Corp., Interactive Communications Int'l, Transcend LLC, MBC Direct LLC, ITC Financial Services, American Express, Galileo Processing, One Global Finance, Simon Property Group, FSV Payment Systems, NetSpend Corp., Next Estate Communications, Wildcard Systems, Qwest, and 3 other defendants (18 in total). The patents asserted were the '608 and '787 patents. McClanahan & Clearman of Houston took the lead. There was a claim construction hearing in May 2005, but as far as I know, it settled before any opinion was issued.

I did not notice any reexaminations on the '608 or '787 patents.

Now who is Robert Dorf? According to his LinkedIn profile, he operates this website relating to "GoPay." Note that the website is marked with the two patent numbers. That's all I could really find out about him. He either lives in Raleigh, NC, or Sarasota, FL, or both.

I don't think many people will find these cases that interesting. But I do think that a bunch of cases filed in the last half-year over these gift-card patents has propelled Alexsam towards the top of the lists of inventor-shell corporations that sue a lot. With that activity will come attention, and maybe a reexam, but who really knows? The priority dates for the patents are July 1997. Was the following representative independent claim really new and nonobvious in July 1997?

20. A loyalty card system, comprising:
a. at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking

Association for use in a banking network, said identification
number corresponding to the loyalty card system;
b. means for receiving loyalty data from an unmodified existing
standard retail point-of-sale device when said loyalty card is
swiped through the point-of-sale device, said loyalty data
comprising the unique identification number of the card and
purchase data; and
c. means for crediting an account corresponding to the loyalty
card with loyalty points based upon the purchase data.

So that's Robert Dorf and Alexsam: 5 lawsuits, 28 defendants, and
counting, on claims that seem kind-of-broad, to me. Who else has
electronic gift cards, prepaid phone cards or loyalty cards that might
be targeted?

TT

PS - Nice comments in the previous blog post. Thanks for both
viewpoints! I do think that if you file a lawsuit, you're a limited public
figure. What, it would be wrong for me to comment on something
that any person anywhere in the world could find with a few clicks on
the Internet? Anyway, thanks for keeping the commentary civil.

Posted by Troll Tracker at 12:08 AM      7 comments
Labels: Alexsam

THURSDAY, JANUARY 24, 2008

## J. Carl Cooper and Technology Licensing Corporation

What's a troll tracker to do? I have poor J. Carl Cooper's biography
already written, but there are so many other tempting stories. First,
there's this drivel, on how patent reform will ruin society and lead to
the crash of our economy, etc. I'll respond in a couple of weeks -
closer to the actual debate in the Senate. It sure got the cheering
section going, though. Second, there are 37-defendant cases being
filed in Texas left and right. Minerva on Tuesday; Source, Inc.
yesterday. So I'll add that one to the list. Third, I'm getting a ton of
email from people suggesting this story or that story - good leads,
most of them. So I now have a backlog of ideas to last me a while.

Without further adieu, on to J-Carl. I previously posted this feature on
a case Technology Licensing Corporation and IP Innovation, LLC filed
in the Eastern District of Texas against Red Hat and Novell. At the
time, I concluded, correctly, that Technology Licensing Corporation
was a shell corporation for the inventor, J. Carl Cooper. I didn't really
explore too much, though.

Now I have. In numerous court filings, Technology Licensing Corp. (not to be confused with the totally separate California patent licensing shop, Technology Licensing Company -- more on them another day) admits it is a shell for J. Carl Cooper. TLC first started working with TechSearch back in the day, and now Acacia since the big Acacia-TechSearch transaction.

Who is J. Carl Cooper, anyway? For one, he is a registered patent agent. He also sometimes testifies as an expert in patent litigation. He used to be affiliated with the Los Gatos, California company Pixel Instruments Corp., but now has moved to the Lake Tahoe area. Similarly, Technology Licensing, once located at the home offices of Pixel in Los Gatos, has moved to Carson City, Nevada.

This article on Ray Niro (titled, by someone else, "Meet the Original Patent Troll") states that Cooper came to Niro through an introduction made by Anthony O. Brown of TechSearch. The article claims that Niro has netted over $50 million for Cooper.

According to this cached page from 3 years ago, Cooper was on the Board of Directors of TechSearch before it was vastly sold to Acacia. He had over 43 patents as of that time. Cooper's company submitted an amicus brief in the *eBay* case re injunctions. His attorneys explained that Cooper could not compete against foreign copyists, "and thus turned to licensing and patent enforcement instead of manufacturing." Cooper recently told the Wall Street Journal that the Supreme Court's decisions have made his enforcement program harder, due to the difficulty of getting injunctions.

Technology Licensing Corp. also has a website. On it, they explain that the amount of money they have made is actually $100 million. We also learn that they have a licensing manager in Pebble Beach, California - Warren E. Small. And now they have over 60 patents.

The reason the number jumped from 43 to 60 is that TLC is now not only licensing its own home-grown patents, but is in the business of buying patents of others and suing on those patents to make money. Given the number of lawsuits, the amount of money he has made, and this recent patent-buying-for-the-purpose-of-assertion binge, I'm hard-pressed to call J. Carl Cooper the typical "small inventor." The most recent case that got a ton of press was the case where Acacia and TLC went halvsies on patents from Xerox, and then sued Red Hat and Novell (after quickly getting a settlement from Apple), and then, Google.

So let's look at the litigation filed by Cooper and TLC. He started out on his own in 1997, suing Toshiba and Circuit City. In 1998, HP filed a

declaratory judgment action against him, and his attorneys were disqualified. That's when he first hooked up with the Niro Scavone law firm and Ray Niro. That second case involved U.S. Patent 5,424,780. Two ex parte reexaminations were filed on the '780 patent, and a reexam certificate issued in 2002.

In total, Cooper and TLC have filed at least 23 litigations against at least 44 defendants, and have obtained at least 34 settlements. They lost two cases. One involved a dismissal for lack of standing, which was affirmed on appeal. The other was a loss at a bench trial, where the district court found one patent invalid and the other not infringed. That particular case is on appeal to the Federal Circuit.

Niro Scavone has represented TLC and Cooper in about 12 of the 23 litigations, although there are a couple others recently filed in Texas where the firm may be behind the scenes but hasn't made an appearance. The three cases TLC filed in 2007, against Apple, Red Hat and Novell, and Google, all involved patents purchased from Xerox, and all three were filed in Marshall, Texas. The Apple case settled quickly, but the other two are still in the very early pleading stage.

The most recent litigation was just last Thursday, January 17, in the Northern District of Illinois. Acacia subsidiary IP Innovation & Cooper's Technology Licensing Corp., represented by Niro, sued Mitsubishi for infringement of the '780 patent, as well as U.S. Patents 6,529,637 and 6,870,964. Neither the '637 nor the '964 patents have been involved in any reexamination. The '964 is a continuation of the '637, which is a continuation-in-part of the '780. This is at least the tenth time the '780 patent family has been asserted in litigation by Cooper.

Other than the case up on appeal to the Federal Circuit and the 2 cases recently filed in Texas, the only other TLC case pending before last week was one brought by IP Innovation and TLC in Chicago in September 2005 against 9 defendants. The Fourth Amended Complaint in that litigation asserts 11 different patents, including the 3 asserted by IP Innovation and TLC in the Mitsubishi case (the 2005 case also includes co-plaintiffs New Medium/Acacia, and AV Technologies/Acacia. Evidently, each Acacia subsidiary teams with Cooper to assert different groups of patents).

So that's one story of the small American inventor at work, buying patents, forming shells, suing hundreds of companies. In both Cooper's case and the earlier story on Ware, they had patents that survived ex parte reexamination -- as many patents do. Nobody has tried to put Cooper's recent patents into inter partes reexamination. More likely, companies look at the vast portfolio, the number of patents asserted, the number of settlements, the high cost of patent litigation, and the chilling estoppel effect of inter partes reexamination (and recent

slowness of the PTO Board of Patent Appeals), and decide to do what dozens others have done: settle.

Posted by Troll Tracker at 12:02 AM    38 comments
Labels: Acacia, IP Innovation, J. Carl Cooper, Niro Scavone,
Technology Licensing Corp., TechSearch

T U E S D A Y ,   J A N U A R Y   2 2 ,   2 0 0 8

## Minerva Awarded Exclusive Right to Cellphones with Wireless Internet and Other Generic Features; Sues RIM, Apple, and Motorola

At 12:01 this morning, Minerva Industries (a Los Angeles patent holding corporation for Los Angeles inventor Ki Il Kim, represented by Los Angeles lawyers at Russ, August & Kabat, and who I featured previously), filed 3 lawsuits on recently issued U.S. Patent 7,321,783. The first lawsuit named Research In Motion and Cricket Communications as defendants. I saw this lawsuit appear on January 21, and had a post up about it, briefly. But Minerva caught its mistake, killed that lawsuit, and filed the new one. The now-dead lawsuit will appear on ECF, but clicking through will just generate a message that nothing's there. So problem solved, apparently (RIM still could have seen the mistake and filed a DJ on the East Coast to win the race to the courthouse -- a race that will almost completely be eliminated by patent reform. It would have been useless, though, given the earlier filed lawsuit by Minerva against 40+ defendants in Marshall, including RIM).

The second lawsuit was against Apple and AtlanticRT over the iPhone. From the Apple complaint, it appears that the Minerva patent was about to issue in August, Apple waited until a week before issuance, and then sent prior art to Minerva. Minerva pulled the patent from issuance, sent the art to the PTO, interviewed the examiner, and got the issuance over that prior art. Kudos to Connolly Bove Los Angeles for smart prosecution moves.

The third lawsuit names 29 defendants: Motorola, Nokia, Alltel, AT&T Mobility, Dobson Cellular, Helio, HP, MetroPCS Wireless, Sprint Spectrum, Nextel of Texas, Nextel South Corp., Nextel of New York, Nextel of the Mid-Atlantic, Nextel of California, Nextel West, T-Mobile USA, Tracfone Wireless, Cellco Partnership, Virgin Mobile USA, High Tech Computer Corp., HTC America, Kyocera Wireless, LG, Palm, Pantech Wireless, Sanyo, Utstarcom, Sony Ericsson, and Samsung.

That's a total of 33 defendants sued just minutes after this patent issued. And what a patent it is! The '783 patent has 125 claims. The broadest claim appears directed to a cellphone with a wireless

internet connection, a memory card, a microprocessor, a display panel for displaying internet data. So far, so broad. Also required are 1 of the following: voice dialing, wireless earphone, or wired earphone with microphone. OK, then also required are that the phone is capable from downloading one of the following from the internet: videos, music, or videos and music combined. The patent has a little over 4 columns in the specification, but has almost 32 columns of claims! Don't believe me? See for yourself.

Priority date: either March 2000 or, if CIP entitled to earlier priority date, then April 1997. I know of prior art predating the 2000 date, but what about April 1997? Does the original specification really support the claims? Is it enabling? I'll leave that to the experts.

Posted by Troll Tracker at 1:00 AM     19 comments

Labels: Apple, Minerva, Motorola, RIM

MONDAY, JANUARY 21, 2008

## Paul Ware and Acacia

OK, people. I'm not dead yet. To the small inventor commentor on the last post, did you even *read* what I wrote?

Since I have gotten so many emails and comments regarding how great the "small inventor" is and how these inventors are unfairly maligned, I thought I'd put the spotlight on a couple of prolific inventors. Well, prolific in the sense of number of defendants sued, anyway.

I'll start off today looking at Paul Ware.

Paul N. Ware (not to be confused with Goodwin Proctor lawyer Paul F. Ware) is a former airline pilot who owns a patent reported to be on "a system that eliminates the need to have a cardholder's name and account number printed on a receipt by numbering the credit card sales," a method that "is used by nearly every retailer in the country."

Ware's patent is U.S. Patent 4,707,592, titled "Personal Universal Identity Card System for Failsafe Interactive Financial Transactions." It was filed in October 1985 and issued in November 1987. In 2003, he granted an exclusive license to TechSearch, LLC -- the company that is now Global Patent Holdings. Later, Acacia acquired that license from TechSearch.

Ware has been featured in several news articles as the "face of the small inventor." See this Financial Post story from January 2006, reporting that how he knew the industry was practicing his invention

back in the late 80s, but waited until Acacia called him in 2004 before actively monitizing his invention. See similar insight from Mr. Ware here.

In May 2005 and September 2005, two ex-parte reexaminations on the '592 patent were filed. After interviews conducted by lawyers from the litigation firm Friedman, Suder & Cooke, and a response emphasizing the uniqueness of the transaction number, which was alleged to be new in 1985, the PTO issued a reexamination certificate last summer confirming all of the claims of the '592 patent.

Ware and Financial Systems Innovation, LLC (a subsidiary of Acacia, formerly a subsidiary of TechSearch, the company now known as Global Patent Holdings) have filed 10 patent litigations in the last four years, against 144 defendants. Friedman, Suder & Cooke is representing Ware and Acacia in all of the litigation, most of which are pending either in the Northern District of Georgia or Northern District of Texas. The big filing was one last June against 106 defendants, which I reported on here. While 3 of Ware's cases were settled, the rest were stayed pending the first reexamination. There are motions in each of those cases to lift the stay. Some are being granted, but in other cases, more trouble brews.

The reason is that in April and May of 2007, following the Supreme Court's decision in *KSR*, two other third party requesters submitted ex parte reexamination requests based on other prior art. The PTO granted the reexam requests in each case, and each case is now awaiting a first office action.

In fact, in the massive Ware/FSI/106-defendant case in Rome, Georgia, Judge Beverly Martin ordered the one case to be split into four parts and stayed pending this second reexamination. She really seemed to criticize Acacia's strategy of suing everyone in one case, and perhaps her ruling was a bit of a backlash. She wrote (on December 27, 2007):

> As the court advised plaintiffs' counsel at a hearing on December 17, 2007, the court finds itself utterly unable to manage this case as a single lawsuit. . . . Because of the enormity of the number of defendants accused of infringement in this action, and because each of those defendants will be entitled to be heard from in the claim construction process, this case is particularly appropriate for a stay pending the USPTO's determination as to whether any claims will be cancelled. Cancellation of even one claim could eliminate hundreds of pages of briefing on the subject by the numerous defendants sued in this action. . . . Mr. Ware has made the tactical choice to

sue over 100 defendants in this action, and did not file this
action until roughly six months ago. As a result of Mr. Ware's
decision in this regard, the court must necessarily look for ways
to manage this litigation, and waiting for the USPTO's
reevaluation of his patent seems an obvious solution.

So that's where Mr. Ware is today. Having allegedly discovered a great
way to combat credit card fraud in 1985, he waited 22 years to sue
the industry, and now is having his cases stayed pending
reexaminations going on at the PTO. Many defendants allege that his
patent should not have been issued at the time, and are thus refusing
to pay him. Others have settled. I don't know how much money he has
made over this idea, but I'm quite sure that without TechSearch and
Acacia, he would have made nothing. It's a win-win situation for Ware
and Acacia. He helps Acacia make money and thus satisfy its
shareholders; Acacia helps him get money from a patent he had left
for dead. It will be interesting to see what happens now.

Wednesday*, I'll look at an inventor with even more patents and more
lawsuits: J. Carl Cooper.

* It was "tomorrow," but I think that I'll spread my posts over two
weeks instead, as I need some time off from blogging. Unless
something surprising happens, of course.

Posted by Troll Tracker at 12:01 AM     10 comments

Labels: Acacia, Financial Systems Innovation, Friedman Suder, Paul
Ware, TechSearch

SATURDAY, JANUARY 19, 2008

## The Writing Process

When I started this blog, I just wanted to focus on the great many
patent cases being brought by companies that make no products, and
exist solely to license patents and monetize them. There was a
convenient term already out there -- I'm not Peter Detkin, so I didn't
coin it. So I used it: patent troll. I guess I didn't expect all the
kerfuffle that would cause among those who make a living monetizing
intellectual property. Even Ray Niro used the term in his chapter in
the book *Making Innovation Pay* - albeit while arguing that these so-
called patent trolls were beneficial to society. Right next to the
picture of him with his Ferrari near his Aspen home.

Anyway, over the last few months I have begun to transition out the
term. It doesn't add anything to the dialogue; in fact, it distracts from
the message I'm trying to get across. That message being that patents

are not being asserted like they were 20 years ago, that today's American small and large businesses have to navigate a minefield like never before. Whether the plaintiffs are well-deserving individual inventors, their shell corporations, or large licensing entities solely seeking to monetize patents, it adds up for the mom-and-pop businesses and the big corporations alike. All I want to do is highlight who is behind these cases, who is backing them financially, and where these cases are being litigated. And if we can have some fun along the way, and not take ourselves so seriously, all the better, right?

This whole "reward" business has obviously created a roadblock in my quest. Mr. Niro claims to be close - he may even know who I am already. So be it. This blog, or others like it, will continue whether I'm unmasked or not. In fact, I won't be surprised if others plan similar types of information-gathering services. For profit, of course. (I knew I should have patented this business method).

So I'll continue on for a while, see how it goes. But despite the fact that the vast majority of my readers when surveyed said they aren't offended by the term patent troll, I'm going to cut back on my use, if not stop using it altogether. You can make your own conclusions.

Many of you wrote in comments in the survey that you don't see how I get the time to write as much as I do. This post took 20 minutes, including writing and editing. There was no research involved. Most of my posts, including research, writing, and editing, take 30-45 minutes, and I do about 4 a week. I tend to think of my ideas for a post while exercising - and usually desperately scribbling notes when I'm done so I don't forget. Some posts (Fortune 100) take longer than others.

My estimate is that over the course of a year, I probably will have sacrificed 200 billable hours to this blog. Lucky for me, I'm a workaholic, so due to the massive hours I have put up in the past, nobody is going to miss those billable hours. I do much of my writing on the weekend.

For example, due to the fact I'm definitely crammed with work this week, I already wrote this week's posts. Unless something earth-shattering happens, this week I'm featuring a look back at entities I have featured in the past. On Monday, I have a dream that I'll feature Acacia, and their efforts to make all inventors equal. Well, I'll focus only on Paul Ware and J. Carl Cooper on Monday, but these are impressive inventors, and their litigation is no less impressive.

If any new cases are filed this week -- well, they'll have to wait until I extricate myself from this pile of paper.

Posted by Troll Tracker at 11:46 AM      18 comments
Labels: blogging

## Survey Results

View my survey results here. For those of you who just want the summary, read on and don't click through. Note that I couldn't enable the results with the "other" entries revealed, because a few of you provided personal information, such as phone numbers. It would have been a violation of those people's privacy to enable everyone to see, and there was no way for me to delete any entries. So, instead, below are some typical responses for each of the questions which allowed an "other" answer.

The results will remain available for the next week or so, after which the link will be inactive.

1. Are you offended, in general, by the term "patent troll?"
12% of you are offended.
88% are not.

2. To which of the following categories should the term patent troll apply?
88% of you said it should apply to "Corporations whose sole purpose is to obtain and assert patents, with little or no connection to the inventors."
73% of you said it should apply to "Venture capital or other financial firms who are acquiring IP as an investment to be capitalized through enforcement (e.g., Altitude Capital Partners)"
64% of you said it should apply to "Contingency fee lawyers who go around putting bounties on bloggers' heads"
58% of you said it should apply to "Shell corporations set up by the patent inventor, who have filed numerous lawsuits against dozens of companies"
51% of you said it should apply to "Corporations that make products, but are acquiring and asserting patents with no relationship to their products, as a revenue-generating business model"
The other choices got less than majority support.
41 of you indicated "other." Here are some of the more interesting ones:

--> anyone (including, if the shoe fits, individual inventors and/or university entities) engaged primarily in naked patent licensing without any attendant technology transfer; anyone whose business is inventing patents rather than patenting inventions (though perhaps the latter should be labeled troll facilitators)

-->One key feature of a patent troll is the inability of the defendant to assert any patents against patent counterclaims. Corporations that make products take a risk by suing, regardless of the relationship between the asserted patents and their products. Trolls take no risk, and that's what dictates their style of litigating akin to class action securities lawyers.

-->Patent attorneys who write up paper patents with themselves listed as the inventor or co-inventor.

-->Local and state government hiding behind 14th amendment

-->There is no such thing

3. If I decide to stop using the term "patent troll," which of the following choices is the best substitute?
66% of you implore me to keep using the term.
17% of you like "non-practicing entity"
Only 6% of you liked "patent speculator"
21 of you indicated "other." Here are some of the more interesting ones:

-->Patent Shark (I got a lot of these)

-->"PLEC" - Patent Licensing / Enforcement Company

-->patent enforcer

-->Patent [insert derogatory term here]

-->dirty rotten patent sharks (with hat tip to Monty Python episode on names for Belgians)

4. How do you feel about the mix of serious content and humorous content on the blog?
88% of you said "just right."
10% of you said "too serious."
2% of you are no fun whatsoever.

5. If you have any suggestions on how to improve/enhance the blog, please let me know here.
I got 48 comments, with a wide range. Here are some of the more interesting ones:

-->I got quite a few "don't change a thing" - thanks...

-->1. Hold a limerick or "actual rhyme" poetry contest--that would be

more fun than haiku. 2. Report more on the patent attorneys with the white hats who fight the big, bad trolls. 3. Solicit other attorneys over the Web to anonymously help you in various projects (e.g., compiling particular kinds of lawsuit statistics; researching and shedding light on the background of certain trolls) to save yourself time and increase effectiveness. 4. Provide an overview of the typical strategies of patent trolls both pre-lawsuit and after a lawsuit is filed. 5. Provide an overview of the typical order of events in a litigation in the various rocket docket jurisdictions (and explain how this differs from non-rocket dockets). [May be a good project to ask other litigators to contribute to, anonymously, one from each of the relevant jurisdictions.]

-->If you are getting too busy, consider accepting posts by guest commentators, sort of like this blog does: http://www.volokh.com/ (note - I'm considering it)

-->More JPEGs

-->add a forum for people to discuss the cases (note - anyone want to send me the "Dummies Guide" to adding a forum to your blog?)

-->I really enjoy reading your blog. I think you do a great job at uncovering a lot of shady lawsuits. However, sometimes I feel like you view anyone other than a large corporation as a patent troll. I know that you came up with metrics to classify level of troll (or non-troll) but the vibe is still there and I am glad that you have created this survey to (hopefully) remedy this problem. Individual inventors and bankrupt companies should be able to exercise their patent rights. They took a chance, disclosed their technology, and for one reason or another could not make it commercially successful. Those who are able to make the invention commercially successful should respect patent rights of others, as others should respect their patent rights.

-->Include nude pictures of the patent attornies involved. Seriously though - Check out Roughly Drafted. The writer uses some really nice graphics to make his points. (comment - no!!!)

-->Be more explicit in expressing the bases for your conclusions. You often assert premises to arguments that are assumed; if you are asserting a particular practice or tactic to be bad or unfair, explain why you think so, rather than simply saying that it is. For example, explain why it's such bad thing to sue multiple defendants if the claims asserted have merit.

-->I am offended by the constant mischaracterization of Acacia as a Patent Troll. Acacia has done an outstanding job of enforcing our patents as an exclusive licensee. We are a small company that could

not afford to enforce the patents directly. As is the case of many of
the patents that Acacia acts as exclusive licensee, ours are
encompassed in our technology and actively marketed by our
company. This hardly makes Acacia or our company a patent troll.
Boo hoo for the big companies that would otherwise infringe our
patents and would rather us be roadkill on their way to huge profits
and market domination. I think you should get your facts staright
before you start your mischaracterization campaign against Acacia or
its clients. I find your vetting of the facts to be fairly accurate,
however, this is poisoned by your bias. I do not accept that you would
like to see inventors or small companies abridged from enforcing their
patents to the benefit of large entities. Your blog is intelligent but
this bias toward large entities is illogical.

6. Choose the answer below that best describes you:
16% of you chose "associate at law firm"
14% of you chose "in-house counsel"
14% of you chose "partner at law firm"
10% of you chose "small business owner"
8% of you chose "inventor"
About 5% of you are at a law school (clearly, Dennis Crouch isn't
referring enough people to me)
About 3% of you are at the PTO/US Courts/other government

That's the people who answered. I got 25% "others," with some of the
interesting answers as follows:

-->I totally forgot about "consultants" - there were a few of you.

-->Journalists

-->Retired

-->Computer Scientist

-->Quite a few people identified themselves as "open source
advocates" and the like

7. Choose the answer below that you think best describes me:
29% of you think I'm an associate at a law firm.
21% of you think I'm a partner at a law firm.
13% of you think I'm an in-house counsel.
8% of you think I'm at a law school.
Only 1 of you thinks I'm an inventor.
37 of you chose "other," with some of the interesting answers as
follows:

-->You are a patent attorney that specializes in defending large

corporations that willfully infringe on the patents of small inventors.
You started troll tracker as a vehicle to pollute the jury poll against
your rivals and potential rivals :)

-->someone with courage and insight

-->I haven't a clue and I don't care. You perform a public service. Keep
it up.

-->Bored

-->I like this question. It gives a good picture of your motivation. Ego!

8. Where do you live?
23% of you live on the East Coast of the U.S.
21% of you live on the West Coast of the U.S.
14% of you live in the Midwest
10% of you live in Texas
10% of you live in Europe
5% of you live in Asia

9. Where do you think I live?
26% of you think I live on the East Coast of the U.S.
23% of you think I live in Texas
18% of you think I work at the Niro Scavone law firm or live on Planet
Niro
16% of you think I live on the West Coast of the U.S.
1 of you thinks I live in India!

10. What is your opinion on Global Patent Holdings' assertion of
claim 17 of the reexamined '341 patent against anyone with a
website with a JPEG image on it?
46% of you haven't reviewed the claim.
27% of you chose "the claim is invalid" (whether you reviewed the
claim before choosing that, I have no idea)
12% don't care, because it's my problem, not yours. Hey, thanks.

Here's a bonus: the top 10 search terms used to reach my blog in
the last week (not including troll tracker or something similar):
1. Wiav Solutions
2. Erich Spangenberg
3. Acacia
4. Mondis
5. Altitude Capital
6. Scott Harris
7. silly patents
8. contingency fee lawyers
9. Jerry Harthcock

10. Global Patent Holdings
53. "I need a good patent attorney for my ofdm wireless idea"
58. "Is there a law to stop patent infringement?"
87. "How to troll for fish"
98. "Reverse commode"
101. "When did Barack Obama work for White & Case?" (it was Sidley,
wasn't it?)
130. "Your ip address be gone, troll."

Thanks for all the feedback, everybody! I do appreciate it. I may
be "unmasked" soon, and I'm not sure if I'll keep the blog going after
that, or I might transform it into more of a community/collaboration.
But until then, other than some dark periods coming up where work
will make blogging just completely prohibitive, I'll be back with more
interesting news on patent litigation in general, and patent trolls,
shell corporations, individual inventors, greedy corporations, "serial
infringers" (as Patent Hawk and others call them), and everyone else.

Posted by Troll Tracker at 9:03 AM     6 comments
Labels: blogging

T H U R S D A Y ,   J A N U A R Y   1 7 ,   2 0 0 8

## A Note About Civility

It is absolutely unacceptable for people to post threats in the
comments. They will be deleted as soon as I see them. I was just
made aware of one such threat posted over a month ago, and was
appalled. I don't care if the threats are meant to be sympathetic
towards me, it will be deleted.

Also, please be aware that unless you are using a proxy server, I can
obtain the IP address of anyone who leaves a comment on this blog.

Posted by Troll Tracker at 7:06 PM     2 comments

W E D N E S D A Y ,   J A N U A R Y   1 6 ,   2 0 0 8

## Oral Argument in Quanta v. LG

The Supreme Court had oral argument this morning in Quanta v. LG,
the patent exhaustion case. Maureen Mahoney of Latham & Watkins
argued for Quanta. Thomas G. Hungar, Deputy Solicitor General, gave
the United States' views on behalf of Quanta. Carter G. Phillips of
Sidley & Austin argued for LG.

It's very hard to read Supreme Court tea leaves. In this case, though, I
think that Justices Roberts, Stevens, and especially Breyer honed in
on exactly the problem with the Federal Circuit's opinion in LG.

Justices Alito and Thomas were completely quiet. Justices Scalia, Kennedy, Ginsburg and Souter asked questions, but without really revealing which way they were leaning, although Justice Scalia did seem to discount that LG/Intel's notice meant anything, and Justice Ginsburg picked up on the fact that LG could have expressly conditioned its license requiring Intel to sell products only to licensed companies. So, on balance, I'd say the Court appears to be *leaning* towards overturning the Federal Circuit, but perhaps only slightly, and I certainly won't be surprised if it's a 5-4 or 6-3 decision the other way. And who knows what the scope of the opinion will be? Should be interesting.

That's just my opinion. You can form your own opinions by reading the oral argument transcripts, located here. Scroll to the end of this post if you want to see the links to news stories on the case. Meanwhile, these are a couple of highlights:

This is what Deputy SG Hungar was able to rattle off before he was interrupted by Justice Ginsburg:

> For 150 years this Court has held that an authorized sale removes the particular item sold from the protection of the patent laws. The [Federal Circuit] erroneously transformed that patent-exhaustion doctrine from a definitional principle that delimits the scope of the patent grant into an optional default assumption that can be discarded at the whim of the patentee. If the rationale of the court of appeals were correct, this Court's decisions in cases like Univis, Motion Picture Patents, Straus, Bauer and Boston Store would have to have gone the other way, because in each of those cases this Court held that the exhaustion principle overrode express restrictions that the patentee had attempted to impose on after-sale use or resale by an authorized purchaser.

> This Court should follow its precedents and reaffirm the principle that the patent-exhaustion doctrine precludes a patentee from employing the patent law to enforce post-sale restrictions on use or resale by authorized purchasers . . .

I also thought this exchange between Justice Breyer and Carter Phillips was the heart of why Justice Breyer will either write the majority opinion or a strongly worded dissent!

> JUSTICE BREYER: So what I do I go to the shop and I buy this, this mechanism with the pedals on it, and then I insert it in my bicycle. Now, actually I need help in doing that, but I do it. Okay. Now I start pedaling off, and now what is it for all these

things here that would stop that original inventor from catching me and hauling me into court, and say, what you've done, Breyer, is you've put my -- my mechanism here in this bicycle and I happen to have a patent on the system. And now you start talking to me about, well, the patent was exhausted on the bicycle -

MR. PHILLIPS: Pedal.

JUSTICE BREYER: -- pedals, but not on the system.

MR. PHILLIPS: Right.

JUSTICE BREYER: And you agree that shouldn't happen.

MR. PHILLIPS: Right.

JUSTICE BREYER: But if I follow you and I write an opinion just for you, what stops it from happening?

MR. PHILLIPS: Well, in that -- in that particular context, in the absence of relatively clear notice, I think it would be quite reasonable to potentially find that there was an implied license to use it under those circumstances.

JUSTICE BREYER: Then why isn't it in your case?

JUSTICE BREYER: Why doesn't it mean that? Why isn't it in your case equally?

MR. PHILLIPS: Because the courts below specifically analyzed whether there was -- JUSTICE BREYER: You mean that they just got it all wrong? You mean it should be that they got it wrong?

MR. PHILLIPS: No, no. They got it right because there was very specific and explicit notice provided to the purchaser at the time of the purchase that, while this clearly gives you the right to use this particular product, what it doesn't give you the right

JUSTICE BREYER: Oh, so if I go in the bicycle shop, I go in the bicycle shop and I buy the pedals and then they give me, you know, one of these pieces of paper that has all of the 42,000 words on it and there in these 42,000 words it says, and now you are put on notice that once you put it in your bicycle and you pedal away, they're going to get you and you're going to be hauled into Patent Court, then -- then that's okay?

MR. PHILLIPS: Well, Justice Breyer, we can quarrel about sort of the nature of the notice and what notice is adequate to do that, but the basic point here, which I think is indisputable, is that, one, the notice here is quite clear. It's one page. It's very specific. These are very sophisticated parties and they understood that they were not obtaining an implied license by purchasing the chips rather than going out and purchasing the systems.

JUSTICE SOUTER: Okay. But assuming a simple notice, the answer to his bicycle hypo is yes, they can chase me down the road.

MR. PHILLIPS: Oh, to be sure.

I just cannot imagine this court -- the court that issued *KSR* --

accepting a situation where bicycle manufacturers can chase bicycle users down the road. Again, maybe I'm wrong. Maybe they'll just count on the courts to invalidate "system" patents strongly based on "component" patents.

Later, Justice Breyer was back on his bicycle kick...

JUSTICE BREYER: Then explain -- now this you might know because it's just following up on what Justice Souter said better than I did. I think from these briefs I've gotten the impression that at least some people think that where you invent a component, say, like the bicycle pedals, and it really has only one use, which is to go into a bicycle, it's the easiest thing in the world to get a patent not just on that component but to also get a patent on the system, which is called handlebars, body, and pedals.

And since that's just a drafting question, all that we would do by finding in your favor is to destroy the exhaustion doctrine, because all that would happen, if it hasn't happened already, is these brilliant patent lawyers, and they don't even -- they can be great patent lawyers, not just fine lawyers, and just draft it the way I said and that's the end of the exhaustion doctrine. And that's why it is preferable to say it is exhausted. What is exhausted? One, the patent on this component and, two, the patent on any system involving this component where that system is the only reasonable use of the component, rather than using the terminology "implied license."

Now, I think that's an argument that's being made in some of these briefs, and if so I'd like to you reply.

MR. PHILLIPS: Well, I think that clearly understates the role of the PTO in granting a separate patent. I mean, this is not -- these are not things you pick up at the corner drugstore. You have to justify them. And if you look at Section 282, "a patent shall be presumed valid," each claim shall be presumed valid independently of the validity of other claims. And there's an independence that's embedded in this entire scheme. If it's true that the PTO has in fact granted patent rights on something that's fundamentally not different from the other -- from some other patent, the solution to that is a validity challenge. And candidly, I think that's exactly what all of those arguments are

CHIEF JUSTICE ROBERTS: Well, then -

MR. PHILLIPS: -- is patent validity challenges.

CHIEF JUSTICE ROBERTS: That argument didn't prevail last year in the KSR case, right? I mean, we're -- we've had experience with the Patent Office where it tends to grant patents a lot more liberally than we would enforce under the patent law.

MR. PHILLIPS: Right, but all -- I'm not --I'm not particularly

criticizing the PTO. What I'm saying is that the statutory scheme
presumes that there is a separateness when a patent is issued
and, therefore -- and which is why -- again, the first -- there's no
reason to go to an expansion of the first-sale doctrine in order to
deal with the kinds of problems you have here because in
general -- in general you can deal with it as a matter of implied
license, but that issue has been resolved adverse to the other
side in this case, and there's no reason to sort of fill in that void.

Finally, Chief Justice Roberts identified what is troubling him. I
thought Carter Phillips' reply was pretty good:

CHIEF JUSTICE ROBERTS: And the way you achieve that result is
to condition the sale. What you're trying to do is expand what
you get under a condition to what you get under a notice. And
the reason that troubles me is because if you had imposed a
condition on the sale, Intel wouldn't have paid you as much for
it. But you say, all right, we'll take the money because --
additional money because there's no condition, but we want to
achieve the same result because of the notice.
MR. PHILLIPS: I mean there can't -- there's no serious basis for
doubting what Intel knew precisely what it was getting in this. It
was getting peace on both sides of the aisle in terms of
litigation, and it knew that there were separate patents here
and that when it sold the chips it would certainly be entitled to
assume that there would be exhaustion. That's the provision you
read. But when it sells the chips, it didn't know and it
specifically gave notice that it recognized that that doesn't
remotely say what the right answer is with respect to the
systems and with respect to the methods. And that to me, Mr.
Chief Justice, is the fundamental distinction.

Here are some links to news stories about the oral argument in
*Quanta v. LG*. I'll update these with additional links as they come in.

Justices Skeptical of Patent-Holders' Claim (law.com, subscription
required?)
U.S. Patent Case Likely to Redefine Royalties (International Herald
Tribune, quoting Bob Krupka of Kirkland & Ellis)
U.S. High Court Uncomfortable with LG Position in Patent Case
(CNNMoney)
Court May Limit Patent Owners' Rights (AP)
Quanta v. LG: Will the Supreme Court Clarify the Exhaustion Doctrine?
(Patently-O, guest post by Charley Macedo)

Note that all of the above links tend to predict that the Supreme

Court will overturn the Federal Circuit. Now, for a contrary view, we have:

Patent Exhaustion: Supreme Court Fatigue? (e-Commerce News -- the author concludes that the entire patent bar "hopes that the Supreme Court does not overrule the reasonable approach taken by the Federal Circuit." You mean, other than all those members of the patent bar who submitted amicus briefs for Quanta? I guess if Hal Wegner says it, it must be true for the entire patent bar if you're a DC patent lawyer...).
Exhaustion Exasperated (Patent Hawk). Of course there's Patent Hawk on the other side, describing Quanta's attorney as a "spitter" and the deputy SG as a "lapdog." Ever the painter of words, is Patent Hawk. I may not agree with his point of view, but it's refreshing to see the irreverance.

---

Posted by Troll Tracker at 5:37 PM    0 comments
Labels: patent exhaustion, Supreme Court

---

## Patent Exhaustion Takes Center Stage at SCOTUS

I'm pushing the survey results back until Friday because (1) I'm out of the office this week, (2) I haven't figured out how to share my results yet, and (3) I had forgotten that today is the Supreme Court oral argument in Quanta v. LG. I previously posted about the case here and here, but for the really best summary, I have two words for you: SCOTUS Wiki!!! Seriously, today is the first I have ever checked out this really cool website.

See also this article from today's Financial Times, which calls LG's position "absurd," and adds

> chips are only useful if combined with other components to make a computer. But in the true spirit of global profit- maximisation, LG wants the people that make computers – and not just people that make chips – to pay for its technology. The Supreme Court must decide whether LG's patent rights are "exhausted" when it licenses the technology to Intel, or whether it can continue to extract patent royalties all the way up the manufacturing chain.

Hat tips to Howard Bashman for pointing out the FT article and to SCOTUSBlog for directing me to the wiki. For more information, see this guest post on Philip Brooks' Patent Infringement Updates blog, by a couple of attorneys from Amster Rothstein.

While I won't be able to follow the Supreme Court argument in real time, I'll post some observations on it tonight, time permitting.

Posted by Troll Tracker at 5:14 AM     0 comments
Labels: patent exhaustion, Supreme Court

TUESDAY, JANUARY 15, 2008

## Is the United States Navy the Latest Patent Troll?

Network Signatures, LLC of Rancho Santa Margarita, California, is the
exclusive licensee of U.S. Patent 5,511,122, a patent which is owned
by the U.S. Navy. This patent relates to secure communication and
authentication methods involving the use of public and private keys.
Thanks to the plaintiff filing their agreement with the Navy publicly,
we learn that the Navy gets 30% of any litigation proceeds.

Well, Network Signatures has now sued Bank of America, Wachovia,
Wells Fargo, and Washington Mutual, all in the Central District of
California (Orange County), hoping to start monetizing the Navy's
patent. The U.S. Navy is not practicing this invention, but their
exclusive licensee told the Navy that it was. Is that so? Check out
their website and decide for yourself. One could argue it is practicing
something - using a cell phone to authenticate so you don't have to
carry around a VPN password-generating device. But that's not what
Network Signatures is suing over, if you read the complaint carefully.

While I am not making this conclusion, there is certainly room to
argue that in this case, the United States Navy is authorizing the filing
of some very patent troll-like lawsuits. At the very least, the Navy has
authorized patent infringement lawsuits against the financial services
industry, and stands to make money off of those suits. Unbelievable.

Posted by Troll Tracker at 9:15 AM     2 comments
Labels: Network Signatures, US Navy

MONDAY, JANUARY 14, 2008

## New York Times Article Sets the Stage for Upcoming Patent Reform Debate Renewal

The New York Times had an interesting feature on the soon-to-be-
renewed fight in Washington over patent reform. The reporter, John
Markoff, highlighted that the big corporations were for patent reform,
and that certain individual inventors are against it, and summarized
some of the reasons given for the positions of both sides (e.g., huge
NTP-RIM damages award out of proportion to the inventiveness and
validity of the NTP patents in one corner, the chance that patent
reform will change the incentive for inventors in the other).
Unfortunately, the article seemed to miss the third wheel here: the
biotech industry's opposition.

The individual inventors featured in the article were Dean Kamen and Steve Perlman. There is no doubt that Kamen and Perlman are not "patent trolls," despite that the article seems to improperly lump them with the trolls. There are extensive quotes from Perlman. I have a few problems with Perlman's conclusions about how the proposed patent reform will impact inventors like him.

First, Perlman claims that patent reform is unnecessary in light of two recent Supreme Court cases: *eBay v. MercExchange* and *KSR v. Teleflex*. This makes little sense. Sure, the threat of injunction has been greatly reduced for trolls. But that won't stop the Acacias and Global Patent Holdings of the world from suing massive amounts of defendants. Further, many patent trolls are simply conducting "research" to take advantage of the "CSIRO loophole" to eBay. In addition, *KSR* is of little help in jurisdictions that rarely if ever grant summary judgments. Patent holders will still be able to sue on clearly invalid patents, get no stay pending reexamination, and put tremendous pressure on defendants to settle or face massive verdicts.

The proposed patent reform addresses these problems. In the words of Mark Lemley, quoted in the article, "I have to say I'm frankly astonished that apportionment has been this controversial. I can't think of a straight-faced argument that you as a patent owner are entitled to more than your invention has contributed to a product."

Perlman also is concerned because in the computer industry, innovation reduces cost. According to Perlman, under patent reform, if you reduce the cost of your device, then your apportionment becomes less and less. Huh? I sure hope he was misquoted there (the problems with newspaper interviews - I'm sure there's a 1,000-word explanation that makes his point better). But if you invent a tremendous improvement in computers, that drives the market, the current patent reform bill will allow you to get the entire market value. And if you just invent a tweak that's very useful, you can still use experts to prove how much your improvement is worth as a percent of the overall invention. What's controversial about that?

Finally, Perlman opines that under patent reform, "Microsoft will clone a crummy version of one of [his] inventions, and [he]'ll be bowled over." Yes, and if they do that, then under patent reform, you still will be able to get an injunction and enhanced damages for Microsoft's willful infringement.

To be sure, there's more to the current patent reform bill than damages apportionment and venue reform. Some of it I support, some of it, well, I could live without it (first-to-file!). And I'm sure there will be many changes ahead. But I sure hope that the individual

inventor community does better than "damages apportionment will lead to the end of innovation as we know it" and "let the Supreme Court fix it, and don't touch the laws, Congress."

Update: The following blogs are also covering the NYT story:
Immodest Proposals has a blog titled "This Congress Might Get Something Right?!?"
Leveraging Ideas has a story titled "Patent Reform: Boring But Important"
ZDNet has a Government Blog titled "Patent Reform: Stopping the Insanity or Inventor Ripoff?"
TechCrunch has a blog titled "Patent Reform Act Focuses on the Wrong Problem" (the real problem is poor patent quality, says the blog.

Posted by Troll Tracker at 12:01 AM      9 comments
Labels: New York Times, patent reform

FRIDAY, JANUARY 11, 2008

## Troll Call and Other Statistics for December 2007

We reached the end of 2007. All the other blogs are reporting an overall decrease in IP litigation, a cutback from 2006, or are reporting the slightest of increases in patent filings from 2006 to 2007. That's simply not true. By the real count -- the number of defendants sued for patent infringement -- 2007 was a record year. In fact, here's my headline: "2007 shows a 30% increase in patent litigation over 2006, fueled by a 40% increase in the Eastern District of Texas." And certainly from the number of patent cases brought by non-practicing entities and so-called patent trolls, it was a year that saw a tremendous increase in both the quantity and diversity of these entities.

Before we go on, let's explore statistics for a minute. Say in 2006 there are 25 lawsuits, each against 1 defendant. Then in 2007, there are 20 lawsuits, each against 5 defendants. 25 defendants sued 1 year, 100 the next. The patentees could have filed 100 lawsuits, and in effect, did so. Why isn't that a 4-fold increase? Yet people look just at the number of cases filed, which gets them to declare a 20% decrease.

This month, I'd like to start with the 2007 year-end statistics. Here's what I have compiled:

As a disclaimer, these numbers are taken raw from PACER/ECF without my usual investigation to make sure they aren't a transfer/duplicate/etc. But since I'm comparing several years, there

needs to be an apples-to-apples comparison, and I'm not about to go look at every case in 2006!One other disclaimer: I didn't actually count every defendant in every case. I took the top jurisdictions, counted them, and extrapolated. The ones I counted constituted over two-thirds of the patent cases, so if my number of defendants is off, it's not off by much. Plus, the same extrapolation method was used for all three years I compare below.

With those disclaimers out of the way, this is what the data shows when looking at the national patent infringement statistics:

- In 1990, there were 921 patent cases nationwide (1 in EDTX), and 1,596 defendants sued (1 in EDTX).
- In 2006, there were 2,822 patent cases nationwide (264 in EDTX), and 6,118 defendants sued (996 in EDTX).
- In 2007, there were 2,953 patent cases nationwide (364 in EDTX), and 8,045 defendants sued (1,402 in EDTX).
- Comparing 2007 to 2006, nationwide there was a 4.6% increase in patent cases (I have read 6% elsewhere), but there was a 31.5% increase in the number of defendants sued for patent infringement.
- Comparing 2007 to 2006 just for the Eastern District of Texas, there was a 37.9% increase in the number of patent cases, and there was a 40.8% increase in the number of defendants sued for patent infringement.
- Comparing 2007 to 1990, nationwide there has been over a tripling in the number of patent cases (+221%), and a quintupling in the number of defendants sued for patent infringement (+404%).
- In 1990, the Eastern District of Texas accounted for roughly 1/100 of all national patent cases, and less than 1/100 of all defendants sued.
- By 2007, those EDTX numbers had grown to being roughly 1/8 of all national patent cases and 1/5 of all defendants sued.

I say pshaw to the notion that patent infringement increased only 4-6% in 2007. Look at the defendants sued: there was over a 30% increase this past year. That's the number that matters. Now where will 2008 fall?

Let's next turn to the numbers from December for the 7 districts I have been highlighting this year.

December statistics

ED Texas: 21 patent cases, 82 defendants sued (11 troll cases)
CD California: 21 patent cases, 82 defendants sued (6 troll cases)

D New Jersey: 11 patent cases, 20 defendants sued (0 troll cases)
D Delaware: 19 patent cases, 40 defendants sued (2 troll cases)
ND Illinois: 12 patent cases, 30 defendants sued (3 troll cases)
ND California: 4 patent cases, 9 defendants sued (0 troll cases)
SD New York: 7 patent cases, 11 defendants sued (1 troll cases)

December was the first month this year that another district rivaled
the Eastern District of Texas in both cases filed and defendants sued.

Non-EDTX Troll/NPE Cases

There were some interesting non-practicing entity /troll cases filed
outside of the Eastern District of Texas in December. Some were very
interesting. For the first month since I started the blog, I have
more "NPE" cases outside of EDTX than I do inside. A preview of life
after venue reform, perhaps? Here are the highlights:

1) Document Generation Corp. v. AllMeds, and 18 other defendants
(SDIL, December 4). I featured this case here.

2) Action Technologies, LLC v. Avid Technology, Inc. (SDNY, December
4). Action is sub of General Patent Corp., according to the statement
it filed with the court in New York. I profiled GPC here.

3) Global Patent Holdings, LLC v. ADT, and 6 other defendants (SDFL,
December 5). I featured this case here.

4) Innovative Patented Technologies, LLC v. Nokia & Samsung (SDFL,
December 5). Scott Harris, J-Beau, and Niro. Blogged it here.

5-8) Network Signatures, Inc. v. Bank of America Corp. (CDCA,
December 10).
Network Signatures, Inc. v. Wachovia Corp. (CDCA, December 10).
Network Signatures, Inc. v. Wells Fargo & Co. (CDCA, December 10).
Network Signatures, Inc. v. Washington Mutual Bank (CDCA, December
10). You might think by looking at Network Signatures' website that I
have incorrectly included these four cases as "non-practicing entity"
cases. But there's more here than meets the eye. I'll elaborate more
in a special spotlight on these cases next Tuesday. I'll add a forward
link here once I create that post.

9) Guardian Media Technologies, Ltd. v. Daewoo Electronics Corp.
(CDCA, December 18). Guardian Media is a Texas limited partnership
that bought two patents in 2003, and has sued a bunch of companies.
It is in patent litigation all over, and the patent-in-suit is in ex parte
reexamination. This lawsuit was filed two months after the PTO issued
an 81-page office action rejecting the claims of the patent-in-suit as
invalid.

10) PSN Illinois, LLC v. Abcam, Inc., Abgent, Inc., Affinity Bioreagents, Inc., Discoverx Corp., Exalpha Biologicals, Inc., Genetex, Inc., LifeSpan Biosciences, Inc., Multispan, Inc., and Novus Biologicals, Inc. (NDIL, December 21). An old troll friend returns! PSN Illinois is a shell. I'm not sure who owns it, but Chicago-area attorney Michael Mazza represented it in 3 prior patent litigations. 2 of the 3 prior PSN Illinois litigations were over pet litter patents, and the other one over porcelain veneer restoration materials. This new case asserts two patents titled "Molecular Cloning and Expression of G-Protein Coupled Receptors." It's safe to say that if you have a single entity asserting pet litter, porcelain veneer, and molecular cloning patent, it's a troll. And in this case, a BIOTROLL. The inventor of the two patents-in-suit is now a University of Cincinnati professor. He evidently sold his patents back in September 2007.

11) Fifth Market Inc. v. CME Group Inc. (Del, December 21). 5th Market is a failed startup. I found this article from 1999 interviewing some of the inventors of the now-asserted patent. The inventors generally list 5th Market in their LinkedIn profiles as being a past job. But the first-named inventor, Scott Nieboer, still seems to run this website from his office in Nashville, where he also runs a few other businesses - investment businesses. Here is the cached "management" page from the old Fifth Market website. My conclusion? A once-company, now a shell being monetized.

12) Wall Corporation v. BondDesk Group LLC (Del., December 26). I'm really not sure about this one. The first-named inventor, Webster Hughes of Charlotte, NC, was in upper management at X-Bond, the company that first owned the patent-in-suit. Then in September 2004 the patent was assigned to Wall Corp of Greenwich, CT, a company I can find nothing about. Now Wall Corp lists its address as the same as the law firm that filed the suit - Shore Chan Bragalone, of Dallas. Shore Chan is a firm I have featured as representing Acacia. This one has a general smell of a troll case about it, but I can't say for sure. Since there's nothing about Wall anywhere I can find, I'm putting it at least in the NPE camp for now.

13) Zappos.com v. Global Patent Holdings (DNV, December 26) (DJ). See here.

14) Meirav Kesher Hadadi, Ltd. v. Zipcar Inc., Mobility Inc. d/b/a Flexcar, and I-Go (NDIL, December 28). The plaintiff is an Israeli shell corporation set up by the Israeli inventor of the car rental patent. One of the defendants, I-Go, is Chicago's only non-profit car sharing service. It actually seems like a pretty cool idea -- the defendants' idea, that is, not the plaintiff's patent, the claims of which seem stretched to be able to capture the accused "product."

15) Innovative Patented Technology, LLC v. Motorola (NDIL, December 31). I profiled this case here.

16) Harvard Label v. Advanced Card Technologies LLC (CDCA, December 31) (DJ). According to ACT's website, it is a subsidiary of General Patent Corp.

Cumulative Statistics for 2007

Here are the cumulative statistics for all of 2007, comparing the various "big 7" districts.

ED Texas: 364 patent cases, 1,402 defendants sued (151 troll cases)
CD California: 272 patent cases, 729 defendants sued (23 troll cases)
D New Jersey: 187 patent cases, 349 defendants sued (13 troll cases)
D Delaware: 147 patent cases, 350 defendants sued (18 troll cases)
ND Illinois: 137 patent cases, 261 defendants sued (26 troll cases)
ND California: 131 patent cases, 249 defendants sued (19 troll cases)
SD New York: 102 patent cases, 255 defendants sued (14 troll cases)

That's one patent case filed a day in the Eastern District of Texas. 28 defendants sued a week! Twice as many as any other district. Over 150 troll cases (41%).

Here is my last "troll call" for 2007 - the December cases. I'm planning a little bit of a change for 2008, by the way. While EDTX still drives the troll cases, I no longer plan to track EDTX and non-EDTX troll cases separately. Starting with January's troll call, everything will be merged. Hopefully that will make this sort of post more readable.

Troll Call for December 2007 in EDTX

141) Klausner Technologies v. Apple, AT&T, AT&T Mobility, CSC Holdings, Comcast, eBay, GotVoice, Simulscribe (Marshall, December 3). Dovel & Luner filed this lawsuit, which I blogged about here.

142) epicRealm Licensing, LLC v. The Macerich Co. (Texarkana, December 3). epicRealm made my original blog post, at #6, from way back in January. This case is one that Judge Folsom ordered to be bifurcated from the original one.

143) Typhoon Touch Technologies, Inc. v. Motion Computing, Inc., Dell, Inc., Nova Mobility Systems (Tyler, December 5). This looks like a once-company that has gone over to the dark side.

144) Tessera, Inc. v. A-DATA Technology Co., A-DATA Technology USA, Acer, Inc., Acer America, Centon Electronics, Elpida Memory, Elpida

Memory USA, International Products Sourcing Group, Kingston Technology Co., Nanya Technology Corp., Nanya Technology USA, Peripheral Devices & Products Systems, Powerchip Semiconductor Corp., ProMOS Technologies, Inc., Ramaxel Technology Ltd., SMART Modular Technologies, Inc., TwinMOS Technologies Inc., TwinMOS Technologies USA (Marshall, December 7). Some people consider Tessera to be a research institution. Some people consider it to be a patent troll. It's hard to decide, but if you sue 18 companies in one lawsuit in Marshall, Texas, you inch towards that troll line.

145) Coronary Stent Visualization Corp. v. Philips Electronics North America Corp. (Marshall, December 17). Acacia, as I described here.

146) Trover Group, Inc. v. Regions Bank (Marshall, December 18). According to this article, Trover Group was previously known as Dozier Financial Corp. Indeed, Trover is run by Charles Dozier, one of the inventors of the patents-in-suit. This appears to be an inventor's shell.

147) Beneficial Innovations v. AOL, Google, IGN Entertainment, Morris Communications Co., Dallas Morning News, Tribune Interactive, Yahoo! and YouTube (Marshall, December 20). I discussed Beneficial Innovations and inventor Sheldon F. Goldberg last week.

148) Parallel Networks, LLC v. Netflix, ATA Airlines, E*Trade, John Wiley & Sons, SkyMall, and The Finish Line (Marshall, December 28). The funny thing about this case, is that it asserts U.S. Patents 5,894,554 and 6,415,335 -- the same two patents asserted by epicRealm in its prior litigations. Same attorneys, same principals seem to be involved. Perhaps Parallel Networks is just a new name for epicRealm.

149) Media Technologies Licensing, LLC v. Tristar Productions, Ace Authentic, Bench Warmer Int'l, Press Pass, Razor Entertainment Group, Razor Entertainment LLC, SA-GE Collectibles, and Stellar Collectibles (Marshall, December 28). Media Technologies Licensing is a California LLC (in Beverly Hills) formed by the inventor of the patents-in-suit, Adrian Gluck. Those patents are 5,803,501 and 6,142,532. The patents are titled "Memorabilia Card" and had been previously asserted against The Upper Deck Co. in the Central District of California. In fact, Media Technologies Licensing filed another case just last week in CDCA. So it's strange seeing them in Texas, but there they are.

150) American Microsystems Ltd. v. WIAV Solutions, LLC (DJ) (Sherman, December 28). For more on this new case involving new troll WIAV, see here.

151) Mondis Technology Ltd. v. LG Electronics, LG Electronics USA,

Hon Hai Precision, and Innolux (Marshall, December 31). And you can go to that same post for information on Mondis, too.

TT

Posted by Troll Tracker at 12:08 AM     3 comments

Labels: epicRealm, General Patent Corp, Guardian Media, Media Technologies Licensing, Parallel Networks, patent reform, PSN Illinois, statistics, Tessera, Typhoon Touch, venue

THURSDAY, JANUARY 10, 2008

## Global Patent Holdings Sues Boca Raton Resort & Club

Check out all of those JPGs on the website at the Boca Raton Resort & Club. I guess somebody had a bad stay there or couldn't get a good tee time, for on Tuesday 1/8, Global Patent Holdings asserted its JPEG-on-a-website patent in SDFL against the Club. If you don't know what I'm talking about, click on the Global Patent Holdings label below. Niro Scavone, of course.

Posted by Troll Tracker at 11:17 AM     0 comments

Labels: Global Patent Holdings, Niro Scavone

WEDNESDAY, JANUARY 9, 2008

## Wednesday Miscellany, 1/9/08

A bunch of tidbits today, mainly thanks to reader tips. Before I get to them, if you haven't done so already, you have two days to take my Patent Troll Tracker Blog Survey before it closes. I'll provide the results next week.

1) My post last Friday on Mondis prompted Inpro to take Dechert off of its "extended team" on its website. But thanks to a reader tip, you can still see Dechert featured as part of the Inpro team in this Inpro document.

2) A reader (who I am keeping anonymous for now) compiled for me a list of recent patent litigations where the inventor(s) of the patent(s)-in-suit were patent attorneys. I know there are more than are on the list, but these are mainly the cases I have featured on this blog. If anyone knows of any other patent-attorney-as-inventor cases, let me know. Meanwhile, see the current list by clicking on this link. Note this list doesn't include the case brought yesterday in Texas (see #8 below). Update, 1/10/08: now it does, plus it includes another case sent my way.

3) Not many interesting cases from last Wednesday-Friday, but one did catch my eye. After Burst.com got a reported $50M settlement from Microsoft, and a reported $10M from Apple, RealNetworks decided to file its own declaratory judgment case against Burst, in the Northern District of California. An eager Burst.com investor has evidently been posting evidence of several companies' infringement on YouTube (see here), including RealNetworks. Unfortunately, the complaint is not available online yet.

4) I don't usually post about Federal Circuit decisions, but I have to take issue with the CAFC's 2-1 opinion in *SRI Int'l, Inc. v. Internet Security Sys., Inc.* (January 8, 2008). The majority (Rader, Mayer) acknowledged that the prior art Live Traffic paper invalidated the four patents-in-suit, if publicly available, but reversed a summary judgment of invalidity because it was doubtful that putting a paper on an Internet FTP Server constituted public availability. They likened it to the thesis, sitting in the library, without an index so people could find it. Anyone who has ever used an FTP server knows that this conclusion is just not true. And Judge Moore, in dissent, picked up on the exact issue in footnote 1 and surrounding text:

> The majority concludes without any evidence or support in the record that the FTP server "did not contain an index or catalog or other tools for customary and meaningful research." The majority bases this conclusion on a number of "facts" not supported by the record or even argued by the parties. First, the majority implies that a sophisticated computer security researcher would need a "README" file to find a file in an FTP server. There is no support in the record for this suggestion and the parties never argued it. The majority also states, without record support, that "it is doubtful that anyone outside the review committee looking for papers submitted to the Internet Society's Symposium would search a subfolder of an SRI server" and "it is also doubtful that anyone outside the review committee would have been aware of the paper or looked for it at all in early August 1997." Neither of these "doubts" are supported by any record evidence. Moreover, the relevant inquiry for public accessibility is not whether a reference is available to people looking specifically for that reference, but rather whether the reference is publicly available to someone looking for information relevant to the subject matter. Given that the EMERALD subdirectory was publicized to the cyber security community as a source of information related to projects on intrusion detection, this paper, like everything else in the EMERALD subdirectory, was publicly accessible to anyone interested in material on intrusion detection.

Right on, Judge Moore! This is actually an important issue: there

haven't been many published cases if any at all that attempt to meaningfully extrapolate the CAFC's library indexing law to specific areas of the Internet. This is important enough that I hope the whole court considers the issue *en banc*. But somehow I doubt it.

5) Acacia has struck again. Its subsidiary, Credit Card Fraud Control Corporation, sued six companies (Full Spectrum Telecommunications, National A-1 Advertising, Network Telephone Services, SPG Solutions, Utel Networks, and Teligence), on U.S. Patent No. 6,282,276 ("Method of Billing a Value-Added Call"). Acacia alleges it is the exclusive licensee of the '276 patent. The patent itself seems to be owned by Fraud Control Systems.com, a Boca Raton, Florida company owned by the inventor, David Felger. The fascinating thing about this is that if you go to Fraud Control Systems' website (and you should do it before they change it, which they always do to TrollTracker), it says for more information about the "patented fraud-control solutions," contact Rick S. Nathan of Pricewaterhouse Coopers. Is PWC somehow involved in this Acacia litigation? Somehow, I doubt it.

6) Speaking of Acacia, I profiled here a 23-defendant case Acacia subsidiary Autotext filed in Cleveland. I thought the case was frivolous and should be dismissed immediately. I guess Acacia listened, for yesterday it did dismiss the entire litigation. No reasons given, of course.

7) Further speaking of Acacia, it has moved to transfer its own case! Really. Acacia subsidiary Refined Recommendation Corporation sued Netflix in New Jersey. Netflix moved to transfer the case to the Northern District of California, where it is headquartered, and where significant prior art is located (not to mention it's close to the Portland, Oregan patent attorney inventor, Gary Odom a/k/a Patent Hawk - see here for my prior post explaining that one). Take that, said Acacia. Not only will we oppose your motion, but we'll cross-move to transfer the case - to the Central District of California. The reasons? There's infringement there. But there was alleged infringement in New Jersey, right? What makes CDCA *more* convenient than NDCA? According to Acacia, it gets cases done faster -- 7.2 months to 7.4 months. Not kidding. Acacia wants the court to transfer the case to CDCA to save 6 days. Their cross-motion seems like a bit of a waste of the court's time. If you're going to send the case 3,000 miles across the country, why not send it to where the defendant and all the documents are located?

8) And speaking of meaningless shells, venue ridiculousness, and patent-attorney-trolls, we turn to Traffic Information LLC, a company formed by yet other Portland, Oregon patent attorneys Bruce DeKock and Kevin Russell to assert U.S. Patent No. 6,785,606. "Traffic" made my September Troll Call at #103 when it/they sued Honda. Yesterday

they/it struck again, suing Alpine Electronics (CDCA), Magellan
Navigation (NDCA), and Sanyo North America (SDCA) in Marshall,
Texas. Parker Bunt & Ainsworth leads the 3-Texas-firm contingent
representing Traffic Information/DeKock/Russell. 42% of ALL
complaints filed in Marshall so far in 2008 have been patent
infringement complaints (3 out of 7), and 100% of the EDTX patent
cases this year have been filed in Marshall. The statistic is
meaningless now due to the early date, but I'll be checking back with
it periodically throughout the year.

Back on Friday with December's Troll Call.

Posted by Troll Tracker at 9:17 AM      0 comments
Labels: Acacia, attorney-trolls, Autotext, Burst.com, Credit Card
Fraud Control Corp., Dechert, Federal Circuit, Inpro, Judge Moore,
Mondis, RealNetworks, Refined Recommendation, Traffic Information,
venue

TUESDAY, JANUARY 8, 2008

## Number of Utility Patent Claims Issued By USPTO Per Year Has Quintupled in 30 Years

Dennis Crouch had an interesting post from December 23 on rising
claim counts. Dennis provides a graph showing that the number of
average total claims in a U.S. Patent rose from about 10 in 1976, to
15 in 1995, to nearly 20 in 2004.

Looking at 1976 through 2006, we can go here to find the number of
utility patents issued per year, and multiply it by Dennis's number, to
get roughly the following graph, of the number of patent claims
issued per year, over a 30-year period (imagine that there are
actually *readable* numbers along the x-axis representing years from
1976 to 2006 - it's amazing I was even able to figure out how to do this
graph - can't figure out how to get the years on it so anyone can read
them, but you get the picture).



## Number of Utility Patent Claims Issued by USPTO per Year, 1976-2006

| Year | Patents Issued | Claims/Patent | Claims Issued |
|------|----------------|---------------|---------------|
| 1976 | 70,226 | 10.1 | 709,282 |
| 1977 | 65,269 | 10.2 | 665,744 |
| 1978 | 66,102 | 10.7 | 707,291 |
| 1979 | 48,854 | 11.7 | 571,572 |
| 1980 | 61,819 | 11.3 | 698,555 |
| 1981 | 65,771 | 12.4 | 815,560 |
| 1982 | 57,888 | 11.6 | 671,501 |
| 1983 | 56,860 | 11.7 | 665,262 |
| 1984 | 67,200 | 11.4 | 766,080 |
| 1985 | 71,661 | 11.0 | 788,271 |
| 1986 | 70,860 | 11.8 | 836,148 |
| 1987 | 82,952 | 11.9 | 987,129 |
| 1988 | 77,924 | 12.6 | 981,842 |
| 1989 | 95,537 | 13.2 | 1,261,088 |
| 1990 | 90,365 | 12.9 | 1,165,709 |
| 1991 | 96,511 | 12.5 | 1,206,388 |
| 1992 | 97,444 | 13.0 | 1,266,772 |
| 1993 | 98,342 | 14.8 | 1,455,462 |

| 1994 | 101,676 | 14.6 | 1,484,470 |
| 1995 | 101,419 | 16.1 | 1,632,846 |
| 1996 | 109,645 | 17.2 | 1,885,894 |
| 1997 | 111,984 | 17.1 | 1,914,926 |
| 1998 | 147,518 | 16.7 | 2,463,551 |
| 1999 | 153,485 | 17.9 | 2,747,381 |
| 2000 | 157,494 | 18.4 | 2,897,890 |
| 2001 | 166,036 | 18.9 | 3,138,080 |
| 2002 | 167,331 | 19.2 | 3,212,755 |
| 2003 | 169,023 | 19.6 | 3,312,851 |
| 2004 | 164,291 | 20.2 | 3,318,678 |
| 2005 | 143,806 | 19.5 | 2,804,217 |
| 2006 | 173,771 | 19.5 | 3,388,535 |

Note that the number of claims issued per year has almost quintupled in those 30 years, from under 700,000 claims per year to over 3 million for the last several years. That's amazing. And people wonder why the PTO is passing rules attempting to limit continuations and the number of claims per application.

Posted by Troll Tracker at 12:02 AM    0 comments
Labels: examiner overload, patent reform, statistics

MONDAY, JANUARY 7, 2008

## Rembrandt's Interesting Injunction Strategy (Possibly)

There is one patent troll case (that I know of) going to trial this month in the Eastern District of Texas: Rembrandt v. Ciba Vision. Rembrandt may be up to something interesting.

Besides Rembrandt's foray into high tech patents, Rembrandt also bought contact lens patents, and put them in a shell named Rembrandt Vision Technologies, L.P. Rembrandt sued Bausch & Lomb and Ciba Vision in Marshall, Texas back in October 2005. Eventually, Bausch & Lomb settled, and Ciba decided to take it to trial. The parties agreed to have Magistrate Everingham preside over the case (or, as several friends in Texas call him, "Magistrate Chad"). Jury selection was supposed to have been January 3, with trial beginning January 15 (update: I am informed jury selection is January 30, with opening statements to begin immediately thereafter).

In the pretrial order, Ciba asserted that Rembrandt settled with

Bausch & Lomb, whereby in exchange for money, not only did Rembrandt dismiss B&L (and maybe give it a license), it also gave its injunction rights to B&L. According to Ciba, Rembrandt did this in an attempt to skirt *eBay*:

> CIBA wishes to bring to the Court's attention the serious issues that arise from the Master Agreement (the "Settlement Agreement") settling the dispute between defendant Bausch & Lomb Inc. ("B&L") and Rembrandt Vision. In addition to dismissing all pending claims between B&L and Rembrandt Vision, the Settlement Agreement will effectively cause B&L to switch sides in this litigation – from being CIBA's co-defendant (and sharing privileged defense strategies with CIBA under a common interest agreement) to pursuing an injunction against CIBA under the Chang patent. While the Settlement Agreement is lengthy and complex, in effect it purports to split the beneficial ownership of the patent such that Rembrandt Vision's parent companies keep rights to virtually all monies flowing from this action, but B&L obtains the right to seek an injunction against CIBA under the patent in the event that Rembrandt Vision prevails against CIBA at trial. This assignment of the right to seek an injunction is a transparent attempt to circumvent the guidance of the Supreme Court's eBay decision, in which a plurality of justices counseled against granting injunctions to non-practicing plaintiffs. *See eBay, Inc. v. MercExchange, LLC*, 126 S. Ct. 1837, 1842 (2006). Neither Rembrandt Vision nor its parent companies practice the invention of the Chang patent. By purporting to transfer the right to seek an injunction to B&L, Rembrandt Vision hopes to improve its chances of obtaining an injunction. CIBA believes there are serious problems with this arrangement in addition to those concerning injunctive relief that could affect the trial of this case and intends to raise these issues at the appropriate time, including, but not limited to, an opposition to any post-verdict motion by Rembrandt Vision for an injunction. CIBA expects that discovery on the circumstances underlying the Settlement Agreement and the timing of B&L's decision to switch sides in this litigation will be necessary. CIBA also anticipates that B&L's new alignment with Rembrandt Vision, given the confidential, strategic information governed by the Common Interest Agreement between CIBA and B&L, may give rise to separate issues regarding the conduct of counsel for Rembrandt Vision and B&L. CIBA may also take separate action against B&L and Rembrandt Vision for breaching the terms of the Common Interest Agreement between B&L and CIBA.

Of course, Rembrandt disagreed, stating that Ciba mischaracterized the Rembrandt-B&L agreement and that Rembrandt would be happy to explain at the court's convenience, but it did not flat-out deny it

wouldn't use the agreement to aid in its seeking an injunction. If true, and that's what Rembrandt is really trying to do, then it's a very interesting strategy. Side with one of the co-defendants and induce them to switch sides to improve their chance of an injunction. Fish & Richardson represents Rembrandt, along with a host of local counsel, including Parker Bunt & Ainsworth, Ireland Carroll & Kelley, Brown McCarroll, and Jones & Jones. Banner Witcoff appears to represent Ciba, along with Sidley Austin and Potter Minton, and perhaps others. Note's Ciba's veiled threat to go after Fish & Richardson. Just what Fish needs!

The other case that was going to go to trial in January was Mobile Micromedia Solutions LLC v. Nissan. Just last week, however, Judge Folsom granted a motion continuing the trial until May 2008, due to the "numerous pending motions for summary judgment, Daubert motions, voluminous motions *in limine*, and a plethora of exhibit issues and deposition designations," along with the unavailability of a key plaintiff's witness. Judge Clark's cases slated for January 2008 trial appear to have settled. I don't know of any Ward or Davis cases going to trial, so Rembrandt may have center stage this month in EDTX.

Posted by Troll Tracker at 12:06 AM    1 comments
Labels: Ciba, injunctions, Judge Everingham, Rembrandt

F R I D A Y ,   J A N U A R Y   4 ,   2 0 0 8

## 4 Interesting New Cases From Last 2 Weeks of December

Well, what do we have for you today? How about the Rothschild family investing in a Eurotroll, and suing in Marshall, Texas? How about an ex-Fish & Richardson *associate* buying patents for millions of dollars (while an associate) and being D/J'd in Sherman, Texas after trying to shake down an EDTX company? How about a couple of lawsuits by a guy who, with related patents, has made the Electronic Frontier Foundations' 10 Most Wanted Invalid Patents? How about yet another Scott Harris/J-Beau/Ray Niro lawsuit? Yeah, you could read those other ABA-nominated patent blawgs, but I've got your *juicy* patent news right here!

WIAV Solutions: Choongsoo Park

Let's start off with the D/J case of American Microsystems Ltd. v. WIAV Solutions, filed in the Eastern District of Texas on December 28. Now why would anyone file a D/J case in the Eastern District? Well, in this case, perhaps it makes sense. The accused infringer is a company located smack dab in the middle of EDTX. It received letters from

WIAV Solutions, a company of unknown origin (so unknown that AML
had to plead WIAV was not from Texas on "information and belief").
Actually, the letters came from Sidley Austin-San Francisco.
Since AML couldn't figure out who is behind WIAV Solutions, I decided
to dig around to see if I could figure it out. It wasn't too hard. WIAV
asserted U.S. Patents 5,400,338 and 6,480,497 in its correspondence
with AML. These patents, prosecuted by Townsend and Townsend and
Crew in San Francisco, were originally assigned to Metricom of Los
Gatos, CA. From there, they went to Ricochet Networks, which
became part of Terabeam, of San Jose, CA. They show no further
assignment.

But Google and the USPTO Assignment database shed more
information. The USPTO Assignment database shows WIAV Solutions
buying a boatload of patents from Skyworks Solutions. In the
transaction, executed in September 2007, WIAV listed an address in
Reston, Virginia (which appears to be a home address). If you search
for "5400338 6480497 Terabeam," you get one result: a Terabeam SEC
filing showing the sale of these patents. A couple more clicks, and you
get this SEC filing -- the actual assignment agreement transferring
patents from Terabeam to SPH America, a Virginia limited liability
company, located at the same address as WIAV. All in all, SPH
America bought 4 patents from Terabeam for $5M, including the two
now-in-suit.

But who is behind Virginia LLCs SPH America and WIAV Solutions?
According to Virginia corporate filings and Terabeam/Proxim SEC
documents, it was Choongsoo Park, who, at the time of the
purchases, was a lowly associate in the D.C. offices of Fish &
Richardson. TrollTracker does not understand how an associate can
afford to spend $5M on patents (more, actually, if you include the 88
patents bought from Skyworks). But apparently Park knew what he
was doing - he has an advanced degree in Electrical Engineering.

Park is no longer on the F&R website (as of sometime between
Halloween and now), so apparently he no longer works for F&R.
Question is whether he's happy or not litigating his patents in
Sherman, Texas against a company that actually employs people in
the District. More on the case here. More on the technology behind
the original Metricom/Ricochet system here. Metricom, the original
technology developer, was a victim of the tech bubble bursting. The
Ricochet technology is a good example of what others described to be
exciting technology that generated a lot of buzz, but never got off the
ground due to a bad business model.

It would be nice to hear that Park has left F&R to form his own
company to commercialize the Ricochet technology, rather than, as
American Metrosystems alleged, making money only "by suing alleged

infringers of [the] patents and negotiating license fees from its victims." Time will tell. You have to admit: it's a bit strange, a law firm associate spending multi-millions on patents that are then asserted in an attempt to gain licensing revenue. It's one thing to be Scott Harris, and invent your own patents. It's quite another to be, well, Acacia, or Erich Spangenberg. You have to wonder whether Park is fronting for someone else.

Mondis Technology Ltd.: Inpro Licensing SarL

IPEG had an interesting post about how Europe has generally escaped the patent troll problem. But Europeans have been rumored to be gobbling up US patents to sue in American courts. This case is a perfect example. On New Years' Eve, Mondis Technology Ltd. of London sued Korean manufacturer LG, and Taiwanese manufacturers Hon Hai and Innolux (both related to Foxconn), in Marshall, Texas (on 5 patents). Dechert-Philadelphia filed the complaint, with help from Otis Carroll.

Who is Mondis Technology? According to UK corporate documents, it is Inpro Limited. Inpro is a EuroTroll, apparently. Mondis was originally formed at 160 Queen Victoria St. in London -- home of Dechert's offices there. Then it was moved to 19 Perrin Lane in Hampstead, London. That is the same address as a company known as Inpro IP Services. Inpro IP Services and Inpro Limited appear to me to be related to Inpro Licensing, a Luxembourg company that bought the IP portfolio of once-company Elonex, of London. And Inpro's mission? To make money off of intellectual property. Other ties between Inpro-Luxembourg and Mondis? Inpro considers Dechert to be part of its extended team. The same Dechert lawyers who represented Inpro in patent litigation against RIM appear to be representing Mondis in this case. My conclusion: Mondis is an Inpro company.

Oh, and then there's this: click on "DDC Patents" on Inpro's "Current Projects" web page, and you get 3 out of the 5 patents in suit. So I guess that's more circumstantial evidence.

Another fascinating tidbit: RIT Capital Partners, a publicly traded company on the London Stock Exchange that is about 25% owned by the Rothschild family, owns more than 10% of Mondis. You know, related to the winemaking Rothschilds? Other directors of Mondis include David John Morrison, who owns Prospect Investment Management, a London private equity firm. This is a well-funded EuroTroll. What's it doing slumming in Texas?

I may have the answer: It looks like "Mondis"/Inpro bought the five patents in suit from Hitachi on October 30, 2007. I'm sure LG and Foxconn will send a big thank-you to Hitachi for that. Of course, LG

and Hitachi already have 4 patent litigations pending between them in the Eastern District. So could it be that Hitachi is hitting back at LG not just with a suit brought by itself, but with a troll lawsuit? I have no idea, but if true, it would be interesting....

Beneficial Innovations: Sheldon Goldberg

Beneficial Innovations is a Nevada company owned by patent inventor Sheldon F. Goldberg. He is suing companies on U.S. Patents 6,712,702 (Method and System for Playing Games on a [Computer] Network) and 6,183,366 (Network Gaming System). He was noted four years ago on Slashdot for threatening a bunch of companies that he owned the rights to games played on a computer network. Jason Schultz, a/k/a LawGeek, called the '366 patent his Silly Internet Patent #4 a ways back. Sheldon Goldberg made the EFF's "Most Wanted" poster for "Crimes Against the Public Domain, Willful Ignorance of Prior Art, and Egregious Displays of Obviousness." (oh, hello, Acacia!). According to Ted Frank's post on the wonderful blog, Overlawyered, Goldberg's other patents claimed computer solitaire, on-line game rankings, and pop-up advertising. Goldberg first sued a bunch of defendants in June 2007, and it hardly rated a mention here. But given this second suit and my additional research, this certainly falls under the patent troll category, in my opinion.

16 defendants have now been sued in Marshall: Blockdot, CareerBuilder, Cnet Networks, Digg, Ebaum's World, Jabez Networks, The New York Times, The Washington Post, The Weather Channel, and The Washington Post.Newsweek Interactive Company were sued in June on the same two patents. The latest suit named AOL, The Dallas Morning News, Google, IGN Entertainment, Morris Communications, Tribune Interactive, Yahoo!, and YouTube. Dovel & Luner, a firm that is challenging Niro Scavone for the most contingent-fee multi-defendant cases, represents Beneficial Innovations.

Innovative Patented Technologies: James B. "J-Beau" Parker/Scott Harris

Speaking of Niro, he filed his own New Years Eve case, in Chicago, on behalf of Innovative Patented Technologies. The first IPT case filed was in South Florida, in early December, as I reported here. James "J-Beau" Beauregard Parker owns Innovative Patented Technologies, a company that does nothing other than hold patents invented by Scott Harris, a former Fish & Richardson principal who is in a dispute with his former firm (and litigation in Chicago). IPT does nothing other than assert patents and try to collect licensing fees. The latest company to be sued was Motorola, on the same 4 patents as the South Florida litigation. Since Motorola has a big facility in South Florida, why not sue them there and/or add them to the other case? Anyway,

Motorola's popular RAZR phone and its Q smartphone were listed as accused products.

To recap, at least the following 5 lawsuits against 10 defendants are now pending involving the Scott Harris patents now owned by James Parker -- all brought by the Niro firm:

Memory Control Enterprise, LLC v. Honda, LG Electronics, Motorola, Oakley, and US Cellular (NDIL, August 2007)
BarTex Research, LLC v. FedEx (EDTX, August 2007)
Illinois Computer Research v. Google (NDIL, September 2007)
Innovative Patented Technology v. Nokia and Samsung (SDFL, December 2007)
Innovative Patented Technology v. Motorola (NDIL, December 2007)

There were other troll cases filed in the second half of December in EDTX and elsewhere, but that's enough for today! The rest can wait for the December Troll Call, coming sometime next week.

Survey reminder

Don't forget to take my Patent Troll Tracker Blog Survey if you haven't already.

(Update: hey - welcome to all the visitors from The New York Times - my first link from "traditional" media. Wonder if it's because I mentioned they are a defendant in the Goldberg lawsuit. This is a disappearing link, though - after Saturday, January 5, it will likely be gone).

Posted by Troll Tracker at 12:07 AM     1 comments
Labels: Beneficial Innovations, Choongsoo Park, Dechert, Eurotroll, Fish_Richardson, Innovative Patented Technology, Inpro, James Parker, Mondis, Niro Scavone, Scott Harris, WIAV

THURSDAY, JANUARY 3, 2008

## Acacia December 2007 Update

Turning to our busiest patent troll in 2007, Acacia, it kept up momentum in December with new lawsuits.

Acacia's new subsidiary Coronary Stent Visualization Corp., established in Delaware on 11/19/07 with a principal place of business of 500 Newport Center Drive, 7th Floor, Newport Beach, CA, filed a lawsuit less than a month after formation. Acacia sued Philips Electronic North America Corp. on 3 patents owned by Cedars-Sinai Medical Center (Los Angeles) and allegedly exclusively licensed to

Acacia. The exclusive license likely happened at some point just prior to February 2007, when Cedars-Sinai (represented by Jones Day-LA) told the PTO it had lost its small entity status. The 3 patents are 5,054,045; 5,457,728; and 5,822,391. The lawsuit, involving a Los Angeles patentee, Los Angeles inventors, a Los Angeles exclusive licensee/plaintiff, a Los Angeles prosecuting attorney/law firm (well, now-defunct Lyon & Lyon, anyway), and a New York defendant, was filed in Marshall, Texas on 12/17/07 by DiNovo Price Ellwanger of Austin.

Acacia also filed a big case on December 4, in the Southern District of Illinois (East St. Louis) - the second case they have filed there. This time the sub was Document Generation Corp., and Acacia used Simon Passanante of St. Louis. Patent asserted was 5,148,366. Again, Acacia said it is only the exclusive licensee. 19 defendants were sued, all in the medical software field. GE Healthcare and McKesson are the big ones, but 17 small-to-medium business were sued, too:

1. AllMeds, Inc. (Tennessee-based corporation)
2. Allscripts, LLC (Chicago, Illinois)
3. Cerner Corp. (Missouri)
4. Healthport, Inc. (South Carolina)
5. eClinicalWorks, LLC (Massachusetts)
6. Sage Software Healthcare, Inc. (Florida)
7. AMT Solutions, Inc. (Texas)
8. iMedica Corp. (California - Northern)
9. McKesson Corp. (California - Northern)
10. MediNotes Corp. (Iowa)
11. Misys Healthcare Systems, LLC (North Carolina)
12. NextGen Healthcare Information Systems, Inc. (Pennsylvania)
13. Noteworthy Medical Systems, Inc. (Ohio - Northern)
14. Infor-Med Medical Information Systems, inc. (California - Central)
15. Pulse Systems, Inc. (Kansas)
16. SSIMED, LLC (Connecticut)
17. Physician Micro Systems, Inc. (Washington)
18. A4 Health Systems, Inc. (Chicago, Illinois)
19. GE Healthcare (New Jersey)

So, let's get this straight. Acacia, a California company located in CDCA, is an exclusive licensee who has sued 19 defendants, who are located in 17 different judicial districts (including CDCA). The original assignee and inventors were all from Minnesota, then the patent was transferred via merger and relocation to a company in the Southern District of Ohio, and finally has ended up with I-Think, LLC, an Ann Arbor Michigan corporation which appears to be a subsidiary of the original Minnesota assignee, now called DocuMed. That's about 20 different judicial districts that make sense in terms of venue, yet Acacia chose the Southern District of Illinois. Why, exactly? What's in

East St. Louis that appeals to Acacia?

According to this website, DocuMed itself has only 2 employees, one of which is presumably the VP, Secretary and Treasurer of I-Think, Douglas Kassab. This looks like a once-company, looking for a cashout before one of its remaining assets, a patent that expires in 22 months, is no longer useful.

Back tomorrow with some highlights of the last couple of weeks in the Eastern District of Texas.

Posted by Troll Tracker at 12:07 AM    0 comments
Labels: Acacia, Coronary Stent Visualization Corp., DocuMed, Document Generation Corp., GE Healthcare, McKesson, Philips, venue

WEDNESDAY, JANUARY 2, 2008

## Global Patent Holdings Update

Let's start the new year off with an update on our #1 patent troll from 2007, Global Patent Holdings.

To recap, it filed another patent infringement case on the JPEG-on-a-website patent (5,253,341) on December 5 in Florida. Then while I was on hiatus, Nevada company Zappos.com filed a declaratory judgment complaint in Las Vegas on December 26, seeking a declaratory judgment of invalidity, noninfringement and intervening rights on the GPH '341 patent. Parsons Behle & Latimer of Salt Lake City filed the DJ complaint on Zappos.com's behalf.

The DJ complaint, available here, has some nice insights into the Niro firm's method of trying to collect on behalf of GPH. Evidently, on August 14, Mr. Niro sent a claim chart to Zappos, explaining how the Zappos website infringes the reexamined claim 17 of the patent. I'm a bit miffed by that, because Mr. Niro refused to send me a claim chart as to my website. Zappos did not attach the claim chart to its complaint. Nor did it attach the "royalty schedule," which Niro also sent to Zappos. The Niro firm wrote to Zappos again on September 27, notifying it of the Green Bay Packers lawsuit, and then on December 12, notifying it of the Florida lawsuit.

With four litigations now pending in three districts against 17 companies, MDL seems like an increasingly likely option.

Back tomorrow with an update on Acacia.

Posted by Troll Tracker at 9:30 AM    5 comments
Labels: Global Patent Holdings, MDL, Niro Scavone, Zappos

## Happy New Year

I thought the last half of December would be quiet in terms of patent
troll activity. Well, not really. Happy New Year to everyone, and look
for the following stories this week and next:

- Global Patent Holdings and Acacia updates
- News about a bunch of patent troll cases in the Eastern District
  of Texas, including one involving yet another Fish & Richardson
  attorney?
- Is one of the newest patent trolls . . . the US Navy?
- Wrap-up on 2007 statistics, including December's list.

Meanwhile, nothing starts the new year like some humor. Thanks to a
reader, we have these two comic strips by James Turner, about
patent trolls (click here and here).

Posted by Troll Tracker at 1:11 PM     1 comments

Newer Posts                              Home                              Older Posts

Subscribe to: Posts (Atom)

# Exhibit M

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

MAR 1 3 2008

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK   10:45am

### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| **JOHN WARD, JR.** | § | |
| | § | |
| **Plaintiff** | § | No. 08-4022 |
| | § | |
| **V.** | § | JURY TRIAL DEMANDED |
| | § | |
| **CISCO SYSTEMS, INC. and RICK** | § | |
| **FRENKEL** | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

John Ward, Jr., Plaintiff complains of Cisco Systems, Inc. and Rick Frenkel, Defendants, and for causes of action hereby shows:

### THE PARTIES

1.     Plaintiff is an individual who has resided in Gregg County, Texas at all times relevant to the causes of action alleged in this pleading.

2.     Defendant Cisco Systems, Inc. ("Cisco") is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Jose, California. It may be served with process by delivering a copy of the complaint to its registered agent, Prentice Hall Corporation System, 300 Spring Building, Suite 900, Little Rock, AR 72201.

3.     Defendant Rick Frenkel ("Frenkel") is an individual who, upon information and belief, resides in the State of California. He may be served with process by delivering a copy of the complaint to him at his place of employment, Cisco Systems, located at 170 West Tasman Dr., M/S SJC-10/2/1, San Jose, CA 95134-1700.

### JURISDICTION

4.    Subject matter jurisdiction over this dispute is conferred upon this Court by 28 U.S.C. § 1332.

5.    This Court has jurisdiction over defendant Cisco because Cisco is subject to general jurisdiction in the State of Arkansas. This Court has personal jurisdiction over defendants Frenkel and Cisco because Defendants have minimum contacts with the State of Arkansas such that this Court's exercise of personal jurisdiction over defendants Frenkel and Cisco will not offend traditional notions of fair play and substantial justice.

### VENUE

6.    Venue in this district is proper in this judicial district pursuant to 28 U.S.C. § 1391.

### FACTUAL BACKGROUND

7.    Plaintiff has resided in and practiced law in the State of Texas, almost exclusively in the Eastern District of Texas, since 1997. Prior to the defamatory remarks by the Defendant, the Plaintiff enjoyed an excellent reputation. The Plaintiff's reputation for integrity and sound business judgment had earned him an AV rating by his peers. Throughout his professional career, Plaintiff has enjoyed a sterling reputation for ethical and responsible representation of clients. Neither the State Bar of Texas nor any state or federal court has ever taken any disciplinary action against Plaintiff. In additional, Plaintiff's license to practice law has never been suspended or revoked for any reason. As a result of this reputation, Plaintiff has developed a successful practice concentrated largely in intellectual property disputes in the Eastern District of Texas. Approximately ninety percent of Plaintiff's business comes from referring lawyers, former clients, or

2

former opponents of Mr. Ward. In furtherance of his practice on October 16, 2007, Plaintiff filed a patent infringement suit against Cisco on behalf of ESN, LLC ("ESN").

8.       Defendant Frenkel is an attorney licensed to practice law in the State of California. He is employed by Defendant Cisco as its Director of Intellectual Property Litigation. With the knowledge and consent, express or implied, of his direct supervisor at CISCO, Frenkel publishes an internet "blog" www.trolltracker.blogspot.com. Frenkel's blog comments regarding patent litigation, including patent litigation in the Eastern District of Texas, or what Defendant Frenkel refers to as the "Banana Republic of East Texas."

9.       In October of 2007, while publishing anonymously, Frenkel posted false, scandalous, and defamatory allegations about Plaintiff on his internet blog. On or about October 18, 2007 Defendant Frenkel published a written statement alleging that Plaintiff had "conspired" with others to "alter documents to try to manufacture subject matter jurisdiction where none existed" during the filing of a civil complaint Plaintiff filed on behalf of his client, ESN, in Federal Court in the Eastern District of Texas. Defendant alleged that Plaintiff engaged in felonious activity in order to create subject matter jurisdiction against Cisco, subjecting Cisco to suit in the Eastern District of Texas.

10.      Defendant Frenkel's comments were made within the course and scope of his employment at Cisco. Defendant Frenkel is a licensed attorney who, at the time he made the false statements, was and is employed as Defendant Cisco's Director of Intellectual Property. In his role as Cisco's Director of Intellectual Property, Frenkel had been charged by Cisco with responsibility for management of the ESN v. Cisco litigation —the case that was the subject matter of Frenkel's false, scandalous, and defamatory

3

anonymous statements. Defendant Frenkel has publicly admitted that he engaged in this activity with the full knowledge and consent of his employer Defendant Cisco Systems, Inc. Accordingly, Plaintiff alleges that Defendant Cisco is vicariously and directly liable for the intentional torts of Defendant Frenkel.

11.    Frenkel's anonymous comments accused Plaintiff of committing a crime (for example 18 U.S.C. § 1001) and engaging in conduct that could result in disciplinary proceedings before the State Bar of Texas. Upon information and belief, Frenkel's statements were purposefully calculated by Frenkel and Cisco to damage Plaintiff's reputation and business, to expose plaintiff to financial injury, and to impeach Plaintiff's honesty, integrity, virtue, or reputation, exposing Plaintiff to public hatred, shame, and ridicule.

12.    Defendant Frenkel intentionally concealed his identity on his web blog, and identified himself as "[j]ust a lawyer, interested in patent cases, but not interested in publicity." Defendant Frenkel was well aware of the fact that Plaintiff represented numerous parties involved in patent infringement lawsuits in the Eastern District of Texas, in part because Plaintiff was adverse to Cisco in the ESN v. Cisco litigation. Defendants were aware that the public, many litigants and attorneys accessed his web blog seeking information relating to the Eastern District of Texas.

13.    Defendants Frenkel and Cisco purposefully maximized the dissemination of the Frenkel's false, scandalous, and defamatory statements. Defendant Frenkel's blog is devoted to intellectual property litigation, including patent litigation venued in the Eastern District of Texas and is directed to a nationwide audience of persons with an interest in the subject matter of Plaintiff's law practice. On information and belief,

4

Frenkel and Cisco further employed search engine techniques and internal linking within the blog to direct persons seeking information about Ward through popular search engines such as "Google" to the defamatory statements. Defendants Frenkel and Cisco knew that many people were reading the defamatory statements. Defendant Frenkel printed the following boast on his blog site on January 30, 2008:

> I have been counting visitors now for a little over 6 months. This morning, around 5am Eastern, visitor #100,000 came to the blog, from Mendoza, Argentina[.]

14.     A true and correct copy of the defamatory writing distributed by Defendant Frenkel is attached to this petition as Exhibit A and incorporated by reference.

## COUNT 1: DEFAMATION

15.     Plaintiff incorporates each of the statements set forth in paragraphs 7-14 above as if fully set forth herein.

16.     Defendants Frenkel and Cisco knowingly, recklessly, and/or negligently published false statements of fact accusing Plaintiff of criminal conduct, unethical conduct, and conduct unbefitting of an officer of the Court.

17.     Defendants acted with knowledge that the statements were false or with negligence in failing to determine the truth of the statements prior to publication.

18.     Defendants published statements that were defamatory.

19.     As a result of Defendants' false, scandalous, and defamatory statements, Plaintiff sustained monetary damages, damages to his business, harm to his reputation, emotional distress and Plaintiff's relations with others have been detrimentally effected.

20.     Defendants' publication of the false, scandalous and defamatory statements is a proximate cause of Plaintiff's damages.

## **PRAYER FOR RELIEF**

21.    As a direct and proximate result of Defendants' false and defamatory statements, Plaintiff has endured financial loss, shame, embarrassment, humiliation, and mental pain and anguish. Additionally, Plaintiff has and will in the future be seriously injured in his business reputation, good name, and standing in the community, and will be exposed to the hatred, contempt, and ridicule of the public in general as well as of his business associates, clients, friends, and relatives.

22.    Plaintiff is entitled to exemplary damages from Defendant Frenkel because he acted with the malice required to support an award of exemplary damages. Defendant Frenkel acted with a specific intent to cause injury to Plaintiff and/or conscious indifference to the rights, safety, or welfare of Plaintiff with actual, subjective awareness that his conduct involved an extreme degree of risk of harm to the Plaintiff.

23.    Plaintiff is entitled to exemplary damages from Defendant Cisco. At the time Defendant Frenkel published his defamatory statements he was (and remains) the Director of Intellectual Property at Defendant Cisco Systems, Inc. His acts were committed in his managerial capacity. In fact, they were made in connection with a lawsuit naming his employer as a defendant. In performing the acts described in this petition, he was acting within the course and scope of his employment. Alternatively or additionally Defendant Cisco is liable for exemplary damages as it ratified and approved the conduct of Defendant Frenkel with full knowledge that he was acting with malice.

24.    Plaintiff requests that Defendants be cited to appear and answer, and that on final trial the Plaintiff have the following:

6

- Judgment against Defendants for compensatory damages in excess of $75,000;

- Judgment against Defendants for damages to compensate Plaintiff for harm to his reputation, emotional distress and harm to Plaintiff's relations with others that have been detrimentally effected by Defendants' tortious conduct;

- Judgment for exemplary damages against Defendants in a sum determined by the trier of fact and in an amount that will deter the Defendants from similar outrageous conduct in the future;

- Prejudgment and postjudgment interest as provided by law;

- All costs of suit;

- A public retraction of the false, scandalous and defamatory statements made against Plaintiff;

- Any other relief the Court finds just and proper.


Respectfully Submitted,


Nicholas H. Patton
State Bar No. 63035
Patton, Tidwell & Schroeder, LLP
4605 Texas Boulevard
Texarkana, Texas 75503
Tel:    (903) 792-7080
Fax:    (903) 792-8233
Email: nickpatton@texaskanlaw.com

ATTORNEY FOR PLAINTIFF

7

| | SEARCH BLOG | FLAG BLOG | Next Blog- | | Create Blog | Sign In |

# Patent Troll Tracker

**THURSDAY, OCTOBER 18, 2007**

## ESN Convinces EDTX Court Clerk To Alter Documents To Try To Manufacture Subject Matter Jurisdiction Where None Existed

I got a couple of anonymous emails this morning, pointing out that the docket in ESN v. Cisco (the Texas docket, not the Connecticut docket), had been altered. One email suggested that ESN's local counsel called the EDTX court clerk, and convinced him/her to change the docket to reflect an October 16 filing date, rather than the October 15 filing date. I checked, and sure enough, that's exactly what happened – the docket was altered to reflect an October 16 filing date and the complaint was altered to change the filing date stamp from October 15 to October 16. Only the EDTX Court Clerk could have made such changes.

Of course, there are a couple of flaws in this conspiracy. First, ESN counsel Eric Albritton signed the Civil Cover Sheet stating that the complaint had been filed on October 15. Second, there's tons of proof that ESN filed on October 15. Heck, Dennis Crouch may be subpoenaed as a witness!

You can't change history, and it's outrageous that the Eastern District of Texas is apparently, wittingly or unwittingly, conspiring with a non-practicing entity to try to manufacture subject matter jurisdiction. This is yet another example of the abusive nature of litigating patent cases in the Banana Republic of East Texas.

(n.b.: don't be surprised if the docket changes back once the higher-ups in the Court get wind of this, making this post completely irrelevant).

Posted by Troll Tracker at 1:13 PM                    0 comments

**WEDNESDAY, OCTOBER 17, 2007**

## Troll Jumps the Gun, Sues Cisco Too Early

Well, I knew the day would come. I'm getting my troll news from Dennis Crouch now. According to Dennis, a company called ESN sued Cisco for patent infringement on October 15th, while the patent did not issue until October 16th. I looked, and ESN appears to be a shell entity managed by the President and CEO of DirectAdvice, an online financial website. And, yes, he's a lawyer. He clerked for a federal judge in Connecticut, and was an attorney at Day, Berry & Howard. Now he's suing Cisco on behalf of a non-practicing entity.

**Send email**

email TrollTracker

**About Me**

Troll Tracker
Just a lawyer, interested in patent cases, but not interested in publicity

View my complete profile



**Blogs TrollTracker Reads**

Dennis Crouch's Patently-O Blog

Peter Zura's 271 Patent Blog

Patent Prospector

Michael Smith's EDTX Blog

Delaware IP Law Blog

Chicago IP Litigation Blog

Phillip Brooks' Patent Infringement Updates

Just a Patent Examiner

SCOTUSBlog

Patently Silly

**Subscribe Now: Feed Icon**

 Subscribe in a reader

**Google**

Add to Google

Exhibit A

I asked myself, can ESN do this? I would think that the court would lack subject matter jurisdiction, since ESN owned no property right at the time of the lawsuit, and the passage of time should not cure that. And, in fact, I was right:

> A declaratory judgment of "invalidity" or "noninfringement" with respect to Elk's pending patent application would have had no legal meaning or effect. The fact that the patent was about to issue and would have been granted before the court reached the merits of the case is of no moment. Justiciability must be judged as of the time of filing, not as of some indeterminate future date when the court might reach the merits and the patent has issued. We therefore hold that a threat is not sufficient to create a case or controversy unless it is made with respect to a patent that has issued before a complaint is filed. Thus, the district court correctly held that there was no justiciable case or controversy in this case at the time the complaint was filed. GAF contends, however, that the issuance of the '144 patent cured any jurisdictional defect. We disagree. Later events may not create jurisdiction where none existed at the time of filing.

*GAF Building Materials Corp. v. Elk Corp. of Texas*, 90 F.3d 479, 483 (Fed. Cir. 1996) (citations and quotations omitted).

One other interesting tidbit: Cisco appeared to pick up on this, very quickly. Cisco filed a declaratory judgment action (in Connecticut) yesterday, the day after ESN filed its null complaint. Since Cisco's lawsuit was filed after the patent issued, it should stick in Connecticut.

Perhaps realizing their fatal flaw (as a couple of other bloggers/news items have pointed out), ESN (represented by Chicago firm McAndrews Held & Malloy and local counsel Eric Albritton and T. Johnny Ward) filed an amended complaint in Texarkana today - amending to change absolutely nothing at all, by the way, except the filing date of the complaint. Survey says? XXXXXX (insert "Family Feud" sound here). Sorry, ESN. You're on your way to New Haven. Wonder how Johnny Ward will play there?

Posted by Troll Tracker  at 7:00 PM              1 comments

## TrollSurfing: Monts & Ware, Ward & Olivo, and Their Clients

Similar to surfing the web, I started by checking out a hunch I had about Monts & Ware being behind all sorts of troll cases. Then I trollsurfed through a bunch of cases, and I ended up not only with Monts & Ware (Dallas litigation firm), but also Ward & Olivo (patent lawyers from New York/New Jersey), as a thread behind a bunch of

### Blog Archive

▼ 2007 (83)

  ▼ October (17)

   ESN Convinces EDTX Court Clerk To Alter Documents ...

   Troll Jumps the Gun, Sues, Cisco Too Early

   TrollSurfing: Monts & Ware, Ward & Olivo, and Thei...

   Orion, the Hunted

   Texas Judge Bans Using Term "Patent Troll" in Tria...

   A Look at the Fortune 100 and Patent Litigation, P...

   Addendum to Part 1, Fortune 100

   A Look at the Fortune 100 and Patent Litigation, P...

   Last Week Wasn't Even the First Time Niro Scavone ...

   Acacia Targets Linux in New Lawsuit Against Red Ha...

   Patent Troll Sues Fish & Richardson

   Bill Gates, Steve Jobs, Hugh Hefner and Larry Flyn...

   Troll Call and Other Patent Stats for September 20...

   Ode to Patent Trolls

   Wednesday Miscellany

   Unveiling TrollTracker's Troll Severity Assessment...

   Patent Reform, Front and Center in the News :-. and...

  ► September (27)

  ► August (20)

  ► July (11)

  ► June (3)

  ► May (5)

## Sitemeter

# Exhibit N

Labels: anonymity, blogging, bounty, media troll-coverage

## 4 comments:

**Bart Simpson said...**

Poor **Ray** - wants to pick a fight but can't find out who to pick it with. Hey **Ray**: eat our shorts.

December 6, 2007 2:10 AM

**Ned Ulbricht said...**

This isn't funny.

If you **shoot** and kill **Ray Niro** tonight, I would consider it a justifiable killing.

When someone puts a price on your head, you're entitled to believe they're serious.

December 7, 2007 1:26 AM

**Shark Girl said...**

You said: "Finally, a word on the power of anonymous blogging. The right to criticize authority is a bedrock constitutional principle in our country."

Don't let them find out who you are. They will make an example out of you, like they are doing to me. I've been offered bribes. I've been threatened. I've been told I have to give up my company plans to two corporations. One of which sued the pants off Intel over the clipper chip patent.

I'm criticizing authority on my blog (currently going after the USDOJ, and if I get guts enough, I'm going to oust a JAG lawyer who I was stupid enough to hire, only to find out he was helping the defendants).

It's amazing what corporations and lawyers will do over intellectual property rights, and/or stopping someone from getting their ideas sponsored.

They are making sure my project stays in their hands, and

The Volokh Conspiracy

Patently Absurd Inventions Archive

Patently Silly

**EMail Newsletter**

Enter your email address below to receive the Patent Troll Tracker blog posts in a daily newsletter. The newsletter, containing the previous day's posts, will be emailed late in the morning, Eastern US Time.

Enter your email address:



Subscribe

Delivered by FeedBurner

**Subscribe Now: Feed Icon**

 Subscribe in a reader

**Google**

 Google

**Blog Archive**

▼ 2008 (10)
  ▼ January (10)
    New York Times Article Sets the Stage for Upcoming...

    Troll Call and Other Statistics for December 2007

    Global Patent Holdings Sues Boca Raton Resort & Cl...

    Wednesday Miscellany, 1/9/08

# Exhibit O

| SEARCH BLOG |     | FLAG BLOG | Next Blog»                    Create Blog | Sign In

# Patent Troll Tracker

Showing posts for query Raymond.  Show all posts

**WEDNESDAY, DECEMBER 19, 2007**

## Patent Troll Tracker Haiku Contest Results

You people have not made it easy. I thought I'd get a few submissions,
but I actually got dozens. And I'm a horrible judge. But here are my
favorites - in no particular order within each category. I didn't include
everything I received, but thanks to everyone who sent me a
submission. Some people wanted complete anonymity; others gave
me a moniker. If you submitted something and didn't tell me one way
or the other, I assumed anonymity.

<u>Scott Harris Category</u>

Scott Harris lost his
job 'cause he wanted his Fish
And to eat it too.

-- Anonymous Patent Practitioner

Pesky ethics rules.
Conflicts mean nothing to trolls.
Help me, Ray, help me!

-- Random Examiner

Genius since age twelve.
Invented on boss's time.
Ridiculed on web.

-- Random Examiner

<u>Global Patent Holdings/JPEG Category</u>

J-Peg Patent is
invalid due to B-Boards
from 1980s.

---

**Email TrollTracker**

trolltracker@gmail.com

**About Me**

Troll Tracker
Just a lawyer, interested in
patent cases, but not interested
in publicity

   View my complete profile

EFF is helping bloggers protect
their Constitutional right to
anonymous speech



**Blogs TrollTracker Reads**

   Dennis Crouch's Patently-O Blog

   Peter Zura's 271 Patent Blog

   Patent Prospector

   Michael Smith's EDTX Blog

   Phillip Brooks' Patent
   Infringement Updates

   Techdirt

   Above The Law

   WSJ Law Blog

   Overlawyered

   Patent Baristas

   Just a Patent Examiner

   Hal Wegner's Blog

-- Anonymous

A thousand words? If
that pic's a JPEG then it's
worth a thousand bucks.

-- Anonymous Patent Practitioner

Internet is fun:
News, porn, and patent law blogs.
Please don't enjoin it.

-- Random Examiner

Winter for Niro
More Spurious JPEG Suits
Stay at Super 8

-- Anonymous

For a bad time call,
5-2-5-3-3-4-1!
End up on lame date.

-- Applesauce Zombie (in honor of "Jenny")


<u>Ray Niro Category</u>

The first patent troll --
Thought he would have thicker skin.
(I will get sued now.)

-- Random Examiner

Bounty on my head.
Hope my parents don't try to
collect the reward.

-- Patent Troll Tracker

Excuse me, Raymond.
How do you know that I don't
work in your office?

-- Patent Troll Tracker

IP Geek

Delaware IP Law Blog

Chicago IP Litigation Blog

Washington State Patent Law
Blog

Anticipate This!

Benefit of Hindsight

Patent Demand

Ideation Lab

SCOTUSBlog

How Appealing

The Volokh Conspiracy

Patently Absurd Inventions
Archive

Patently Silly

**EMail Newsletter**

Enter your email address below to
receive the Patent Troll Tracker
blog posts in a daily newsletter.
The newsletter, containing the
previous day's posts, will be
emailed late in the morning,
Eastern US Time.

Enter your email address:



Delivered by FeedBurner

**Subscribe Now: Feed Icon**

Subscribe in a reader

**Google**

Blog Archive

▼ 2008 (18)

　▼ January (18)

　　Minerva Awarded Exclusive

Eastern District of Texas Category

Huntin' buddy judge.
Brother Bubba is local.
The Eastern District.

-- Anonymous Texas Litigator

Johnny and Otis:
My local counsel one case,
Against me the next.

-- California Litigator

Driving to Marshall.
I-20 is quite boring.
Beam me up, Scotty.

The Markman Hearing:
Judge Clark plays "Grill the Witness;"
My expert blew it.

Client just filed an
inter-partes reexam.
Will Ward stay? No way!

-- Patent Troll Tracker

Patent Trolling in General Category

Big corporations
stole my patented life's work.
Sam Baxter saves me.

-- "Don't publish my name, asshole"

Trolls and their lawyers
have proved that some of the time
extortion's legal.

-- Anonymous Patent Practitioner

I'm from Ohio
Plaintiff is from NJ, why's
the court in Texas?

-- Anonymous Patent Practitioner

Paul Ware and Acacia

The Writing Process

Survey Results

A Note About Civility

Oral Argument in Quanta v.
    LG

Patent Exhaustion Takes
    Center Stage at SCOTUS

Is the United States Navy the
    Latest Patent Troll?...

New York Times Article Sets
    the Stage for Upcoming...

Troll Call and Other Statistics
    for December 2007

Global Patent Holdings Sues
    Boca Raton Resort & Cl...

Wednesday Miscellany,
    1/9/08

Number of Utility Patent
    Claims Issued By USPTO
    Pe...

Rembrandt's Interesting
    Injunction Strategy (Possi...

4 Interesting New Cases From
    Last 2 Weeks of Decem...

Acacia December 2007 Update

Global Patent Holdings
    Update

Happy New Year

► 2007 (136)

Labels

104 E. Houston St. (3)

1st Media (1)

1st Technology (3)

Acacia (42)

Accolade Systems (1)

ADISCOV (2)

Adv Tech Incubator (1)

Alexsam (4)

Aloft Media (1)

KSR: Court says
everything is obvious.
Oh, my aching head!

-- "Mike"

The snow will not melt
on IBM's patented
way to patent troll.

-- TrolletRolle

I could say "troll" or
non-practicing entity.
Grow some thicker skin.

-- Patent Troll Tracker

Blogging Intelligentsia Category

Hal Wegner sends out
one thousand emails a day;
To Hal: Get a Blog.

-- Anonymous Guy On Hal's Email List

Well meaning law news
turns into patent bitch-fest.
Beats doing real work!

-- Random Examiner

Does Dennis Crouch know
That Kimberly is married
With four kids in tow?

-- Anonymous Patent Practitioner

Patent Hawk tells me
I should go to hell (I think).
It's all in good fun?

What can you expect
from a guy whose patents are
owned by Acacia?

Altitude Capital Partners (9)

anagrams (3)

anonymity (11)

Antor Media (5)

AOL (1)

Apple (8)

Aris Mardirossian (1)

Artesyn (1)

AT_T (6)

attorney-trolls (7)

Austin (1)

Automated Facilities (2)

Autotext (3)

Barry Thomas (1)

BarTex (3)

Beneficial Innovations (1)

Bill Gates (1)

bio-pharma (4)

blogging (15)

Bodog (2)

Boston (1)

bounty (2)

Brian Marcus (1)

British Technology Group (1)

Bruce Renouard (1)

Burst.com (1)

Cablevision (1)

Calvin Ayre (3)

Card Activation Techs (1)

champerty (1)

Charles Hill (1)

Choongsoo Park (1)

Ciba (1)

Cingular (1)

Cisco (4)

Citrix (1)

Clay Dark (1)

-- Patent Troll Tracker

Write my patent blog.
I wish it paid 160.
Google, buy me please.

-- Anonymous Texas Litigator

Posted by Troll Tracker at 8:04 AM    1 comments
Labels: haiku, Hal Wegner, Niro Scavone, Patent Hawk, Scott Harris

F R I D A Y ,   D E C E M B E R   1 4 ,   2 0 0 7

## Friday Miscellany

I'm back from out of town, and have a few things in my inbox to clear.
I know these are miscellaneous and seemingly unrelated topics, but
that's why they call it Friday Miscellany...

———————————————————————

First, I have a couple of programming announcments. Coming next
week is another installment of Patent Troll Tracker haikus. Submit
your entry to trolltracker@gmail.com, and I'll publish the best.

The theme for next week's haikus: choose from one of the following:

Ray Niro
Ray Niro's client GPH's JPEG-on-a-website patent
Scott Harris
James Beauregard Parker
The patent blogging intelligentsia (e.g., Dennis Crouch, Michael
Smith, Patent Hawk, Hal Wegner).
Eastern District of Texas

I won't publish anything I consider offensive or defamatory. I'll have a
First Place, Second Place, Third Place, and several Honorable
Mentions. I'll post everything anonymously or with whatever moniker
you sign your email, and will delete all emails. You have to
affirmatively tell me if you want me to use your real name.

Deadline is 8pm EST on Tuesday 12/18. I'll post the winning entries (if
I get any at all) on Wednesday.

Next Thursday, I'll have my top ten patent trolls of 2007. Guess who's
number one? (Actually, I haven't decided yet. If you want to nominate
anyone, you can email me that, too).

———————————————————————

Comcast (1)
Commil USA (2)
Computer Acceleration (3)
Constellation IP (1)
contingency fee (4)
Cooley (2)
Coronary Stent Visualization
Corp. (1)
corporate shell games (2)
Creative Internet (1)
Credit Card Fraud Control Corp. (
1)
Cross Atlantic (1)
CSIRO (3)
Cybergym (3)
Dallas (4)
Dan Henderson (1)
dance contest (1)
Data Encryption (1)
Data Match (2)
David Pridham (7)
Dechert (2)
defendants_sued (8)
Dell (2)
Dennis Crouch (8)
Diagnostic Systems (1)
Digital Choice (2)
Digital Reg (2)
Digital Technology Licensing (1)
Disc Link (1)
DJ (2)
DocuMed (1)
Document Generation Corp. (1)
eBay (1)
ECF (1)
Electrolux (1)
epicRealm (2)
Eric Albritton (3)

Have I said how much I am enjoying Techdirt? Thanks for the support from that community. I chuckled over the comment that the reason why Ray Niro is really trying to unmask me is so that he can arrange a clambake! TrollTracker loves clambakes.... Although I think it's more likely to be an alligator bake. After all, Ray is probably headed down to his massive Boca Raton home (complete with pool). Why do you think Niro is filing multi-defendant JPEG lawsuits in West Palm Beach? So he can spend more time at this nice getaway (and write it off on his taxes)?

_____

## Are Patent "Trolls" Wrongly Named and Maligned? Do They Have a Future?

That's the question that was asked and answered by James H. Wallace, Jr. of Wiley Rein, at the October 2007 AIPLA Annual Meeting in Washington, D.C. The AIPLA has made his paper available here. Note that it was Wallace who decided to put a JPG of Raymond Niro and Peter Detkin, side by side, in his paper, not me. And by linking to the AIPLA paper, I am in no way condoning the use of JPGs in any computer medium without first sending a check to Mr. Niro and Global Patent Holdings.

My favorite part of the paper is a breakdown given to Wallace by "well-known Silicon Valley patent litigator, Doug Lumish," of the four types of patent trolls. This is a unique way of categorization.

Here is the Lumish Troll Typing:

1. True Blue Trolls. "Non-manufacturing companies which acquire patents from inventors." Examples given are Acacia, Rembrandt, and Intellectual Ventures.

2. The Thinking Person's Trolls. Entities that "develop inventions for the purpose of licensing and enforcement, not to manufacture and sell products." Lumish/Wallace gives an example of universities, but I disagree. I don't think Universities are trolls. I'd split this group into two. The half that develop inventions for the sake of research and advancing science, and licensing is a side result, are not trolls. The other half that file patent applications only to gain intellectual capital to transform into money, without a legitimate effort to advance science through research, may be appropriate for this "thinking person's troll" category.

3. Incidental Trolls. "Failed manufacturing companies left with patent assets ready to be exploited." The example given is NTP. I don't disagree. The somewhat grey line, to me, is when a business is starting to fail, but is still making significant products, but tries to use

Erich Spangenberg (13)

ESN (3)

Eurotroll (1)

Evil Pete (1)

examiner overload (1)

F_G Research (1)

Facebook (2)

Federal Circuit (4)

Fenner Investment (1)

Financial Systems Innovation (2)

Fish_Richardson (15)

Fluid Dynamics (1)

Ford (1)

Forgent (1)

Fortune 100 (4)

FotoMedia (1)

FRCP 1 (1)

Freedom Wireless (1)

Friedman Suder (4)

Function Media (2)

GE Healthcare (1)

Gellman (2)

Gemini IP (1)

General Patent Corp (2)

Global Commns (1)

Global Patent Holdings (10)

GM (1)

Google (11)

GPNE (1)

Guardian Media (1)

haiku (3)

Hal Wegner (3)

Harthcock (2)

Hennigan Bennett (3)

Hospital Systems (1)

HP (2)

Hugh Hefner (1)

a licensing program to supplement its failing manufacturing. For example, I don't think Texas Instruments was/is a troll. Other companies fall on the other side of that line.

4. Competitors. "A company [that] acquire[s] patents to target a competitor with suit." Sorry, I strongly disagree here. Broadcom is not a troll. This, to me, falls in the same camp as the "incidental trolls." Anyway, that just goes to show that there is room for healthy debate, and you can categorize in so many different ways and justify it, and open yourself up to criticism. The rest of the Wallace paper is also interesting, arguing that the "patent party" may be over. Anyone who has been watching EDTX in the six weeks since he gave his paper, though, may disagree.

———————————————————

MercExchange, the non-practicing entity run by inventor Thomas G. Woolston (former Fish & Richarson patent attorney), finally got a judgment in the long-running eBay case. As you may recall, eBay originally was enjoined, in a decision that was eventually overturned by the Supreme Court. Now there's a judgment in favor of MercExchange in the amount of $30 million.

———————————————————

Professor Gerard Magliocca of the Indiana University School of Law has a solution to today's patent troll problem: let's eliminate all software and business method patents. See this blog entry for more details.

———————————————————

I got my first email from the Coalition for Patent Fairness, who wants me to pass on to my readers, many of whom are small businesses, that they can sign an online letter in support of the Patent Reform Act of 2007. Evidently, 30 companies have already signed up. I do know that many small businesses are targeted by patent holding companies like Global Patent Holdings, Acacia, Erich Spangenberg, Katz, and others. So if any of you targeted small businesses are actually reading this blog and want to sign, go here.

Of course, the Coalition should update the front page of its website, where it reports that 116 patent cases have been filed in EDTX in the last 16 months. I'm sure that number was true at the time they posted it, but it's much more now. According to PACER, that number is 430 over the past 16 months! That's right, over the past 16 months, the Eastern District of Texas has averaged a patent case a day, when just a few years ago, it was averaging less than one per month.

———————————————————

Hybrid (2)

Hypercom (1)

IBM (2)

Illinois Computer Research (5)

injunctions (1)

Innovative Patented Technology (2)

Inpro (2)

Intellectual Ventures (7)

International Intellectual Mgmt (1)

International Printer (1)

IP business models (1)

IP Innovation (3)

iPhone (1)

J. Carl Cooper (1)

James Parker (9)

James Sokolove (1)

Jarg (1)

Jenner Block (2)

Johnny Ward (3)

Johnson_Johnson (1)

joint infringement (1)

Joseph Zito (2)

Judge Clark (5)

Judge Davis (3)

Judge Everingham (1)

Judge Folsom (3)

Judge Moore (1)

Judge Ward (2)

jury verdict (6)

Katten Muchin (1)

Katz (4)

Kevin Zilka (1)

Keystone Autonics (1)

Klausner (1)

KSR (3)

Larry Flynt (1)

It truly was a post of miscellaneous information, no? Back next week with haikus, top ten lists, and a feature I'm calling "The Running of the Trolls."

Posted by Troll Tracker at 12:03 AM    5 comments
Labels: haiku, MercExchange, patent reform, troll assessment

T U E S D A Y ,   N O V E M B E R   1 3 ,   2 0 0 7

## Established and Emerging IP Business Models

Thanks to Ron Laurie of Inflexion Point Strategy for giving me permission to reprint/post a paper he and Raymond Millien of PCT Capital presented at the Sedona Conference last month. The paper, which can be downloaded here, outlines some names that are familiar around these parts, and some new players, too. Good reading if you wondered out Altitude Capital Partners, Rembrandt, Intellectual Ventures, Acacia, and others fit together in the big picture in today's world of patent commoditization.

*Update*: Peter Zura has good observations about the Millien/Laurie paper here.

Posted by Troll Tracker at 12:31 AM    0 comments
Labels: Acacia, Altitude Capital Partners, Intellectual Ventures, IP business models, Peter Zura, Rembrandt, Ron Laurie

W E D N E S D A Y ,   S E P T E M B E R   2 6 ,   2 0 0 7

## Reply From Ray Niro

Was going to post something analytical about patent reform today, but it just didn't happen. May do so later today, but meanwhile, I got this reply from Ray Niro to my follow-up letter to his original patent assertion.

*Dear Mr. Tracker:*

*When you identify yourself (maybe you can include your photograph), we can respond. I suggest you read pp. 64-65 of the Board's decision. ("A typical instance of an asymmetric technique is one for continuous-tone imagery such as JPEG.").*

*Raymond P. Niro*

OK, that doesn't answer many, if any, of my questions. But since I'm not going to identify myself, I guess we're at a standoff. I'll be following the case in Chicago, though. You know, the one where the Green Bay Packers are the lead defendant. What's next, suing the

Larry Germer (1)

law firms (1)

LG (3)

LHConcepts (1)

Lin Packaging (1)

Linex (1)

linux (1)

Lonestar Inventions (2)

Lowe's (1)

LPL Licensing (1)

magically changing docket dates (1)

malpractice (1)

Marshall Credit (2)

Marshall Electronics (3)

Marshall Packaging (2)

Matt Powers (1)

McKesson (1)

McKool Smith (8)

MDL (2)

Media Technologies Licensing (1)

media troll-coverage (8)

Memory Control (1)

MercExchange (1)

Mershon (1)

MHL TEK (2)

Michael Smith (7)

Microsoft (9)

Minerva (6)

MIT (1)

Mobile Micromedia (2)

Mondis (2)

Monts_Ware (6)

motions_compel (1)

Motorola (3)

NDGA (1)

netPL (1)

Yankees in Boston?

Posted by Troll Tracker at 11:01 AM    12 comments
Labels: Acacia, anonymity, Global Patent Holdings, Niro Scavone, stupid patent tricks

FRIDAY, SEPTEMBER 14, 2007

## TrollTracker Responds to Ray Niro's Threat Letter

TrollTracker got the following email from Ray Niro of Niro Scavone (timed to arrive just before 5pm on a Friday, no less). Apparently, he's serious about suing me personally. And people keep asking me why the anonymity:

*Please identify yourself. You may be infringing United States Patent No. 5,253,341.*

*Raymond P. Niro*
*(Transmitted by Donna L. Wartman)*

I looked, and this patent belongs to Acacia**. So now Acacia wants to shut down this website? Here is my response:

Dear Mr. Niro,

I have received your email dated September 14, 2007. TrollTracker respects the intellectual property rights of third parties, and takes such accusations seriously. In order to better investigate your claim that I "may" be infringing U. S. Patent No. 5,253,341, please provide me with more information. How, exactly, am I infringing any claim of this patent? Is any blogger automatically infringing the '341 patent by posting a blog? Or does your claim pertain to my methods of searching public databases to get information? Is it your claim that anyone who searches the PTO Assignments database or the Illinois Corporations database automatically infringes Acacia's '341 patent? Would you be willing to put that in writing?

I look forward to your response. However, unless and until I get a more detailed response outlining how, exactly, I am infringing the Acacia '341 patent, I will be unable to further respond to your letter.

Sincerely,

TrollTracker

PS Greg Aharonian, help me now!

Network Signatures (1)
New York Times (1)
NextCard (3)
Nintendo (1)
Niro Scavone (23)
Nokia (2)
non-EDTX rocket dockets (1)
Northeastern U (1)
Ocean Tomo (1)
Online Res. (1)
open source (1)
OPTi (3)
Orbitz (1)
Orion IP (12)
Otis Carroll (1)
PA Advisors (1)
Paice (1)
Paid Search Engine (1)
Palm (1)
Parallel Networks (1)
Parallel Processing (1)
patent exhaustion (4)
Patent Hawk (4)
patent reform (33)
Patriot Scientific (1)
Paul Hickman (4)
Paul Ware (1)
Performance Pricing (1)
Peter Courture (1)
Peter Zura (2)
Philips (1)
Phoenix IP (3)
PhoneTel (1)
Plutus IP (11)
Polaris IP (2)
Polymer Solvents (2)
Positive Techs (1)

Update: Well, that didn't take long. Just yesterday, Global Patent Holdings, LLC, a subsidiary of Acacia**, sued the Green Bay Packers, Ed Napleton Acura, Apple, Orbitz, Peapod, OfficeMax, Caterpillar, and Kraft Foods, for infringement of the '341 patent. Case filed in Chicago by Ray Niro, of course. Didn't show up on my radar because Niro filed it as an amended complaint in a case that had been originally filed against Greg Aharonian and stayed for 7 years. In the Green Bay Packers' case, they were accused of "participating in at least one football contest against the Chicago Bears every year." Suing the Packers in Chicago? To get the jury swayed? Right. Anyway, evidently this patent just emerged from a 7-year reexamination, where only a single claim survived. And supposedly the posting of a JPEG picture on a website is the act of infringement. I guess there goes the Troll Crossing photo (temporarily)!

*Edit 12/8/07* : Acacia doesn't own the patent, Global Patent Holdings, which is not a subsidiary of Acacia, does own it, per this post

Posted by Troll Tracker at 5:22 PM    8 comments
Labels: Acacia, contingency fee, Global Patent Holdings, Niro Scavone, stupid patent tricks

Newer Posts                 Home                 Older Posts

Subscribe to: Posts (Atom)

Power Integrations (1)

Power-One (1)

Premier Intl (1)

privilege (2)

PSN Illinois (1)

QPSX (1)

Quantum World (1)

RealNetworks (1)

Red Hat (1)

Reese (1)

Refined Recommendation (2)

Reid (1)

Rembrandt (7)

RIM (2)

Ron Laurie (1)

Rule 11 (2)

Rusty Rose (3)

Rutan Tucker (2)

Sam Baxter (2)

Samsung (2)

Saxon Innovations (3)

Scott Harris (15)

Scott Lewis (3)

Screentone (2)

Seagate (4)

Silicon Valley (2)

silly patents (1)

Simon Passanante (1)

Sky Technologies (2)

Slashdot (1)

small inventors (2)

Software Rights Archive (1)

Sony (1)

SP Technologies (2)

Sprint (1)

ST Sales Tech (3)

standing (1)

statistics (31)

Steve Jobs (1)

StorMedia (2)

stupid patent tricks (8)

Supreme Court (3)

Susman Godfrey (3)

Sutton (1)

T-List (1)

Taeus (1)

Target (2)

TechSearch (1)

Tessera (1)

Texas MP3 Technologies (1)

TGIP (5)

Thomas Harvey (1)

threatening emails (3)

Tillotsin (2)

Time Warner (1)

Tinkers_Chance (1)

Traffic Information (2)

Trent West (1)

Triton IP (2)

troll assessment (3)

Trontech (1)

Typhoon Touch (1)

UFOs (1)

US Navy (1)

Vdata (2)

venue (30)

Verizon (2)

Verve (1)

Viacom (1)

Visto (1)

VTran (1)

Wal-Mart (1)

Ward_Olivo (4)

Warren Heit (1)

Wavport (1)

Web Telephony (1)

Weil Gotshal (3)

White_Case (1)

Wi-LAN (3)

WIAV (1)

willfulness (3)

Williams Kherkher (1)

Yahoo (2)

Zappos (1)

# Exhibit P

| SEARCH BLOG |    | FLAG BLOG | Next Blog»                    Create Blog | Sign In

# Patent Troll Tracker

Showing posts for query Ray.  Show all posts

**Email TrollTracker**

trolltracker@gmail.com

**THURSDAY, SEPTEMBER 6, 2007**

## While We Wait for CDCA, Some More Troll Anagrams

I had so much fun anagramming Cooley Godward Kronish into *Lying Crooks Who Are Odd* a couple of weeks ago, that I decided to try a few more while I wait patiently for the Central District of California PACER/ECF crew to hurry up! so I can post the August statistics (they run about a week behind in putting patent cases online - more on that tomorrow). Here are a few more I came up with:

Niro Scavone = Naive? Or Cons?
Rod G. Dorman, Tall Lawyer = Amoral Troll, Gnawed Dry
Leonard Davis = Android Slave
*Fish & Richardson* should be representing EchoStar because their anagram is *Dish Franchisor*


Eh. That's all I could come up with. Apologies to Ray Niro, Rod Dorman, and Judge Davis. All in good fun. No apologies to Fish & Richardson or EchoStar.

If anyone sends me any good ones, I'll post them here! Send to trolltracker@gmail.com

Posted by Troll Tracker at 8:53 AM     0 comments
Labels: anagrams, Cooley, Fish_Richardson, Hennigan Bennett, Judge Davis, Niro Scavone

**MONDAY, JULY 23, 2007**

## Defense Verdict in Marshall vs. Troll

Hybrid Networks used to be a real company. Then it sold its assets to Daniel Henderson, who formed the company Hybrid Patents, Inc. Hybrid Patents is a patent troll, and Henderson is a king troll wannabe. Henderson also owns Trontech Licensing Inc. (which sued Thomson recently) and owns PhoneTel Licensing Inc. (which was

**About Me**

Troll Tracker
Just a lawyer, interested in patent cases, but not interested in publicity

View my complete profile


EFF is helping bloggers protect their Constitutional right to anonymous speech



Blogs TrollTracker Reads

Dennis Crouch's Patently-O Blog

Peter Zura's 271 Patent Blog

Patent Prospector

Michael Smith's EDTX Blog

Phillip Brooks' Patent Infringement Updates

Techdirt

Above The Law

WSJ Law Blog

Overlawyered

Patent Baristas

Just a Patent Examiner

Hal Wegner's Blog

involved in lawsuits, too). More on Henderson's early days, working with his buddy Ray Niro, here.

Charter Communications, on the other hand, is a cable company with almost 6 million customers, and has over 15,000 employees. Despite the fact that Charter is headquartered in St. Louis and Henderson and his entities are in Fort Worth, the litigation was filed in Marshall, Texas. Henderson/Hybrid claimed that Charter, by using cable modems compliant with the DOCSIS standard, infringed three patents. Hybrid, in a second suit, also sued Comcast, Cox, Time Warner Cable, Cablevision, and other related entities.

As is typical with Judge Ward's cases, there was not a claim construction ruling until 2 months before trial. And although Charter moved for summary judgment of noninfringement, Judge Ward denied that motion on July 6th - 3 days after jury selection.

The case went to trial, and after five days of trial, the jury took only an hour and a half to find all three patents not infringed. Click here to download a copy of the verdict. It looks like the other cable companies will get to ride on the coattails of the Charter team (represented by Kirkland & Ellis, John Desmaris - Hybrid was represented by William Slusser). For if Hybrid accused Charter of infringing the DOCSIS standard, and if Charter's products, which practice the standard, don't infringe the patents, collateral estoppel would dictate that Hybrid loses the rest of its DOCSIS cases, too.

So, if you're counting at home, that's three patent troll jury trials in Texas in the last three months:

Forgent Networks: patent invalidated by Echostar.
Orion IP: $36M verdict against Hyundai.
Hybrid Patents: jury found patents not infringed by Charter.

Posted by Troll Tracker at 10:11 PM    1 comments
Labels: Dan Henderson, Forgent, Hybrid, Judge Ward, jury verdict, Orion IP, PhoneTel, Trontech

Newer Posts                    Home                    Older Posts

Subscribe to: Posts (Atom)

## IP Geek

Delaware IP Law Blog

Chicago IP Litigation Blog

Washington State Patent Law Blog

Anticipate This!

Benefit of Hindsight

Patent Demand

Ideation Lab

SCOTUSBlog

How Appealing

The Volokh Conspiracy

Patently Absurd Inventions Archive

Patently Silly

**EMail Newsletter**

Enter your email address below to receive the Patent Troll Tracker blog posts in a daily newsletter. The newsletter, containing the previous day's posts, will be emailed late in the morning, Eastern US Time.

Enter your email address:



Delivered by FeedBurner

**Subscribe Now: Feed Icon**


Subscribe in a reader

**Google**



**Blog Archive**

▼ 2008 (18)

   ▼ January (18)

      Minerva Awarded Exclusive

Paul Ware and Acacia

The Writing Process

Survey Results

A Note About Civility

Oral Argument in Quanta v. LG

Patent Exhaustion Takes Center Stage at SCOTUS

Is the United States Navy the Latest Patent Troll?...

New York Times Article Sets the Stage for Upcoming...

Troll Call and Other Statistics for December 2007

Global Patent Holdings Sues Boca Raton Resort & Cl...

Wednesday Miscellany, 1/9/08

Number of Utility Patent Claims Issued By USPTO Pe...

Rembrandt's Interesting Injunction Strategy (Possi...

4 Interesting New Cases From Last 2 Weeks of Decem...

Acacia December 2007 Update

Global Patent Holdings Update

Happy New Year

► 2007 (136)

Labels

104 E. Houston St. (3)

1st Media (1)

1st Technology (3)

Acacia (42)

Accolade Systems (1)

ADISCOV (2)

Adv Tech Incubator (1)

Alexsam (4)

Aloft Media (1)

Altitude Capital Partners (9)

anagrams (3)

anonymity (11)

Antor Media (5)

AOL (1)

Apple (8)

Aris Mardirossian (1)

Artesyn (1)

AT_T (6)

attorney-trolls (7)

Austin (1)

Automated Facilities (2)

Autotext (3)

Barry Thomas (1)

BarTex (3)

Beneficial Innovations (1)

Bill Gates (1)

bio-pharma (4)

blogging (15)

Bodog (2)

Boston (1)

bounty (2)

Brian Marcus (1)

British Technology Group (1)

Bruce Renouard (1)

Burst.com (1)

Cablevision (1)

Calvin Ayre (3)

Card Activation Techs (1)

champerty (1)

Charles Hill (1)

Choongsoo Park (1)

Ciba (1)

Cingular (1)

Cisco (4)

Citrix (1)

Clay Dark (1)

Comcast (1)

Commil USA (2)

Computer Acceleration (3)

Constellation IP (1)

contingency fee (4)

Cooley (2)

Coronary Stent Visualization Corp. (1)

corporate shell games (2)

Creative Internet (1)

Credit Card Fraud Control Corp. (1)

Cross Atlantic (1)

CSIRO (3)

Cybergym (3)

Dallas (4)

Dan Henderson (1)

dance contest (1)

Data Encryption (1)

Data Match (2)

David Pridham (7)

Dechert (2)

defendants_sued (8)

Dell (2)

Dennis Crouch (8)

Diagnostic Systems (1)

Digital Choice (2)

Digital Reg (2)

Digital Technology Licensing (1)

Disc Link (1)

DJ (2)

DocuMed (1)

Document Generation Corp. (1)

eBay (1)

ECF (1)

Electrolux (1)

epicRealm (2)

Eric Albritton (3)

Erich Spangenberg (13)

ESN (3)

Eurotroll (1)

Evil Pete (1)

examiner overload (1)

F_G Research (1)

Facebook (2)

Federal Circuit (4)

Fenner Investment (1)

Financial Systems Innovation (2)

Fish_Richardson (15)

Fluid Dynamics (1)

Ford (1)

Forgent (1)

Fortune 100 (4)

FotoMedia (1)

FRCP 1 (1)

Freedom Wireless (1)

Friedman Suder (4)

Function Media (2)

GE Healthcare (1)

Gellman (2)

Gemini IP (1)

General Patent Corp (2)

Global Commns (1)

Global Patent Holdings (10)

GM (1)

Google (11)

GPNE (1)

Guardian Media (1)

haiku (3)

Hal Wegner (3)

Harthcock (2)

Hennigan Bennett (3)

Hospital Systems (1)

HP (2)

Hugh Hefner (1)

Hybrid (2)

Hypercom (1)

IBM (2)

Illinois Computer Research (5)

injunctions (1)

Innovative Patented Technology (2)

Inpro (2)

Intellectual Ventures (7)

International Intellectual Mgmt (1)

International Printer (1)

IP business models (1)

IP Innovation (3)

iPhone (1)

J. Carl Cooper (1)

James Parker (9)

James Sokolove (1)

Jarg (1)

Jenner Block (2)

Johnny Ward (3)

Johnson_Johnson (1)

joint infringement (1)

Joseph Zito (2)

Judge Clark (5)

Judge Davis (3)

Judge Everingham (1)

Judge Folsom (3)

Judge Moore (1)

Judge Ward (2)

jury verdict (6)

Katten Muchin (1)

Katz (4)

Kevin Zilka (1)

Keystone Autonics (1)

Klausner (1)

KSR (3)

Larry Flynt (1)

Larry Germer (1)

law firms (1)

LG (3)

LHConcepts (1)

Lin Packaging (1)

Linex (1)

linux (1)

Lonestar Inventions (2)

Lowe's (1)

LPL Licensing (1)

magically changing docket dates (1)

malpractice (1)

Marshall Credit (2)

Marshall Electronics (3)

Marshall Packaging (2)

Matt Powers (1)

McKesson (1)

McKool Smith (8)

MDL (2)

Media Technologies Licensing (1)

media troll-coverage (8)

Memory Control (1)

MercExchange (1)

Mershon (1)

MHL TEK (2)

Michael Smith (7)

Microsoft (9)

Minerva (6)

MIT (1)

Mobile Micromedia (2)

Mondis (2)

Monts_Ware (6)

motions_compel (1)

Motorola (3)

NDGA (1)

netPL (1)

Network Signatures (1)

New York Times (1)

NextCard (3)

Nintendo (1)

Niro Scavone (23)

Nokia (2)

non-EDTX rocket dockets (1)

Northeastern U (1)

Ocean Tomo (1)

Online Res. (1)

open source (1)

OPTi (3)

Orbitz (1)

Orion IP (12)

Otis Carroll (1)

PA Advisors (1)

Paice (1)

Paid Search Engine (1)

Palm (1)

Parallel Networks (1)

Parallel Processing (1)

patent exhaustion (4)

Patent Hawk (4)

patent reform (33)

Patriot Scientific (1)

Paul Hickman (4)

Paul Ware (1)

Performance Pricing (1)

Peter Courture (1)

Peter Zura (2)

Philips (1)

Phoenix IP (3)

PhoneTel (1)

Plutus IP (11)

Polaris IP (2)

Polymer Solvents (2)

Positive Techs (1)

Power Integrations (1)

Power-One (1)

Premier Intl (1)

privilege (2)

PSN Illinois (1)

QPSX (1)

Quantum World (1)

RealNetworks (1)

Red Hat (1)

Reese (1)

Refined Recommendation (2)

Reid (1)

Rembrandt (7)

RIM (2)

Ron Laurie (1)

Rule 11 (2)

Rusty Rose (3)

Rutan Tucker (2)

Sam Baxter (2)

Samsung (2)

Saxon Innovations (3)

Scott Harris (15)

Scott Lewis (3)

Screentone (2)

Seagate (4)

Silicon Valley (2)

silly patents (1)

Simon Passanante (1)

Sky Technologies (2)

Slashdot (1)

small inventors (2)

Software Rights Archive (1)

Sony (1)

SP Technologies (2)

Sprint (1)

ST Sales Tech (3)

standing (1)

statistics (31)

Steve Jobs (1)

StorMedia (2)

stupid patent tricks (8)

Supreme Court (3)

Susman Godfrey (3)

Sutton (1)

T-List (1)

Taeus (1)

Target (2)

TechSearch (1)

Tessera (1)

Texas MP3 Technologies (1)

TGIP (5)

Thomas Harvey (1)

threatening emails (3)

Tillotsin (2)

Time Warner (1)

Tinkers_Chance (1)

Traffic Information (2)

Trent West (1)

Triton IP (2)

troll assessment (3)

Trontech (1)

Typhoon Touch (1)

UFOs (1)

US Navy (1)

Vdata (2)

venue (30)

Verizon (2)

Verve (1)

Viacom (1)

Visto (1)

VTran (1)

Wal-Mart (1)

Ward_Olivo (4)

Warren Heit (1)

Wavport (1)

Web Telephony (1)

Weil Gotshal (3)

White_Case (1)

Wi-LAN (3)

WIAV (1)

willfulness (3)

Williams Kherkher (1)

Yahoo (2)

Zappos (1)

# Exhibit Q

Join SPJ    Why Join?    |    Home   Members   Leaders   Help/Contact    |    Search



# Society of Professional Journalists

*Improving and protecting journalism*

**Start the weekend right with SPJ Leads! Latest issue: Starbucks card! Be like Howard, Work abroad**

**About SPJ**

**Sigma Delta Chi Foundation**

**Job Bank**

**Freelancer Directory**

**Training**

**Local Connection**

**Freedom of Information**

**Ethics**

**Diversity**

**Convention & Journalism Conference**

**Awards**

**Generation J**

**Tools for Leaders**

**Internships, fellowships, scholarships**

**Legal Defense Fund**

**Legal Advocacy**

**First Amendment**



**Download a printable copy [PDF]**

## Preamble
Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. The duty of the journalist is to further those ends by seeking truth and providing a fair and comprehensive account of events and issues. Conscientious journalists from all media and specialties strive to serve the public with thoroughness and honesty. Professional integrity is the cornerstone of a journalist's credibility. Members of the Society share a dedication to ethical behavior and adopt this code to declare the Society's principles and standards of practice.

## Seek Truth and Report It
Journalists should be honest, fair and courageous in gathering, reporting and interpreting information.

Journalists should:

— Test the accuracy of information from all sources and exercise care to avoid inadvertent error. Deliberate distortion is never permissible.
— Diligently seek out subjects of news stories to give them the opportunity to respond to allegations of wrongdoing.
— Identify sources whenever feasible. The public is entitled to as much information as possible on sources' reliability.
— Always question sources' motives before promising anonymity. Clarify conditions attached to any promise made in exchange for information.

**SPJ Code of E**
English | PDF ver
Spanish
French
Portuguese
Slovene
Arabic [PDF]
Chinese [PDF]
Croatian [PDF]
German [PDF]
Greek [PDF]
Hungarian [PDF]
Macedonian [PD

Other Codes of E

**Ethics**
Ethics Home
News/Articles
Code of Ethics
Case Studies
Ethics Answers
Ethics Hotline
Resources
Ethics week
Ethics Committe
Message Board

**Code Words:**
**SPJ's Ethics Co**
**Blog**
• Suspect IDs
• 'The Press Is To
• To Vote, or Not

**Ethics Commi**
This committee's
to encourage the
Society's Code of
which promotes t
professional stan
journalists of all o
Public concerns a
answered by this
It also acts as a s
reporting trends i

**Publications**

**Event Calendar**

**Public and the Press**

**SPJ Blogs**

**Discussion Boards**

**Resources for...**
Students
Freelancers
Educators
International journalists
Arab journalists

Keep promises.
— Make certain that headlines, news teases and promotional material, photos, video, audio, graphics, sound bites and quotations do not misrepresent. They should not oversimplify or highlight incidents out of context.
— Never distort the content of news photos or video. Image enhancement for technical clarity is always permissible. Label montages and photo illustrations.
— Avoid misleading re-enactments or staged news events. If re-enactment is necessary to tell a story, label it.
— Avoid undercover or other surreptitious methods of gathering information except when traditional open methods will not yield information vital to the public. Use of such methods should be explained as part of the story
— Never plagiarize.
— Tell the story of the diversity and magnitude of the human experience boldly, even when it is unpopular to do so.
— Examine their own cultural values and avoid imposing those values on others.
— Avoid stereotyping by race, gender, age, religion, ethnicity, geography, sexual orientation, disability, physical appearance or social status.
— Support the open exchange of views, even views they find repugnant.
— Give voice to the voiceless; official and unofficial sources of information can be equally valid.
— Distinguish between advocacy and news reporting. Analysis and commentary should be labeled and not misrepresent fact or context.
— Distinguish news from advertising and shun hybrids that blur the lines between the two.
— Recognize a special obligation to ensure that the public's business is conducted in the open and that government records are open to inspection.

## Minimize Harm

Ethical journalists treat sources, subjects and colleagues as human beings deserving of respect.

Journalists should:

— Show compassion for those who may be affected adversely by news coverage. Use special sensitivity when dealing with children and inexperienced sources or subjects.
— Be sensitive when seeking or using interviews or photographs of those affected by tragedy or grief.
— Recognize that gathering and reporting information may cause harm or discomfort. Pursuit of the news is not a license for arrogance.
— Recognize that private people have a greater right to control information about themselves than do public officials and others who seek power, influence or attention. Only an overriding public need can justify intrusion into anyone's privacy.
— Show good taste. Avoid pandering to lurid curiosity.
— Be cautious about identifying juvenile suspects or victims of sex crimes.
— Be judicious about naming criminal suspects before the formal filing of charges.
— Balance a criminal suspect's fair trial rights with the public's right to be informed.

accumulating cas
jobs well done un
circumstances.

**Ethics Commi**
**Andy Schotz, ch**
Hagerstown, Md.
E-mail
**Bio (click to ex**

**Fred Brown, vic**
2862 S. Oakland
Aurora, Colo., 80
303/829-4647
E-mail
**Bio (click to ex**

**SPJ Ethics Committee M**

**Robert Buckma**
337/482-5221
E-mail
**Bio (click to ex**

**Casey Bukro**
847/869-4193
E-mail
**Bio (click to ex**

**Jerry Dunklee**
203/392-5801
E-mail
**Bio (click to ex**

**Mike Farrell**
E-mail
**Bio (click to ex**

**Irwin Gratz**
207/874-6570
E-mail
**Bio (click to ex**

**Liz Hansen**
859/608-7681
E-mail
**Bio (click to ex**

**Jane Kirtley**
612/625-9038
E-mail
**Bio (click to ex**

**Paul LaRocque**
E-mail
**Bio (click to ex**

**Sara Stone**
E-mail
**Bio (click to ex**

**Peter Sussman**
510/845-1311
E-mail
**Bio (click to ex**

**Adrian Uribarri**
786/514-5758

E-mail
**Bio (click to exp**

**Nerissa Young**
E-mail
**Bio (click to exp**

# Act Independently

Journalists should be free of obligation to any interest other than the public's right to know.

Journalists should:

—Avoid conflicts of interest, real or perceived.
— Remain free of associations and activities that may compromise integrity or damage credibility.
— Refuse gifts, favors, fees, free travel and special treatment, and shun secondary employment, political involvement, public office and service in community organizations if they compromise journalistic integrity.
— Disclose unavoidable conflicts.
— Be vigilant and courageous about holding those with power accountable.
— Deny favored treatment to advertisers and special interests and resist their pressure to influence news coverage.
— Be wary of sources offering information for favors or money; avoid bidding for news.

# Be Accountable

Journalists are accountable to their readers, listeners, viewers and each other.

Journalists should:

— Clarify and explain news coverage and invite dialogue with the public over journalistic conduct.
— Encourage the public to voice grievances against the news media.
— Admit mistakes and correct them promptly.
— Expose unethical practices of journalists and the news media.
— Abide by the same high standards to which they hold others.

*The SPJ Code of Ethics is voluntarily embraced by thousands of writers, editors and other news professionals. The present version of the code was adopted by the 1996 SPJ National Convention, after months of study and debate among the Society's members.*

*Sigma Delta Chi's first Code of Ethics was borrowed from the American Society of Newspaper Editors in 1926. In 1973, Sigma Delta Chi wrote its own code, which was revised in 1984, 1987 and 1996.*

Copyright © 1996-2008 Society of Professional Journalists. All Rights Reserved. Lega

**Society of Professional Journalists**
Eugene S. Pulliam National Journalism Center, 3909 N. Meridian St., Indianapolis, IN 46
317/927-8000 | Fax: 317/920-4789 | Contact SPJ Headquarters | Employment Opportun

# Exhibit R



**USC ANNENBERG**
ONLINE JOURNALISM REVIEW®



Supported by the Annenberg School for Communication at USC

OJR thanks the following sponsors for their financial support:

YAHOO!®



*Your town. Your news. Your take.*

Ads by Google    

**Ethics Training**
Leading online business ethics training courses with full tracking
www.saiglobal.com/compliance

**Business Ethics**
Join our Program Today!
At Loyola University Chicago
luc.edu/BusinessEthics

**Business Ethics**
Make Decisions, Resolve Conflicts, Build Teams.
Business Ethics
www.business.com

**Ethics Training Video**
Free online previews & shipping. Customer reviews. Discounts avail.
www.media-partners.com

**Digital Journalism School**
Learn Digital Journalism at NBC News & New York Film Academy
www.NYFA.com/

ONLINE JOURNALISM WIKIS

# What are the ethics of online journalism?

These principles help separate the good writers and publishers from the frauds and con artists online.

Updated: 2007-01-14 at 5:24 PM (MST) by Robert Niles
[**Printer-friendly page** | **Previous versions**]

The ethics of online journalism are, ultimately, no different than the ethics of journalism. The Society of Professional Journalists has articulated a comprehensive **policy of journalism ethics** that can help guide any consciencious online writer.

That said, here are some basic qualities that any good online writer ought content ought to demonstrate:

### No plagiarism

By now, you've likely discovered that writing is hard work. You certainly don't want someone else swiping your effort and presenting it as his or her own.

So don't steal others' work.

Such theft is plagiarism. It includes not just cutting and pasting whole articles, but copying photos, graphics, video and even large text excerpts from others and putting them on your web page as well.

If you want to reference something on another website, **link it** instead.

If you are concerned that the page you're linking to will disappear, give your readers the name of the publication that published the page, its date of publication and a short summary of its content. Just like news reporters used to reference other content before the Web. (*"In a Sept. 20 report, the Wall Street Journal reported...."*).

When in doubt, do both. There's no such thing as too much supporting information.

### Disclose, disclose, disclose

Tell your readers how you got your information, and what factors influenced your decision to publish it. If you have a personal or professional connection to people or groups you're writing about, describe it. Your readers deserve to know what has influenced the way you reported or wrote a story.

Don't hide whom you work for, or where the money to support your site comes from. If your site runs advertising, label the ads as such. Let readers know if you are making money off links

**JOIN OJR**

Log-In
Register

**OJR DELIVERED**

OJR Newsletter:

Enter Your E-mail    [Go]

News feed
MY YAHOO!
OJR on Facebook
OJR on Twitter

**HOW-TO GUIDES**

Earning Revenue
Ethics
Glossary of Terms
Publishing Tools
Reporting
Shooting Video
User-Generated Content
Writing



Become a better digital journalist and dynamic newsroom leader with in-depth seminars at USC Annenberg School for Communication.

» Learn More

**OJR ARCHIVES**

entrepreneurial journalism
grassroots journalism
tools
newsroom convergence
social media
management
revenue
discussion boards
ethics
journalism education
website design
newspaper blogs
multimedia
political blogs

elsewhere on your site, as well.

**No gifts or money for coverage**

One common way journalists avoid conflicts of interest is by refusing gifts or money from sources they cover. Writers who accept gifts, payments or honoraria from the people or groups they cover open themselves up to charges that their work is a paid advertisement for those sources. Or, at the very least, that those writers are too "close" to these sources to cover them honestly. You can avoid controversy by politely declining such offers.

Most major news organizations do allow their writers to accept free admission to events for the purpose of writing a feature or review. But most of those organizations bar their writers from "junkets," where groups provide free travel and hotel rooms in addition to attendance at their event.

Many companies also send items such as books and DVDs to writers who review them. Items of significant value ought to be returned after the review. Less expensive items, such as books, can be donated to a local school or charity.

If you are writing about your employer, obviously you are accepting money from it. But let your readers know that. Identify yourself as an employee, even if you are writing anonymously, so people know enough about your background that they can make their own judgment about your credibility.

As writers should not accept money from sources, they also should not ask for it. If your site runs ads, do not solicit people or groups you cover to buy ads or sponsorships on your site. Find someone else handle your ad sales.

**Check it out, then tell the truth**

Just because someone else said it, this statement does not make it true. Reward your readers with accurate information that stands up to scrutiny from other writers. Check out your information before you print it.

Find facts, not just others' opinions, to support your comments. Start with sites such as our **guide to reporting** to learn how to find real data, not someone else's spin. Make sure that what you are writing isn't merely repeating some **urban myth**, either.

If you are writing about someone else, **call** or e-mail them for a comment before you publish. If your subject has a blog, link to it. That link will notify the subject that you've written about them, and will allow your readers to click-through and read the subject's side of the story.

If you want to write satire or spoofs, fine. But make sure your audience knows that what you are writing is not literal truth. Tricking readers won't help you develop the respect, credibility or loyal audience that truthful writers enjoy and rely upon.

**Be honest**

In summary, be honest with your readers and transparent about your work. If people wonder for a moment about your honesty or your motives, you've lost credibility with them. Don't let them do that. Answer those questions even before readers ask.

media law
online video
press freedom
censorship
The Los Angeles Times
awards
content management
systems
elections
Flash
Google
mergers and acquisitions
news aggregators
sourcing
usability
interactivity
OJR conference
infographics
photojournalism
question of the week
search engine optimization
student spotlight
The New York Times on the
Web
crowdsourcing
Iraq
opinion journalism
sports journalism
YouTube

**SEARCH ARCHIVES**

**STAFF**

Editor:
Robert Niles

Advisory board:
Michael Parks
Xeni Jardin
Chris Jennewein
Robin Miller
Anthony Moor
Lisa Stone

And most important is to never utilise your power of press for personal gains or simply annoying someone.

**Links to this article: Google Blog Search, Technorati, Yahoo**

*Would you like to edit, correct or add to this article?*

Edit this wiki

This work is licensed under a **Creative Commons License**.

©2008 **USC Annenberg School for Communication**.
**About OJR - Privacy policy - Contact the Editor**

# Exhibit S

# The Platform
## The Official Cisco Blog

## Opinions and Insights from Cisco



« Cisco's Internet Postings Policy | Main | NBA and Cisco: Going Global with TelePresence »

**Blogs@Cisco Home**

**March 24, 2008**

**Lessons Learned….Cisco Updates Policy on Employee Blogging**

We have chosen to dedicate a substantial post to this topic since it is an important issue affecting Cisco and many other companies as online communications continue to evolve.

Our recent experiences have shown us that as corporate blogging becomes more prevalent, new questions arise about transparency and etiquette. Corporate blogging is an important vehicle for two-way dialogue and communications, and it is a vehicle we are committed to utilizing here at Cisco. Most recently, we've learned some important lessons and through this blog post, hope our learnings add value to those participating in this important new media.

**Policy Change**

Cisco today is amending its policy on employee blogging. These changes follow the disclosure by a Cisco employee that he had authored an anonymous blog commenting on various policy and legal matters with which the company has been involved and on which he worked. In addition, Cisco employees who knew he was the author circulated links to the blog without revealing that a Cisco employee authored the blog.

The company believes strongly in employees' right to freedom of expression, online and elsewhere. At the same time, we expect our employees, when commenting on matters related to Cisco's business, to exercise that freedom in a manner consistent with Cisco's corporate values of transparency and integrity. Therefore, we have evolved our employee blogging policy to expressly address:

· blogging anonymously about issues employees have responsibilities for at Cisco; and

· passing on to third parties "anonymous" blog postings of any kind that employees know were written by someone at Cisco.

The revised blogging policy will include the following clause, to take effect immediately:

"If you comment on any aspect of the company's business or any policy issue the

### APRIL 2008

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     | 1   | 2   | 3   | 4   | 5   |
| 6   | 7   | 8   | 9   | 10  | 11  | 12  |
| 13  | 14  | 15  | 16  | 17  | 18  | 19  |
| 20  | 21  | 22  | 23  | 24  | 25  | 26  |
| 27  | 28  | 29  | 30  |     |     |     |

**Subscribe**

** More info on XML/RSS feeds



**SEARCH THIS BLOG**

**Search**

**EMAIL SUBSCRIPTIONS**

**Sign Up**    **Remove**

**More Info on Email Subscriptions

**CATEGORIES**

○  Community and Philanthropy
○  General
    ○  Healthcare
    ○  Retail
○  Partner
○  Public Policy
○  Technologies

company is involved in where you have responsibility for Cisco's engagement,
you must clearly identify yourself as a Cisco employee in your postings or blog
site(s) and include a disclaimer that the views are your own and not those of
Cisco. In addition, Cisco employees should not circulate postings that they know
are written by other employees without informing the recipient that the source was
within Cisco."

## Background

A lawyer in Cisco's intellectual property department, Rick Frenkel, created the
Patent Troll Tracker blog. Rick started his anonymous blog in May 2007, writing
frequently and broadly on patents and presenting relevant data related to patent
litigation, an area currently of great public interest, in which Cisco also has an
interest. He identified himself as the author of the blog in a posting on his site on
February 23, 2008. Once his authorship became public, confusion was created
between Rick's views and Cisco's views on various patent issues discussed in his
blog.

## What We Learned

As we have investigated this issue, there are clear lessons we have learned.
There are two very distinct issues in this situation that have been instructive:

1. No one from Cisco edited Rick's anonymous postings or required him to write
on any topic, no one in his chain of command beyond his immediate supervisor
knew that he was the author of Troll Tracker, and Rick intended that the blog
solely reflect his opinions. However, given that Rick worked on intellectual
property matters for Cisco, Rick's relationship to Cisco should have been made
clear and Cisco takes responsibility for the content of the blog.

2. We believe that a few Cisco employees used poor judgment when they
suggested topics to Rick for his anonymous blog or pointed third parties to the
blog without disclosing that the content was created by a Cisco employee. These
are not appropriate communications activities for Cisco employees and are
inconsistent with our values and principles.

These shortcomings began innocently – with Rick's desire for personal anonymity
and Cisco employees' desire to disseminate useful information while respecting
Rick's anonymity. But eventually this opened the door for a perception that Cisco
somehow had something to hide. Cisco is committed to transparency in our
communications and in the relationships we have with all of our constituencies,
and we regret that this situation occurred.

## Moving Forward

We are committed to our policy of allowing our employees appropriate online
expression. As an employee, Rick is free to continue his personal blog, Patent
Troll Tracker, in compliance with the revised policy. Rick has many fans who
appreciate the information he collects and disseminates on patent litigation trends

ARCHIVES

April 2008
March 2008
February 2008
January 2008
December 2007
November 2007
October 2007
September 2007
August 2007
July 2007
June 2007
May 2007
April 2007
March 2007
February 2007
January 2007
December 2006
November 2006
October 2006
September 2006
August 2006
July 2006
June 2006
May 2006
April 2006

RECENT ENTRIES

Keith Goodwin's Parting Words for
Channel Partners

Thierry Drilhon, VP Worldwide
Channels, European Markets

Cisco Worldwide Partner Summit:
Interview with Inbar Lasser-Raab

Mobility Vlog Series

Cisco Perspectives: One CEO's
Insights

and recognize his blog as an important voice in the on-going national dialogue on patent issues.

Blogging and blog policy are evolving areas for many companies. We believe we have learned a valuable lesson from this regrettable situation. Our goal now is to bring further clarity to our employees in the area of online communication, and our hope is that others will learn from this experience as well.

Posted by **Cisco** on March 24, 2008 09:00 AM

**RELATED LINKS**
News@Cisco
Blogger Biographies

**BLOG ROLL**
Ars Technica
Dilbert Blog
GigaOm
Layer 8
InfoWorld Daily
SiliconValleyWatcher
TechCrunch
TechMeme
ZDNet Between the Lines
Barron's Tech Trader Daily
NYTimes "Bits" Blog
WSJ "BizTech" Blog

**LEGAL**

Disclaimer

| Trackback Pings |
|---|

TrackBack URL for this entry:

http://blogs.cisco.com/cgi-bin/mt/mt-t.cgi/1542

| Comments |
|---|

Great post. I didn't know the story, but I sure appreciate Cisco outing this situation and publicly sharing changes your undertaking to ensure alignment with company values and policies while still respecting the importance of this new communication medium.

sean

Posted by **Sean ODriscoll** on March 24, 2008 12:01 PM

Stealing others' property is bad behavior! Conducting anonymous smear campaigns against inventors and their partners is bad behavior! PIAUSA members are confident that the "Banana Republic" courts will deal with Cisco in a manner appropriate for their conduct.

Cisco claims "We believe we have learned a valuable lesson from this regrettable situation."

Here is an inventor's perspective. I am certain that Cisco has not learned the lesson they should be learning but confident that as the stakes are raised that they will learn. In my opinion the lesson they need to learn is to operate as RESPONSIBLE corporate citizens who fairly compensate those who produce the inventions which Cisco needs to function in their market. They need to look at the inventors as valued partners and embrace them. They need to acquire patent properties before they incorporate them into products.

Cisco and other Piracy Coalition members need to recognize that today's inventor community is much more organized than it was twenty years ago. The reality is that companies like Cisco have failed to understand this and as a result are receiving attitude adjustments for their conduct.

Their response has been to smear the good names of inventors rather than changing their approach to use of other's patent properties.

Deep pockets go a long way towards shaping public opinion as evidenced by the troll campaign. But the flip side is that inventors are no longer operating in isolation. We are sharing information and we are working in concert to see justice served.

We have Cisco's number.

Has it occurred to anyone that Cisco is getting sued because they have a big appetite for other's patent property and a big ego that gets in the way of acquiring the rights to the patent properties they need to succeed in the market?

Could the reason that Cisco has seen its litigation increase by an order of magnitude be that they are taking liberties with an increasing number of other's patent properties?

Have you considered that Cisco gets sued after they have refused a legitimate offer for a license? Inventors do not like litigation, but in the face of

Is it possible that Cisco's entitlement mentality has led them down the wrong path, a path where greed and ego trumps ethics?

Or have you considered that Cisco's membership in the Coalition for Patent fairness and PIRACY, aka. the Piracy Coalition is a good indication that birds of a feather do flock together?

Some companies start as inventors, and some start as parasites on those who have invented. I believe that Cisco is a parasite.

Eventually they end up alike, one group never being inventive and the second losing the ability to invent as they age. Both will try to substitute quantity in patent filing for the quality of inventions they are incapable of producing. It does not work.

All Piracy Coalition members fit one of these profiles. Tech companies who are past their prime, insurance and banking collectively have no shame!

What they very good at producing is innovative media hype which obfuscates the reality of their existence. Their multi-million dollar "troll" campaign is a perfect example of this. They paint their victims as "trolls" while the courts are finding their conduct so egregious that they are handing down staggering judgments which are generally being upheld by higher courts. This is what happens to those who are caught lying, cheating, and stealing and no amount of public relations painting their victims as evil "trolls" can change the facts of these cases.

Personally I think that it is a shame that Piracy Coalition members have failed to learn the lesson that inventors and the courts are teaching. It is all about conducting one's business in an ethical manner!

Ronald J. Riley,

Speaking only on my own behalf.

Affiliations:

President - www.PIAUSA.org - RJR at PIAUSA.org

Executive Director - www.InventorEd.org - RJR at InvEd.org

Senior Fellow - www.patentPolicy.org

President - Alliance for American Innovation

Caretaker of Intellectual Property Creators on behalf of deceased founder Paul Heckel

Washington, DC

Direct (202) 318-1595 - 9 am to 9 pm EST.



Note: Response from Jeanette Gibson, Director of New Media: We are always happy to engage in policy debates and discuss the merits of our positions. For Cisco's position on patent reform, please see our Global Policy and Government Affairs site: http://www.cisco.com/web/about/gov/markets/patent_reform.html

**Legal Disclaimer**

Some of the individuals posting to this site, including the moderators, work for Cisco Systems. Opinions expressed here and in any corresponding comments are the personal opinions of the original authors, not of Cisco. The content is provided for informational purposes only and is not meant to be an endorsement or representation by Cisco or any other party. This site is available to the public. No information you consider confidential should be posted to this site. By posting you agree to be solely responsible for the content of all information you contribute, link to, or otherwise upload to the Website and release Cisco from any liability related to your use of the Website. You also grant to Cisco a worldwide, perpetual, irrevocable, royalty-free and fully-paid, transferable (including rights to sublicense) right to exercise all copyright, publicity, and moral rights with respect to any original content you provide. The comments are moderated. Comments will appear as soon as they are approved by the moderator.

© 1992-2007 Cisco Systems, Inc. All rights reserved.

Posted by **Ronald J Riley** on March 24, 2008 01:20 PM

Thanks for sharing these lessons-learned; it's valuable input for many of us. And I applaud Cisco's focus on transparency and openness.

A question comes to mind as I read the text of your new policy. May employees still blog anonymously, as long as the indicate their relationship to Cisco?

I'm interested in understanding how Cisco views the balance between personal privacy (i.e. anonymity) and the responsibility for disclosure. Any insight you share would be appreciated.

*Full Disclosure: I am employed by Savvis, Inc. (www.savvis.net), which is a Cisco customer. Any views expressed in this message are my own and not those of my employer.*

Posted by **Benson Schliesser** on March 24, 2008 04:36 PM

So, is Trolltracker coming back? I, for one, miss it -- it was the best blog out there on patent litigation, period.

Posted by **Richard Cauley** on March 24, 2008 10:54 PM

It is understandable that patent trollophiles like Mr. Riley oppose the major corporate patent players like Cisco. But he apparently doesn't have a clue what the EDTX (Banana Republic) SLAPP suits are all about.

Irrespective of any position or tactic taken by Cisco in the patent market place, you and Rick have my admiration in opposing the these lawyers' attempts to choke off first amendment free speech.

I might note the irony that usually it's the other way around -- it's the deep pockets trying to stifle criticism by individuals.

Babel Boy

Posted by **BabelBoy** on March 25, 2008 09:12 AM

Firstly, I am glad Cisco is and does what they do in this day and age. I am a blogger who does the same thing as your lawyer, Rick (but not the same topics - although I will cover controversial topics).

However, I believe you are overreaching your potential for constructive blogs and other forums to be provided by requiring overtness of identities in this form in the workplace.

Although I do understand that there are legal liabilities of concern, it is somewhat excessive to require someone to expressly state that their opinions are not Cisco's, as they never expressly stated that their opinions do represent Cisco, nor would it easily be implied in the court of law especially for defamation. Beyond that we all know that patent trolls are of a very litigious in nature, and settling this lawsuit outside of court would logically incite other patent trolls to file suit as well.

Posted by **Matt** on March 25, 2008 01:19 PM

That the word "troll" is still being used here demonstrates that perhaps no lesson at all has or will be learned.

In many if not most cases, the word troll is simply a derogatory term for a patentee asserting a legitimate government granted right in good faith. Particularly given that, Peter Detkin, the individual most often credited with coinage of the term troll has renounced it, the use of such pejoratives to describe patentees seeking redress denigrates the entire patent bar and identifies the user as somewhat unenlightened.

Promotion of the concept of a troll by a company with deep involvement in patent issues offends every active patent attorney. I think Mr. Frenkel and others who are fond of the term troll owe the patent bar an apology. I daresay, from here forward, Cisco will have a difficult time asserting any patent rights it may choose to assert.

Posted by **CaveMan** on March 25, 2008 07:37 PM

Whats the stance with the network world top 20 cisco related websites/blogs, ie, the CCIE blogs, NAC and MARS blogs?

Posted by **C Jones** on March 27, 2008 02:57 PM

I agree with your employee blogging policy..........most other large companies
have similar policies and they have worked out quite well.

Posted by **Vectorpedia (Rick)** on March 30, 2008 09:22 AM

Great!

Posted by **mtlops** on April 6, 2008 03:12 AM

**Post a Comment**

If you have a TypeKey identity, you can sign in to use it here.

Name:

Email Address:

URL:

Remember Me? ◯ Yes  ◉ No

Comments: (you may use HTML tags for style)

Enter the phrase 'dsow3k' below **(required)**:

**Post**

# Exhibit T

**EXHIBIT T**

**FRENKEL'S UNATTRIBUTED QUOTATION OF THE *FAINARU-WADA* DECISION**

This Court in <u>In re Fainaru-Wada</u>, 438 F.Supp.2d 1111 (N.D. Ca. 2006) analyzed the Supreme Court's decision in <u>Branzburg</u> as follows  (the parts Frenkel omitted are shown in boldface):

> **Movants claim that "[w]hatever the law was in 1972 when *Branzburg* was decided, in the 34 years since *Branzburg*, much has changed." (Mot. at 19.) Accordingly, they urge the Court to apply three factors identified by the Supreme Court in *Jaffee v. Redmond, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996)*, which they contend support the recognition of a common law reporter's privilege under *Federal Rule of Evidence 501* ("*Rule 501*").  Those three factors are** (1) whether important private and public interests would be served by recognition of the privilege; (2) whether the evidentiary cost of recognizing the privilege is likely to be modest; and (3) whether similar protections are afforded by the states, either through legislation or the common law. *See Jaffee, 518 U.S. at 10-15*. **According to the Movants' argument, "[t]here is now an overwhelming consensus in this country that a reporter's privilege exists and must be given effect." (Mot. at 19.)**
>
> **Movants are correct that a large number of states have recognized a reporter's privilege.  However, federal courts generally have been reluctant to follow the lead of the states, in the context of grand jury proceedings. *See, e.g., Gonzales,    F.3d   , 2006 U.S. App. LEXIS 19436, 2006 WL 3130645 at \*7* (stating that "[i]t is unnecessary . . . for us to rule on whether such a privilege exists under *Rule 501*" because "any such privilege would be a qualified one . . . [and] would be overcome as a matter of law on these facts"); *In re Miller, 438 F.3d at 1150* ("The Court is not of one mind on the existence of a common law privilege. Judge Sentelle would hold there is no such common law privilege[.] . . . Judge Tatel would hold that there is such a common law privilege. Judge Henderson believes that we need not, and therefore should not, reach that question. However, all believe that if there is any such privilege, it is not absolute and may be overcome by an appropriate showing," and "that if such a privilege applies here, it has been overcome."); *In re Special Proceedings, 373 F.3d at 44* (reading *Branzburg* to "flatly reject[] any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the *First Amendment* or of a newly hewn common law privilege"); and *In re Special Counsel Investigation., 332 F. Supp. 2d at 32* (construing *Branzburg* to reject *First Amendment* and common law reporter's privilege in the grand jury context, and rejecting recognition of privilege under *Rule 501*). The exceptions appear to be *In re Williams, 766 F. Supp. 358, 367 (W.D. Pa. 1991), aff'd by equally divided court 963 F.2d 567 (3rd Cir. 1992) (en banc)* (recognizing qualified reporter's privilege under *Rule 501* and concluding that government had not met its burden to overcome privilege) and *New York Times v. Gonzales, 382 F. Supp. 2d 457, 492-***

*508 (S.D.N.Y. 2005)* **(recognizing privilege under *Rule 501*), however, as noted, the latter opinion was subsequently vacated by the Second Circuit.** *Gonzales, F.3d , 2006 U.S. App. LEXIS 19436, 2006 WL 3130645 at \*7.*

Fainaru-Wada, 438 F.Supp.2d at 1118-1119

# Exhibit U

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS COMPUTER RESEARCH, LLC., | ) | |
| *Plaintiff and* | ) | |
| *Counterclaim Defendant,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GOOGLE INC., | ) | |
| *Defendant, and* | ) | |
| | ) | |
| FISH & RICHARDSON  P.C., | ) | Case No.  07 C 5081 |
| *Defendant, Counterclaimant* | ) | |
| *and Third Party Plaintiff,* | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | Honorable Rebecca R. Pallmeyer |
| | ) | Mag. Judge Maria Valdez |
| SCOTT HARRIS, | ) | |
| *Third-Party Defendant and* | ) | |
| *Counterclaimant,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FISH & RICHARDSON P.C., | ) | |
| *Defendant, Counterclaimant* | ) | |
| *Third-Party Plaintiff and* | ) | |
| *Counterclaim-Defendant.* | ) | |

## <u>SCOTT HARRIS' COUNTERCLAIM AGAINST FISH & RICHARDSON P.C.</u>

Scott C. Harris counterclaims against Fish & Richardson PC ("Fish") as follows:

1.     This counterclaim involves Fish's tortious interference with Scott Harris'
prospective economic advantage through its unwarranted and intentionally false
assertion of contrived ownership and other claims made against him that challenge his
lawfully obtained rights in his inventions and patents.  Mr. Harris also asserts a claim for
defamation <u>per se</u> for the intentionally false statements Fish made to the press after it
forced his resignation and for statements made to professional associates that injured

Mr. Harris' reputation and professional standing. Mr. Harris also asserts a claim against Fish for the wrongful withholding of wages under California law.

## THE PARTIES

2.    Scott C. Harris is a resident of Rancho Santa Fe, San Diego County, California, and was an employee at Fish & Richardson from 1994 until his forced resignation on September 14, 2007.

3.    Fish is a professional corporation headquartered at 225 Franklin Street, Boston, Massachusetts  02110-2804 but with offices throughout the United States. Fish conducts substantial business in this judicial district, has represented its clients in this judicial district (including clients in lawsuits brought before this Court) and has asserted a claim against Mr. Harris in this Court.

## JURISDICTION AND VENUE

4.    Jurisdiction exists under 28 U.S.C. §§ 1332 and 1367. The amount in controversy greatly exceeds $75,000.

5.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(b).

## BACKGROUND

6.    Scott Harris was an employee at Fish for approximately 14 years before his forced resignation on September 14, 2007. Mr. Harris worked for Fish as a patent attorney, predominately in the area of obtaining patents for clients. Mr. Harris was one of the highest billing Fish attorneys, and had among the highest origination numbers of any Fish attorney.

7.      A reason for his success as a patent attorney is that Mr. Harris, like many of his clients, is a prolific inventor in his own right.  Mr. Harris made his first invention at the age of 12, and spent his lifetime in the pursuit of technology innovations.  He first attended Duke University and then George Washington University, where he received a degree in electrical engineering.  Mr. Harris later worked as an electrical engineer in the communications and software fields and thereafter attended George Washington University Law School to pursue his interest in the patent law where he graduated and became a patent attorney.  He is admitted to practice before the United States Patent and Trademark Office ("PTO").

8.      Mr. Harris, at the invitation of respected professionals in the field of intellectual property, has taught various topics in patent law and practice to attorneys and technologists.  He has taught basic patent law and has presented a primer class on software patenting to more than 30 companies.  He has been invited to present a class on patent cost reduction via outsourcing and has taught one-hour class called "Patents for Kids," a program designed to teach young people about intellectual property.  Mr. Harris' patent lectures have taken place throughout the country.  Mr. Harris has also been extensively quoted in national and local publications concerning issues involved with patent law.  Mr. Harris was named the top patent prosecuting attorney in the *IP Law & Business* "Patent Hall of Fame" in 2003.

9.      Until September 12, 2007, Mr. Harris also was a faculty member of Patent Resources Group ("PRG"), a prestigious patent law education organization founded by Professor Irving Kayton of George Washington University Law School in 1969.  PRG explains the quality of its faculty as follows:

3

One of the important characteristics of PRG is our exceptional faculty. Only the best patent attorneys, litigators and strategists are permitted to teach at Patent Resources Group. In fact, we know of no other patent law training program that has a waiting list of highly accomplished would-be instructors.

Professor Kayton personally invited Mr. Harris to join the PRG faculty and, since 2002, Mr. Harris has played an integral role in its programs. Until September 12, 2007, Mr. Harris also was identified on PRG's website as a faculty member.

### Fish Was Well Aware Of -- And Assented To -- Mr. Harris' Personal Inventorship Activities

10.     Mr. Harris has invented many new technologies, and has been awarded 27 issued United States Patents and has pending approximately 80 patent applications in diverse fields of technology. Many of those patents and applications were sold to different companies that license and enforce Mr. Harris' patents. Most of the sales of Mr. Harris' patents were carried out by Mr. Harris at Fish's insistence. At all times during his tenure at Fish, Fish attorneys -- including those responsible for firm management -- were aware of Mr. Harris' personal inventorship activities. Indeed, at or about the time Mr. Harris joined Fish, he informed (now retired) Fish attorney Charles Winchester, then Fish's Ethics Chairman, that (1) he had made inventions, (2) he was currently prosecuting his own patent applications on those inventions before the PTO, and (3) he would continue to invent while associated with Fish. Mr. Winchester responded that the firm saw no problem with that, and that it was not unusual for patent prosecution attorneys to seek their own patents; indeed, others at Fish had done so before and after Mr. Harris did.

11.     Thereafter, Mr. Harris also sought the advice of a Fish administrator, Judy Filamond, who then headed Fish's "Practice Systems" group. Ms. Filamond likewise

advised Mr. Harris that she saw no problems with his personal inventorship activities, and saw no reason why his inventions should be integrated into Fish's patent prosecution docketing system.

12.    Mr. Harris' inventorship activities were open and well known within Fish. At no time did Mr. Harris conceal his inventorship activities from Fish.  As an example, a co-inventor on one of his patents (U.S. Patent No. 6,664,896) is the wife of former Fish Managing Partner John Gartman.

13.    Mr. Harris also prominently displayed plaques of some of his patents, including U.S. Patent Nos. 5,339,174 and 5,438,436, in his office.  Anyone entering Mr. Harris' office would have seen that he was the sole inventor on the displayed patents and that such activity was taking place while he was associated with Fish.  Many Fish attorneys – including the Managing Partner of the San Diego office -- came into Mr. Harris' office and saw such plaques on his wall.

14.    Mr. Harris also provided his U.S. Patent Office PKI (Public Key Infrastructure) certificate to Fish, and allowed Fish to store this certificate in a way that allowed every person in every Fish office to obtain access to this certificate.  This enabled any Fish attorney to check the status of his patent filings.  That certificate was associated with Fish's customer number and also with Mr. Harris' personal customer number, which enabled the user to view all of Mr. Harris' personal filings.  According to the PTO:

> You can log in to the Patent Office's website using your certificate, and get access to all the customer numbers and cases, associated with that certificate.  For example, you can review Pending and Patented Application Information, Prosecution History, Status and Location and other things about the cases.

15.     Mr. Harris also used examples of his personal patent prosecution in public presentations to other Fish attorneys.  After one such presentation in 2005, an attorney in Fish's Dallas office, Wes Musselman, specifically asked him about the example Mr. Harris discussed (related to automatic detection of cell phones at gas pumps) because another Fish client was interested in filing a patent application on similar technology. Mr. Harris confirmed that the cited example was for one of his own patents, and gave Mr. Musselman the patent number (U.S. Patent No. 6,222,458).

16.     In early 2005, Mr. Harris sought oversight of the PTO's actions by the Court of Appeals for the Federal Circuit on one of his pending patent applications (In re Scott C. Harris, Federal Circuit Appeal No. 05-1247), contending that the PTO was applying the wrong legal standard of patentability in examining business method claims. Like many intellectual property firms, Fish closely monitors events in the PTO and Federal Circuit Court of Appeals.  During that court action, in or around May of 2005, Fish attorney John Dragseth sent an email to many or all Fish attorneys, discussing that lawsuit and specifically identifying the application as belonging to Mr. Harris.

17.     In April of 2006, Mr. Harris also submitted public comments to the PTO's proposed rule changes on continuing applications in which he acknowledged his status as an inventor:

> These comments are responsive to Proposed Rules for Changes to Practice on Continuing Applications, (Federal Register Vol 71, no 1, pp 48-61).  These comments are made by Scott C. Harris, individually, as a registered patent attorney (Reg number 32,030), **and also as an independent inventor on numerous issued and pending patents.** These comments are not made on behalf of Fish & Richardson PC, the law firm with which I am associated (emphasis added).

6

These comments were publicly posted, and still can be viewed on the PTO website at http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_continuation/harris.pdf. Mr. Harris said the same thing in his comments on examination of claims (http://www.uspto.gov/web/offices/pac/dapp/opla/comments/fpp_claims/harrisscott.pdf). These comments are viewed by thousands of patent attorneys, and it is inconceivable that they were overlooked by Fish or all of its attorneys who practice in this area.

18.     At no time did Mr. Harris use any client information in the prosecution of his patents.  To the contrary, Mr. Harris even assigned at least two of his patents on which he was only a co-inventor to Fish's clients precisely to avoid any contention that he personally benefited from client information.

19.     As was the practice at Fish, other attorneys employed at Fish likewise were inventors on their own patents.  A well-known example is that of Tom Woolston, who prosecuted his own patents while at Fish  Those very patents were the basis for Woolston's founding of MercExchange (as in eBay v. MercExchange, 126 S.Ct. 1837 (2006)), a company of which the Managing Partner of Fish's San Diego office, John Phillips, is a co-owner.

20.     Other attorneys sought and filed their own patents while at Fish, including Tim Pham, who has since left Fish to work for Google.

21.     Neither the "employment agreement" under which Fish principals are employed, nor any firm policy, written or unwritten, prohibited Mr. Harris or any other firm employee or principal from making inventions and/or obtaining patents on inventions.

**Fish Clears Mr. Harris Of Wrongdoing,
But Forces Him To Leave The Firm Nonetheless**

22.     In March 2007, Dell Computer allegedly complained to Fish that it had been sued for infringement of a patent (U.S. Patent No. 6,704,791) by Mr. Harris and his exclusive licensee, Memory Control Enterprise ("MCE").   Thereafter, on March 19, 2007, Mr. Harris was contacted by John Steele, Fish's Ethics and Conflicts Director and Special Counsel.   Mr. Steele told Mr. Harris that Dell was a client of Fish and, for that reason, Mr. Harris could not be a party in any lawsuit against Dell.   Mr. Harris later learned that Dell may not, in fact, have been a client of the Fish firm at that time.   When Mr. Harris inquired of Mr. Steele by email whether Dell was, in fact, a Fish client, Mr. Steele chose not to respond.   Mr. Harris told Mr. Steele about all of his patents and applications.   At that time, Mr. Steele indicated (like all others at Fish over the years who Mr. Harris had told about his patents and applications) that this was not a problem, but instructed Mr. Harris to get all his pending patent applications into the Fish conflicts system.  Beginning on March 21, 2007, he began doing so to satisfy that demand.

23.     On April 10, 2007, Mr. Steele asked Mr. Harris for an update on ownership of the '791 patent.  At that time, MCE simply had an exclusive license under the patent and Mr. Harris retained all ownership rights.  Mr. Harris told Mr. Steele that he would form a separate company and transfer title to it and also withdraw from the pending litigation personally.  Mr. Steele informed Mr. Harris that he had outside counsel look into the issue of whether Mr. Harris had done anything unethical or inappropriate in obtaining the '791 patent and pursuing litigation against Dell.  He conceded to Mr. Harris that the investigation cleared Mr. Harris of any wrongdoing.

24.    On April 22, 2007, Mr. Harris sent an email to Mr. Steele informing him that he had formed a separate company to own the '791 patent, and that he was going to assign the '791 patent to that company so it could be formally substituted for him as a plaintiff in the lawsuit against Dell.  Later that day, Mr. Harris received an email from Mr. Steele saying: "Scott, thanks for hopping on this.  Let's talk Monday."  On Monday, April 23, 2007, Mr. Harris again informed Mr. Steele that he was about to assign the '791 patent to a separate company, but Mr. Steele told Mr. Harris "to hold off for now."  Mr. Harris complied with his directive.

25.    A week later, on May 1, 2007, Mr. Harris received a telephone call from Mr. Steele and Kathi Lutton, another Fish attorney.  Mr. Steele and Ms. Lutton told Mr. Harris that he had two choices: (a) drop the lawsuit against Dell or (b) leave Fish.  Ms. Lutton further ordered Mr. Harris to dismiss the suit against Dell or to sell whatever interest he had in the '791 patent and also to sell any other patents he owned within the next few days.  Mr. Harris told Ms. Lutton that he had never seen a patent sale happen in such a short amount of time.  Ms. Lutton agreed, but told Mr. Harris that he had to sell all of his patents anyway.  Ms. Lutton warned Mr. Harris to "weigh [your] options carefully."

26.    Based upon Fish's demands, Mr. Harris took immediate steps to sell his patents and pending patent applications to third parties.  The timing of Fish's demand, however, required that Mr. Harris seek and accept less than optimum terms of sale. Eventually, Mr. Harris was able to find purchasers for some of his patents and pending applications, one of which was Illinois Computer Research LLC ("ICR"), which acquired the '252 patent and U.S. Patents Nos. 7,231,050, 7,194,624 and 7,069,313, as well as

U.S. Patent Applications Nos. 09/569,816 and 09/669,959 and any continuations from and reissues or reexaminations of these patents and applications.   Purchasers of other of Mr. Harris' patents included Bar Tex Research, LLC, Innovative Biometric Technology LLC, Innovative Patented Technology, LLC, Parker Innovative Technologies and Virginia Innovative Technology, LLC.  Any prospective purchaser of patents determine value by identifying a list of users of the relevant technology for each patent and prospective purchasers did so, including organizations that routinely purchase patents from inventors.

27.    After the sale of his patents to ICR, ICR sent a letter to Google on August 29, 2003, stating that it was infringing the '252 Patent.  Google is a client of Fish and, on information and belief, Google immediately complained to Fish and sought its help in having the infringement claim withdrawn.

### Fish Not Only Fires Mr. Harris, But Seeks To Damage His Professional Reputation And The Value Of His Patent Portfolio

28.    Even though Fish had demanded that Mr. Harris sell these patents, and Mr. Harris had used his best efforts to comply with that directive, Fish immediately attempted to pressure, punish and intimidate Mr. Harris anyway.  On September 6, 2007, Mr. Steele told Mr. Harris that, if he proceeded with litigation against anyone enforcing his patents, Fish would claim that he copied ideas from firm clients and otherwise violated ethics rules.

29.    Fish then embarked on a campaign to damage Mr. Harris' professional reputation and cast a cloud over his patent portfolio, all to reassure potential infringers that Fish would assist in undermining the value of that portfolio.

30.    Specifically, on September 12, 2007, before Fish had even demanded Mr. Harris' resignation, PRG notified him that (1) it had received a call from a Fish official, and (2) it was terminating Mr. Harris from its faculty and removing him from the PRG website.  This, alone, greatly damaged Mr. Harris' professional standing.

31.    Then, later on September 12, 2007, Fish's Managing Partner, Peter Devlin, demanded the resignation of Mr. Harris within 24 hours.  Mr. Harris reluctantly complied with that demand.  Such demand was an effort to punish Mr. Harris for his inventorship activities and to signal that Fish would assist in undermining the value of Mr. Harris' patent portfolio.

32.    As part of that effort, on September 13, 2007, Fish, through its "Ethics Director" Steele, telephoned the employment lawyer for Mr. Harris, Ms. Lynne Lasry, and made a number of claims and demands.  In that conversation, Fish claimed that it – and not Mr. Harris – owned Mr. Harris' patents.  Fish asserted that "the patents are being held in constructive trust for the firm."  Fish demanded that Mr. Harris "get these patents back" and insisted on seeing all of Mr. Harris' privileged communications with the Niro law firm, which had represented Mr. Harris.  Fish, through Steele, also stated that, if Mr. Harris pursued patent infringement litigation, Mr. Harris would face inequitable conduct claims and his life could be made "miserable."

33.    Then, or about September 21, 2007, Fish gave the media a prepared statement, falsely charging that Mr. Harris' patent activities were "not authorized".  As alleged above and below, Mr. Harris' actions were in fact authorized by the firm.  Indeed, Mr. Harris sold his patents at the express demand of Fish.  On information and belief, in September and early October of 2007, Fish continued to make the same false

statements to third parties, all in an effort to undermine the assertion of Mr. Harris' patent portfolio against infringers. For good measure in early October 2007, Fish publicly made the same declaration to the National Law Journal ("Harris was involved in outside business ventures that were not authorized by the firm…."). This statement (like the others) was false.

34. On information and belief, before filing this lawsuit, Fish also improperly told Google and others that it had ownership rights in Mr. Harris' patents, a fact that encouraged Google and others not to accept and pay for a license under the Harris patents or to pay far less than the actual value of a license.

35. Fish's false ownership claims and statements that Mr. Harris had engaged in unlawful ("not authorized") activities regarding his patents brought the expectancy of licensing Mr. Harris' patent portfolio on reasonable terms to a screeching halt.

36. Fish knew that its ownership and other claims were baseless. As alleged above, from the very beginning, Mr. Harris fully disclosed his personal inventorship activities to Fish, and Fish expressly and implicitly gave its blessing to those activities. As alleged above, Mr. Harris was quite open about his inventorship activities, and those activities were publicized and widely known within the firm. In one case, twelve lawyers at Fish were given power of attorney to act on Mr. Harris' behalf in connection with the '252 patent. In addition, Fish was clearly on actual and constructive notice of all Mr. Harris' inventorship activities. Fish personnel had access to detailed information about each and every one of Mr. Harris' patents via his PKI certificate. Fish personnel used this access virtually every day, and could have viewed information about his patents at any time. All Fish attorneys were likely actually on notice of, Mr. Harris' comments on

the rule changes in which indicated that he "was an independent inventor on numerous issued and pending patents".  This alone is enough to show that Fish knew that Mr. Harris was an inventor and had and was obtaining his own patents while employed by Fish.  Moreover, Mr. Harris had already been cleared of any wrongdoing in Fish's internal ethics investigation.  Finally, Mr. Harris had sold many of his patents and pending applications to third parties at Fish's insistence.  This was also known to Fish.

37.    Even then, Fish continued to exert pressure on Harris and assert its fabricated claims of ownership, this time through several conversations between Mr. Harris' employment counsel, Ms. Lasry, and Fish's outside counsel, Jenner & Block, in September and early October 2007.  During those conversations, Fish:  (1) continued to assert that it owns the Harris patents and all of its clients are entitled to "paid-up licenses"; (2) demanded that this lawsuit be dismissed; (3) demanded that Mr. Harris "renegotiate" his Agreement with ICR; (4) refused to discuss the sums due Mr. Harris; and (5)  made another reference to inequitable conduct. Fish also improperly cancelled Mr. Harris' health insurance coverage in clear violation of Federal Law, prior to offering him coverage under COBRA.  Medical insurance was not reinstituted until almost a month and a half after Mr. Harris' forced termination.

## Fish's Use Of "Firm Resources" Contention

38.    Fish falsely represented to Mr. Harris that its "ownership" rights are purportedly based on its contention that Mr. Harris used "firm resources" in obtaining his patents.

39.    In actuality, Mr. Harris personally handled his inventorship activities on his own time, and at no time did such activities interfere with his billable work.  Indeed, Mr.

Harris' billable hours were, for all the years in question, above the goal set by Fish as the required number of hours to be billed per year. He routinely billed 1,900 to 2,000 hours per year. In a firm where many attorneys did not meet their billing goals, this often placed Mr. Harris in the top 25% highest billers at Fish. Moreover, Mr. Harris never used any firm personnel during employment hours to assist him in any way with any of his personal patent filings, with the exception of those filings which were done on behalf of firm clients.

40. In fact, Mr. Harris worked on his personal patent filings, responses and formalities for the most part at home, on his own time, using his own computers and other resources. As alleged above, he had a separate customer number with the PTO for his personal patent filings to avoid confusion between those filings and Fish's filings. That customer number was associated with the same PKI certificate which Fish's customer numbers were associated – evidencing Mr. Harris' practice of making his personal inventorship activities open and well known within Fish. He also had his own separate deposit account, which he personally funded, and which he used to pay fees to the PTO that were due for his personal patent filings. None of his work on personal patent filings in any way interfered with his work as a patent attorney for Fish.

41. Fish's contention about "firm resources" is directly at odds with its own policies. Fish, like many large firms, is dependent upon its lawyers billing a high number of billable hours. In that regard, and to facilitate the achievement of billable hours goals, Fish recognized that it is inevitable that its attorneys will have to transact business regarding outside commercial ventures, investments, family matters and charitable activities in the course of a normal day at the office. Fish allowed and even

encouraged the use of "firm resources" (secretaries, paper, telephones, computers) for such activities as long as it facilitated billable hour production. For example, attorneys routinely would copy and mail personal papers at Fish, such as tax returns. They would pay bills at work using the Fish computer. They would use "firm resources" for other purposes that were in fact wholly personal. Fish allowed this kind of use. In fact, Fish allowed charging certain personal items such as copies and mailings to an attorney's "personal account", which would then be deducted from the attorney's paycheck.

42.     Fish's contention about "firm resources" also is at odds with its actual practices and the numerous examples of non-firm commercial dealings by its attorneys. Mr. Steele conceded to Mr. Harris that many Fish attorneys had what he called "side businesses" on which they conducted personal work activities from their offices at Fish. Mr. Harris is aware of numerous examples, including that of Mr. Phillips, the Managing Partner of the San Diego office, who is co-owner of MercExchange. Other examples include: (1) Steve Stodgill, an attorney in the Dallas office who purportedly has a number of outside business deals, some with noted entrepreneur Mark Cuban; (2) John Schnurer, an attorney in the San Diego office, who purportedly crafted, and personally benefited from, several non-firm real estate deals; and (3) Charles Heiken, an attorney with significant business relationships with Bose corporation. Fish's contention is also contradicted by the express language in the "employment agreement" which it filed in this case. Section 4b of that agreement states the limits placed on outside activities of employees to be limited only to those activities that "impinge substantially on time or energy normally required for business of the corporation". Examples given are things like "holding public office". Nowhere does this or any other section of the employment

agreement reference (much less limit) the employee's rights to file patent applications for their own inventions. Moreover, Mr. Harris' billing history while at Fish – which was always found satisfactory to management and was never below the set billing "goal" – clearly demonstrates that his other activities did not impinge on his time or energy for his Fish work.

### COUNT I

### TORTIOUS INERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE AGAINST FISH

1-42.   Mr. Harris restates Paragraphs 1-42 as Paragraphs 1-42 of Count I.

43.    Mr. Harris' sale of many of his patents and pending applications to third parties was at Fish's demand and insistence. The purpose of such sales was to facilitate the licensing and enforcement of Mr. Harris' patent portfolio by entities other than Mr. Harris personally.

44.     Mr. Harris has a valid business expectancy of financially benefiting from the licensing and enforcement of his patent portfolio.

45.    Fish has knowledge of that expectancy, indeed, it has so pled in its claim against Mr. Harris.

46.    Fish has purposefully, intentionally and wrongfully interfered with Mr. Harris' legitimate expectancy (without justification) by, among other things, wrongfully asserting ownership and "unauthorized venture" claims for not just the '252 patent, but for all of his personal inventorship activities, thereby casting a cloud over, and interfering with the ownership of, the entirety of Mr. Harris' patent portfolio.

47.    Fish made and publicized such claims prior to asserting them in litigation.

48. Mr. Harris has been damaged by Fish's actions. Indeed, potential licensees of Mr. Harris' patents already have pointed to Fish's ownership claims as a purported reason why they do not need a license or why the amount of any payment for a license should be greatly discounted. Fish's actions have greatly diminished the value of Mr. Harris' patents.

## COUNT II

## DEFAMATION

1-48. Mr. Harris restates Paragraphs 1-48 of Count I as Paragraphs 1-48 of Count II.

49. Fish's statements to the press and other third parties were false, and Fish knew them to be false.

50. Fish made the statements with actual malice.

51. Fish's statements constitute defamation per se, and Mr. Harris' professional reputation has been damaged.

52. If Fish followed through with its stated intention to claim that Mr. Harris copied his inventions from firm clients (to Google, for example), that, too constitutes defamation per se. Mr. Harris does not yet know precisely what Fish told PRG that prompted his termination from the PRG faculty, but such statements also were likely defamatory and false and Mr. Harris already has been damaged thereby.

## COUNT III

## VIOLATION OF THE CALIFORNIA LABOR CODE

1-52. Mr. Harris restates Paragraph 1-52 of Count II as Paragraphs 1-52 of Count III.

53.     As further leverage for its demands on Mr. Harris, Fish willfully withheld wages due Mr. Harris in violation of the California Labor Code.

54.     Specifically, though Fish was required to pay Mr. Harris wages of $27,234.50 immediately after his forced resignation (California Labor Code Section 201), Fish withheld payment until September 28, 2007.

55.     Under California Labor Code Section 203, Fish is therefore required to pay a daily statutory penalty for the late payment.

56.     Fish also has not paid Mr. Harris for his accumulated vacation time as required by California Labor Code Section 227.3.  Under firm policy, Fish provides its "employees" with 80 hours of vacation time per year.  After Fish terminated Mr.Harris, it failed to pay him for his accrued vacation time – over several hundred thousand dollars – plus statutory penalties under California Labor Code Section 203.

## PRAYER FOR RELIEF

WHEREFORE, Scott Harris respectfully requests this Court to enter judgment against Fish & Richardson, P.C., granting the following relief:

A       Compensatory damages in an amount in excess of the jurisdictional limit sufficient to redress the harm caused Mr. Harris from Fish's conduct;

B.      Punitive damages;

C.      Costs of suit; and

D.      Any other relief deemed appropriate by the Court.

### Jury Demand

Mr. Harris demands a trial by jury on all issues presented in this Counterclaim.

/s/ Paul K. Vickrey
Raymond P. Niro
Paul K. Vickrey
David J. Sheikh
Richard B. Megley, Jr.
Karen L. Blouin
Niro, Scavone, Haller & Niro
181 West Madison, Suite 4600
Chicago, Illinois 60602
(312) 236-0733
Fax:  (312) 236-3137

Steven L. Platt
Arnold and Kadjan
19 West Jackson Blvd., Suite 300
Chicago, IL  60604
(312) 236-0415

***Attorneys for Scott C. Harris***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing **SCOTT HARRIS'**
**COUNTERCLAIM AGAINST FISH & RICHARDSON P.C.** was electronically filed with
the Clerk of Court using CM/ECF system, which will send notification by electronic mail
to the following:

>David J. Bradford
>Eric A. Sacks
>Daniel J. Weiss
>Jenner & Block LLP
>330 N. Wabash Avenue
>Chicago, IL  60611
>(312) 222-9350
>>**Counsel for Fish & Richardson, P.C.**

Additionally, a copy of the foregoing was served on the following by First-Class U.S.
Mail:

>Michael S. Kwun
>Google Inc.
>1600 Amphitheatre Parkway
>Mountain View, CA  94043
>mkwun@google.com
>>**Counsel for Google Inc.**

on this 31st day of October, 2007.

>>/s/ Paul K. Vickrey
>>Attorney for Scott C. Harris

# Exhibit V

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 5081 | **DATE** | 3/4/2008 |
| **CASE TITLE** | Illinois Computer Research, LLC vs. Fish & Richardson, P.C. | | |

**DOCKET ENTRY TEXT**

Motion hearing held. Scott Harris's and ICS's motion to proceed with discovery [103] granted. If proceeding with depositions at this point is premature, and depositions must be reopened following the naming of additional parties, Plaintiff's counsel will be required to pay the cost for the reopened depositions. Fish & Richardson P.C.'s renewed motion to compel production of documents [105] granted in part and denied in part without prejudice by agreement. Date for filing of Defendant's reply in support of motion for leave to amend [99] extended to 3/10/2008. Ruling date of 3/17/2008 stricken and reset to 4/8/2008 at 9:00.

Docketing to mail notices.

00:23

| | Courtroom Deputy Initials: | ETV |
|---|---|---|

07C5081 Illinois Computer Research, LLC vs. Fish & Richardson, P.C.

Page 1 of 1