Peter M. Rehon (SBN 100123)
Mark V. Isola (SBN 154614)
REHON & ROBERTS
A Professional Corporation
Ten Almaden Blvd., Suite 550
San Jose, CA 95113-2238
Telephone: (408) 494-0900
Facsimile: (408) 494-0909

Raymond P. Niro, Esq.
Paul K. Vickrey, Esq.
David J. Sheikh, Esq.
Richard B. Megley, Jr., Esq.
Karen L. Blouin, Esq.
NIRO, SCAVONE, HALLER & NIRO
181 W. Madison St., Suite 4600
Chicago, IL 60602
Telephone: (312) 236-0733

Attorneys for Plaintiff/Counterclaim Defendant Illinois Computer
Research, LLC and Third-Party Defendant/Counterclaimant Scott C. Harris

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Jose Division)

| | |
|---|---|
| ILLINOIS COMPUTER RESEARCH, LLC., *Plaintiff and Counterclaim Defendant*, <br><br> v. <br><br> FISH & RICHARDSON P.C., *Defendant, Counterclaimant and Third-Party Plaintiff*, <br><br> v. <br><br> SCOTT C. HARRIS, *Third-Party Defendant and Counterclaimant*, <br><br> v. <br><br> FISH & RICHARDSON P.C., Defendant, Counterclaimant, Third-Party Plaintiff and Counterclaim Defendant. | Miscellaneous Action No. <br> CV 5:08-mc-80075-JF (HRL) <br> [Action pending in the United States District Court for the Northern District of Illinois as Case No. 07 C 5081] <br><br> **ICR'S AND HARRIS' RESPONSE TO FRENKEL'S AND CISCO'S MOTIONS TO QUASH ICR'S SUBPOENA FOR DOCUMENTS AND TESTIMONY** <br><br> Date:  May 13, 2008 <br> Time:  10:00 a.m. <br> Courtroom 2 <br><br> Hon. Mag. Judge Howard Lloyd |

# TABLE OF CONTENTS

Page No.

STATEMENT OF THE ISSUE.................................................................................1

STATEMENT OF FACTS ......................................................................................1

ARGUMENT.........................................................................................................6

I.      INTRODUCTION ......................................................................................6

II.     FRENKEL AND CISCO HAVE NOT EVEN PROVIDED ENOUGH
        INFORMATION TO PERMIT RATIONAL CONSIDERATION OF THEIR
        "PRIVILEGE" ARGUMENTS ....................................................................7

        A.      Having Given This Court No "Privilege Log," Frenkel and Cisco Cannot
                Satisfy Their Burden Of Proving The Applicability Of Any "Privilege" .............7

        B.      Frenkel And Cisco Cannot Remedy Their Failures In Reply.................9

III.    FRENKEL'S ACTIVITIES WERE THE ANTITHESIS OF "NEWS
        REPORTING"............................................................................................10

        A.      Frenkel Consistently Flouted The Most Basic And Universally-
                Recognized Principles Of Journalistic Ethics .........................................11

        B.      Cisco Now Admits Frenkel Acted Inconsistently With Journalistic Ethics ..........13

IV.     "FEDERAL COMMON LAW," NOT STATE LAW, CONTROLS THE
        DECISION ON FRENKEL'S AND CISCO'S "PRIVILEGE" ARGUMENTS .............14

V.      FRENKEL'S ONE-PARAGRAPH DISCUSSION OF "FEDERAL COMMON
        LAW" DOES NOT SATISFY HIS BURDEN OF PROVING ENTITLEMENT
        TO ANY ALLEGED "REPORTER'S PRIVILEGE".......................................15

        A.      *Jaffe* Does Not Support Frenkel ..........................................................15

        B.      *Branzburg* Does Not Support Frenkel..................................................17

VI.     FRENKEL'S RELIANCE ON THE "CALIFORNIA SHIELD LAW" IS
        MISPLACED............................................................................................18

        A.      Even If The "Shield Law" Applied, Frenkel's Attempt To Invoke It Would
                Be Premature ..........................................................................................18

    B.    Frenkel The Cisco Attorney Does Not Qualify  For Protection Under The
          "Shield Law" In Any  Event Because He Was Not Acting As A
          "Reporter"..................................................................................................................19

VII.   FRENKEL'S RELIANCE ON AN ALLEGED "CONSTITUTIONAL
       PRIVILEGE" DERIVED FROM *BRANZBURG* IS MISPLACED..................................20

VIII.  CISCO'S ATTEMPT TO INVOKE "ATTORNEY-CLIENT PRIVILEGE" AND
       "WORK PRODUCT IMMUNITY" TO CHALLENGE THREE OF THE TEN
       SUBPOENA TOPICS IS BOTH SUBSTANTIVELY AND PROCEDURALLY
       DEFECTIVE..................................................................................................................21

IX.    CISCO'S REQUEST TO HAVE THIS COURT  INTERFERE WITH OTHER
       LAWSUITS IN OTHER COURTS IS WITHOUT LEGAL SUPPORT.........................22

X.     THE DISCOVERY ICR SEEKS IS NOT BURDENSOME;  IT IS RELEVANT
       AND REASONABLY CALCULATED  TO LEAD TO THE DISCOVERY OF
       ADMISSIBLE EVIDENCE ...........................................................................................22

XI.    CONCLUSION AND RELIEF SOUGHT ....................................................................25

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

**Page(s)**

Admiral Insurance Co. v. U.S. District Court,
881 F.2d 1486 (9th Cir. 1988) ........................................................................................20

Branzburg v. Hayes,
408 U.S. 665 (1972)..........................................................................................................16

C.T. v. Liberal School District,
2008 U.S. Dist. LEXIS 5863 (D. Kan. 2008) ................................................................8

Elliott v. Chicago Housing Authority,
2000 U.S. Dist. LEXIS 17813 (N.D. Ill. 2000) ............................................................14

In re Fainaru-Wada,
438 F. Supp. 2d 1111 (N.D. Ca. 2006) .....................................................................15, 16

Granberry v. Jet Blue Airways,
228 F.R.D. 647 (N.D. Cal. 2005).....................................................................................13

Heat & Control, Inc. v. Hester Industries, Inc.,
785 F.2d 1017 (Fed. Cir. 1986) ......................................................................................21

Hemstreet v. Compuscan, Inc.,
16 U.S.P.Q. 2d 1208 (N.D. Ill. 1990) ...........................................................9, 10, 12, 13

Herbert v. Lando,
441 U.S. 153 (1979)..........................................................................................................19

Jaffe v. Redmond,
518 U.S. 1 (1996)..............................................................................................................14

Lohrenz v. Donnelly,
187 F.R.D. 1 (D.D.C. 1999) ..............................................................................................8

Marriner v. California Army National Guard,
2006 U.S. Dist. LEXIS 61692 (E.D. Ca. 2006) ..............................................................9

McKay v. Town & Country Cadillac, Inc.,
2002 U.S. Dist. LEXIS 10257 (N.D. Ill. 2002) ..............................................................9

McKevitt v. Pallasch,
339 F.3d 530 (7th Cir. 2003) ..........................................................................................14

Micro Motion, Inc. v. Kane Steel Co.,
894 F.2d 1318 (Fed. Cir. 1990) ........................................................................21

Multi-Ad Services, Inc. v. NLRB,
255 F.3d 363 (7th Cir. 2001) ..............................................................................9

NLRB v. North Bay Plumbing, Inc.,
102 F.3d 1005 (9th Cir. 1996) ...........................................................................13

Perrignon v. Bergen Brunswig Corp.,
77 F.R.D. 455 (N.D. Cal. 1978) .........................................................................13

Reichhold Chemicals, Inc. v. Textron, Inc.,
157 F.R.D. 522 (N.D. Fla. 1994) ......................................................................13

In re Scarce,
5 F.3d 397 (9th Cir. 1993) ................................................................................16

Shoen v. Shoen,
5 F.3d 1289 (9th Cir. 1993) ..............................................................................19

Sims v. Mulcahy,
902 F.2d 524 (7th Cir. 1990) ..............................................................................9

Stump v. Gates,
211 F.3d 527 (10th Cir. 2000) ............................................................................9

In re Subpoena to Kroll,
224 F.R.D. 326 (E.D.N.Y. 2004) ...............................................................8, 9, 20

The Nautilus Group, Inc. v. Icon Health and Fitness, Inc.,
308 F. Supp. 2d 1208 (W.D. Wash. 2003) ..........................................................9

U.S. Department of Education v. NCAA,
481 F.3d 936 (7th Cir. 2007) ............................................................................16

United States v. Health Care Management Partners, Ltd.,
2006 U.S. Dist. LEXIS 58186 (D. Colo. 2006) ..................................................8

## STATE CASES

51 Cal. at 459-60, 273 Cal. Rptr. at 815 .........................................................17

Mitchell v. Superior Court,
37 Cal. 3d 268, 690 P.2d 625 (1984) ................................................................16

ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND CISCO'S MOTIONS TO UASH ICR'S
SUBPOENA FOR DOCUMENTS AND TESTIMONY

New York Times Co. v. Superior Court,
51 Cal. 3d 453, 796 P.2d 811 (1990) .......................................................................17

O'Grady v. Superior Court,
139 Cal. App. 4th 1423, 44 Cal. Rptr. 3d 72 (6th Dist. 2006)...................................18, 19

Rancho Publications v. Superior Court,
68 Cal. App. 4th 1538, 81 Cal. Rptr. 2d 274 (4th Dist. 1999)...................................17, 18

## **FEDERAL STATUTES**

28 U.S.C. §1338(a) .................................................................................1, 3, 4, 6,
.............................................................................................................13

Fed.R.App.P. 28(c) ................................................................................................9

Fed.R.Civ.P. 26(b)(5) .....................................................................................7, 21

Fed.R.Civ.P. 45.............................................................................................8, 9

Fed.R.Evid. 501 ....................................................................................................17

## **STATE STATUTES**

Cal. Evid. Code §1070(a) .................................................................................17, 18

1

2

## STATEMENT OF THE ISSUE

3

    Whether Richard Frenkel should be ordered to testify and to produce documents as required by ICR's and Harris's subpoena *duces tecum*.

4

5

## STATEMENT OF FACTS

6

    Illinois Computer Research LLC ("ICR") filed the patent infringement lawsuit underlying this discovery dispute against Google, Inc. on September 1, 2007. (Attached to the Declaration of Karen Blouin ¶ 2 as Ex. A, Complaint). Google was charged with infringing Scott Harris' U.S. Patent No. 7,111,252 entitled "Enhancing Touch and Feel on the Internet," which is now owned by ICR. (Blouin Dec. ¶ 2, Ex. A) Federal question jurisdiction was predicated on 28 U.S.C. §1338(a), the jurisdictional statute for patent infringement actions (Blouin Dec. ¶ 2, Ex. A). A settlement was reached with Google by November 6, 2007 (Blouin Dec. ¶ 3 Ex. B, Order entered November 6, 2007). But by then, the patent infringement lawsuit had acquired a life of its own in the form of attacks on the inventor, Scott Harris, that have been mounted by his former employer, the patent law firm of Fish & Richardson, P.C. in cooperation with Richard Frenkel, who acted as Fish & Richardson's anonymous mouthpiece while employed by Cisco Systems, Inc., another Fish & Richardson client.

7

8

9

10

11

12

13

14

15

16

17

    The pertinent facts are these. Until September 14, 2007 (though he was asked to resign on September 6, 2007), Scott Harris was a patent attorney with Fish & Richardson, a position he had held for fourteen years. Harris is also an electrical engineer and had invented before he joined Fish. With Fish's knowledge and acquiescence (Blouin Dec. ¶ 4, Ex. C, Lutton Dep. p. 47) and, like other Fish attorneys, Mr. Harris obtained 27 patents on his own inventions (and filed patent applications for about 80 more inventions).

18

19

20

21

22

23

    Fish & Richardson was initially supportive (or at least tolerant) of Mr. Harris's inventions – not surprisingly, since several other Fish & Richardson attorneys also had patents invented while working at the firm (Blouin Dec. ¶ 5, Ex. D, Devlin Dep. p. 17). But, Fish & Richardson turned on Mr. Harris when Google, a Fish & Richardson client, complained that it had been charged in a letter (Blouin Dec. ¶ 6, Ex. E, Letter to Google, Inc.) with infringing the '252 patent – ironically, a patent which Fish had earlier demanded Mr. Harris sell to ICR (Blouin Dec. ¶ 4,

24

25

26

27

28

1

Ex. C, p. 97; Blouin Dec. ¶ 5, Ex. D p. 49).  Fish & Richardson reacted angrily by asserting that it – not Mr.  Harris or ICR – "owns" the Harris patents (Blouin Dec. ¶ 5, Ex. D p. 42); by insisting that Mr. Harris "get the patents back" from ICR; by threatening Mr. Harris with inequitable conduct claims and ultimately by showing Mr. Harris the door, while withholding any refund of his capital contribution to the firm (Blouin Dec. ¶ 7, Ex. F, Letter from Fish & Richardson P.C.).  And Fish did so even though Mr. Harris has a stellar background, is a nationally recognized patent attorney and was one of the most productive and highly paid attorneys at the firm (Blouin Dec. ¶ 5, Ex. D 25-27).

Frenkel is no stranger to Fish's lawsuit against Harris and ICR.  Frenkel had close ties with Fish, its head of litigation, Kathi Lutton, with attorney John Steele and with Google's Head of Patent and Patent Strategy, Michelle Lee.  Indeed, the four of them were on the faculty of the Advanced Patent Law Institute  (Blouin Dec. ¶ 8, Ex. G, Advanced Patent Law Institute Faculty). Fish (and Lutton specifically) represented Cisco in a patent lawsuit in which Frenkel was involved (Blouin Dec. ¶ 9, Ex. H, Docket Report for Case No. 1:07 cv 00671).  Lutton, another Fish attorney, John Dragseth and Frenkel appeared together on a May 30, 2007 webinar just as Lutton, Dragseth and others were investigating Harris.  Even Cisco now admits there is a connection between Frenkel and Fish: "Fish represents Cisco on certain [unspecified] matters *and Frenkel has been indirectly involved [neither Cisco nor Frenkel say how] in some of them* [which ones are not specified]."  (Cisco brief, p. 4) (emphasis added).

What is most pertinent to Frenkel's motion to quash, of course, is his inglorious role in the spectacle of Fish & Richardson's extra-legal attempts to shield its clients, such as Dell Computer and Google, from the consequences of their infringement of the Harris patents.

Frenkel is a director in the Intellectual Property Group at Cisco Systems who created an anonymous blog called the "Patent Troll Tracker."  Frenkel falsely stated that he was: "Just a lawyer, interested in patent cases, but not interested in publicity" (Blouin Dec. ¶ 10, Ex. I, Patent Troll Tracker, January 19, 2008).  He also candidly admits he is not a reporter, a broadcaster or any other species of journalist.  His declaration explains his job as follows:

**ICR'S AND HARRIS' RESPONSE TO FRENKEL'S AND  CISCO'S MOTIONS TO  UASH ICR'S SUBPOENA FOR   DOCUMENTS AND TESTIMONY**

> *I am an attorney* and a member of the California Bar since 1999, and am licensed to practice in California. *I have worked at Cisco since February 2006 as an attorney* in the Intellectual Property Law Department. As of April 2007, my full title became Director, Intellectual Property – Consumer & Emerging Technologies.

(Frenkel Dec. ¶¶ 1-2) (emphasis added). Cisco, Frenkel's employer, also insists that he is an attorney, not a reporter:

> *Frenkel is an attorney*, employed by Cisco as a Director, Intellectual Property ... and as such oversees certain litigation involving the company.

(Cisco motion to quash, p. 5) (emphasis added). Frenkel attended undergraduate school at the University of Michigan – Ann Arbor, Michigan, from which he received a bachelor's degree in aerospace engineering; he also has a degree in mechanical engineering. His only other professional education was a J.D. degree from Loyola Law School in Los Angeles, California, on the strength of which he was admitted to the California State Bar in 1999 (Blouin Dec. ¶ 11, Ex. J, California State Bar Member Search). Frenkel has no degree in journalism; no professional training as a reporter; and has never been employed as a reporter or journalist. He has no public relations responsibilities at Cisco. Indeed, after he was finally forced to admit he was the author of the "patent troll tracker" blog, Cisco promptly muzzled him by insisting that his blog could continue to operate "by invitation only" (Blouin Dec. ¶ 12, Ex. K, http://trolltracker.blogspot.com, "This blog is open to invited readers only")

Perhaps most importantly, Frenkel wasn't "just a lawyer interested in patent cases." Having concealed his identity for many months, Frenkel finally was forced to identify himself after someone unknown to ICR or the Niro firm threatened to reveal Frenkel's identity. (Blouin Dec. ¶ 13, Ex. L, Frenkel confession). Frenkel did not "unmask himself" as Cisco incorrectly states at p. 8 of its brief; he was compelled to reveal his identity when someone stated he was about to be unmasked regardless. (Id.)

Frenkel turned out to be a highly-placed Cisco employee who used his anonymous blog to champion positions for his employer and friends, even going so far as to accuse a federal judge's son of a crime based upon his involvement in a case against Cisco, then calling the United States District Court for the Eastern District of Texas, the "Eastern District of the Banana

ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND CISCO'S MOTIONS TO UASH ICR'S
SUBPOENA FOR DOCUMENTS AND TESTIMONY

Republic" (Blouin Dec. ¶ 14, Ex. M, Docket No. 1, Case No. 08-4022 filed in the Western District of Arkansas). A sampling of Frenkel's anonymous statements are attached to the subpoena as Exhibits A-C (Frenkel Dec., Exhibits A-C). They are not uplifting reading; astonishingly, even death threats were made against ICR's and Harris' attorney.

> **"If you shoot and kill Ray Niro tonight, I would consider it a justifiable killing."**

Comment made on Frenkel's "Patent Troll Tracker" blog, December 6, 2007 (Blouin Dec. ¶ 15, Ex. N). (emphasis added). Frenkel encouraged his readers to write haikus on subjects he selected. He then published "winning" haikus:

> Scott Harris lost his job 'cause he wanted his Fish
> And to eat it too.

> Pesky ethics rules. Conflicts mean nothing to trolls
> Help me, Ray, Help me!

(Blouin Dec. ¶ 16, Ex. O, Patent Troll Tracker, December 19, 2007). Complementing his offensive haikus, Frenkel also posted "Troll Anagrams." (Blouin Dec. ¶ 17, Ex. P, Patent Troll Tracker, September 6, 2007). Among the anagrams was: "Niro Scavone = Naive? Or Cons?" Id. The following excerpts from Frenkel's blog give the flavor of Frenkel's self-described "journalism":

> October 2, 2007 – Unveiling TrollTracker's Troll Severity Assessment System:

> 2 points for having other, troll-like qualities (again, subjective, but what I'm thinking about are things like having Niro Scavone as your counsel, sending threat letters to anonymous bloggers, filing "strike suits" with no warning, etc. I'll know it to award it when I see it)

> October 4, 2007 – Troll Call and Other Patent Stats for September 2007:

> *Illinois Computer Research v. Google* (NDIL). I featured this one earlier. This is the one that potentially got Scott Harris in trouble. I don't know who's behind it all, but I pegged this enterprise with related companies as a Category 3, and was tempted to go higher.

> October 9, 2007 – Patent Troll Sues Fish & Richardson:

> Like, who exactly is behind ICR if it's not Harris? Is it the James Parker guy? Is there any connection between Parker and Harris? If not, then why did Harris have to resign from Fish & Richardson. If you sell your patent and retain no interest,

there's no conflict, right? Or is it just that he still has an agreement to cooperate with Parker/ICR?

October 9, 2007 – Fish & Richardson Strikes Back at Scott Harris:

The counterclaim attempts to paint a story about a highly-paid patent attorney who was so greedy he couldn't resist suing his firm's clients to make a few extra bucks.

Yeah, right, J-Beau. You're all about aiding and abetting Harris and Niro if you can make a quick and easy buck.

November 8, 2007 – A Paradigm for Wasting the PTOs Time:

"Over at Patently-O, Dennis Crouch has a very interesting post about something else Scott Harris is up to: actually practicing patent law.
Get the whole scoop ,,, here ,,.

I am amused by two things:

1) That Harris or anyone else thinks that the following rejected claim "promotes the progress of science and useful arts," in any way ,,, shape or form:

,, Harris, for ,, himself ,, and some co-inventors, is trying to corner the market on marketing software in a particular business method. Aren't there marketing companies out there that help coordinate marketing for other companies in exchange for money?  Putting aside the 101 issues Crouch and others so ably discuss, isn't kind of obvious, if you are doing it for a fixed fee, to charge a contingency fee percentage instead?  Let's take that claim, and redo it, with something Harris may now be rapidly becoming familiar with:

December 4, 2007 – Ray Niro Offers $5,000 Bounty For Information On My Identity:

* * * *

Here is a grand summary of my posts about Ray Niro (you can click on the Niro Scavone labels to read them all):

1) I posted Fish & Richardson's allegations against him. But those were F&R's words, not my own. By the way, the judge granted expedited discovery to allow F&R to determine whether to add Ray Niro personally as a defendant. And if F&R does sue Niro, personally, I'll report about it here. Which is not disparaging him, just reporting.

2) I posted about how Niro secured a permanent injunction that was stayed in light of BMC v. Paymentech. True!

3) I dared Niro to sue the New York Yankees in Boston on the '341 patent. But I don't think he wants to litigate out of state. C'mon Ray, if you want to stay in Chicago, at least add the Detroit Lions and Minnesota Vikings as defendants, too. (They have JPEG images).

4) I reported that he represents Acacia in a bit of patent litigation. All true.

**ICR'S AND HARRIS' RESPONSE TO FRENKEL'S AND  CISCO'S MOTIONS TO  UASH ICR'S SUBPOENA FOR   DOCUMENTS AND TESTIMONY**

5) I speculated that he actually represents non-practicing entities as a fair amount of his overall practice. Also, true.

December 14, 2007 – Friday Miscellany:

The theme for next week's haikus: choose from one of the following:

Ray Niro
Ray Niro's client GPH's JPEG-on-a-website patent
Scott Harris
James Beauregard Parker

After all, Ray is probably headed down to his massive Boca Raton home (complete with pool). Why do you think Niro is filing multi-defendant JPEG lawsuits in West Palm Beach? So he can spend more time at this nice getaway (and write it off on his taxes)?

December 20, 2007 – Top Ten Patent Trolls of 2007:

The trinity of Scott Harris, James Parker, and Ray Niro. These three first hit my radar screen in August, when Memory Control Enterprises sued in Illinois and BarTex sued in Texas. Who's the kingpin, I asked? It seemed like James Parker. …(Frenkel Dec., Exhibits A-C)

In short, what Frenkel did on his "trolltracker" website, at least with respect to Scott Harris, the Harris patents and Mr. Niro, never bore any resemblance to news reporting (see Section III, below).

## ARGUMENT

### I.    INTRODUCTION

Richard Frenkel the self-proclaimed "reporter" seeks shelter in an alleged "reporter's privilege" – but the fact is that everything he has done with his "patent troll tracker" blog is the antithesis of journalism (see Section III, below).   And in any event, there is no "reporter's privilege" that could shield Frenkel from discovery.   Inasmuch as Frenkel has not even tried to shoulder his burden of showing that the discovery he wants to avoid complying with is not calculated to lead to the discovery of admissible evidence, his motion (and Cisco's) should be denied.

**ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND  CISCO'S MOTIONS TO  UASH ICR'S
SUBPOENA FOR   DOCUMENTS AND TESTIMONY**

## II. FRENKEL AND CISCO HAVE NOT EVEN PROVIDED ENOUGH INFORMATION TO PERMIT RATIONAL CONSIDERATION OF THEIR "PRIVILEGE" ARGUMENTS

Frenkel does not seriously challenge the relevance of the discovery sought by ICR's subpoena. Instead, Frenkel and Cisco pepper the Court with a host of arguments about "reporter's privilege" (with a nod from Cisco to "attorney-client privilege"). Those arguments are unsupported by the facts and legally untenable to boot.

Frenkel objects to eight of the ten topics in ICR's subpoena as "seek[ing] privileged and/or confidential information" (Frenkel objections, pp. 3-4). He does not object to topics 2 and 7 on "privilege" grounds at all (Id.). As to those topics, therefore, Frenkel's and Cisco's assertions of "privilege" are not even relevant.

### A. Having Given This Court No "Privilege Log," Frenkel and Cisco Cannot Satisfy Their Burden Of Proving The Applicability Of Any "Privilege"

Neither Frenkel nor Cisco has provided this Court with any "privilege log" or any specifics to define which documents or testimony sought by the subpoena might qualify for protection under the attorney-client privilege (invoked by Cisco at pp. 5-7 of its brief, and incorporated by reference at p. 3 of Frenkel's brief) or any alleged "reporter's privilege." Not a single document has been identified in any way; nor does Frenkel even stoop to discussing any specific area of testimony. (Frenkel's "objections" to ICR's subpoena are mere boilerpate asserting all of the topics are "overbroad, not limited in time, unduly burdensome, not relevant, and/or not reasonably calculated to lead to the discovery of admissible evidence.")

Cisco relies solely on boilerplate as well. Its **only** "showing" that the subpoena to Frenkel seeks anything arguably protected by the attorney/client privilege is a single conclusory sentence written by Cisco's "senior corporate counsel" William Freedman, which in turn deals only with requests nos. 1, 3 and 4 among the ten requests in the subpoena:

> In my capacity as Senior Corporate Counsel, I am familiar with certain communications between Cisco employees and the law firm Fish & Richardson, P.C. and Kathi Lutton, Esq., which are the subject of a subpoena issued to Richard Frenkel (request Nos. 1, 3, 4). ... ***Some or all of the testimony and material covered by these requests concerns confidential communications between Cisco and its lawyers regarding legal advice sought on behalf of Cisco***

***for the purpose of protecting its legal rights.*** Accordingly, the requests seek to compel testimony and materials protected by Cisco's attorney client privilege, a privilege that Cisco has not waived.

(Freedman 4/7/08 Dec. ¶2) (emphasis added). This bald, one-sentence assertion falls well short of the showing that would be required for Cisco to meet its substantial burden of proving that testimony and documents sought by requests 1, 3 and 4 are actually entitled to protection.

When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party ***must***: (i) expressly make the claim; and (ii) describe the nature of the documents, communications or tangible things not produced or disclosed – and do so in a manner that ... will enable other parties to assess the claim.

Fed.R.Civ.P. 26(b)(5) (emphasis added). This showing is not optional, yet Cisco has not even made any gesture toward compliance with this requirement. For that additional reason, Cisco's conclusory assertions of "attorney/client privilege" and "work product immunity" must be rejected. See, e.g., Lohrenz v. Donnelly, 187 F.R.D. 1, 6-7 (D.D.C. 1999) (where no "privilege log" was provided, "a bald assertion of these privileges clearly cannot suffice under the federal rules. ... Therefore, to the extent that plaintiff is withholding any responsive documents under assertions of attorney-client or work-product privilege, these documents must be produced."); In re Subpoena to Kroll, 224 F.R.D. 326, 328 (E.D.N.Y. 2004) (requirement of submitting a privilege log under Fed.R.Civ.P. 45 also applies to a non-party patent attorney who is seeking to quash a subpoena; "[f]ailure to submit a privilege log may be deemed a waiver of the underlying privilege claim").

Cisco's "showing" with respect to work product immunity is equally defective: again, Freedman merely asserts – without the slightest gesture toward providing any evidence – that "some or all of the testimony and material" sought in the subpoena "concerns the impressions, opinions, conclusions, legal theories and research prepared by Cisco's lawyers" (Freedman Dec. ¶5). What "testimony and material"? Which of "Cisco's lawyers"? What "impressions, opinions, conclusions" and so forth? What are the pertinent dates? Cisco has chosen to withhold from this Court that essential information, thus leaving the Court with no basis to evaluate Cisco's claims and thereby failing to sustain its burden of proving entitlement to attorney-client

privilege or work product immunity. See, e.g., <u>C.T.</u> v. <u>Liberal School District</u>, 2008 U.S. Dist. LEXIS 5863, *26 (D. Kan. 2008) ("The party asserting work product immunity bares the burden of establishing the applicability of the privilege, and must do so by making a 'clear showing' that the work product immunity applies. To that end, the party claiming work product immunity must establish all elements of the immunity and can only meet this burden 'through an evidentiary showing based on competent evidence.' This burden cannot be 'discharged by mere conclusory or *ipse dixit* and a 'blanket claim' that the work product doctrine applies is insufficient.") (footnotes omitted); <u>United States</u> v. <u>Health Care Management Partners, Ltd.</u>, 2006 U.S. Dist. LEXIS 58186, *15-*16 (D. Colo. 2006) ("The bare-bones Privilege Log supplied by the United States in this case is insufficient to meet the requirements of Rule 26(b)(5). In particular, it does not describe the nature of the documents or communications in a manner that enables the defendants to assess the applicability of the work product claim. Among other things, there are no dates provided, so it is impossible to determine, for example, whether the materials were prepared in anticipation of litigation or for trial.").

Obviously, only Cisco and Frenkel – not ICR nor Harris – have the detailed information required by Fed.R.Civ.P. 45 which this Court needs to decide Cisco's motion. (Indeed, Lutton claimed to be unable to remember key facts relating to Frenkel's activities. Blouin Dec. ¶ 4, Ex. C, pp. 341-42, 344, 345-49) This Court need go no further to deny both Cisco's motion and Frenkel's as well, since neither has presented any "privilege log" or otherwise particularized its arguments with reference to specific documents or topics.

> In this case, Kroll's refusal to prepare and reveal a privilege log as required under Fed.R.Civ.P. 45(d)(2) effectively deprived the Court of the ability to determine whether the documents requested in the subpoena are protected by a privilege. Kroll's blanket statement that all 12 requests in the subpoena seek privileged information is insufficient to prove the essential elements of the attorney-client privilege. Accordingly, Kroll's motion to quash the subpoena is denied and Kroll is directed to comply with the subpoena.

<u>Kroll</u>, 224 F.R.D. at 329.

**B.     <u>Frenkel And Cisco Cannot Remedy Their Failures In Reply</u>**

One final point. Having decided to withhold the information required by Fed.R.Civ.P.

ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND CISCO'S MOTIONS TO UASH ICR'S
SUBPOENA FOR DOCUMENTS AND TESTIMONY

45, Cisco and Frenkel cannot attempt to mitigate their failures by inserting in their reply briefs the information concealed in their opening briefs:

> It is well-settled that parties may not raise new arguments ***or present new facts*** for the first time in reply. *See* Fed.R.App.P. 28(c); *Sims v. Mulcahy*, 902 F.2d 524, 536 n.5 (7th Cir. 1990). Multi-Ad did not make these specific arguments in its opening brief, and, therefore, these claims are not properly before this Court. Consequently, the Board's motion to strike is granted.

Multi-Ad Services, Inc. v. NLRB, 255 F.3d 363, 370 (7th Cir. 2001) (emphasis added); Marriner v. California Army National Guard, 2006 U.S. Dist. LEXIS 61692, *38 (E.D. Ca. 2006) ("A moving party's attempts to introduce ***new facts*** or different legal arguments in reply papers is improper") (emphasis added); McKay v. Town & Country Cadillac, Inc., 2002 U.S. Dist. LEXIS 10257, *9 (N.D. Ill. 2002) (stating "new issues [] cannot be raised in a Reply"); The Nautilus Group, Inc. v. Icon Health and Fitness, Inc., 308 F. Supp. 2d 1208, 1214 (W.D. Wash. 2003) (granting motion to strike new evidence submitted with reply brief); Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000) (declining to consider new issue in reply because consideration of new issue "robs the appellee" of the opportunity to refute new factual and legal assertions); Hemstreet v. Compuscan, Inc., 16 U.S.P.Q.2d 1208, 1212 (N.D. Ill. 1990) (declining to consider issues raised for the first time in defendant's reply brief because "plaintiff was not provided with an opportunity to respond to the argument").

## III.   FRENKEL'S ACTIVITIES WERE THE ANTITHESIS OF "NEWS REPORTING"

Frenkel's brief simply asserts, over and over again, that he is a "journalist" and that therefore "he is and was a reporter engaged in news-gathering activities." (Elsewhere Frenkel and Cisco insist that he is an attorney acting as such, but they ignore the irreconcilable dissonance between those two assertions explained in Section V, below.) Nowhere, however, does Frenkel confront or even acknowledge the principle that there is more to being a "reporter" who is gathering and disseminating "news" than typing words into a computer and broadcasting them to all and sundry over the internet.

It is for good reason that Frenkel and Cisco don't examine too closely (or at all) what it

means to be a "reporter." Whatever terms might be applied to Frenkel's activities (and some of the labels that come to mind are not very complimentary), "reporting the news" isn't one of them.

As set forth in the Statement of Facts, above, Frenkel has no education nor training whatever as a journalist. If he had, he would have learned that his activities in connection with his "troll tracker" blog were the diametrical opposite of what "reporters" do.

### A. Frenkel Consistently Flouted The Most Basic And Universally-Recognized Principles Of Journalistic Ethics

If he had been acting as a "reporter," Frenkel would have upheld the universally-recognized and codified duty of reporters, which is to "seek truth and provid[e] a fair and comprehensive account of events and issues." (Blouin Dec. ¶ 18, Ex. Q, Society of Professional Journalists Code of Ethics). In fact, the journalism profession promotes ethical guidelines to aid in promoting ethical behavior and standards of practice. Id. Ethical guidelines for online journalism are no different than the ethics of journalism. (Blouin Dec. ¶ 18, Ex. R, University of Southern California, "What are the Ethics of Online Journalism?"). Ethical principles aid in "separat[ing] the good writers from...the frauds and con artists online." Id. Frenkel consistently violated the ethical principles of journalism, and in doing so proved he was not acting as a reporter – whatever he wants this Court to believe now.

| What Journalistic Ethics Require | What Frenkel The Self-Proclaimed "Reporter" Actually Did |
|---|---|
| "If you have a personal or professional connection to people or groups you're writing about, describe it. Your readers deserve to know what has influenced the way you reported or wrote a story. Don't hide who you work for, or where the money to support your site comes from. ... If you are writing about your employer, obviously you are accepting money from it. But let your readers know that. *Identify yourself as an employee, even if you are writing anonymously.*" (U.S.C. "Ethics of Online Journalism") (emphasis added). | Frenkel concealed his work as a Director of Intellectual Property for Cisco. He even lied about his position, falsely claiming to be "just a lawyer, interested in patent cases." Worse, he wrote about Cisco cases calling opposing lawyer's criminals. |

11                    ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
                      AND  CISCO'S MOTIONS TO  UASH ICR'S
                      SUBPOENA FOR  DOCUMENTS AND TESTIMONY

| What Journalistic Ethics Require | What Frenkel The Self-Proclaimed "Reporter" Actually Did |
|---|---|
| "Tell your readers how you got your information, and what factors influenced your decision to publish it." (U.S.C. "Ethics of Online Journalism")<br><br>"Identify sources wherever feasible." (Society of Professional Journalists Code of Ethics) | Frenkel and Cisco both continue to refuse to reveal any of their sources, allegedly "confidential" or otherwise. |
| "Make certain that headlines ... sound bites and quotations do not misrepresent." (Society of Professional Journalists Code of Ethics) | Frenkel accused Niro of dishonesty, of "filing 'strike suits' with no warning;" of "wasting the PTO's time;" of having "troll-like qualities" and more. |
| "Avoid conflicts of interest, real or perceived." (Society of Professional Journalists Code of Ethics) | Frenkel's concealment of his employment with Cisco (and that of some of his still-anonymous sources) was intended to conceal serious conflicts of interest. Frenkel stated: "The purpose of this blog is to bring to light the extreme problems our US patent system is having with patent trolls: corporations that make no products, but do nothing but acquire patents to sue and make revenue." Had he not concealed his position as in-house counsel for Cisco, Frenkel would have revealed his strong bias against individual inventors, patent holding companies and the attorneys who represent them – the group he derisively calls "patent trolls." |
| "Distinguish between advocacy and news reporting. ... Distinguish news from advertising and shun hybrids that blur the lines between the two." (Society of Professional Journalists Code of Ethics) | Frenkel attacked parties opposed to Cisco (such as John Ward and Eric Albritton, whom Frenkel accused of having committed various felonies in Texas |
| "Show good taste. Avoid pandering to lurid curiosity." | This Court can form its own opinion about the level of "good taste" Frenkel's blog displayed. |
| "And ***most important*** is to never utilize your power of press for personal gains or simply annoying someone." (U.S.C. "Ethics of Online Journalism") (emphasis added). | Frenkel's blog has made a specialty of "simply annoying" every person and institution he, Fish & Richardson and/or Cisco dislikes – even descending to the publication of death threats. |

In short, Frenkel used his blog to advance his own and Cisco's agenda, and that of his employer and its attorneys, and for his personal gain (not to mention Cisco's). By violating the ethical standards to which reporters and journalists are held, Frenkel behaved in a fashion far removed from providing "public enlightenment...the forerunner of justice and the foundation of democracy" (Blouin Dec. ¶ 18, Ex.Q) which is required of "reporters."

ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND CISCO'S MOTIONS TO UASH ICR'S
SUBPOENA FOR DOCUMENTS AND TESTIMONY

1
2
3
4
5

The fundamental premise of almost all of Frenkel's and Cisco's arguments, therefore, is fatally flawed. Frenkel was not a "reporter" as that term is understood in the profession, both in California and elsewhere. He was not engaged in "gathering news" but, rather, in promulgating propaganda favorable to his employer Cisco, in utter contempt for the ethical cannons that bind real reporters. For that reason alone, his arguments fail at the outset.

6
7

      **B.**    **Cisco Now Admits Frenkel Acted
              <u>Inconsistently With Journalistic Ethics</u>**

8
9
10
11

Most ironically, having finally been unmasked as Frenkel's employer, Cisco now shamefacedly admits that the actions of Frenkel and of other Cisco employees in promulgating Frenkel's "troll tracker" blog were wrong – and for the very same reasons those actions controverted the accepted principles of journalistic ethics discussed above.

12
13
14
15
16
17
18
19
20
21
22

In a small masterpiece of spin, Cisco belatedly admits that Frenkel was "commenting on various policy and legal matters with which the company has been involved and on which he worked" and that "Cisco employees who knew he was the author circulated links to the blog without revealing that a Cisco employee authored the blog" (Blouin Dec. ¶ 20, Ex. S, Official Cisco Blog, March 24, 2008, p. 1). This was wrong, Cisco now admits, because "given that Rick [Frenkel] worked on intellectual property matters for Cisco, Rick's relationship to Cisco should have been made clear" (<u>Id.</u> p. 2). "A few [still unidentified] Cisco employees used poor judgment when they suggested topics to Rick for his anonymous blog or pointed [also unidentified] third parties to the blog without disclosing that the content was created by a Cisco employee" (<u>Id.</u> p. 2). "[C]onfusion was created between Rick [Frenkel's] views and Cisco's [unidentified] views on various [unidentified] patent issues discussed in his blog" (<u>Id.</u> p. 2).

23
24
25
26
27

By way of damage control, now Cisco trumpets that it has told its employees that "you must clearly identify yourself as a Cisco employee in your postings or blog site(s) and include a disclaimer that the views are your own and not those of Cisco. In addition, Cisco employees should not circulate postings that they know are written by other employees without informing the recipient that the source was within Cisco." (<u>Id.</u> p. 2).

28

    **ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND  CISCO'S MOTIONS TO  UASH ICR'S
SUBPOENA FOR   DOCUMENTS AND TESTIMONY**

Cisco says "we believe we have learned a valuable lesson from this regrettable situation" (Id. p. 3). If so, what Cisco has learned still remains incomplete: Cisco is still violating journalistic ethics by not identifying the other employees, third parties and the like to which it refers in its "Official blog" – and, for that matter, by not identifying the author of its own left-handed "apology."

Cisco and Frenkel should not be permitted to tout Frenkel as a "reporter" while simultaneously continuing to evade the ethical requirements with which real reporters must comply. It is that attempt to sit on both sides of the fence that underlies all of the arguments Frenkel and Cisco now make.

## IV.   "FEDERAL COMMON LAW," NOT STATE LAW, CONTROLS THE DECISION ON FRENKEL'S AND CISCO'S "PRIVILEGE" ARGUMENTS

Federal jurisdiction over this lawsuit is predicated on 28 U.S.C. §1338(a), so this is a federal question case. Frenkel's and Cisco's motions must be decided based on federal common law. "Nor is any state-law privilege relevant. In federal question cases, federal privilege law applies." NLRB v. North Bay Plumbing, Inc., 102 F.3d 1005, 1009 (9th Cir. 1996) (affirming district court's denial of motion to quash subpoena).

> As a preliminary matter, the Court notes that, *even though this case involves both federal and state claims, the federal law of privilege should apply.* See *Reichhold Chems., Inc. v. Textron, Inc., 157 F.R.D. 522, 528 (N.D. Fla. 1994)* (stating that, in federal question case with pendent state law claims, federal law of privileges governs entire case); Perrignon v. Bergen Brunswig Corp., 77 F.R.D. 455, 458 (N.D. Cal. 1978) (stating that *"in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation"*); see also 6-26 Moore's Fed. Prac. -- Civ. § 26.47[4] ("In federal question cases ... in which state law claims are also raised ..., *any asserted privileges relating to evidence relevant to both state and federal claims are governed by federal common law.*").

Granberry v. Jet Blue Airways, 228 F.R.D. 647, 650 (N.D. Cal. 2005) (emphasis added). See also, e.g., Elliott v. Chicago Housing Authority, 2000 U.S. Dist. LEXIS 17813, *4 (N.D. Ill. 2000) ("Rule 501 of the Federal Rules of Evidence governs the applicability of privileges in federal courts. Federal common law applies in cases based upon a federal cause of action even where the complaint states a pendent state law claim."); McKevitt v. Pallasch, 339 F.3d 530, 533

14                    **ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
                       AND CISCO'S MOTIONS TO UASH ICR'S
                       SUBPOENA FOR DOCUMENTS AND TESTIMONY**

1  (7th Cir. 2003) (refusing to apply Illinois "reporter's shield" statute because "state-law privileges

2  are not 'legally applicable' in federal-question cases like this one"). Frenkel's conclusory

3  assertion that state law applies (in footnote 5 of his brief) is wrong and ignores controlling

4  authority.

5      Frenkel's discussion of state law – such as "the California Shield Law," to which Frenkel

6  devotes much of his brief – therefore misses the mark altogether. It has nothing to do with the

7  issues facing this Court. See Section VI, below.

8  **V.   FRENKEL'S ONE-PARAGRAPH DISCUSSION OF "FEDERAL COMMON**
   **LAW" DOES NOT SATISFY HIS BURDEN OF PROVING <u>ENTITLEMENT</u>**
9  **<u>TO ANY ALLEGED "REPORTER'S PRIVILEGE"</u>**

10     When he finally gets around to "federal common law" at p. 10 of his brief, Frenkel

11 dismisses it in just one paragraph with what looks like a quotation from <u>Jaffe</u> v. <u>Redmond</u>, 518

12 U.S. 1 (1996). Frenkel urges this Court to consider three factors, one of which is state law.

13     **A.   <u>*Jaffe* Does Not Support Frenkel</u>**

14     Frenkel does not discuss the facts of <u>Jaffe</u>, and for good reason. Although one would

15 never know it from Frenkel's brief, the Supreme Court in <u>Jaffe</u> was confronted with a claim of

16 "psychotherapist-patient privilege" – not the hypothetical "reporter's privilege" now claimed by

17 Frenkel the attorney. This Court will search the <u>Jaffe</u> decision in vain for a single word about

18 "reporter's privilege" or newspapers or journalism or any related topics. Instead, the <u>Jaffe</u>

19 decision discusses at length the policies underlying the work of psychotherapists and social

20 workers, and the reasons why "[e]ffective psychotherapy, by contrast [with treatment of physical

21 ailments], depends upon an atmosphere of confidence and trust in which the patient is willing to

22 make a frank and complete disclosure of facts, emotions, memories, and fears." 518 U.S. at 10.

23 <u>Jaffe</u> also relies on the recommendation of the Judicial Conference Advisory Committee in 1972

24 "that Congress recognize a psychotherapist privilege as part of the Proposed Federal Rules of

25 Evidence." 518 U.S. at 10.

26     Here, Frenkel is already trying to cram more than one mutually-incompatible hat onto his

27 head by pretending simultaneously to be both a reporter dedicated to promulgating "news" for

28 public consumption and an attorney complying with a duty to maintain communications in strict

**ICR'S AND HARRIS' RESPONSE TO FRENKEL'S**
**AND CISCO'S MOTIONS TO QUASH ICR'S**
**SUBPOENA FOR DOCUMENTS AND TESTIMONY**

confidence.  There is no room left for a psychotherapist's or social worker's hat too – and Frenkel has no more qualifications as a psychotherapist than he does as a reporter.  His reliance on Jaffe is utterly misplaced.

Even though Frenkel's brief at p. 10 appears (but for the misleadingly easy-to-overlook word "see") to include a quotation from Jaffe, it is not a quotation – or more precisely, it is not a quotation from Jaffe.  (The language at p. 10 of Frenkel's brief does not appear in the Jaffe opinion.)  What Frenkel has done is quote incomplete excerpts from In re Fainaru-Wada, 438 F.Supp.2d 1111 (N.D. Ca. 2006), to make up the arguments at p. 10 of his brief – and without even citing Fainaru-Wada, which is the only decision of any court anywhere in which the language used by Frenkel appears.  What Frenkel's unidentified source, the Fainaru-Wada decision, actually says is shown in Exhibit T to the Blouin Declaration, which compares Fainaru-Wada with Frenkel's unattributed quotation from that decision.  What this Court actually held in Fainaru-Wada was the following:

> [T]he Ninth Circuit's position on the issue appears clear to this Court: unless and until the Supreme Court states that a common law reporter's privilege exists, or unless Congress enacts such a privilege, Branzburg's mandate is binding.  ***Accordingly, the Court declines Movants' invitation to apply the Jaffee factors and recognize a common law reporter's privilege under Rule 501.***

Fainaru-Wada, 438 F.Supp.2d at 1119 (emphasis added).

Using the magic of cut-and-paste, Frenkel transmuted the Fainaru-Wada decision, in which this Court squarely ***rejected*** Frenkel's argument (which is the same as the unsuccessful "movant's argument" in Fainaru-Wada), into a paragraph that seems to support him.  In addition to the holding of Fainaru-Wada quoted just above, Frenkel also left out the parts of Fainaru-Wada reproduced in Exhibit T, which state that "federal courts have been reluctant to follow the lead of the states" [concerning the alleged "reporter's privilege]" and "reading Branzburg to "flatly reject[] any notion of a general-purpose reporter's privilege for confidential sources, whether by virtue of the First Amendment or of a newly hewn common law privilege" and characterizing the two cases Frenkel did not omit from his chopped quotation (Williams and New York Times) as "the exceptions."

**ICR'S AND HARRIS' RESPONSE TO FRENKEL'S AND CISCO'S MOTIONS TO UASH ICR'S SUBPOENA FOR DOCUMENTS AND TESTIMONY**

**B.    _Branzburg_ Does Not Support Frenkel**

Setting aside Frenkel's creative treatment of Jaffe and Fainaru-Wada, federal courts which have addressed the issue of an alleged "reporter's privilege" under "federal common law" have rejected the thesis that any such "privilege" exists. First off, in Branzburg v. Hayes, 408 U.S. 665 (1972), the opinion of the Court stated:

> We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.

Branzburg, 408 U.S. at 668-69. Although one would never know it from Frenkel's brief, the Supreme Court in Branzburg **refused** the invitation to create a "reporter's privilege" in federal common law. So has the Ninth Circuit, in "federal common law" cases like grand jury subpoenas: See, e.g., In re Scarce, 5 F.3d 397, 401 (9th Cir. 1993) ("We are asked to create another [privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do."); Fainaru-Wada, 438 F.Supp.2d at 1119 ("the Court declines Movants' invitation to apply the Jaffee factors and recognize a common law reporter's privilege under Rule 501."). So have other circuits. See, e.g., U.S. Department of Education v. NCAA, 481 F.3d 936, 938 (7th Cir. 2007) ("There isn't even a reporter's privilege in federal cases") (citing Branzburg).

Nor is there any common law "reporter's privilege" under California state law. California "Evidence Code section 911 ... precludes the creation of a common law privilege in California." Mitchell v. Superior Court, 37 Cal.3d 268, 274 n.3, 690 P.2d 625, 628 n.3 (1984).

That leaves Frenkel's reliance on Jaffe, which as shown above is misplaced. Indeed, this Court may well ask itself why, if Frenkel has a persuasive argument on the merits, he felt compelled to distort the Fainaru-Wada decision beyond recognition, without even citing it. Such behavior doesn't say much for Frenkel's claim to be a "reporter" ostensibly dedicated to

1    informing the public of the truth.  (For that matter, it doesn't reflect favorably on his behavior as

2    a lawyer either.)  In short, Frenkel's "federal common law" argument is utterly discredited.

3    **VI.    FRENKEL'S RELIANCE ON THE**
     **"CALIFORNIA SHIELD LAW" IS MISPLACED**

4

5    Because this is a case in which jurisdiction is predicated on a federal question, state

6    privilege law does not apply under Fed.R.Evid. 501.  See Section II, above, discussing <u>North

7    Bay Plumbing</u>, <u>Granberry</u>, <u>Perrignon</u> and related decisions.  Moreover, even if the California

8    statute were applicable here (which it is not), it would not excuse Frenkel from having to testify

9    and to produce documents.

10        A.    **Even If The "Shield Law" Applied,**
               **Frenkel's Attempt To Invoke It Would Be Premature**

11

12        The California "shield" statute provides that a reporter "***cannot be adjudged in contempt***

13   ... for refusing to disclose ... the source of any information procured" while "connected or

14   employed upon a newspaper, magazine, or other periodical publication, or by a press association

15   or wire service ..."  Cal. Evid. Code §1070(a) (emphasis added).  The California Supreme Court

16   in <u>New York Times Co.</u> v. <u>Superior Court</u>, 51 Cal.3d 453, 455, 796 P.2d 811, 812 (1990), held:

17   "the shield law by its own terms provides only an immunity from contempt, not a privilege.

18   Thus, a newsperson's petition for extraordinary relief is premature until a judgment of contempt

19   is entered."  For that reason, "[a]llowing relief before a judgment of contempt would violate the

20   unambiguous language of the shield law."  51 Cal.3d at 459, 796 P.2d at 814.  According to the

21   California Supreme Court, "premature relief would also allow newspersons to avoid the

22   responsibility of choosing between disclosing information and being held in contempt," thus

23   causing "an increased burden on reviewing courts."  51 Cal. at 459-60, 273 Cal. Rptr. at 815.

24   See also, e.g., <u>Rancho Publications</u> v. <u>Superior Court</u>, 68 Cal. App. 4th 1538, 1543, 81 Cal. Rptr.

25   2d 274, 277 (4th Dist. 1999) (the California shield law "only provides an immunity against

26   contempt, rather than a more expansive privilege against testifying").

27        Frenkel's attempt to invoke the California "shield law" is therefore premature.  If he

28   refuses to answer questions at his deposition, and is subsequently held in contempt, only then

     could he invoke its protection.  That may not happen; Frenkel may decide to answer questions

18    **ICR'S AND HARRIS' RESPONSE TO FRENKEL'S**
          **AND  CISCO'S MOTIONS TO  UASH ICR'S**
          **SUBPOENA FOR   DOCUMENTS AND TESTIMONY**

and produce documents, in which case this Court would have been placed in the position of rendering an advisory opinion. What the "shield law" actually does in this dispute is highlight the impropriety of presenting to this Court abstract theories which may turn out to be inapplicable when Frenkel is deposed.

> **B.    Frenkel The Cisco Attorney Does Not Qualify
> For Protection Under The "Shield Law" In Any
> Event Because He Was Not Acting As A "Reporter"**

Even if it applied in this lawsuit – which it does not – the "shield law" would not extend to what Frenkel was doing. By its terms, the statute is limited to someone who is "a publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication." Cal. Evid. Code § 1070(a). Frenkel is employed by Cisco, which is not "a newspaper, magazine, or other periodical publication." Nor is he a reporter – indeed, he and his employer Cisco have both told this Court that he is an attorney. For the reasons set forth in Section III, above, his acts were the antithesis of what a "reporter" does, as recognized in California. Moreover, Frenkel cannot be both an attorney and a "reporter" under the circumstances of this dispute because he cannot simultaneously assert that he has a duty as an attorney to withhold information and a privilege as a reporter to disclose information to the public (see Section III), above.

Frenkel's covert attempts to promote the interests of Cisco make his blog into what amounts to a paid advertisement for Cisco – and Cisco has effectively admitted as much by boasting publicly that "Cisco takes responsibility for the contents of [Frenkel's] blog" (Blouin Dec. ¶ 20, Ex. S, Official Cisco Blog, March 24, 2008, p. 2). The shield law does not extend to Frenkel's puffing for a commercial business such as Cisco. Rancho Publications, 68 Cal. App. 4th at 1545, 81 Cal. Rptr. 2d at 278 ("Surely Peter Zenger, A.J. Liebling and Rebecca West occupy more hallowed niches in American history than Joe Camel, Tony the Tiger and the Budweiser talking lizards. We know of no Pulitzer prizes for want ads.").

Finally, Frenkel's anonymous and scurrilous "haikus," "anagrams" and childishly snide remarks (set forth in the "Statement of Facts," above) bear no resemblance to "news reporting"

1  anyway.  See Section III, above.  If the "shield law" were applicable here (which it is not), it

2  would not extend to Frenkel's activities.

3      Frenkel makes much of O'Grady v. Superior Court, 139 Cal. App. 4th 1423, 44 Cal. Rptr.

4  3d 72 (6th Dist. 2006).  But, the petitioners in that case actually were "assumed to be

5  journalists," 139 Cal. App. 4th at 1438, 44 Cal. Rptr. 3d at 82 – not an attorney running a

6  combination advertising circular and scandal sheet for his employer on the side.  Moreover, in

7  O'Grady there was not even any dispute that a "constitutional privilege" was applicable.  139

8  Cal. App. 4th at 1468, 44 Cal. Rptr. 3d at 106.  In short, nothing in O'Grady bears on the issues

9  facing this Court.

10  **VII.   FRENKEL'S RELIANCE ON AN ALLEGED "CONSTITUTIONAL
PRIVILEGE" DERIVED FROM *BRANZBURG* IS MISPLACED**

11

12      Not content with "federal common law" (which actually supplies the rule of decision

13  here) and the "California shield law," Frenkel also argues that Branzburg and Shoen v. Shoen, 5

14  F.3d 1289 (9th Cir. 1993) somehow created a "qualified First Amendment privilege for reporters

15  to prevent disclosure of their confidential sources and other unpublished information" (Frenkel

16  Br. p. 7).

17      "Evidentiary privileges in litigation are not favored."  Herbert v. Lando, 441 U.S. 153,

18  175 (1979) (rejecting the argument that a "reporter's privilege" bars inquiry into the editorial

19  processes of a defendant in a defamation lawsuit).  As shown in Section V-B, above,

20  Branzburg does not support Frenkel's argument: in fact, the Court's opinion in Branzburg

21  *refused* the invitation to create a "reporter's privilege" in federal common law.  Frenkel's

22  reliance on Shoen ignores the fact that the underlying lawsuit there was a state law libel action,

23  present in federal court only because of diversity jurisdiction.  As shown in Section VI, above,

24  state law does not control the "privilege" issue in this federal-question case.  The Mitchell and

25  Miller cases cited at pp. 7-8 of Frenkel's brief are state law cases too.

26      In any event, neither Shoen nor the cases from other circuits cited at pp. 8-9 of Frenkel's

27  brief would support Frenkel here even if they were controlling.  There are two reasons.

28

20          **ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND CISCO'S MOTIONS TO UASH ICR'S
SUBPOENA FOR DOCUMENTS AND TESTIMONY**

First, by no stretch of the imagination can Frenkel plausibly claim ever to have been acting as a "reporter" gathering "news" in operating his blog as a covert mouthpiece for Cisco. See Section III, above.

Second, Frenkel insists that he ought to be able to claim some kind of "reporter's privilege" because without it, there allegedly would be "a serious detriment to Frenkel's future ability to gather and disseminate news" (Frenkel Br. 9). This argument is nonsensical, because Frenkel's own employer Cisco has already created such a "serious detriment" by effectively shutting down Frenkel's blog – it now operates "by invitation only" (Blouin Dec. ¶ 12, Ex. K: "This blog is open to invited readers only"). Frenkel has already been muzzled by Cisco. Requiring him to comply with ICR's subpoena cannot interfere in any further way with his "future ability to gather and disseminate news" – something he was not actually doing as a self-proclaimed "reporter" in any event. See Section III, above.

## VIII. CISCO'S ATTEMPT TO INVOKE "ATTORNEY-CLIENT PRIVILEGE" AND "WORK PRODUCT IMMUNITY" TO CHALLENGE THREE OF THE TEN SUBPOENA TOPICS IS BOTH SUBSTANTIVELY AND PROCEDURALLY DEFECTIVE

Cisco insists that three (nos. 1, 3 and 4) of the ten requests in the subpoena duces tecum are barred by attorney-client privilege. This schizophrenic argument is belied on substantive grounds by Frenkel's own brief, in which he insists vociferously that he is a "reporter" and that he was acting as a reporter in promulgating his now-secret blog. If, as Frenkel assures this Court in his brief, he is a reporter (or anyway acting as such), then Cisco cannot maintain any claim of attorney-client privilege because an essential element of the privilege is the participation of an attorney who is actually doing legal work. <u>Admiral Insurance Co.</u> v. <u>U.S. District Court</u>, 881 F.2d 1486, 1492 (9th Cir. 1988) ("we set forth the essential elements of the attorney-client privilege: (1) Where legal advice of any kind is sought (2) from a professional legal adviser ***in his capacity as such*** ...") (emphasis added); <u>Kroll</u>, 224 F.R.D. at 328 ("It is well settled that the attorney-client privilege only protects confidential communications between client and counsel that are made for the purpose of obtaining or providing legal advice."). Frenkel's furious attempt to invoke what he calls a "reporter's privilege" – an attempt Cisco has not disavowed – dooms

Cisco's attorney-client privilege and work product arguments.

Cisco's argument must be rejected for another, independent reason: it is fatally defective from a procedural standpoint as well. Cisco's failure to present any "privilege log" also forecloses the relief it seeks, as set forth in Section II-A, above.

**IX.    CISCO'S REQUEST TO HAVE THIS COURT
         INTERFERE WITH OTHER LAWSUITS IN
         OTHER COURTS IS WITHOUT LEGAL SUPPORT**

Cisco requests a "protective order" prohibiting disclosure of his deposition to "any person related to the Arkansas or Texas litigation" (Cisco brief p. 2). Cisco cites no authority to support its extraordinary request. And it would be strange indeed if this Court were to take upon itself the responsibility of regulating discovery in two different lawsuits, in a different court, between different parties who are not even present in this lawsuit. (After all, the plaintiffs in the lawsuits in Arkansas and Texas have not even been heard on the question Cisco asks this Court to anticipate.)

Cisco evidently is afraid of what Frenkel knows and what he might reveal in a deposition. Perhaps Cisco has reasons for that apprehension – indeed its whole argument about "standing" depends upon that. But, there is no rational basis for Cisco's demand that this Court anticipate and decide disputes in other lawsuits between other parties which may never come to fruition.

**X.     THE DISCOVERY ICR SEEKS IS NOT BURDENSOME;
         IT IS RELEVANT AND REASONABLY CALCULATED
         TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE**

As an afterthought, Frenkel complains that the discovery ICR seeks is "unduly burdensome" (Frenkel Br. pp. 9-10). The delay occasioned by his resistance to the subpoena has obviated his first gripe, that he was given insufficient time to respond. He will now have more than a month.

As for being "unduly burdensome," the law does not favor Frenkel's argument. "The burden of proving that a subpoena is oppressive is on the party moving to quash and is a heavy one." Heat & Control, Inc. v. Hester Industries, Inc., 785 F.2d 1017, 1025 (Fed. Cir. 1986). As shown below, Frenkel's conclusory boilerplate cannot satisfy that burden.

To justify quashing ICR's subpoena, Frenkel and Cisco must first prove that the

22

discovery sought is not "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). The issue of relevance is a matter of federal law. <u>Micro Motion, Inc.</u> v. <u>Kane Steel Co.</u>, 894 F.2d 1318, 1326 (Fed. Cir. 1990). Frenkel's and Cisco's burden is a heavy one; "the quashing of a subpoena *ad testificatum* is rarely granted." <u>Micro Motion</u>, 894 F.2d at 1328. Concentrating instead on spurious arguments about "privilege," Frenkel does not even seriously challenge the relevance of the discovery ICR seeks. (Frenkel's "objections" to the subpoena (Exhibit B-1 to his brief) are mere boilerplate; conclusions expressed in identical words for each topic.) Cisco's brief complains that the discovery sought is "not relevant" – but, of course, that is not the standard.

Here is why Frenkel's testimony is calculated to lead to admissible evidence in the trial of this case:

• Frenkel had (and evidently still has) close ties with Fish, its head of litigation, Kathi Lutton, with John Steele and with now-dismissed defendant Google's Head of Patent and Patent Strategy, Michelle Lee. Frenkel, Lutton, Steele and Lee were on the faculty of the Advanced Patent Law Institute (Blouin Dec. ¶ 8, Ex. G). Fish (and Lutton specifically) represented Cisco in a patent lawsuit in which Frenkel was involved (Blouin Dec. ¶ 9, Ex. H). Lutton, Dragseth and Frenkel appeared together on a May 30, 2007 webinar just as Lutton, Dragseth and others were investigating Harris. Even Cisco now admits there is a connection between Frenkel and Fish: "Fish represents Cisco on certain [unspecified] matters **and Frenkel has been indirectly involved [neither Cisco nor Frenkel say how] in some of them** [which ones are not specified]." (Cisco brief, p. 4) (emphasis added). One of the reasons Frenkel should be deposed is to ascertain what his involvement was – something neither Frenkel nor Cisco is now willing to reveal.

• Frenkel (we believe, with encouragement and support from Fish and possibly Google, as well) targeted Scott Harris, his lawyers and owners of the Harris patents in an effort to diminish the value of his patents, to discourage their enforcement and to force an assignment of the patents to Fish. That was the demand Lutton, Steele and others made both before and after Harris' termination. Fish also caused Harris to lose his teaching position at the patent Resources

23

Group and has threatened him with charges of inequitable conduct and more (Blouin Dec. ¶ 22, Ex. U, Case No. 07 5081, Docket No. 27, ¶ 30).

• Obviously, if Fish or Google used Frenkel as a vehicle to aid or assist in the tortious interference with ICR's and Harris' licensing and enforcement of the Harris patents or in defaming Harris, it could lead to (if not itself constitute) highly relevant evidence.

The deposition topics and their potential relevance are as follows:

1. Communications with Kathi Lutton concerning Scott Harris, Raymond P. Niro, NSHN, James B. Parker, Courtney Sherrer, Fish and Richardson or the relevant lawsuit.

   • Relevant to Frenkel's Involvement in the tortious interference.

2. Papers, speeches and publications, including, but not limited to webinars, where Kathi Lutton was a collaborator, participant, or mentor.

   • Relevant to the connection between Frenkel and Fish.

3. Communications with Fish or its counsel concerning Scott Harris, NSHN, James B. Parker, Courtney Sherrer, Raymond P. Niro or the relevant lawsuit, including without limitation, an identity of the individuals from Fish with whom communications were made and the substance of those communications.

   • Relevant to the connection between Fish and Frenkel.

   • Involvement of Frenkel in tortious interference.

4. All lawsuits where Fish was retained by Cisco for representation, including any in which Kathi Lutton filed an appearance.

   • Relevant to the connection between Fish and Frenkel.

5. Factual bases for Patent Troll Tracker blog articles identified in Exhibits A to C.

   • Relevant to Fish's role in attempts to defame Harris and tortiously interfere with licensing of his patents.

6. Investigative materials, sources for, and procedure for Patent Troll Tracker blog articles identified in Exhibits A to C.

   • Relevant to the involvement of Frenkel in tortious interference.

7. All Patent Troll Tracker blog entries concerning Scott Harris, Raymond P. Niro, NSHN, James B. Parker, Courtney Sherrer, or the relevant lawsuit.

   • Relevant to support from Fish in efforts to defame Harris and tortiously interfere with licensing of his patents.

**ICR'S AND HARRIS' RESPONSE TO FRENKEL'S AND CISCO'S MOTIONS TO UASH ICR'S SUBPOENA FOR DOCUMENTS AND TESTIMONY**

8.    The origin and history of the Patent Troll Tracker blog.

•    Background.

9.    The decisions on subjects, including but limited to Scott Harris, Raymond P. Niro, NSHN, James B. Parker, Courtney Sherrer, addressed in the Patent Troll Tracker blog.

•    Relevant to the connection between Fish and Frenkel.

10.    Any communications with Jenner & Block regarding Scott Harris or the relevant lawsuit.

•    Relevant to the connection between Fish and Frenkel.

Cisco's arguments do not negate the relevance of the documents and testimony sought. For example, Cisco asserts that Frenkel has no documents responsive to some of the topics; but that merely highlights the need for a deposition to probe that assertion. Similarly, Cisco insists that the subpoena "is broader than the discovery allowed in the Chicago case" – but the Northern District of Illinois was denied any opportunity to rule on the proper scope of the subpoena for testimony and documents by Frenkel's insistence on having this Court deal with his objections. (In any event, the Northern District of Illinois did not enter any order limiting the scope of discovery from Frenkel.  Blouin Dec. ¶ 23, Ex. V, 3/4/08 Order, Case No. 07 C 5081, N.D. Ill.).

## XI.    CONCLUSION AND RELIEF SOUGHT

By the standards of Frenkel's own "authority" (such as the California "shield law"), his motion is premature.  He has failed to present this Court with any sufficiently-specific dispute to permit any reasoned decision; neither he nor Cisco has even bothered to submit any "privilege log," as required by the Federal Rules (see Section II-B, above).  The logical (and legally correct) approach is for Frenkel's deposition and his production of documents to proceed.  If any

ICR'S AND HARRIS' RESPONSE TO FRENKEL'S
AND  CISCO'S MOTIONS TO UASH ICR'S
SUBPOENA FOR   DOCUMENTS AND TESTIMONY

1   real, concrete dispute arises, it can be dealt with in the context of contempt proceedings if they

2   even prove necessary - just as the statute Frenkel relies upon requires.  Frenkel's and Cisco's

3   motions to quash should be denied.

4   Date:  April 22, 2008                      Respectfully submitted,

5                                              _____Mark V. Isola  /s/_____

6                                              Mark V. Isola
                                               Rehon & Roberts, APC
7                                              Ten Almanden Blvd., Suite 550
                                               San Jose, CA  95113
8                                              Tel:  (404) 494-0900

9                                              Raymond P. Niro
                                               Paul K. Vickrey
10                                             David J. Sheikh
                                               Richard B. Megley, Jr.
11                                             Karen L. Blouin
                                               Niro, Scavone, Haller & Niro
12                                             181 West Madison, Suite 4600
                                               Chicago, Illinois 60602-4515
13                                             (312) 236-0733
                                               Fax:  (312) 236-3137
14

15                                             Attorneys for Illinois Computer Research, LLC and
                                               Scott C. Harris
16

17

18

19

20

21

22

23

24

25

26

27

28